**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **AUTOSEIS, INC.,** *et al.*,[1] | § | **Case No. 14-20130** |
| | § | |
| **Debtors.** | § | **Joint Administration** |
| | § | **Requested** |
| | § | |

**<u>DECLARATION OF SEAN M. GORE IN SUPPORT OF FIRST DAY MOTIONS</u>**

I, Sean M. Gore, declare as follows under penalty of perjury:

I am the Chief Financial Officer and a Senior Vice President of Global Geophysical Services, Inc. ("<u>GGS</u>," together with the other debtors in the above captioned cases, the "<u>Debtors</u>"). I have been employed in this capacity since January 2014. I am familiar with Debtors' day-to-day operations, business, and financial affairs.

1.      I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these cases and in support of the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the pleadings filed by the Debtors on or around the Petition Date. I have reviewed the factual support set forth in each of the first day pleadings and attest to the accuracy thereof. Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based on upon experience, knowledge, and information concerning the Debtors'

---

[1] The Debtors in these chapter 11 cases are:  Autoseis, Inc. (5224); Global Geophysical Services, Inc. (4281); Global Geophysical EAME, Inc. (2130); GGS International Holdings, Inc. (2420); Accrete Monitoring, Inc. (2256); and Autoseis Development Company (9066).

operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

2.      This declaration has two parts.  Part One of this Declaration provides an overview of the Debtors' business, capital structure, events giving rise to these chapter 11 cases, and information regarding the Debtors' bankruptcy objectives.   Part Two summarizes the relief requested with respect to, and the support for, the Debtors' various first day motions and requests for related interim and final orders.

PART ONE:  FIRST DAY NARRATIVE

**I.      Overview of the Debtors and their Business**

3.      Global Geophysical Services, Inc. ("GGS") and the other Debtors[2] in these cases provide an integrated suite of seismic-data solutions to the global oil and gas industry consisting primarily of seismic-data acquisition, micro-seismic monitoring, processing, and interpretation services and the sale of seismic recording equipment to third parties.  Through these services, the Debtors deliver data that enables the creation of high-resolution images of the earth's subsurface and reveals complex structural and stratigraphic details.  These images are used primarily by oil and gas companies to identify geologic structures favorable to the accumulation of hydrocarbons, to reduce risk associated with oil and gas exploration, to optimize well-completion techniques, and to monitor changes in hydrocarbon reservoirs.  The Debtors integrate seismic survey design, data acquisition, processing and interpretation to deliver enhanced services to their clients.  In addition, the Debtors own and market, directly or through third parties, a seismic-data library and license that data to clients on a non-exclusive basis.

---

[2] The Debtors in these chapter 11 cases are:  Autoseis, Inc.; Global Geophysical Services, Inc.; Global Geophysical EAME, Inc.; GGS International Holdings, Inc.; Accrete Monitoring, Inc.; and Autoseis Development Company.

4.     As further described below, the Debtors generate revenues primarily by providing two types of services to their clients, proprietary services and multi-client services.  Proprietary services ("Proprietary Services") consist of conducting geophysical surveys for clients on a contractual basis where the clients generally acquire all rights to the seismic data obtained through such surveys.  Multi-client services ("Multi-client Services") include selling licenses, on a non-exclusive basis, to seismic data the Debtors own as a part of their collection of seismic data, generally referred to as "seismic-data library" or "multi-client library."  The Debtors also generate revenues by providing microseismic monitoring, data processing, and interpretation services and through the sale of seismic-recording equipment to third parties.

5.     Many of the world's largest and most technically advanced oil and gas exploration and production companies use the Debtors' services.  This includes national oil companies, major integrated oil companies, and large independent oil and gas companies.  The Debtors and their foreign non-debtor subsidiaries provide seismic-data acquisition services throughout the world, including in some of its most challenging political and natural environments, such as marshes, forests, jungles, arctic climates, mountains, and deserts.

6.     The Debtors also have significant operational experience in most of the major U.S. shale and tight reservoir plays, including Eagle Ford, Bakken, the Haynesville, Permian, Utica, Fayetteville, and Woodford, where Debtors believe their high resolution RG-3D Reservoir Grade$^{SM}$ ("RG3D") seismic solutions are particularly well-suited.  As of December 31, 2013, the Debtors owned approximately 135,000 recording channels that were primarily comprised of their new AUTOSEIS® High Definition Recorder Systems.  The Debtors' recording channels and systems are interoperable, which provides operational scalability and efficiency enabling the Debtors to execute on large and technologically complex projects.

7.     Indeed, the Debtors and their foreign subsidiaries operate on a truly global scale with crews currently operating in Alaska, Colombia, Brazil, Iraq (Kurdistan), and Kenya.  The Debtors' crews work in some of the world's most challenging environments, and their experience includes projects in the Continental U.S., and internationally in Algeria, Argentina, Canada, Chile, the Republic of Georgia, India, Mexico, Oman, Peru, Poland, and Uganda.  As further described below, the Debtors' recent and projected growth is overwhelmingly international in its focus, principally through foreign branch offices of GGS and foreign non-debtor affiliates.

8.     The Debtors have long-standing client relationships with a number of blue chip oil and gas companies, including many national and major integrated oil companies.  The Debtors' technology platform and global operating ability leverage these relationships throughout the world.  The Debtors' management has the knowledge base, experience, and relationships that underlie the Debtors' strong operational reputation in the seismic industry.

### Proprietary Services

9.     The Debtors provide seismic-data acquisition, microseismic monitoring, data processing, and interpretation services on a proprietary basis where their clients ultimately own the output of the Debtors' efforts.  For proprietary seismic-data acquisition services, clients typically request a bid for a seismic survey based on their own survey design specifications.  In some cases, the Debtors are shown a prospect area and asked to propose and bid on a survey of the Debtors' own design.  In other cases, the Debtors may be able to propose modifications in the process or scope of a proposed project in ways intended to create value for the Debtors' customers, in which case the Debtors are able to propose and bid on an alternative survey design.  Once the scope of the work is defined, either the Debtors or the client will undertake to obtain

the required surface and mineral access consents and permits.  Once the required consents and permits are obtained, the Debtors survey the prospect area to determine where the energy sources and receivers that are required to acquire the seismic data will be located based on the chosen design.  The Debtors' crews then place geophones and energy sources into position, initiate the energy sources, collect the data generated, and deliver the data sets to the client.  Where possible, the Debtors seek to combine seismic-data acquisition with processing and interpretation services.  Throughout the entire process, the Debtors coordinate with clients in an effort to add value at each stage of data acquisition, processing, and interpretation.  This integrated approach allows the Debtors to sell multiple bundled services, offer clients greater value, and advance toward obtaining the highest available margins.

### *Multi-client Services*

10.      The Debtors also offer data-acquisition services in a multi-client structure.  These Multi-client Services projects differ from Proprietary Services projects in that the Debtors set the specifications of the program (with some input from clients), generally handle all aspects of the acquisition from permitting to data processing, and maintain ownership of the seismic data and associated rights after the project is completed, including any future revenue stream.  Clients also participate in the Multi-client Surveys by underwriting all or a portion of the costs of acquiring the data, which we refer to as pre-commitments.  In return for their underwriting participation in a Multi-client Services project, customers receive a non-exclusive license to a designated portion of the underlying seismic data acquired by the Debtors at a favorable price on a per-square-mile basis.

11.      The Debtors include the seismic data sets acquired through multi-client surveys in their multi-client library, which is then available for licensing to other clients on a non-exclusive

basis for a fee (referred to as a "Late Sale"). The seismic data licenses are typically transferable only under limited circumstances and only upon payment to the Debtors of a specified transfer fee. Substantially all costs directly incurred in acquiring, processing and otherwise completing seismic surveys are capitalized into the multi-client surveys and then amortized based on estimated future revenues (both from pre-commitments and Late Sales).

