**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **AUTOSEIS, INC., et al.[1]** | § | **Case No. 14-20130** |
| | § | |
| **Debtors.** | § | **Joint Administration** |
| | § | **Requested** |
| | § | |

**DEBTORS' EMERGENCY MOTION FOR
ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO
(A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362,
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND (B) USE CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363, (II) GRANTING ADEQUATE PROTECTION
PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (III) SCHEDULING FINAL
HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND (c)**

**NOTICE UNDER BLR 9013-1(b) AND 9013-1(i)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU
OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING
PARTY TO RESOLVE THE DISPUTE.  IF YOU AND THE MOVING PARTY CANNOT
AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY.
YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS
WAS SERVED ON YOU.   YOUR RESPONSE MUST STATE WHY THE MOTION
SHOULD NOT BE GRANTED.  IF YOU DO NOT FILE A TIMELY RESPONSE, THE
RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE
THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND
THE HEARING.  UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY
CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE
HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE
MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS
TO ANSWER.  IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE
THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD
FILE AN IMMEDIATE RESPONSE.

---

[1] The Debtors in these chapter 11 cases are:  Autoseis, Inc.; Global Geophysical Services, Inc.; Global Geophysical
EAME, Inc.; GGS International Holdings, Inc.; Accrete Monitoring, Inc.; and Autoseis Development Company.

The debtors and debtors in possession in the above-captioned cases (together, the "Debtors") hereby move (the "Motion") for entry of interim and final orders, under Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 4001 and 6003, authorizing the Debtors to: (a) enter into a senior secured postpetition financing agreement on a superpriority basis (the "DIP Facility") in an aggregate principal amount of up to $60 million, with $25 million available on an interim basis, upon the terms and conditions described herein and the commitment letter and term sheet attached as **Exhibit A** and the proposed interim order attached as **Exhibit B** (as may be revised prior to the hearing with regard thereto, "Interim Order") (collectively with such final documentation, as may be amended, supplemented, restated, or otherwise modified from time to time, including, the "DIP Financing Agreement" and the "DIP Documents"); (b) authorizing the Debtors to execute and deliver the DIP Financing Agreement and all other DIP Documents by and among the Debtors, the DIP Agent and the DIP Lenders; (c) granting the DIP Facility and all obligations owing thereunder and under the DIP Documents to the DIP Agent and the DIP Lenders (collectively, and including all obligations under or with respect to the DIP Financing Agreement, the "DIP Obligations") allowed superpriority administrative expense claim status in each of these chapter 11 cases (the "Chapter 11 Cases") and any successor cases under chapter 7; (d) granting to the DIP Agent, for the benefit of the DIP Lenders, automatically perfected security interests in and priming liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code), and providing adequate protection to the extent of any diminution in value of their pre-petition collateral as a result of the DIP Facility to the Prepetition Agent and Prepetition Lenders; (e) authorizing the use of Cash Collateral and providing adequate protection to the Prepetition Agent and Prepetition Lenders to

the extent of any diminution in value of their pre-petition collateral as a result of the DIP Facility; and (f) modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents.  The Debtors also request that the Court schedule a hearing to consider approval of the DIP Financing Agreement on a final basis (the "Final Order" and, together with the Interim Order, the "DIP Orders").  In support of the Motion, the Debtors rely upon and incorporate by reference the Declaration of Sean M. Gore in Support of the First Day Pleadings (the "Gore Declaration") filed concurrently herewith, and respectfully represent as follows:[2]

## PRELIMINARY STATEMENT

1.      After a record year in 2013, the Debtors find themselves with more than $330 million of indebtedness and less than $2 million in cash as of the Petition Date.  As described in the Gore Declaration, unforeseen liquidity challenges have required a financing bridge possible only through debtor-in-possession financing.  The Debtors have an urgent and immediate need for liquidity.  Despite a substantial backlog in contracts and projected cash flows for the second half of 2014, the Debtors need an immediate infusion of cash in order to continue to fund and eventually realize cash flows from substantial new projects, make payroll, and to fund the administration of these cases.

2.      Following a competitive process, the Debtors have obtained up to $60 million in debtor-in-possession financing from certain of their Noteholders that are parties to the DIP Facility (the "DIP Lenders"), and Wilmington Trust, as administrative and collateral agent (the "DIP Agent").  The DIP Facility will permit the Debtors to quickly fund the new projects that have caused a bottle neck in liquidity, and provide a sound basis for a successful reorganization.

---

[2] Capitalized terms used but not defined herein shall have the meaning given in the Gore Declaration or the Interim Order, as applicable.

3.     The DIP Facility commitment received by the Debtors is a backstop by certain Noteholders.   It constitutes an important endorsement of the Debtors' operational plans for improving cash flows and asset values during these cases.   The DIP Facility commitment received by the Debtors is  provided by certain Noteholders who hold a significant amount of the Debtors' senior notes.   The fact that the DIP Facility is being provided by such Noteholders constitutes an important endorsement of the Debtors' operational plans for improving cash flows and asset values during these cases.   This fact cannot be understated: the likely future equity owners of any reorganized enterprise in these cases have determined that the potential value of this enterprise is sufficient for them to provide additional liquidity to the Debtors to protect the value of such investors' pre-petition investment.   And management and the Debtors' other decision makers, in recognition of this fact and important development, chose to take the financing provided by these institutions as an indication that they are supportive of the efforts of these investors to maximize the value of the estate for *all stakeholders*, rather than agree to restrictive financing terms offered by secured lenders who are incentivized to extract only the first $82 million of value.   In the business judgment of the Debtors' boards, the financing offered by the Prepetition Lenders would have been more expensive, provided less liquidity (both in immediately available funds and ultimate funds available), would have been shorter in duration, thereby unduly interfering with development of attractive business opportunities, was only committed in part, and would be viewed by customers as being less supportive of the Debtors' performance under existing and proposed new contracts.

4.     Indeed, the Term Sheet proposed by the DIP Lenders made it simple for the Debtors to exercise their business judgment and choose the DIP Facility: **by its own terms, it would be superior to any proposal provided by the Prepetition Lenders, and would not have**

*case milestones or other covenants intended to cause "foot defaults."* As such, the DIP

Lenders made the Debtors' decision smoother because they agreed to beat the terms, no matter

what those terms were, provided by the senior secured lenders.

5.      The proposed DIP Facility provides for a fully underwritten $60 million multiple

draw term loan facility, available in two tranches:  $25 million upon entry of the Interim Order

and an additional $35 million upon entry of the Final Order.[3]  The DIP Facility would be

advanced on a superpriority administrative claim basis and would be secured by a first-priority

priming lien against the Debtors' property and assets that are encumbered on the Petition Date

(except for certain Permitted Priority Liens and subject to a carve-out for certain administrative

expenses of these cases).  The DIP Facility will allow the Debtors to complete certain urgent

capital projects that are critical to their efforts to enhance cash flow and successfully reorganize,

and will provide the Debtors with adequate liquidity through these Chapter 11 Cases.  The

Debtors seek immediate authority to borrow up to $25 million under the DIP Facility pursuant to

the Interim Order.