12.     In addition to acquiring seismic data through multi-client seismic surveys, in certain cases the Debtors will grant a non-exclusive license to a specific multi-client data set in the seismic-data library to a client in exchange for ownership of complementary proprietary seismic data owned by that client. The seismic data acquired from the client by Debtor under such an arrangement will then be added to the Debtors' seismic-data library.

II.     **Overview of Capital Structure**

*Senior Secured Term Loan Facility*

13.     GGS is party to a secured Financing Agreement, dated as of September 30, 2013 (as amended, the "Financing Agreement"), with TPG Specialty Lending, Inc. and Tennenbaum Capital Partners, LLC (collectively, the "Pre-petition Secured Lenders"). TPG is the administrative and collateral agent. The Financing Agreement provides for a senior secured first-lien term loan in the initial principal amount of $82.8 million. As of the Petition Date, approximately $81.765 million of indebtedness was outstanding under the Financing Agreement.

14.     The debt under the Financing Agreement is guaranteed by each of the Debtors and secured by substantially all real and personal property of the Debtors pursuant to various collateral documents, including a Pledge and Security Agreement dated as of September 30, 2013. The debt under the Financing Agreement is not guaranteed by any of the foreign non-debtor subsidiaries.

### *10.5% Senior Unsecured Notes due 2017*

15.     As of the Petition Date, GGS had approximately $250 million aggregate principal amount in publicly traded unsecured bond debt, consisting of the following two issuances: (i) $200 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of April 27, 2010; and (ii) $50 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of March 28, 2012 (such notes, collectively, the "Notes," and such indentures, as supplemented to the Petition Date, collectively, the "Indentures").   The Bank of New York Mellon Trust Company, N.A., serves as the trustee under both Indentures.

16.     The Notes are the general unsecured, senior obligations of GGS and are jointly and severally guaranteed by each of the other Debtors on a senior unsecured basis.  The Notes mature on May 1, 2017, with interest payable semi-annually on May 1 and November 1 of each year.

### *Other Material Indebtedness*

17.     In addition to the loans under the Financing Agreement and the Notes under the Indentures, the Debtors have other material indebtedness, including:

- Unsecured Bank Notes in Colombia:  GGS has issued six unsecured short-term promissory notes to Bancolombia and HelmBank—both based in Colombia—to finance equipment purchases and working capital needs for foreign operations in Colombia.  The notes are summarized in the chart below:

| Bank | Origination Date | Maturity Date | Amount (approximate U.S. dollars) |
|---|---|---|---|
| Helm | 8/22/11 | 8/5/14 | $2.3 million |
| Helm | 10/6/11 | 3/21/14 | $730,000 |
| Helm | 10/24/11 | 7/11/14 | $1.36 million |
| Bankcolombia | 9/8/12 | 3/18/14 | $1.1 million |
| Bankcolombia | 5/28/13 | 5/28/15 | $780,000 |
| Bankcolombia | 10/10/13 | 4/10/14 | $488,000 |

- LC Facility:   GGS is party to a Letter of Credit Agreement, dated February 5, 2007 with Amegy Bank N.A. (as amended, the "LC Facility") for revolving commitments in an aggregate principal amount of up to $10.0 million.  The facility is cash collateralized by amounts in accounts maintained with Amegy Bank.  As of March 25, 2014, Amegy had issued $947,000 of letters of credit under the LC Facility, all of which remain undrawn as of the Petition Date.  The current cash balance in the collateralized accounts was approximately $985,000 as of the Petition Date.

- Insurance Financing:  GGS is party to (i) a Premium Finance Agreement with Talbot Premium Financing, LLC, dated May 20, 2013 and (ii) a Commercial Insurance Premium Finance and Security Agreement, dated as of April 8, 2013, with BankDirect Capital Finance, a division of Texas Capital Bank, N.A.  As of the Petition Date, the outstanding amount financed under these two agreements is $0.

- Capital Leases:  From time to time, certain of the Debtors enter into capital leases to acquire seismic equipment, computers, and vehicles ("Capital Leases").  The balance outstanding under these Capital Leases as of the Petition Date was approximately $4.4 million.

***Series A Preferred Stock***

18.     In December 2013, GGS received net proceeds of approximately $7.1 million through the issuance of 347,827 depositary shares (the "Depositary Shares"), each representing a 1/1000th interest in a share of GGS's 11.5% Series A Cumulative Preferred stock (the "Series A Preferred Stock").  Holders of the Series A Preferred Stock are entitled to cumulative dividends

(whether or not declared) at the rate of 11.5% per year of the $25,000 liquidation preference per preferred share, and the dividends are payable monthly in arrears when, as and if declared by the GGS's board of directors.  Holders of the Series A Preferred Stock generally have no voting rights, but have the right to elect two additional directors to the GGS board if GGS fails to pay dividends in full for any monthly dividend period within a quarterly period (for a total of six or more quarterly periods) or fails to maintain a listing of the Depositary Shares on a national exchange for 180 consecutive days.

### *Common Stock*

19.     GGS is a public company whose common stock and Depositary Shares representing the Series A Preferred Stock are traded on the New York Stock Exchange.  As of March 1, 2014, there were approximately 38.12 million shares of common stock outstanding, with a total market capitalization of approximately $50 million.  Recent events have significantly depressed GGS' market capitalization.

### *Organizational Structure*

20.     Attached as Exhibit A is a copy of the Debtors' organizational chart.  Only the U.S. entities are debtors; none of the foreign subsidiaries currently are debtors in any proceeding. GGS operates a significant portion of its international business through foreign branch offices of GGS, as opposed to separate foreign subsidiaries.  As a result, a significant portion of the Debtors' operations, employees, and assets are located in foreign jurisdictions.

### III.    Events Leading to Bankruptcy

### *The Debtors Begin a Successful Turnaround in 2013*

21.     The year ending December 31, 2013 was the Debtors' best financial performance (in terms of Cash EBITDA which is defined as earnings before interest, taxes, and depreciation

and further reduced for cash investment in multi-client library and increased for other non-cash charges) since 2009. As further described below, this improvement is the result of an increased focus on Proprietary Services with improved margins and an increase in pre-commitments for acquiring multi-client seismic data, and many of the operational improvements are expected to continue through 2014.

22. During the years ended December 31, 2010, 2011, 2012, and 2013, the Debtors invested approximately $201 million, $199 million, $180 million, and $71 million in their multi-client library, all or substantially all of which is located in the Continental U.S. The aggregate book value for the Debtors' multi-client data as of December 31, 2011 and 2012 was $232 million and $309 million, respectively. Beginning in the last part of 2012 and the first part of 2013, the Debtors began implementing a series of changes designed to transform the focus of their business away from the U.S.-centric Multi-client Services towards Proprietary Services, and in particular to target the more robust international seismic market over the U.S. market that was influenced by competitive conditions and the types and sizes of projects in the U.S.:

- Changes in leadership and staff: In the last eighteen months, nine of the top twelve senior management positions were newly filled either through outside hiring or internal promotions. For this same time period, the total number of employees of the Debtors was reduced by approximately 35%.

- Changes in business mix: At the start of 2013, approximately 54% of the Debtors' revenues were derived from Multi-client Services and 46% from Proprietary Services. During 2013, this proportional mix of revenues changed to approximately 47% from Multi-client Services and 53% from Proprietary Services. The revenue mix for 2014 is projected to be 28% from Multi-client Services and 72% from Proprietary Services. As of February 28, 2014, Proprietary Services accounts for approximately $165 million and 92% of the Debtors' pro-forma backlog,[3] compared to only $35 million and 35% at the end of

---

[3] Pro-forma backlog estimates represent those seismic data acquisition projects as of December 31, 2013 for which a client has executed a contract and has scheduled a start date for the project and unrecognized pre-committed funding from the company's multi-client services segment adjusted for additions through February 28, 2014.