6.      In connection with the priming liens in favor of the DIP Lenders, during the First

Day hearing and the hearing on final entry of the DIP Order (such date, TBD), the Debtors will

provide and show adequate protection of the liens and rights of their prepetition secured lenders

(as further defined and described below, the "Prepetition Lenders"), including, to the extent

necessary to protect the Prepetition Lenders for any diminution in value of their pre-petition

collateral as a result of the incurrence of the DIP Facility and the Debtors' use of cash collateral:

---

[3] As set forth in the DIP Term Sheet, the DIP Lenders will work with the Debtors during the interim period between entry of the Interim Order and entry of the Final Order to determine the appropriate strategy with regard to the senior secured debt, and may determine, if such a path is prudent and in the best interests of the estate, to upsize the DIP Facility to pay off, in full and in cash, the Prepetition Lenders.

- that the Prepetition Lenders are well over secured, with an adequate equity cushion in the prepetition collateral;

- payment to the Prepetition Lenders of post-petition interest under the Prepetition Financing Agreement (defined below) at the non-default rate;

- payment to the Prepetition Lenders of the reasonable fees and expenses of counsel and a financial advisors to the Prepetition Lenders;

- if the Court so orders (which the Debtors do not believe will be necessary based upon the showing to be made by the Debtors at the first day hearings), additional liens in favor of the Prepetition Lenders on unencumbered assets, including assets of the debtors' foreign subsidiaries and the proceeds of contracts worth millions of dollars for work in Brazil, Kurdistan and Canada none of which will be subject to the DIP Liens;

- an administrative claim and replacement liens in favor of the Prepetition Lenders that are junior to the administrative claim and DIP Liens on the DIP Collateral; and

- assurances regarding the maintenance of insurance, payment of post-petition taxes, and maintenance of existing cash management systems.

7.      By the Interim Order, the Debtors seek to borrow (and thus prime the loans of their Prepetition Lenders by) up to $25 million under the DIP Facility.  Based on the Debtors' current implied market value, publicly available financial data, and testimony presented at the hearing on the Interim Order and Final Order, the Debtors will demonstrate that the Prepetition Lenders are adequately protected and that the DIP Financing is in the best interest of all stakeholders.

8.      In short, entry into the DIP Facility is well within the Debtors' business judgment, meets the requirements under the Bankruptcy Code, and will maximize value for all stakeholders.  And moving forward with this DIP Facility will ensure that the Debtors' business operations stabilize and that the Debtors have sufficient liquidity to  reorganize in an orderly fashion.

Active 15335293.4

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

10.     On March 25, 2014 (the "Petition Date"), the Debtors filed a voluntary petition for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

11.     The Debtors remain in possession of their property and are operating their business as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been requested or appointed in these chapter 11 cases.

## BACKGROUND

12.     A detailed description of the Debtors' business, capital structure, and the events leading to these chapter 11 cases is set forth in the Gore Declaration and is incorporated herein by reference.

### *The Prepetition Financing Agreement*

13.     The Debtors are parties to a Financing Agreement dated as of September 30, 2013, as amended and restated (the "Prepetition Financing Agreement") with TPG Specialty Lending, Inc. ("TPG") and Tennenbaum Capital Partners LLC ("TCP"), as lenders and co-lead arrangers, with TPG acting as the administrative and collateral agent (the "Prepetition Agent") (together with TCP, the "Prepetition Lenders").  The Debtors' obligations under the Prepetition

Financing Agreement are secured pursuant to the Pledge and Security Agreement, dated September 30, 2013, between the grantors party thereto and the Prepetition Agent.   The Financing Agreement provides for a senior secured first lien term loan in the initial principal amount of $82.8 million.   As of the Petition Date, approximately $81.765 million of indebtedness was outstanding under the Financing Agreement with an annual interest rate of 10.75%.

14.     The debt under the Financing Agreement is guaranteed by each of the Debtors and secured by substantially all real and personal property of the Debtors pursuant to various collateral documents, including a Pledge and Security Agreement dated as of September 30, 2013.   The debt under the Financing Agreement is not guaranteed by any of the foreign non-debtor subsidiaries.

### *10.5% Senior Unsecured Notes due 2017*

15.     As of the Petition Date, GGS had approximately $250 million aggregate principal amount in publicly traded unsecured bond debt, consisting of the following two issuances: (i) $200 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of April 27, 2010; and (ii) $50 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of March 28, 2012 (such notes, collectively, the "Notes," the holders thereof the "Noteholders," and such indentures, as supplemented to the Petition Date, collectively, the "Indentures").  The Bank of New York Mellon Trust Company, N.A., serves as the trustee under both Indentures.

16.     The Notes are the general unsecured, senior obligations of GGS and are jointly and severally guaranteed by each of the other Debtors on a senior unsecured basis.  The Notes

mature on May 1, 2017, with interest payable semi-annually on May 1 and November 1 of each year.

### *The Process Leading to the DIP Financing Agreement*

17.    Debtors began to explore the need for additional debt financing in connection with the retention of their restructuring advisors in early March.  In light of certain covenants in the Prepetition Financing Agreement and the Indentures, and the relatively sudden change in projected cash flows, it became apparent that such additional financing would likely be possible only through debtor-in-possession financing.

18.    In seeking additional liquidity, through their advisors the Debtors contacted approximately 27 financial institutions, including alternative funding sources, the Prepetition Lenders, and certain Noteholders to seek alternate sources of financing.  Several of the financial institutions contacted were familiar with the Debtors' business or held material ownership in prepetition obligations of the Debtors.

19.    Of the 27 financial institutions the Debtors contacted, 12 parties indicated interest and executed a confidentiality agreement with the Debtors to allow for due diligence and other exchanges of information.  The Debtors thereafter received three term sheets for initial proposals for debtor-in-possession financing, one of which was subsequently withdrawn.  The other two proposals culminated in formal offers to provide a debtor-in-possession facility: one from the Debtors' Prepetition Lenders and one from an ad hoc group of the Debtors' Noteholders.

20.    After substantial negotiations with their Prepetition Lenders regarding the terms of a potential roll-up financing transaction, and negotiations with certain Noteholders regarding the terms of a priming DIP, the Debtors have determined in their business judgment that the priming DIP proposed by the Noteholders represents the best terms available under the

Active 15335293.4

circumstances, and will maximize the Debtors' ability to reorganize and preserve value for the benefit of their stakeholders.

21.     The Debtors negotiated extensively with the Prepetition Lenders, including the provisions of a term sheet, a proposed interim order and a draft DIP credit agreement.   In connection with these negotiations, the Debtors also negotiated the terms of a forbearance agreement with the Prepetition Lenders.   Ultimately, however, the Prepetition Lenders insisted on terms that were too onerous and restrictive.   Most significantly, the Prepetition Lenders would not commit to funding beyond the interim hearing, and thus offered the estates no clear path back to positive cash flows and an exit from bankruptcy.   On the eve of the Petition Date, the Prepetition Lenders terminated the forbearance agreement and purportedly accelerated their debt, implicating the possibility of an immediate sweeping of cash and other foreclosure actions.