2012.  All of these changes reflect the priority that the company has placed on Proprietary Services.

- <u>Changes in geographical focus:</u>  In support of a greater focus on international operations and opportunities, the Debtors have further decentralized their operations and shifted certain administrative and operational functions to Brazil and Dubai.  For 2012, prior to the time the changes in management and increasing focus on international Proprietary Services had been in place sufficiently long to have a meaningful impact, approximately 48% of the Debtors' total revenues derived from international operations and 52% from domestic sources.  In 2013, revenues favored international operations over domestic revenues at a ratio of almost 2:1.  The Debtors' allocation of revenues in 2013 further reflected a more global company with an almost equal balance of expenditures among the United States, Latin America, and the Middle East.  The Debtors' pursuit of the international market is reinforced with 2014 projections:  industry-wide seismic spend is expected to grow 7–9% in international markets and only 3%–4% in domestic markets.

- <u>Changes in funding of Multi-client Services:</u>  New management has also been less willing to invest heavily in the speculative nature of the Multi-client Services projects.  Prior to the changes in management, the Debtors typically performed acquisitions of multi-client data once the projects received on average 65% of their projected costs in pre-commitments from clients.  Since late 2012, however, the Debtors have required 100% of projected survey costs in pre-commitments from customers prior to commencing the acquisition of multi-client projects.  This has reduced the Debtors' exposure risk associated with capitalizing on its balance sheet larger amounts for its multi-client library.

- <u>Backlog Growth:</u>  The Debtors' backlog represents contracts for services that have been entered into but which have not yet been completed, constituting a key indicator of future revenue.  As of February 28, 2014, the Debtors' pro-forma backlog (including both Proprietary Services and Multi-client Services) total was approximately $180 million, representing an 80% increase over the backlog for year-end 2012.  The first two months of 2014 alone account for almost $80 million in backlog increases.  For 2014, the Debtors' target is to reach $200–$225 million total backlog by the end of the year.

- <u>Reduction in Expenses:</u>  In the last six months, management has successfully overseen significant reductions in general and administrative expenses.

23.     These and other changes resulted in a significant improvement in the Debtors'

Cash EBITDA for 2013.

## *Refinancing of Bank Credit Agreement in September 2013*

24.    On September 30, 2013, the Debtors entered into the Financing Agreement, providing for a $82.8 million Term Loan A and a commitment for a $22.2 million Term Loan B which was subject to certain potential strategic transactions.  The Term Loan B was never drawn, and the commitment was terminated in February 2014.  The proceeds from the Term Loan A were used to refinance in full the Debtors' prior revolving credit facility and to pay related fees and expenses.   The commitments under such revolving credit facility were decreasing at September 30, 2013 from $80 million to $67.5 million, and the Debtors desired to refinance such bank debt.

25.    The Debtors' internal sources of liquidity, including their cash position, have historically depended to a large extent on the level of demand for their services, namely Proprietary Services and Multi-client Services. Historically, the Debtors have periodically supplemented their internal sources of liquidity with external sources, including borrowings under the previous revolving credit facility described above, as the need arose.   However, restrictions in the Financing Agreement and the Indentures substantially limited the ability of Debtors to incur or guarantee additional indebtedness or to grant additional liens on assets. Because the Financing Agreement was fully drawn and provided no additional borrowing capacity, and because GGS' common stock price was low, access by Debtors to additional debt and equity capital was severely limited and they were substantially dependent on internal sources of liquidity.   For this reason, Debtors have focused on enhancing operating cash flows, remaining fully pre-funded on investments in the multi-client library, reducing cost, and pursuing recording equipment and asset sales as means of providing liquidity.

*Demand for Liquidity Grew as Sources of Liquidity Shrunk*

26.     The combination of Debtors' strategic focus on the growing international market and buildup of backlog, combined with almost exclusive reliance on operating cash flow for liquidity, had an unintended consequence in early 2014.  In recognition of the Debtors' strong operating performance record, several customers awarded the Debtors several large-value contracts in Latin America, the Middle East, East Africa, and Alaska.  For example, the Debtors increased their backlog by $80 million in just the first two months of 2014 alone.

27.     Although they resulted in a strong build-up of Debtors' backlog, these large projects require substantial upfront working capital to position crews and equipment for the work.  In addition, the start-up expenditures under these projects were required to be incurred well in advance of when Debtors would be entitled to receive project revenues, which negatively impacts the liquidity of the Debtors during the early phases of such projects.  Debtors also experienced in the fourth quarter of 2013 an impairment of their multi-client library in the amount of $61.6 million, reflecting a decrease in the expected cash-flow generation potential of certain portions of the library.

28.     Highly dependent upon operating cash flow, in early 2014 the Debtors experienced increasingly little room for error in liquidity.  By mid-March 2014, the Debtors had experienced a number of relatively small and ordinary problems that, in combination, grew into a full-on liquidity crisis for the short term:

- higher than anticipated working capital requirements and project start-up costs for new international (and to a lesser extent domestic) projects;

- reduced revenues without an equally corresponding decrease in expected costs attributable to reductions in programs in Colombia;

- project interruptions due to permit delays and community relations disruptions resulted in higher than anticipated project costs and increases in estimated taxes in Colombia;

- community relations disruptions and slower than anticipated production in Kenya;

- project cancellations in Libya due to security concerns amid civil conflict, resulting in a loss of cash margin expected from the project; and

- current assessments related to sales and use taxes in Texas dating back to years 2008-2011.

29.     As the list of unexpected issues grew, the Debtors began to have difficulty meeting even their short-term liquidity needs.

30.     Compounding their liquidity problems, the Debtors also faced potential covenant defaults under the Financing Agreement related to liquidity and restatement of historical financial statements and related consolidated financial information for various annual and quarterly periods going back to 2009.  As result of these restatements, management concluded that there were material weaknesses in the Debtors' internal controls and accounting procedures. GGS did not file its annual report with the Securities and Exchange Commission ("SEC") (Form 10-K) on March 17, 2014, and instead filed an 8-K disclosing the events related to the restatements.  This securities filing implicated potential covenant defaults under the Financing Agreement and, by extension, the Indentures.  On the same date, March 17, 2014, the Debtors entered into a Forbearance Agreement with the lenders under the Financing Agreement under which the lenders agreed to forbear from exercising any rights and remedies in connection with existing or potential future specified defaults and events of default.  The forbearance period was subject to termination by such lenders beginning on March 24, 2014.  On March 24, 2014, the day before the Petition Date, the lenders gave notice of such termination and acceleration of the debt under the Financing Agreement.

31.     Notwithstanding the Debtors' recent strides in operational improvements, the Debtors' debt-service obligations—which run almost $40 million a year in interest alone—made it impossible for the Debtors to meet their short-term liquidity needs when faced with unexpected

challenges.  Facing these challenges, the Debtors chose to pursue debtor-in-possession financing to bridge their immediate needs while exploring a longer-term solution for their capital structure.

**IV.**     **The Debtors' Strategic Path Forward**

32.     These cases were filed for hallmark bankruptcy rationales—to achieve a breathing spell for the development of restructuring alternatives, to implement debtor-in-possession financing to resolve liquidity needs, and to maximize value for the benefit of all of the Debtors' stakeholders.

33.     From the protection of chapter 11, the Debtors and their advisors are developing a dual-track strategic path forward.  First, with the additional liquidity of the debtor-in-possession financing, the Debtors believe that a stand-alone plan of reorganization is possible. Deleveraging would immediately add substantial additional liquidity, perhaps as much as $20-$30 million per year, by relief from debt service.  At the same time, the Debtors, with the aid of their restructuring advisors, will explore and develop alternative strategies, which could include a process for a sale of assets, a merger or business-combination transaction, or another form of recapitalization.  Notably, certain holders of the Notes, as the proposed DIP Lenders, continue to have confidence in the Debtors and their future, and are willing to provide additional financing.