22.     The Noteholders approached the DIP transaction with an entirely different perspective.   While the Prepetition Lenders sought only to keep the Debtors afloat long enough to liquidate their $81.765 million claim, the Noteholders took a longer view towards value.   The Noteholders, for the benefit of all stakeholders, were willing to loan at a better rate with a longer maturity, and with certainty with respect to the aggregate amount available upon the entry of a final order.   Unlike the Prepetition Lenders, who are well over secured at an $ 81.765 million position, the Noteholders (six of which are DIP Lenders), collectively hold approximately $250 million in claims, and are now the largest economic class with a stake in the company's going concern value.   Indeed, the DIP Facility being provided by the Noteholder DIP Lenders is intended to *preserve* value for the estate and all stakeholders, and will not allow the entire value of the estates slip away from deserving stakeholders because of foot faults and traps laid by those reaching for a windfall.   The proposed DIP Facility is a backstop offered by unsecured creditors

who, compared to the Prepetition Lenders, bear far more residual risk, and, as is so often said in chapter 11, are willing to "put their money where their mouth is."

23.     As of the Petition Date, the proposed DIP Facility provides the Debtors and the estates the most favorable financing under the circumstances confronting the Debtors, and the Debtors' decision to enter into the DIP Facility was the result of an intensive effort by the Debtors and their professionals to obtain the best terms available.   Indeed, in providing *committed*, new money in the aggregate amount of up to $60 million, the DIP Facility will provide the Debtors with the additional liquidity they need to continue as a going concern. Compared to other, less certain sources of funding with shorter maturities and more restrictive conditions, the proposed facility presents less execution risk and more optionality for the Debtors, and thus a greater breathing space in chapter 11. This will provide the Debtors' trade creditors and other stakeholders the assurance—not just in the United States but across the world—that the Debtors' operations are safe, secure, and will be value maximizing.

### RELIEF REQUESTED

24.     The Debtors respectfully requests that the Court grant the relief provided in the DIP Orders, summarized as follows.[4]

| | |
|---|---|
| **Overview:** | Set forth below is a summary of the pertinent terms and conditions for a Senior Secured DIP Facility to be provided by the DIP Lenders.  The DIP Facility described herein would be provided on a "Priming" basis, and if the Debtors' current senior secured lenders are not willing to consent to such priming, the DIP Lenders are willing to provide the Debtors all assistance reasonable and necessary to prosecute approval of the DIP Facility contained herein.

Most importantly, the DIP Lenders would like to work with the Debtors between entry of the Interim Order and entry of |

---

[4] The following summary comes from the Term Sheet executed by the DIP Lenders.  To the extent any of these terms are inconsistent with the Term Sheet, the Term Sheet governs.

the Final Order with regard to a determination as to whether the DIP Financing should be upsized to pay, in full and in cash (or a portion thereof), the Senior Credit Agreement amount outstanding, upon entry of the Final Order.

**Borrower:** Global Geophysical Services, Inc, a Delaware corporation (the "**Borrower**"), as a debtor and debtor in possession in a case (the "**Borrower's Case**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") to be filed in the United States Bankruptcy Court for Southern District of Texas (the "**Bankruptcy Court**").

**Guarantors:** Each of the Borrower's direct and indirect domestic subsidiaries (collectively, the "**Guarantors**"), each of which will be a debtor and a debtor in possession in cases (collectively, the "**Guarantors' Cases**" and, together with the Borrower's Case, the "**Cases**") under chapter 11 of the Bankruptcy Code filed contemporaneously and jointly administered with the Borrower's Case.  The Borrower and the Guarantors are referred to herein as "**Debtors**" and each, a "**Debtor**".  All obligations of the Borrower under the DIP Facility will be unconditionally guaranteed by the Guarantors.

**DIP Lenders:** The holders of the Borrowers' 10% Senior Notes due 2017 (the "**Senior Notes**") that have committed to collectively provide 100% of the DIP Commitment.

**Proposed Administrative Agent:** Wilmington Trust, National Association

**DIP Facility:** A super-priority senior secured term loan credit facility in an aggregate principal amount of up to $60,000,000 (the "**DIP Facility**" or "**DIP Commitment**"), which shall be drawn in two tranches: (a) $25,000,000 upon entry of the Interim Order (the "**Initial Amount**"), and (b) $35,000,000 upon entry of the Final Order (the "**Final Amount**").

**DIP Facility Termination Date:** All DIP Obligations shall become due and payable on the DIP Facility Termination Date.  The "**DIP Facility Termination Date**" shall be the earliest of (a) the Scheduled Termination Date, (b) 45 days after the entry of the Interim Order (as defined below) if the Final Order (as defined below) has not been entered prior to the expiration of such 45-day period, (c) the consummation of any Section 363 sale, (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date")

of a plan of reorganization filed in the Cases that is confirmed pursuant to an order entered by the Bankruptcy Court and (e) the acceleration of the loans and the termination of the commitment with respect to the DIP Facility in accordance with the DIP Documents.

"**Scheduled Termination Date**" means the date that is the fifteen month anniversary of the commencement of the Cases.

**Purpose:**

In accordance with and subject to the Initial Budget and the Budget (both as defined below), proceeds of the DIP Loans will be used for general corporate purposes of the Debtors during the Cases (including payment of fees and expenses in connection with the transactions contemplated hereby and any adequate protection payments), working capital, certain transaction fees, costs and expenses and certain other costs and expenses with respect to the administration of the Cases.

**DIP Documents:**

The DIP Facility will be documented by DIP Financing Agreement and other guarantee, security and other relevant documentation (defined above as the DIP Documents) reflecting the terms and provisions set forth herein and otherwise in form and substance reasonably satisfactory to the DIP Lenders.

**Interest Rates:**

L + 8.50% with a LIBOR floor of 1.5%.

**Default Interest:**

During the continuance of an event of default (as defined in the DIP Documents), the DIP Loans will bear interest at an additional 2% per annum.

**Amortization:**

None

**Optional Prepayments:**

The Borrower may, upon at least 3 business days' notice, prepay in full or in part, without premium or penalty (other than such breakage costs, if applicable), the DIP Loans.

**Mandatory Prepayments:**

Mandatory prepayments of the DIP Loans shall be required with net cash proceeds from sales or casualty events of any Collateral (excluding sales of inventory in the ordinary course of business); proceeds of any sale or issuance of debt (other than permitted debt) and proceeds of equity securities (other than certain permitted equity issuances to be agreed). There will be no excess cash flow sweep.

**Security and Priority:**

For purposes of this Term Sheet, "**Carve-Out Fees**" means Allowed professional fees and expenses for the Debtors and an official creditors' committee (and the expenses of members of the official creditors' committee) (i) incurred or

accrued after receipt of written notice of a default or event of default from the DIP Lenders (a "**Notice of Default**") in an aggregate amount not to exceed $250,000 and (ii) incurred or accrued, and Allowed, prior to receipt of a Notice of Default up to the amount so specified for such professional in the approved 13-week budget (as approved by the DIP Lenders) for any such fees and expenses plus (iii) all fees and expenses of the United States Trustee.