## PART TWO: TESTIMONY IN SUPPORT OF FIRST DAY RELIEF

**A.**     **Employee Wages and Benefits Motion**

34.     The Debtors request the entry of an order authorizing them to pay, continue, or otherwise honor prepetition obligations to or for the benefit of their current employees and any employees of foreign subsidiaries or branch offices for which the Debtors have payroll-funding obligation (collectively, the "Employees") for wages, salaries, and other compensation and benefits under all plans, programs, and policies implemented by the Debtors prior to the Petition Date.  With respect to the Debtors' Employees, payments on account of prepetition payment obligations are limited to the priority expense limit imposed on employee claims under Section 507(a)(4) of the Bankruptcy Code.  The Debtors further seek the authority to pay any individuals or entities hired on an independent-contractor basis, the Debtors' compensated board members, and certain sales-related agents for any prepetition amounts owing and to continue such payments postpetition in the ordinary course of their business, as the Debtors depend on these services for the continued operation of their business.

35.     As of the Petition Date, the Debtors are responsible for directly funding the payroll of approximately 824 Employees through the Debtors' payroll department and for supplying funding to international subsidiaries and branches for use in meeting local Employee payment obligations.  Some of the Employees provide local support in the Debtors' U.S. offices, wholly owned foreign subsidiaries, or foreign branch offices, while other Employees are currently deployed on field projects throughout the U.S. and abroad.  Employees paid through the Debtors' payroll department are either hourly or salaried and are paid on either a bi-weekly, semi-monthly, or monthly basis depending on the type of Employee.  The Employees perform a variety of critical functions, including the day-to-day operations of the Debtors' business, and the

skills and experience of the Employees, as well as their knowledge of the Debtors' business, are essential to the Debtors' ongoing operations and ability to effectively reorganize their business.

36.     In providing benefits to the Employees, the Debtors pay and incur a number of obligations such as compensation, deductions and payroll taxes, incentive programs, equity plans, severance programs, reimbursement expenses, relocation and expatriate expenses, health benefits, workers' compensation benefits, vacation time, life insurance, accidental death and disability benefits, retirement and savings benefits, and other benefits, including employee contributions, claims and administrative fees to benefit providers, which the Debtors have historically provided and funded in the ordinary course of business.  The Debtors seek authority to pay Employee compensation-related obligations, including wages, salaries, expense reimbursements, benefit obligations, and related fees, deductions and withholdings, including payroll taxes as provided in the Employee Wages Motion.

37.     I believe the vast majority of the Employees rely exclusively on their compensation to pay their daily living expenses.  Such amounts are a critical component of the Employees' total compensation package, and if the Debtors are not permitted to honor their outstanding Employee obligations, I believe many Employees will be exposed to significant financial difficulties.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale will be jeopardized at a time when Employee support is critical.  Any resulting loss in workforce could significant hinder the Debtors' efforts to successfully reorganize.

38.     The Debtors also have various Employee programs and obligations that are administered or paid through third-party administrators, agents, consultants, or providers.  The Debtors seek authority to pay any prepetition fees of these third parties and to continue such

payments post-petition in the ordinary course of their business, in order to insure the uninterrupted delivery of payments or other benefits to the Employees.

39.      I believe that the relief requested in the Employee Wages and Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business during these chapter 11 cases without disruption so as to avoid immediate and irreparable harm to Debtors' estates.   Accordingly, I respectfully submit that the Employee Wages and Benefits Motion should be approved.

**B.**   **Cash Management Motion**

40.      The Debtors seek an order authorizing them (i) to maintain existing bank accounts, and (ii) to continue to operate their cash management system and related processes, including the intercompany transactions, ordinary course payments, credit card programs, and payment of any bank fees, in the ordinary course of business consistent with their pre-petition practices.

41.      Prior to commencing these chapter 11 cases, the Debtors managed their cash, receivables and payables (including payroll and tax obligations) through a cash management system (the "Cash Management System").  The Cash Management System serves as a conduit for revenue obtained from the Debtors' business operations for distribution to employees, vendors, and other creditors.  The Debtors have designed the Cash Management System to meet their operating needs, enable them to centrally control and monitor corporate funds, ensure cash availability and liquidity, comply with the requirements of their financing agreements, reduce administrative expenses by facilitating the efficient movement of funds, and enhance the development of accurate account balances.

42.     As part of their Cash Management System, the Debtors maintain deposit, collection, concentration, disbursement, and other accounts in the United States and abroad. Specifically, the Cash Management System consists of approximately 29 domestic bank accounts and 29 foreign bank accounts (together, the "Bank Accounts") maintained at approximately 13 different banks around the globe, all of which are identified on Exhibit A attached to the Cash Management Motion.

43.     I understand that one of the U.S. Trustee Guidelines in this jurisdiction requires a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts. The Debtors seek a waiver of, among other things, the U.S. Trustee's requirement that the Bank Accounts be closed and new post-petition accounts be opened. This requirement would cause significant disruption in the Debtors' business and would impair their efforts to reorganize. Similarly, the requirement to immediately alter its business forms and checks to comply with the U.S. Trustee obligations would require the Debtors to expend significant time and resources.

44.     The Debtors' continued use of the Cash Management System and the Bank Accounts during the pendency of these chapter 11 cases is essential to the Debtors' business operations. In particular, requiring the Debtors to open new bank accounts and devise a new centralized cash management system at this early and critical stage would disrupt the Debtors' operations and impose needless expense and administrative burden. Any such disruption would adversely affect the Debtors' ability to reorganize and/or maximize the value of their estates, at little to no benefit, as the Debtors maintain accounting controls with respect to each of the Bank Accounts and are putting systems in place to be able to accurately trace the funds throughout their Cash Management System and ensure that all transactions are adequately documented and readily ascertainable.

45.     As part of continuing the Cash Management System, the Debtors seek the authority to continue its systems and practices with regard to intercompany transactions. Although the Debtors believe that engaging in intercompany transactions, including any transfer of funds to the Debtors' foreign subsidiaries and branch offices, on a postpetition basis would be within the ordinary course of its business, the Debtors seek such relief out of an abundance of caution and to provide assurance to those foreign subsidiaries and branch offices.  The Debtors believe that its business judgment to continue intercompany transactions consistent with the Cash Management System and past practices is sound because, among other reasons discussed below with regard to the International Claims Motion, the Debtors' international operations are a critical part of the Debtors' business and maintaining international operations without interruption is necessary to protect these sources of revenue and to service valuable client relationships.  Furthermore, the Debtor's failure to continue such transactions may impair the ability of the Debtors' non-debtor affiliates to meet their obligations, and the value of those non-debtor affiliates, both generally and to the Debtors, may decline.  Thus, the Debtors submit that continuation of the intercompany transactions is in the best interests of the Debtors' estates and their creditors.

46.     In sum, I submit that requiring the Debtors to adopt new cash management systems and open new bank accounts at this early and critical stage of these chapter 11 cases would be expensive, impose administrative burdens, and cause needless disruption.  As a result, the Debtors request authority to continue the use of the existing Bank Accounts and Cash Management System.

47.     The Debtors recognize that additional time is needed to adequately evaluate how best to continue and/or modify their Cash Management System and related Bank Accounts and

processes in connection with these chapter 11 cases.  For this reason, prior to filing these cases, the Debtors' counsel contacted the U.S. Trustee to discuss the possibility of continuing the current accounts and systems in place on an agreed basis while allowing the Debtors and the U.S. Trustee to further discuss the Debtors' going-forward approach to their current cash management-related systems and practices.  I understand that the U.S. Trustee's Office has agreed to allow the Debtors to maintain their existing practices as set forth in this motion pending a final hearing on the motion.