All amounts owing by the Borrower under the DIP Facility and the obligations of the Guarantors in respect thereof will be secured, subject to a carve-out to be mutually agreed upon (the "**Carve-Out**") for Carve-Out Fees, by (i) a first priority perfected pledge of (x) all promissory notes owned by the Borrower and the Guarantors and (y) all capital stock owned by the Borrower and the Guarantors (including 100% of the non-voting capital stock of their respective first-tier foreign subsidiaries but no more than 65% of the voting capital stock of (A) their respective first-tier foreign subsidiaries that are classified as controlled foreign corporations under Section 957 of the Internal Revenue Code ("**CFC**") and (B) entities that are treated as partnerships or disregarded entities for United States federal income tax purposes and substantially all of whose assets consist of capital stock of CFCs, which CFC stock shall not be pledged) and (ii) a first priority perfected security interest in all other assets owned by the Borrower and the Guarantors, including, without limitation, accounts, inventory, equipment, investment property, instruments, chattel paper, deposit accounts, owned and leased real estate, contracts, patents, copyrights, trademarks, other general intangibles and proceeds of avoidance actions (but excluding all avoidance actions themselves—i.e. actions under Chapter 5 of the Bankruptcy Code seeking to recover property from non-debtors), in each case, subject to customary exclusions to be agreed (all aforementioned collateral, the "**Collateral**").

The liens granted under the DIP Facility will prime and be senior to the liens and security interests in the Collateral securing the Borrower's pre-petition credit agreement (the "**Senior Credit Agreement**", as defined below, and the lenders thereunder, the "**SCA Lenders**"), and shall be junior only to the Carve Out and other liens and encumbrances permitted by the DIP Documents.  The SCA Lenders will receive adequate protection in the form of the following to the extent of any diminution in value of their pre-petition collateral as a result of the DIP Facility: (i) payment of post-petition interest in the normal course (but not default interest), (ii) payment of reasonable fees and expenses of one counsel and one financial advisor to the

SCA Lenders, (iii) administrative claim priority junior to the DIP Facility, (iv) maintenance of all insurance policies currently in effect to protect the value of all pre-petition collateral, (v) maintenance of an equity cushion of at least 15%; (vi) replacement liens (junior to the liens of the DIP Facility) on all pre-petition collateral, and (vii) only to the extent deemed necessary by the Bankruptcy Court in order to protect the SCA Lenders to the extent of any diminution in value of their pre-petitiion collateral as a result of the Debtors' incurrence of the DIP Facility, and to the extent not otherwise adequately protected by (i) through (vi) above, replacement liens on certain previously unencumbered assets of the Debtors' foreign subsidiaries.

The Senior Credit Agreement is that certain Financing Agreement, dated as of September 30, 2013, among the Borrower, certain subsidiaries of the Borrower (as Guarantors), various lenders from time to time party thereto, TPG Specialty Lending, Inc. (as Administrative Agent, Collateral Agent, and Co-Lead Arranger), and Tennenbaum Capital Partners, LLC (as Co-Lead Arranger).

In the Cases, the DIP Lenders will be granted in each of the Interim Order and the Final Order a superpriority administrative claim under section 364(c)(1) of the Bankruptcy Code for the payment of the obligations under the DIP Facility with priority above all other administrative claims, subject to the Carve-Out.

**Interim Funding:**

On the business day immediately following the date of entry of the Interim Order (the "Interim Funding Date"), the Administrative Agent shall disburse all funds received by the Administrative Agent from the DIP Lenders on or before 1:00 p.m., New York, New York time, on the Interim Funding Date (the "Required Interim Funding Time") up to and including the Initial Amount to an account designated by the Borrower in writing (the "Borrower Account") in accordance with the Interim Order; *provided* that the Administrative Agent shall only disburse such funds to the Borrower upon receiving from the Requisite Lenders (or their counsel) written confirmation that each of the conditions precedent to the DIP Lenders' obligations to make the DIP Loans on the closing date (the "Closing") for the Initial Amount has been satisfied or waived.

To the extent the Administrative Agent has not received the Initial Amount from the DIP Lenders by the Required Interim Funding Time, the Administrative Agent shall disburse all funds subsequently received from the DIP Lenders up to and including the Initial Amount to the Borrower Account in accordance with the Interim Order as

soon as reasonably practicable.

**Conditions Precedent to the Closing of the Initial Amount:**

The **Closing** for the Initial Amount (and, where applicable, the Final Amount) under the DIP Facility shall be subject to the following conditions (and the conditions set forth under "**Conditions Precedent to Each Loan**"):

A. All documentation relating to the DIP Facility, including the Interim Order and Final Order, shall be in form and substance consistent with the terms contained herein and reasonably satisfactory to the DIP Lenders and their counsel.

B. The Cases shall have been commenced by the Borrower and the Guarantors and the same shall each be a debtor and a debtor in possession.  All "first day orders" entered at the time of commencement of the Bankruptcy Cases shall be reasonably satisfactory in form and substance to the DIP Lenders.

C. All reasonable out-of-pocket fees and expenses (including the fees and expenses of outside counsel and one financial advisor/testifying expert) required to be paid to the Administrative Agent and the DIP Lenders on or before the Closing shall be paid from the proceeds of the first advance of the Initial Amount.

D. The Requisite Lenders shall be satisfied that, except as authorized by the Interim Order, there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or the Guarantors' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder on a post-petition basis.

E. The absence of a material adverse change, or any event or occurrence, other than the commencement of the Cases, which could reasonably be expected to result in a material adverse change, in (i) the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, material agreements or prospects of the Borrower and the Guarantors, taken as a whole, since September 30, 2013, (ii) the ability of the Borrower or the Guarantors to perform their respective material obligations under the DIP

Documents or (iii) the ability of the Administrative Agent and the DIP Lenders to enforce the DIP Documents (any of the foregoing being a "**Material Adverse Change**").

F.     There shall exist no action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Debtors) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases and any action, suit, investigation or proceeding arising from the commencement and continuation of the Cases or the consequences that would normally result from the commencement and continuation of the Cases) that is not stayed (by the operation of the automatic stay arising upon the filing of the Cases, or otherwise) and could reasonably be expected to result in a Material Adverse Change (any such action, suit, investigation, litigation or proceeding, a "**Material Litigation**").

G.     All necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained  and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents or imposes adverse conditions upon the DIP Facility or the transactions contemplated thereby.

H.     The Requisite Lenders shall be satisfied that the Administrative Agent shall have a valid and perfected first priority lien on and security interest in the Collateral.

I.     The Bankruptcy Court shall have entered the Interim Order in form and substance reasonably satisfactory to the DIP Lenders and Debtors.

J.     The Borrower shall have arranged to have delivered to the Administrative Agent and the DIP Lenders (or their respective counsel), no later than the third day after the entry of the Interim Order, endorsements (and to the extent such endorsements can be delivered prior to Closing after the exercise of commercially reasonable efforts, they will be so delivered) naming the Administrative Agent, on behalf of the DIP Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the Collateral.