### C.   <u>Utilities Motion</u>

48.    In connection with the operation of their business, the Debtors obtain electricity, natural gas, water, telephone, internet, and/or other similar services (the "<u>Utility Services</u>") from a number of utility companies or their brokers (the "<u>Utility Companies</u>").  By their motion, the Debtors seek to implement procedures to provide their Utility Companies with adequate assurance of future payment, as follows.

49.    To provide adequate assurance of payment to the Utility Companies, the Debtors submit that an amount equal to one-half of one month's Utility Service payment (calculated as a historical average over the past twelve months) (an "<u>Adequate Assurance Deposit</u>"), together with the Debtors' ability to pay for future Utility Services in the ordinary course of business, provides sufficient adequate assurance of payment and that no additional deposit, security, or other assurance of payment is or should be required for the Utility Services.  A list of the names and addresses of the Utility Companies and proposed Adequate Assurance Deposits is attached as <u>Exhibit A</u> to the Utilities Motion.

50.    The proposed procedures provide that a Utility Company must make an initial request for a Utility Deposit within 20 days of the Petition Date.  In the event that any Utility

Company believes the Utility Deposit does not provide satisfactory assurance, the proposed procedures allow such Utility Company to serve a request for an additional deposit on the Debtors and their counsel within 25 days of the Petition Date.

51.     The Debtors shall then have a brief period to seek to resolve the request by agreement without further order of this Court.  If the Debtors believe that the additional request is unreasonable and/or is unable to resolve the request, then the Debtors shall request a hearing before this Court seeking a determination from the Court that the proposed deposit, plus any additional consideration that may be offered by the Debtors, constitute adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code.  Pending such a hearing, any Utility Company that is the subject of the unresolved request may not alter, refuse, or discontinue services to the Debtors.  In addition, any Utility Company that fails to make a timely request shall be deemed to have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

52.     I believe the proposed procedures are reasonable and it is my understanding they are consistent with those provided by debtors in similar Chapter 11 cases.  In addition, I submit that uninterrupted utility service is essential to the Debtors' ability to maintain their operations, and therefore the emergency relief requested in the motion is necessary to prevent irreparable harm to the Debtors' business.

**D.     Critical Vendors Motion**

53.     The Debtors have limited or no options when it comes to arranging replacement suppliers on anything less than a medium- to long-term basis.  The Debtors' operations in Alaska are constrained by a regulatory operating window of approximately four months, and climate conditions in certain foreign countries similarly result in a shortened operating window.  The

shortened operating window impedes the Debtors' ability to locate, contract with, and mobilize vendors and suppliers in the remote areas.  I believe that replacing existing vendors and suppliers is time consuming, cost prohibitive, and not feasible in certain circumstances.  Because of these limited replacement options, the Debtors depend on the continuous supply of essential materials from their existing supplier base.  Any failure of a supplier to provide certain materials likely would adversely affect the Debtors' operations, impacting cash flow and profitability.  Further, the Debtors have critical relationships with third-party shipping providers that have gained a unique understanding of the Debtors' business and operations.  Replacing such service providers would be costly and time consuming as the Debtors would be forced to spend large amounts of time and resources orienting new service providers to various aspects of their business.

54.     To identify vendors to be paid pursuant to the critical vendor motion, the Debtors, in conjunction with their advisors, closely reviewed their accounts payable and prepetition vendor lists, and consulted with employees most familiar with the Debtors' supply chain to identify those vendors that are most essential to the Debtors' operations.  The Debtors determined that approximately $7.2 million represents the maximum amount that the Debtors believe they may be required to pay to ensure the continued supply of essential goods and services (but the Debtors and their advisors will undertake substantial efforts to attempt to limit the actual payments to an amount that is substantially less than $7.2 million).  Absent the relief requested in the critical vendor motion, I believe that many of the Debtors' vendors may attempt to place the Debtors on cash-in-advance terms, which could divert funds away from the Debtors' funding needs during the critical first weeks of the Debtors' bankruptcy.

55.     As a result, I believe that authority to pay the outstanding prepetition obligations of the these critical vendors is in the best interests of the Debtors, their estates, creditors, and parties in interest and is necessary to avoid irreparable harm.

**E.     International Claims Motion**

56.     As stated above, the Debtors employing over 800 people worldwide.  It is the Debtors' international footprint and extensive experience operating in challenging environments that provide the Debtors a significant competitive advantage over their peers, constitute a major component of the Debtors' existing business, and provide significant opportunities for increased profitability and growth for the future.[4]

57.     While the Company is in the process of restating its financial results for certain time periods as more fully described in a Form 10-K filed with the Securities and Exchange Commission on March 18, 2004, the Debtors expect to report revenues of approximately $292.5 million for 2013, which preliminary results are still subject to finalization in connection with the restatements.   Of this amount, the Debtors estimate that they derived approximately 65 percent of all of their revenue for 2013 from operations in countries other than the United States, an increase from approximately 48 percent of revenue attributable to foreign operations in 2012, as reflected in the Company's Annual Report filed on March 5, 2013 for the period ending December 31, 2012.   Revenues in and outside the United States for the periods ending 2010, 2011, and 2012, as reported in the Company's 2012 Annual Report, but subject to adjustment as part of the restatements, were as follows (in millions):

---

[4]     To further extend the scope of the Debtors' international operations, the Debtors also selectively engage in strategic alliances with foreign partners that foster the Debtors' relationships with regional clients, offer local commercial and regulatory guidance and, for some projects, facilitate or provide enhanced access to local facilities, equipment and personnel.

|  | Revenues | | |
|---|---|---|---|
|  | **2012** | **2011** | **2010** |
| United States | $176.8 | $205.0 | $145.7 |
| International | $162.2 | $180.4 | $109.0 |

58.     Debtors use a combination of foreign branch offices and wholly-owned foreign subsidiaries to conduct their foreign operations throughout the world.  GGS maintains foreign branches—offices registered to do business in their country of operation and strategically located where needed to serve the Debtors' customers—in Argentina, Colombia, Georgia, Libya, Tunisia, Trinidad & Tobago, Saudi Arabia, Mexico, United Kingdom, Dubai, Paraguay and Kenya (collectively, the "Foreign Branches").  Although the Foreign Branches are not distinct legal entities, they function in some respects independently from GGS.  In addition to the Foreign Branches, the Debtors also use foreign non-debtor subsidiaries (collectively, the "Foreign Subsidiaries") to operate in various countries.  The Foreign Subsidiaries currently focus their material operations in Kurdistan, Iraq (through a Cayman Islands subsidiary), Brazil (through a branch office of a Brazilian subsidiary), and Canada (through a Canadian subsidiary).

59.     In the ordinary course of their businesses, the Debtors pay for goods, materials, equipment, and services obtained from, and engage in other business relationships with, numerous foreign creditors in order to support their operations abroad.  Foreign creditors also provide, from time to time, unique equipment and parts that are critical to domestic projects and operations.   Without unfettered access to goods, materials, equipment, and services from, and uninterrupted business and employment relationships with, the foreign creditors, I believe the Debtors' global operations either could not operate or would operate at significantly reduced profitability.