**Conditions Precedent to Each Loan:**

On the funding date of each DIP Loan (i) there shall exist no default under the DIP Documents, (ii) the representations and warranties of the Borrower and each Guarantor therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) no later than 45 days after the entry of the Interim Order, the Bankruptcy Court shall have entered a final order approving the DIP Facility (such order, in form and substance reasonably satisfactory to the DIP Lenders, the "**Final Order**"), and (v) the Interim Order or Final Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the DIP Lenders.

**Representations and Warranties:**

The DIP Documents will contain representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties deemed by the DIP Lenders reasonably appropriate to the specific transaction (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed.

**Affirmative Covenants:**

The DIP Documents will contain affirmative covenants customarily found in loan agreements for similar debtor in possession financings and other affirmative covenants deemed by the DIP Lenders to be reasonably appropriate to the specific transaction, subject to, where appropriate, materiality thresholds, carve-outs and exceptions to be agreed (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries).

**Negative Covenants:**

The DIP Documents will contain negative covenants customarily found in loan agreements for similar debtor in possession financings and other negative covenants deemed by the DIP Lenders to be reasonably appropriate to the specific transaction and where appropriate, subject to materiality thresholds, carve-outs and exceptions to be agreed (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries).

There will be no covenant relating to the Case milestones.

**Financial Covenant:**

The DIP Documents will contain a budget variance covenant to be agreed in the DIP Documents, with a

cushion of 115%.

**Reporting Requirements:** The DIP Documents will contain reporting requirements customarily found in loan documents for similar debtor in possession financings and other reporting requirements deemed by the DIP Lenders reasonably appropriate to the specific transaction, including, without limitation, (i) an initial 13 week budget satisfactory to the DIP Lenders (the "**Initial Budget**"), (ii) prior to the end of the initial 13 week period (and each 13 week period thereafter), a new 13 week budget satisfactory to the DIP Lenders (together with the Initial Budget, the "**Budget**"), and (iii) a weekly budget variance report.

**Events of Default:** The DIP Documents will contain events of default customarily found in loan agreements for similar debtor in possession financings and other events of default deemed by the DIP Lenders to be reasonably appropriate to the specific transaction (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries), including, with, where appropriate, customary grace periods and exceptions to be determined.

**Expenses and Indemnification:** The Borrower will indemnify the Administrative Agent, the DIP Lenders, their respective affiliates, successors and assigns and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "**Indemnified Person**") and hold them harmless from and against all costs, expenses (including reasonable and documented fees, disbursements and other charges of outside counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates) that relates to the DIP Facility or the transactions contemplated thereby; *provided* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from its gross negligence or willful misconduct.  In addition, (a) all out-of-pocket expenses (including, without limitation, reasonable and documented fees, disbursements and other charges of outside counsel and one financial advisor/testifying expert) for each of the Administrative Agent and the DIP Lenders in connection with the DIP Facility and the transactions contemplated thereby shall be paid by the Borrower from time to time, and (b) all out-of-pocket expenses (including, without limitation, documented fees, disbursements and other charges of outside counsel

and one financial advisor/testifying expert) for each of the Administrative Agent and the DIP Lenders, for enforcement costs and documentary taxes associated with the DIP Facility and the transactions contemplated thereby will be paid by the Borrower.

**Rights and Protections of the Administrative Agent:**

The Administrative Agent undertakes to perform such duties and only such duties as are specifically set forth in this Term Sheet and the DIP Documents. The Administrative Agent shall not be a trustee for or have any fiduciary obligation to any party hereto and the Administrative Agent shall take such action with respect to this Term Sheet as it shall be directed by Requisite Lenders, and the Administrative Agent shall not be liable except for the performance of such duties and obligations, and no implied covenants or obligations shall be read into this this Term Sheet and the DIP Documents against the Administrative Agent.

The Administrative Agent shall not be liable for any error of judgment made in good faith by an officer or officers of the Administrative Agent, unless it shall be conclusively determined by a court of competent jurisdiction that the Administrative Agent was grossly negligent in ascertaining the pertinent facts.

The Administrative Agent shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with any direction of the Requisite Lenders.

None of the provisions of this Term Sheet and the DIP Documents shall require the Administrative Agent to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it.

The Administrative Agent may conclusively rely and shall be fully protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

Whenever in the administration of the provisions of this Term Sheet the Administrative Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action to be taken hereunder, such matter (unless other evidence in respect

thereof be herein specifically prescribed) may, in the absence of gross negligence or bad faith on the part of the Administrative Agent, be deemed to be conclusively proved and established by a certificate signed by the Requisite Lenders delivered to the Administrative Agent and such certificate, in the absence of gross negligence or bad faith on the part of the Administrative Agent, shall be full warrant to the Administrative Agent for any action taken, suffered or omitted by it under the provisions of this Term Sheet upon the faith thereof.

Notwithstanding anything to the contrary herein, express or implied, the Administrative Agent shall have no duty to take any discretionary action or exercise any discretionary powers (including making any determination or deeming any matter appropriate, necessary or satisfactory) unless it first receives written direction from the Requisite Lenders.

**Assignments and Participations:**     Neither assignments nor participations shall require the consent of the Administrative Agent, the Borrower, or the Guarantors.

**Requisite Lenders:**     DIP Lenders holding at least a majority of the DIP Commitments (the "**Requisite Lenders**").

**Backstop Commitment Fee:**     In consideration for providing a backstop of the DIP Facility, each DIP Lender will receive a fee in the amount of its pro rata share (based on commitments for the DIP Facility on the date of the filing of any motion to approve the DIP Facility) of 3% of the total committed amount of the DIP Facility, to be paid in cash or OID, at the election of each DIP Lender.  Such fee will be fully earned upon entry of the Interim Order (for the Initial Amount) and upon entry of the Final Order (for the Final Amount).

**Administrative Agent Fees:**     The Administrative Agent shall receive all customary fees and expenses due and payable to the Administrative Agent as are set forth in, and in accordance with a letter agreement to be executed between the Borrower and the Administrative Agent (the "**Fee Letter**"), including, without limitation, the fees, expenses, and disbursements of Ropes & Gray LLP, as counsel to the Administrative Agent.

**Miscellaneous:**     The DIP Documents will include (i) standard yield protection provisions, (ii) waivers of consequential damages and jury trial, (iii) customary agency, set-off and sharing language, and (iv) other provisions customarily found in loan agreements for similar debtor-in-possession financings deemed by the DIP Lenders to be reasonably

Active 15335293.4

appropriate to the specific transaction.

<hr>

## SIGNIFICANT PROVISIONS

25.     As a condition to obtaining the proposed financing, the DIP Lenders and the

Debtors have agreed to certain provisions that may be considered significant provisions to be

highlighted to the Court and parties in interest for purposes of the Court's complex procedures

for chapter 11 cases.[5]  These provisions include the following:

- Priming of Liens.  The proposed Interim Order provides for liens under 364(d) that will prime the liens of the Prepetition Lenders.