60.     For example, I believe that failure to promptly pay the claims of foreign creditors would severely disrupt the Debtors' access to the goods and services provided by the foreign creditors.   Non-payment of invoices creates significant risk that a foreign creditor will sever its business relationship with the Debtors, but even short of that, non-payment of the foreign claims may cause foreign creditors to adopt a "wait-and-see" approach, delaying providing such goods, materials, equipment, and services.   Under either scenario, the Debtors' operations and cash flow will be disrupted and jeopardized, exposing the Debtors' estates to material harm and straining valuable customer relationships.   Further, if the foreign creditors are not paid, they may take precipitous action against the Debtors and their local assets.   Responding to or taking pre-emptive action in the local courts abroad would be unduly expensive, time consuming and the result uncertain.   And such action may contribute to, rather than protect against, operational delays.   In my opinion, the harm avoided, and the benefits gained, by paying the prepetition claims of foreign creditors exceed the amount of the payments.   Given the circumstances and practical realities, paying the foreign claims is necessary for the Debtors to continue to operate their businesses in chapter 11 without disruption, to protect assets and critical business relationships, and to permit the Debtors' to achieve their objective of successfully reorganizing in chapter 11 for the benefit of all constituencies in this bankruptcy case.

**F.     <u>Motion To Preserve Tax Attributes</u>**

61.     The Debtors are seeking entry of orders establishing procedures for transfers of equity securities and establishing an effective date for notice of sell-down procedures for transfers of claims against the debtors' estates (the "<u>Trading Motion</u>").   The Debtors have incurred significant net operating losses ("<u>NOLs</u>") on a consolidated basis of approximately $250 million as of December 31, 2013, and may have substantial net unrealized built-in losses in

their assets (the "Built-in Losses") and other tax attributes, including business income tax credits ("Tax Credits" and together with the NOLs and Built-in Losses, the "Tax Attributes").  The Trading Motion will allow the Debtors flexibility in developing a plan of reorganization that maximizes the value of the Tax Attributes.

62.     The Debtors may lose the ability to use the Tax Attributes if they experience an ownership change for federal income tax purposes.  To prevent this loss of estate assets, and prevent parties from exercising control over property of the estates in violation of the automatic stay, the Debtors request Court approval of procedures to govern the trading of equity interests in GGS during the pendency of the chapter 11 cases.  The Debtors may also ultimately need to seek an order (a "Sell-Down Order") with respect to claims trading to protect and preserve the potential value of the Tax Attributes, and this Motion is intended to give advanced notice of such possibility.

63.     The establishment of the procedures sought in the Trading Motion does not bar transfers of equity in the Debtors, and the procedures will only be in effect until the Debtors emerge from chapter 11.  At this time, the Debtors seek only to establish procedures enabling them to monitor transfers of equity in the Debtors that pose a serious risk to their Tax Attributes. The Debtors are not asking the Court to approve any Sell-Down Procedures with respect to claims trading, or implement any Sell-Down Procedures.  They are merely asking the Court to set a Record Date for purposes of notice, should it become necessary to seek such procedures in the future.

## G.     Debtor-in-possession Financing Motion

64.     In connection with the filing of these cases, the Debtors are asking Court to approve the proposed debtor-in-possession financing facility, more fully described in the DIP

Motion and the proposed interim order thereon (the "<u>DIP Financing Agreement</u>").  As described in the DIP Motion, the DIP Financing Agreement represents an important achievement that will allow the Debtors' to bridge an urgent liquidity gap and forms the basis of a successful reorganization.

65.    As described above in part one, unforeseen liquidity challenges have required a financing bridge possible only through debtor-in-possession financing. The Debtors have an urgent and immediate need for liquidity. Despite the substantial backlog in contracts, the debtors need an immediate infusion of cash in order to continue to fund and eventually realize cash-flows from substantial new projects, make payroll, and to fund the administration of these cases.

66.    Debtors began to explore the need for additional debt financing in connection with the retention of their restructuring advisors in early March.  In light of certain covenants in the Prepetition Financing Agreement and the Indentures, and the relatively sudden change in projected cash flows, it became apparent that such additional financing would likely be possible only through debtor-in-possession financing.

67.    In seeking for additional liquidity, through their advisors the Debtors contacted approximately 27 financial institutions, including alternative funding sources, the Prepetition Lenders, and certain Noteholders, to seek alternate sources of financing.  Several of the financial institutions contacted were familiar with the Debtors' business or held material ownership in prepetition obligations of the Debtors.

68.    Of the 27 financial institutions the Debtors contacted, 12 indicated interest and executed a confidentiality agreement with the Debtors to allow for due diligence and other exchanges of information.  The Debtors thereafter received three term sheets for initial proposals for debtor-in-possession financing, one of which was subsequently withdrawn.  The Debtors

thereafter received three term sheets for initial proposals for DIP financing, one of which was subsequently withdrawn. The other two proposals culminated in formal offers to provide a debtor-in-possession facility: one from the Debtors' Prepetition Lenders and one from an ad hoc group of the Debtors' Noteholders.

69.      After substantial negotiations with their Prepetition Lenders regarding the terms of a potential roll-up financing transaction, and negotiations with certain Noteholders regarding the terms of a priming DIP, the Debtors have determined in their business judgment that the priming DIP proposed by the Noteholders represents the best terms available under the circumstances, and will maximize the Debtors' ability to reorganize and preserve value for the benefit of their stakeholders.

70.      In the course of the negotiations, the Debtors and their advisors asked the DIP Lenders to lend on terms other than a priming loan, including on a junior basis, an unsecured basis, or on some other basis such as an equity investment or other rights offering, and they were unwilling to do so. The Debtors and their advisors also asked the Prepetition Lenders to provide terms similar to those proposed by the DIP Lenders. The Prepetition Lenders would not agree to match the terms proposed by the DIP Lenders, and refused even to provide a commitment for funding on a final basis.

71.      The negotiations with the proposed DIP Lenders were arms' length and in good faith. Given the competitive process between the Noteholders and the Prepetition Lenders,  the Debtors obtained substantial concessions from the DIP Lenders over the material terms of the DIP Financing Agreement.

72.      As of the Petition Date, the proposed DIP Facility provides the Debtors and the estates the most favorable financing under the circumstances confronting the Debtors, and the

Debtors' decision to enter into the DIP Facility was the result of an intensive effort by the Debtors and their professionals to obtain the best terms available. Indeed, in providing committed, new money in the aggregate amount of up to $60 million, the DIP Facility will provide the Debtors with the significant additional liquidity they need to continue as a going concern. Compared to other, less certain sources of funding with shorter maturities and more restrictive conditions, the proposed facility presents less execution risk and more optionality for the Debtors, and thus a greater breathing space in chapter 11.

73.     In light of the uncertainty of alternative sources of financing, the proposed DIP Financing Agreement is the best path forward for the Debtors to continue as a going concern and emerge from chapter 11. For these reasons, entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

## H.     Insurance Motion

74.     The Debtors have asked the Court for authorization to continue their pre-petition insurance program, pay any pre-petition premiums or other related obligations and honor obligations under certain premium financing agreements (the "Insurance Motion").

75.     In the ordinary course of their business, the Debtors maintain a vitally important insurance program (the "Insurance Program"). This program includes eighteen insurance policies that were in effect as of the Petition Date, providing millions of dollars of coverage, including, but not limited to, policies covering the Debtors' operations around the globe, onshore, vessels, workers' compensation, general liability, property casualty, and directors' and officers' liability (collectively, the "Policies"). These Policies are provided by several different insurance carriers (the "Carriers"). Attached as Exhibit A to the Insurance Motion is a

comprehensive list of the Policies, the type of coverage, Policy numbers, the identity of Carriers, and the total annual premium for each Policy.

76.     On an annual basis, the Debtors pay approximately $3.4 million in aggregate premiums and related fees to procure and maintain the Insurance Program.  The premiums due for most of the Policies already have been paid in full for the current policy year or, as discussed further below, are being financed under an insurance financing agreement.

77.     In many cases, the coverage provided by the Policies is required by various regulations, laws and contracts that govern the Debtors' business conduct under applicable non-bankruptcy law.  Likewise, both the U.S. Trustee Guidelines for debtors-in-possession operating in Chapter 11 cases in this Bankruptcy Court and the terms of the Debtors' DIP Facility require the Debtors to maintain adequate insurance coverage.  Such coverage could not be provided without the continuation of the entire Insurance Program.