- Payment of Fees and Expenses.  In connection with the provision of adequate protection for the Prepetition Lenders and agreements of the DIP Lenders, the Debtors will pay reasonable fees and expenses of counsel and financial advisors to such parties.

- Payment of Interest.  In connection with the provision of adequate protection for the Prepetition Lenders, the Debtors will pay the Pre-Petition Lenders interest under the Prepetition Financing Agreement at the non-default rate.

- Avoidance Actions.  Upon entry of a Final Order, the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code will be available for payment of the DIP Superpriority Claims and the Adequate Protection Claim.

- Commitment and Origination Fees.  As described above, the DIP Documents provide for a Commitment Fee for the DIP Lenders.

## BASIS FOR RELIEF

**A.     The Debtors Should be Authorized to Obtain Postpetition Financing through the DIP Documents**

  **i.     *Entry into the DIP Facility Is an Exercise of the Debtors' Sound and Reasonable Business Judgment***

26.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing.   Provided that an agreement to obtain secured credit does not

<hr>

[5] Attached as **Exhibit D** is the Attorney Checklist required under the complex procedures for chapter 11 cases.

undermine the policies underlying the Bankruptcy Code, courts grant a debtor considerable deference in the exercise of its sound business judgment in obtaining such credit. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires an exercise of "sound and reasonable business judgment"); *In re Monitor Dynamics, Inc.*, Case No. 10–51821, 2010 WL 4780375, (Bankr. W.D. Tex. June 30, 2010) (applying business judgment standard for post-petition financing); *In re Broadstar Wind Systems Group LLC*, No. 10–33373–BJH, 2010 WL 5208222 (Bankr. N.D. Tex. July 1, 2010) (same).

27.     Furthermore, in determining whether the Debtors have exercised sound business judgment in deciding to enter into the DIP Documents, the Court should consider the economic terms of the DIP Facility in light of current market conditions. *In re Lyondell Chem.* Co., Case No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009) (recognizing the terms that are now available for a DIP Facility aren't as desirable as in the past). The Court also may appropriately take into consideration the non-economic benefits of a proposed postpetition facility for a debtor and its stakeholders. For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. Relevant

> features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization. This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

28.    In exercising their business judgment, Debtors have determined that a financing transaction with their Noteholders represents the best strategic footing for these cases.

### ii.    The DIP Facility Represents the Best Available Financing

29.    As of the Petition Date, the proposed DIP Facility provides the Debtors and the estates the most favorable financing under the circumstances confronting the Debtors, and the Debtors' decision to enter into the DIP Facility was the result of an intensive effort by the Debtors and their professionals to obtain the best terms available. Indeed, in providing new money in the aggregate amount of up to $60 million, the DIP Facility will provide the Debtors with the significant and committed additional liquidity they need to continue as a going concern. Compared to other potential financing transactions, the DIP Documents present the Debtors with considerably greater value and flexibility going forward. The proposed DIP Financing Agreement is the best path forward for the Debtors to continue as a going concern and emerge from chapter 11. For these reasons, entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

   ***iii.***   ***The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis***

  30.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, postpetition financing on a secured or superpriority basis, or both. Specifically, section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

   (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;

   (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

   (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

  31.  To satisfy the requirements of section 364(c), a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D.

Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of Section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

32.     The Debtors attempted to secure financing on the best terms available.  But given the Debtors' urgent liquidity shortfalls, reporting challenges, and over-leveraged balance sheet, they were unable to do so other than on a secured superpriority basis.  The Court should therefore authorize the Debtors to provide the DIP Agent, on behalf of itself and the other DIP Lenders, a superpriority administrative expense status and liens for any obligations arising under the DIP Documents as provided for in Section 364(c)(1)–(3) of the Bankruptcy Code.

> ### *iv. The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First-Priority Priming Liens*

33.     In addition to authorizing financing under Section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain **such** credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1) (emphasis added).

34.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by Section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtor's assets. Courts consider a number of factors, including, without limitation:

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and proposed lenders; and

- whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See, e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649, at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (16th ed. rev. 2012).  The DIP Documents satisfy each of these factors.

35.     First, as described above, the Debtors and their advisors made good faith efforts to explore alternative financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing the Debtors require.  The Debtors and DIP Lenders negotiated the DIP Documents in good faith and at arm's-length in a competitive process with the Prepetition Lenders, and the DIP Documents reflect the most favorable terms on which the Debtors were able to obtain financing.  Adequate DIP financing with the certainty of a commitment upon the entry of the final order was not available on any basis other than priming.

36.     Second, the Debtors urgently need the funds to be provided under the DIP Facility to preserve and enhance the value of their estates for the benefit of all creditors and other parties in interest.  Absent immediate access to financing as substantial and favorable as the DIP Facility, the Debtors will be unable to operate their business or prosecute these Chapter 11 Cases.  Providing the Debtors with the liquidity necessary to preserve and enhance

their going concern value through the pendency of the Chapter 11 Cases is in the best interest of all stakeholders.

37.     Third, upon entry of the Interim Order, the DIP Facility will provide access to up to $25 million in incremental liquidity, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and relationships with key constituents notwithstanding the commencement of the Chapter 11 Cases and to continue the approved capital projects that are critical to the Debtors' ability to generate increased cash flow and continue to grow their international Proprietary Services business.  The terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring through the pendency of these Chapter 11 Cases.

38.     As described above, it is important to note that the DIP Facility does not seek to prime liens that, as of the Petition Date, were valid, enforceable, non-avoidable, and senior in priority to the liens of the Prepetition Lenders (the "Permitted Liens" under the Prepetition Financing Agreement) on DIP Collateral.  The only liens that the DIP Facility seeks to prime are those of the Prepetition Lenders, which, as described below, are adequately protected here.

*v.     The Interests of the Prepetition Lenders Are Adequately Protected*

39.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  *See* 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-

specific inquiry . . . left to the vagaries of each case . . . ."); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citations omitted)).

40.     To account for any potential diminution in value, the Debtors will provide several forms of consideration to the Prepetition Lenders and otherwise show that the Prepetition Lenders are adequately protected:

(a)     The Prepetition Lenders are Oversecured

41.     Where a secured lender enjoys an adequate equity cushion in its collateral, courts have held that such facts support a finding of adequate protection.  *In re Las Torres Development, L.L.C.*, 413 B.R. 687, 696 (Bankr. S.D. Tex. 2009) (applying the 20% equity cushion test to determine whether the secured lender was adequately protected); *In re Knight Energy Corp.*, Nos. 09–32163, 09–32165, 2009 WL 1851739, at *3 (Bankr. N.D. Tex. June 26, 2009) (same); *In re Matter of Mendoza*, 111 F.3d 1264, 1272 (5th Cir. 1997); *In re Snowshoe Co.*, 789 F.2d 1085 (4th Cir. 1986).