78.     In the ordinary course of business, the Debtors finance the premiums payable on some of the Policies.  As of the Petition Date, the premiums for certain of the Policies are financed under (i) the Premium Finance Agreement dated May 20, 2013, by and between GGS and Talbot Premium Financing, LLC ("Talbot") or (ii) the Commercial Insurance Premium Finance and Security Agreement dated May 1, 2013, by and between GGS and BankDirect Capital Finance, a division of Texas Capital Bank, N.A. ("BankDirect") (collectively, the "Insurance Financing Agreements").

79.     Aggregately under the Insurance Financing Agreements, the Debtors financed more than $2.6 million of premiums due in respect of certain Policies (the "Financed Policies"). any interruption of payments could adversely affect the Debtors' ability to finance premiums for future policies.  Given the nature of their business and substantial insurance needs, financing

premiums will foster the Debtors' ability to reorganize.  Given the Debtors' need to maintain substantial insurance to operate their business and prudently manage and preserve cash flow, authorizing the Debtors to maintain the Insurance Program, including making the payments required by the Policies and the Insurance Financing Agreements, is in the best interests of all parties in interest in these cases.  Thus, the Debtors request authorization to retain in place the existing Insurance Program and honor related obligations.  It is essential to the continued operation of the Debtors' business and reorganization that the Insurance Program be maintained on an ongoing and uninterrupted basis.

I.   **Administrative Motions**

(i)   *Motion for Joint Administration*

80.   Each of the Debtors filed a motion in its respective case seeking an order directing the joint administration of these chapter 11 cases for procedural purposes only.  The Debtors request that the Clerk of the Court be directed to maintain one file and one docket for all six of the Debtors' chapter 11 cases under the case name and number assigned to Debtor Autoseis, Inc.

81.   Joint administration of these cases will eliminate the need for duplicative filings, thereby saving considerable time and expense for the estates, the Court, and all parties in interest. Joint administration will also simply the supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee.  Claim and interest holders will benefit from the reduction in costs resulting from joint administration, and the Debtors accordingly request that the Court grant the order sought in the motion for joint administration.

(ii)   *Extension of Time to File Schedules and Statements of Financial Affairs*

82.   Debtors have not had sufficient time to gather and analyze the necessary information to prepare and file their schedules and statements prior to the Petition Date.  The

urgent need for liquidity and unforeseen challenges giving rise to these cases have prevented them from doing so. The majority of the Debtors' employees do not perform such administrative tasks. Given the limited back-office workforce available, the Debtors need and have solicited the help of financial professionals to assemble and compile the significant amount of information required to prepare the Debtors' schedules and statements. The Debtors' primary focus in their restructuring thus far has been preparing for the filing of their chapter 11 cases and securing DIP financing.

83.     Given the urgency with which these cases were filed, and the amount of work entailed in completing the schedules and statements and the competing demands upon the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, the Debtors will not be able to complete the schedules and all of the statements properly and accurately either within the required fourteen-day time period provided for under Bankruptcy Rule 1007(c) or by the Petition Date. Accordingly, the Debtors request that the deadlines by which the Debtors must file their schedules and statements be extended by forty-five days to May 26, 2014. In view of the above, the amount of information that must be assembled and analyzed, and the significant amount of employee time that must be devoted to complete the schedules and statements, cause exists for the requested extension.

84.     Debtors also seek an order waiving the requirements to file a list of all equity security holders within 14 days of the petition date and give notice to all equity security holders of the commencement of these cases. Preparing the equity holders list and sending the notice of commencement of these chapter 11 cases to all equity holders will be burdensome, time-consuming, expensive and serve little or no beneficial purpose. Instead, Debtors intend to provide the equity holders with notice of the bar date and an opportunity to assert their interests,

in the event that they are required to file proofs of interest.  I believe that the relief requested by Debtors will not prejudice any equity security holders.

### (iii)  *Motion to Implement Certain Notice Procedures*

85.     The Debtors have identified approximately twelve-thousand persons and/or entities to whom notice must be given under the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and/or the Bankruptcy Local Rules.  Such notice would be extremely burdensome to the Debtors, costly to their estates and, in many instances, unnecessary, as many matters have no bearing on certain parties.  Accordingly, the Debtors request the Court to approve the proposed Notice Procedures that will afford due and adequate notice to all parties-in-interest without burdening the Debtors' estates with substantial administrative costs.

86.     The Debtors request authority to file a consolidated creditor matrix in lieu of separate creditor matrices for each Debtor.  Multiple matrices would largely repeat the same information and, as the Debtors are, by separate motion, seeking the joint administration of the Debtors' chapter 11 cases, all such creditors will receive all the same notices, hearing dates, and so forth, regardless of the creditor matrix on which they would appear.  Further, there would be no significant benefit to offset the burden of compiling separate matrices.  Similarly, a single consolidated list of their combined 30 largest unsecured creditors in these cases would be more than sufficient to reflect the body of unsecured creditors that have the greatest stake in these cases and, moreover, would assist in the efficient and orderly joint administration of these cases.  Given that the Debtors are affiliates and that, by the nature of their business relationship, will have several overlapping creditors, such relief is particularly appropriate in these circumstances.

**J.**   **Applications to Employ and Compensate Professionals**

**(i)**   ***Application to Employ Alvarez & Marsal***

87.     The Debtors seek to employ Alvarez & Marsal North America, LLC ("A&M") to provide restructuring and financial advisory services under the terms of the A&M Engagement Letter for the estates.  Subject to further order of the Court and consistent with the terms of the A&M Engagement Letter, A&M will generally provide assistance to the Debtors with respect to management of the overall restructuring process, the development of ongoing business and financial plans, and supporting restructuring negotiations among the Debtors, their advisors, and their creditors with respect to an overall exit strategy for these chapter 11 cases. A&M specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring.

88.     On or about March 5, 2014, the Debtors engaged A&M to provide restructuring advisory services and to assist the company during a liquidity crisis.  Since the commencement of its engagement, A&M has familiarized itself with the Debtors' businesses; advised on the development of ongoing business and financial plans; supported due diligence and restructuring negotiations; evaluated the Debtors' liquidity positions; advised the Debtors on short-term cash management; and coordinated the Debtors' preparation for these chapter 11 cases.  As a result of the prepetition work performed on behalf of the Debtors, A&M has developed institutional knowledge of the Debtors and their businesses and is now familiar with the Debtors' affairs and operations.  Accordingly, the Debtors believe that A&M is uniquely situated to efficiently and effectively serve the Debtors in these chapter 11 cases.

*(ii)*     ***Application to Employ Baker Botts LLP***

89.     The Debtors seek to employ Baker Botts L.L.P. as general bankruptcy counsel in these cases.  In preparing for its representation of the Debtors, Baker Botts has become familiar with the Debtors' businesses and many of the potential legal issues that may arise in the context of these chapter 11 cases.  The Debtors believe that Baker Botts is both well-qualified and uniquely able to represent the Debtors in these chapter 11 cases in an efficient and timely manner.  Subject to further order of the Court and consistent with the Baker Botts Engagement Letter, the Debtors request the retention and employment of Baker Botts to render the legal services described in the Debtors' application to employ Baker Botts.

90.     I believe that the Debtors' employment of Baker Botts is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession and to implement their reorganization.