42.     In *In re Las Torres Development LLC*, this Court evaluated a creditor's objection to the debtor's use of cash collateral. After resolving that the debtors had not met the thresholds to satisfy any of the criteria set forth in sections 361(1), (2) or (3), the court "conclude[d] that the Lender is nevertheless adequately protected because § 361 is not limiting."  Specifically, the court noted that "case law is clear that an equity cushion of 20% or more constitutes adequate protection."  In a footnote, the court acknowledged that dicta in Fifth Circuit precedent also suggests taking into account other factors including the likelihood of depreciation or appreciation, insurance coverage, property tax payments, and the likelihood of a successful

reorganization. *In re Las Torres Development, L.L.C.*, 413 B.R. at 697, n.9. The *Las Torres* court discounted the value of metrics used by the debtor due to the lack of relevant facts on the record, but did not generally dispute their value in assessing adequate protection. The court then applied the parties' conservative valuations to the collateral in question and determined that the property had an equity cushion well in excess of 20% and thus the lender was adequately protected for the use of its cash collateral. *Id.*

43.    Here, the liens and other security interests under the Prepetition Financing Agreement encumber substantially all assets of the Debtors. The Prepetition Lenders claim that as of the Petition Date they are owed approximately $81.765 million. On an interim basis, the Debtors seek to borrow $25 million. The Debtors will show, if necessary at the first-day hearing, that based on the market value of their publicly traded securities, publicly available financial data, and testimony presented at the hearings on this Motion, that the Prepetition Lenders have a substantial equity cushion. That cushion, together with the other forms of consideration described below, constitutes adequate protection for purposes of sections 361, 363(e) and 364(d)(1)(B).

(b)    <u>Additional Liens</u>

44.    As adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral (as defined in the Interim Order), including any Cash Collateral, against any diminution in value of such interests, the Debtors will grant to the Prepetition Agent, for the benefit of itself and the Prepetition Lenders, continuing valid, binding, enforceable and automatically and properly perfected postpetition liens on the DIP Collateral, junior only to the DIP Liens (and subject to the Carve-out). Additionally, and to the extent necessary as determined by the Bankruptcy Court to protect the Prepetition Lenders to the extent of any diminution in the value of their pre-petition collateral as a result of the priming, the Debtors will

provide for the granting of liens in favor of the Prepetition Lenders on property of their non-debtor subsidiaries that is currently <u>not</u> encumbered by the liens and security of the Prepetition Lenders, including the proceeds of multi-million dollar customer contracts for work occurring in Brazil, Kurdistan and Canada.  Although the Prepetition Lenders currently hold pledges of some of the equity in such subsidiaries, they do not have liens on the operating assets, and thus are currently subordinated to all other creditors of such subsidiaries.

(c)    <u>Superpriority Administrative Claims</u>

45.    As further adequate protection of the interests of the Prepetition Agent and Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests on account of the priming liens and use of Cash Collateral, to the extent any obligations under the Prepetition Financing Agreement are outstanding, the Prepetition Lenders shall be granted as and to the extent provided by Sections 503(b) and 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in the Chapter 11 Cases, junior only to the claims and rights afforded to the DIP Lenders and subject to the Carve-out.

(d)    <u>Payment of Interest and Fees</u>

46.    The Debtors and DIP Lenders have agreed to include in the DIP Budget the payment of (i) post-petition interest under the Prepetition Financing Agreement at the non-default rate and (ii) reasonable fees and expenses of the attorneys and a financial advisor to the Prepetition Agent.  Such post-petition payments further support a finding that the Prepetition Lenders are adequately protected for the purposes of sections 363(e) and 364(d)(1)(B).

(e)    <u>Other Factors</u>

47.    This Court has recognized that other factors may be considered when determining whether a secured creditor is adequately protected, including the likelihood of depreciation or appreciation of collateral, sufficient insurance coverage, property tax payments, and the

likelihood of a successful reorganization.  *In re Las Torres Development, L.L.C.*, 413 B.R. at

697.  The DIP Documents will include covenants and other provisions providing regarding,

among other things, the maintenance of sufficient insurance, payment of post-petition taxes, and

maintenance of existing cash management systems, and provide the liquidity bridge necessary

for a successful exist from chapter 11.  The Debtors submit that such terms also support a finding

of adequate protection.

**B.      The Debtors Should Be Authorized to Use the Cash Collateral**

48.      Section 363(c)(2) of the Bankruptcy Code restricts a debtor's use of a secured

creditor's cash collateral.  Specifically, that provision provides, in pertinent part, as follows:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A)  each entity that has an interest in such cash collateral
> consents; or
>
> (B) the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this
> section [363].

11 U.S.C. § 363(c)(2).  Further, Section 363(e) of the Bankruptcy Code provides that "on request

of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee,

the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is

necessary to provide adequate protection of such interest."  *Id.* § 363(e).

49.      The Debtors satisfy the requirements of subsections (c)(2) and (e) of Section 363

of the Bankruptcy Code, and should be authorized to use the Cash Collateral.  For the same

reasons stated above, the Prepetition Lenders' interests in the Cash Collateral are adequately

protected in satisfaction of Section 363(e) of the Bankruptcy Code.  The Debtors are providing

replacement liens on the DIP Collateral and the Prepetition Collateral, including Cash Collateral,

which adequately protects the Prepetition Lenders' interests in the Prepetition Collateral from

diminution caused by the DIP Facility.  Accordingly, the Court should authorize the Debtors to use the Cash Collateral under Section 363(c)(2) of the Bankruptcy Code.

### C.    Debtors Should Be Authorized to Pay Certain Commitment Fees

50.    As described above, the Debtors agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their providing the DIP Facility.  Specifically, in consideration for providing the DIP Facility, each DIP Lender will receive a fee in the amount of its pro rata share (based on commitments for the DIP Facility on the date of the filing of this Motion) of 3% of the total committed amount of the DIP Facility, to be paid in cash or OID, at the election of each DIP Lender.  Such fee will be fully earned upon entry of the Interim Order (for the Initial Amount) and upon entry of the Final Order (for the Final Amount).  The fees the Debtors have agreed to pay to the DIP Lenders and the other obligations under the DIP Documents represent the most favorable terms to the Debtors on which the Debtors could procure DIP financing.  Specifically, these fees are on more favorable terms than those proposed by the Prepetition Lenders.  The Debtors considered the fees described above when determining in their sound business judgment that the DIP Documents constituted the best terms on which the Debtors could obtain the financing necessary to continue their operations and prosecute these cases.  Paying these fees in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors, and other parties in interest.

51.    Courts routinely authorize debtors to pay consent or origination fees similar to those the Debtors propose to pay, where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates.  *See, e.g.*, *In re MPF Holding US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (approving a commitment fee); *see also In re InSight Health Servs. Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011)

(approving 2.0% DIP closing fee); *In re NR Liquidation III Co. (f/k/a Neff Corp.)*, Case No. 10-12610 (Bankr. S.D.N.Y. June 30,2010) (approving 3.1% DIP and exit facility fee); *In re Lear Corp.*, Case No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up-front fee and a 1.0% exit/conversion fee); *In re Gen. Growth Props., Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); *In re Aleris Int'l Inc.*, Case No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%); *In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Jan. 28, 2008) (approving a 2.5% fees related to refinancing and extending a postpetition financing facility); *In re DJK Residential, Inc.*, Case No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with postpetition financing).