*(iii)*     ***Application to Employ Jordan Hyden***

91.     The Debtors seek to employ Jordan, Hyden, Woomble, Culbreth & Holzer, P.C. as bankruptcy counsel in these cases.  The Debtors believe that Jordan Hyden is both well-qualified and uniquely able to represent the Debtors in these chapter 11 cases.  Consistent with the terms of their engagement letter and retention application, Jordan Hyden would advise and assist the Debtors with respect to all necessary motions, applications and order and hearings thereon before the Court.  The Debtors' employment of Jordan Hyden is appropriate and necessary to enable the Debtors to faithfully execute their duties as debtors and debtors-in-possession and to implement their reorganization.

*(iv)*     ***Application to Employ Prime Clerk***

92.     Debtors seek to retain and employ Prime Clerk in these cases to, among other tasks, (i) serve as the noticing agent to mail notices to the estates' creditors, equity security holders, and parties in interest; (ii) provide computerized claims, objection, soliciting, and balloting database services; and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to the Debtors' bankruptcy cases, pursuant to the provisions of the engagement agreement attached to the retention application.

93.     The Debtors believe that Prime Clerk is well qualified to provide such services based on its expertise in the industry.  Prime Clerk's professionals have experience in noticing, claims administration, solicitation, balloting, and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity.  Prime Clerk's professionals have acted as official claims and noticing agent in many large bankruptcy cases in this and other districts nationwide, and the Debtors believe that their engagement for these cases will benefit all parties in interest.

*(v)*     ***Interim Compensation Procedures***

94.     The Debtors seek to establish procedures to compensate and reimburse professionals of the estates on interim basis during the pendency of the cases.  The proposed procedures are similar to those which are customarily used in chapter 11.  The proposed compensation procedures will enable the Debtors and other core parties in interest to closely monitor costs of administration, maintain cash flow availability, and implement efficient cash management procedures. Moreover, these procedures will allow the Court and key parties in interest to ensure the reasonableness and necessity of the compensation and reimbursement sought by professionals.  The Debtors submit that the efficient administration of these chapter 11

case will be significantly aided by establishing the interim compensation and expense reimbursement procedures sought.

**K.**    **Motion to Reject Certain Lease**

95.    The Debtors are asking the Court to authorize them to reject a non-residential real property leases and all amendments thereto, effective retroactively to the Petition Date  (which is also the date they filed this motion).   The leases the Debtors seek to reject are attached as Schedule 1 to the *Motion For An Order Authorizing Rejection of Certain Unexpired Leases Nunc Pro Tunc*.  (the "Leases").   Although this motion was filed on the Petition Date, the Debtors are not seeking an interim order or otherwise seeking to have the motion heard on an expedited basis.   The Debtors seek to reject the Lease because, in their business judgment, it is a net liability for the estates.   The Lease is for a premise the Debtors have already vacated, and for which there is no justification for the incursion of post-petition administrative expenses. Rejection on a nunc pro tunc basis will prevent the estates from incurring unnecessary administrative expenses and the Debtors accordingly request that this motion be granted.

*[Signature Page and Exhibit Follows]*

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of the filing under penalty of perjury.


/s/ Sean M. Gore
Sean M. Gore
Chief Financial Officer and
Senior Vice President

Exhibit A

Organizational Chart

Active 15269554



**Branch Registrations**
Argentina (8)
Colombia (17)
Georgia
Libya (6)
Tunisia (19)
Trinidad & Tobago (21)
Saudi Arabia (22)
Mexico (25)
United Kingdom
Dubai (JLT)
Paraguay
Kenya

**Divisions**
HMS Enterprises (9)
E&P Services (16)

**Branches**
Brazil (28)

Global Servicos Geofisicos Ltda (Brazil) (24) — 99% / 1%

GGS Mexico Services, S. de R.L. de C.V. (Mexico) (5) — 99% / 1%

Global Geophysical Services, S. de R.L. de C.V. (Mexico) (4) — 99% / 1%

Global Geophysical Servicios S.A. (Ecuador) (13) — 99.875% / 0.125%

**GLOBAL GEOPHYSICAL SERVICES, INC. (DE)**

Global Geophysical Services Nigeria Ltd. (Nigeria) — 99.96%

Global Geophysical Services, Ltd. (Cayman Islands) — 100% / 0.04%

Global Geophysical Services, SpA (Chile) (14) — 100%

Global Geophysical Services Sp., z.o.o. (Poland) — 100%

Global Geophysical Services Arabia, Ltd. (Saudi Arabia) (27) — 98%

Global Geophysical Services Canada, Inc. (Canada) (29) — 100%

GGS Lease Co., Inc. (TX) (26) — 100%

Global Microseismic Services, Inc. (TX) (30) — 100%

Autoseis, Inc. (TX) (10) — 100%

Global Eurasia, LLC (DE) (23) — 100%

GGS International Holdings, Inc. (TX) (3) — 100%

Global Geophysical Services (Isle of Man), Ltd . (Isle of Man) (2) — 100%

Expertise for Seismic Services, LLC (Iraq) — 100%

Global Geophysical Services S.A.C. (Peru) (1) — 99.9% / 0.1%

Sensor Geophysical, Ltd. (Canada)

Autoseis Development Company (TX)

Global Neftegeophysica, LLC (Russia)

**Branch Registrations**
Algeria
Belize
Brunei (7)
India (11)
Kurdistan (15)
Oman (12)
Venezuela

**Global Geophysical International Pensions Ltd. (Cayman Islands) (20)**

**GLOBAL LEGAL ENTITY STRUCTURE**
*rev. January 1, 2014*

(1) 1 share was previously held by local counsel; transferred to GGS Intl Holdings, Inc. eff. 02/16/2011 *(pending dissolution).*
(2) 2 shares are held in trust by SMP Partners Limited.
(3) Registered eff.  09/05/2006.
(4) Utilized as an Mexican operating company, registration eff. 11/10/2006.
(5) Utilized as an employee service company, registration eff. 11/10/2006.
(6) Registration eff. 11/09/2006.
(7) Registration eff. 01/16/2007 *(pending dissolution) .*
(8) Registration eff. 03/14/2007.
(9) Division established eff. 09/10/2008.
(10) Registration eff. 05/11/2007
(11) Registered 03/13/2010 *(pending dissolution).*
(12) Registered eff. 12/5/2007.
(13) Registered eff. 12/18/2007.
(14) Registered eff. 01/18/2008.
(15) Sulimanyah region registered eff. 04/20/2008; Erbil region registered eff. 04/21/2008.
(16) Division established eff. 12/13/2012; f/k/a Weinman GeoScience.
(17) Registration eff. 07/08/2008 under the name "Servicios Geofisicos Globales Colombia".
(18) *Reserved*
(19) Registered eff. 10/31/2008.
(20) Registered eff. 10/22/2008; 1 share held by Citco Trustees (Cayman) Ltd as trustee of the Global Geophysical Int'l Retirement Plan.
(21) Registration eff. 03/20/2009.
(22) Registration eff. 09/08/2009.
(23) Registration eff. 10/29/2009 (per the JVA, MMS Holdings Group LLC holds a 20% Membership Interest option).
(24) Registration eff. 04/15/2010.
(25) Registration eff. 06/03/2010.
(26) Changed name eff. 10/17/2013; f/k/a Paisano Lease Co., Inc.
(27) 2% held by Suhayl Abdul Mohsin Al Shoaibi  & Sons  Holding Company Ltd.
(28) 5 branches (1) Rio de Janeiro, (2) Patos de Minas, (3) Curvelo, (4) Maraba, and (5) Imperatriz.
(29) Alberta amalgamated corporation, eff. 01/01/2013 (from 3 amalgamating entities: 799762 Alberta Ltd., Discrete Signal Processing Inc., and Global Services Canada Inc. (continued from British Columbia; previous names "Global Canada Geophysical Services, Inc."  and initially "0928884 B.C. Ltd."; incorporated 12/29/2011)).
(30) Its subsidiary, STRM, LLC (a Colorado LLC) was dissolved eff. 05/23/2012.