52.     Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Documents in connection with entering into those agreements.  Importantly, ***these fees are the only fees that the DIP Lenders are receiving***.

### D.     The Scope of the Carve-Out is Appropriate

53.     As further provided in the proposed Interim Order, the DIP Facility would subject the security interests and administrative expense claims of the DIP Lenders to the Carve-Out in an aggregate amount up to $250,000 after an event of default under the DIP Documents, and before such time in an amount equal to the thirteen-week DIP Budget and allowed by the Bankruptcy Court.  Such carve-outs for professional fees and other costs of administering chapter 11 cases have been found to be reasonable and necessary to ensure that a debtor's estate

and any statutory committee can obtain appropriate assistance from counsel and other professionals. *See, e.g.*, *Ames*, 115 B.R. at 40; *In re United Retail*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 1, 2012); *In re Eastman Kodak Co*., Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Gen. Maritime Corp*., Case No. 11-15285 (Bankr. S.D.N.Y. Nov. 17, 2011). The proposed Carve-Out was thoroughly negotiated at arm's length.  It  is in a reasonable amount to protects against administrative insolvency during the Chapter 11 Cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors' and the Statutory Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

### F.      The DIP Lenders Should Be Deemed Good Faith Lenders

54.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) provides as follows:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

55.    As explained herein and in the Gore Declaration, the DIP Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed postpetition financing, and of extended arm's- length, good faith negotiations between and among the Debtors, the DIP Agent, the DIP

Lenders, the Prepetition Agent and the Prepetition Lenders.  The terms and conditions of the DIP Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Documents other than as described in this Motion and the proposed Interim Order.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of Section 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

### G.    Modification of the Automatic Stay is Warranted

56.    The DIP Documents and the proposed Interim Order contemplate that the automatic stay arising under Section 362 of the Bankruptcy Code shall be modified, upon the occurrence and during the continuation of any Termination Event, so that  the DIP Agent, with the consent of the DIP Lenders, shall be entitled to exercise its rights and remedies in accordance with the DIP Documents and the Interim Order and shall be permitted to satisfy the DIP Superpriority Claim and all DIP Obligations, subject to the Carve-Out.  The Interim Order provides, however, that the DIP Lenders must provide the Debtors with ten business days' prior written notice before exercising any enforcement rights or remedies, which will entitle the Debtors and the Statutory Committee to seek an emergency hearing with the Court for the sole purpose of contesting whether, in fact, a Termination Event has occurred and is continuing.

57.    Stay modification provisions of this sort are ordinary features of postpetition financing arrangements, and, in the Debtors' business judgment, are reasonable under the circumstances. *See, e.g.*, *In re MPF Holdings US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 18, 2009) (final order modifying automatic stay); *see also In re United Retail Grp., Inc.*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 22, 2012); *In re MSR Resort Golf Course LLC*, Case

No. 11-10372 (Bankr. S.D.N.Y. Jan. 25, 2012); *In re InSight Health Servs. Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011); *In re Gen. Growth Props. Inc.*, Case No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); *In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009).

**H.     The Debtors Require Immediate Access to the DIP Facility**

58.     The Court may grant interim relief in respect of a motion filed pursuant to Section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions.  *See Ames Dep't Stores*, 115 B.R. at 36.

59.     The Debtors and these estate will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $25 million under the DIP Facility, is not granted promptly after the Petition Date.  The Debtors have insufficient cash to fund operations without immediate access to the DIP Facility.  Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on its free cash as a result of, among other things, the costs of administering the Chapter 11 Cases, addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of the cases and making the payments authorized by other orders entered granting the Debtors' first day motions.

60.     In addition, the Debtors require immediate access to at least $25 million in order to assure operations continue uninterrupted.  Failure to obtain immediate access to these funds would likely cause work on critical projects to stop, and the Debtors believe that delay

would not be limited to time between the Petition Date and the Final Hearing.  Any material delay in completing currently scheduled projects c ould be devastating to the Debtors' prospects for reorganization.

61.     Accordingly, the Debtors have an immediate need for access to the DIP Facility on an interim basis to, among other things, continue the operation of their business, fund fees and expenses necessary to obtain the DIP Facility, maintain relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain enterprise value for the benefit of all parties in interest.

62.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this and other districts in similar circumstances.  *See, e.g., In re N. Bay Gen. Hosp., Inc.*, Case No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis); *In re MPF Holding US LLC*, Case No. 08-36084 (Bankr. S.D. Tex. Feb. 3, 2009) (same); *see also In re United Retail Grp., Inc.*, Case No. 12-10405 (Bankr. S.D.N.Y. Feb. 2, 2012) (order approving postpetition financing on an interim basis); *In re MSR Resort Golf Course LLC*, Case No. 11-10372 (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010) (same); *In re The Reader's Digest Assoc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Aug. 26, 2009) (same).  Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under Bankruptcy Rule 4001(b) and (c).

I.      **Request for Final Hearing.**

63.     Pursuant to Bankruptcy Rule 4001(c), the Debtors request that the Court set a date that is no longer than 45 days from the entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

64.     The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the parties listed below in the Notice section.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

## REQUEST FOR WAIVER OF STAY

65.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this motion. Pursuant to Bankruptcy Rule 6004(h), "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." As set forth above, the DIP Facility is essential to prevent irreparable damage to the Debtors' operations, value and ability to reorganize. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

## NOTICE

66.     Notice of this Motion has been provided by overnight delivery to: (a) the Debtors and the Debtors' professionals; (b) the United States Trustee for the Southern District of Texas; (c) any debtor-in-possession lender in these Chapter 11 Cases; (d) TPG Specialty Lending, Inc. and its counsel; (e) Tennenbaum Capital Partners, LLC and its counsel; (f) Bank of New York Mellon Trust Company, N.A. as indenture trustee; (g) the 30 largest unsecured creditors of the

Debtors on a consolidated basis; (h) the Securities and Exchange Commission; (i) the Internal Revenue Service; (j) all statutory committees appointed in these Chapter 11 Cases; (k) all parties requesting notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (l) all parties on whom the Court orders notice.  The Debtors believe that the notice provided for herein is fair and adequate and no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Date:  March 25, 2014

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ C. Luckey McDowell
C. Luckey McDowell, State Bar No.  24034565
Omar Alaniz, State Bar No. 24040402
Ian E. Roberts, State Bar No. 24056217
2001 Ross Avenue
Dallas, Texas  75201
Telephone:  214.953.6500
Facsimile:  214.953.6503
Email: luckey.mcdowell@bakerbotts.com
        omar.alaniz@bakerbotts.com
        ian.roberts@bakerbotts.com

JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.

Shelby A. Jordan, State Bar No. 11016700
Nathaniel Peter Holzer, State Bar No. 00793971
Suite 900, Bank of America
500 North Shoreline
Corpus Christi, Texas 78471
Telephone:  361.884.5678
Facsimile:  361.888.5555
Email: sjordan@jhwclaw.com
        pholzer@jhwclaw.com

**PROPOSED COUNSEL TO DEBTORS-IN-POSSESSION**