IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § § | Chapter 11 |
| AUTOSEIS, INC., *et al.*[1] | § § | Case No. 14-20130 |
| Debtors. | § § § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS (1) ESTABLISHING PROCEDURES FOR TRANSFERS OF EQUITY SECURITIES; (2) ESTABLISHING AN EFFECTIVE DATE FOR NOTICE AND SELL-DOWN PROCEDURES FOR TRANSFERS OF CLAIMS AGAINST THE DEBTOR'S ESTATE; AND (3) GRANTING RELATED RELIEF**

**NOTICE UNDER BLR 9013-1(b) AND 9013-1(i)**

THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.

---

[1] The Debtors in these chapter 11 cases are: Autoseis, Inc. (5224); Global Geophysical Services, Inc. (4281); Global Geophysical EAME, Inc. (2130); GGS International Holdings, Inc. (2420); Accrete Monitoring, Inc. (2256); and Autoseis Development Company (9066).

Autoseis, Inc. ("Autoseis") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move for entry of interim and final orders: (1) Establishing Procedures For Transfers of Equity Securities; (2) Establishing An Effective Date for Notice of Sell-Down Procedures for Transfers of Claims Against the Debtors' Estates and (3) Granting Related Relief (the "Motion").[2] In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2). Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL STATUS

2. On March 25, 2014 (the "Petition Date"), the Debtors filed voluntary petitions for relief in this Court under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3. The Debtors remain in possession of their property and are operating their business as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been requested or appointed in this chapter 11 case.

---

[2] Capitalized terms used but not otherwise defined herein have the meaning attributed to them in the *Declaration of Sean M. Gore in Support of First Day Motions* filed contemporaneously herewith

Active 15348083.2

**BACKGROUND**

4.     A detailed description of the Debtors' business, capital structure, and the events leading to these chapter 11 cases is fully set forth in the First Day Declaration and is incorporated herein by reference.

**RELIEF REQUESTED**

5.     The Motion seeks to enforce the automatic stay by implementing narrowly-tailored procedures intended to preserve a valuable asset of this estate:  An approximate $250 million net operating loss and other valuable tax attributes.  In order to formulate a plan of reorganization that maximizes the use of valuable Tax Attributes (defined below), the Debtors request entry of interim and final orders establishing (a) procedures with respect to the ownership, acquisition and disposition of beneficial interests in equity securities in GGS and (b) an effective date for notice and potential sell-down procedures for transfers of claims so that the Debtors have the ability to formulate a plan of reorganization that maximizes the use of their Tax Attributes (the "Record Date Order").  The targeted equity trading procedures sought herein are intended to give the Debtor the ability to monitor and object to proposed stock transfers that jeopardize the estate's use of the Tax Attributes.

**BASIS FOR RELIEF**

6.     Global Geophysical Services, Inc. ("GGS"), the Debtors' parent company and also a debtor in these cases, is publicly traded on the NYSE.  As of March 21, 2014, there were approximately 38.12 million shares of GGS common stock outstanding, with a total market capitalization of approximately $18.6 million.  In addition to having publicly-traded equity, GGS has approximately $250 million in publicly-traded unsecured bond debt.

7.     The Debtors have incurred significant net operating losses ("NOLs") on a consolidated basis of approximately $250 million as of December 31, 2013, and may have

substantial net unrealized built-in losses in their assets (the "Built-in Losses") and other tax attributes, including business income tax credits ("Tax Credits" and together with the NOLs and Built-in Losses, the "Tax Attributes").[3]

8. The Debtors may lose the ability to use these Tax Attributes if they experience an "ownership change" for federal income tax purposes (as described more fully below). To prevent this loss of estate property—and pursuant to Sections 105, 362, and 541 of the Bankruptcy Code—the Debtors request Court approval of procedures to govern the trading of equity interests in GGS during the pendency of the chapter 11 cases. The Debtors may also ultimately need to seek an order (a "Sell-Down Order") with respect to claims trading to protect and preserve the potential value of the Tax Attributes, and this Motion is intended to give advanced notice of such possibility.

9. Under federal income tax law,[4] transfers of beneficial interests in equity securities in the Debtors ("Equity Securities") or transfers of claims against the Debtors could adversely affect the Debtors' tax attributes if:

(a) multiple 5-percent or greater blocks of Equity Securities are created, or too many shares are added to or sold from such blocks, such that, together with previous transfers by 5-percent shareholders during the preceding three-year period, an ownership change within the meaning of IRC Section 382 is triggered prior to consummation, and outside the context, of a confirmed chapter 11 plan; or

(b) the beneficial ownership of claims against the Debtors that are currently held by "Qualified Creditors," as defined for U.S. federal income tax purposes,[5] is transferred prior to consummation of a chapter 11 plan, and those claims (either alone or when accumulated with other claims currently held by non-qualified creditors) would be converted under a

---

[3] The Debtors also have substantial non-U.S. net operating loss carry forwards and state loss carry forwards with various expiration periods and certain foreign tax credit carry forwards.
[4] Similar adverse consequences may also apply under applicable state income tax laws.
[5] *See* IRC Section 382 and Treasury Regulation 1.382-9.

chapter 11 plan into a 5-percent or greater block of the stock of any reorganized Debtor.[6]

10. The procedures requested by this Motion are intended to give Debtors the ability, if necessary, to object to proposed transfers of Equity Securities that could potentially jeopardize the estates' use of valuable Tax Attributes.

11. At this stage, it is too early to determine whether it will be necessary for the Debtors to seek a Sell-Down Order. The Debtors' determination of whether to seek such an order will most likely occur after a plan of reorganization is formulated. Accordingly, this Motion does not seek entry of a Sell-Down Order. This Motion merely seeks to establish a "<u>Record Date</u>,"[7] and to give notice to persons or entities that subsequently trade claims against the Debtors that their claims ultimately may be subject to a Sell-Down Order. For the avoidance of doubt, the only purpose of the Record Date Order is to set and provide notice of the Record Date, which will serve as a placeholder should the Debtor later determine that a Sell-Down Order will be necessary to preserve valuable Tax Attributes. If the Debtors determine that a Sell-Down Order is necessary, the Debtors will file and serve a motion requesting entry of Sell-Down Order applicable to all claims traded after the Record Date.

### A. The Significance of the Debtors' Tax Attributes

12. Pursuant to Sections 39(a), 59(e), 172(b), and 904(c) of the Internal Revenue Code of 1986 (as amended, the "<u>IRC</u>"), the Debtors may be able to carry back and then forward the Tax Attributes to offset future taxable income and tax liability so that they may obtain a cash refund and improved liquidity in the future. For instance, the Debtors can carry back NOLs two taxable years to obtain a cash refund of federal income taxes previously paid in those years and

---

[6] A "qualified creditor" is generally one who (a) has held its claim continuously since at least 18 months prior to the petition date or (b) has held a claim incurred in the ordinary course of the debtors' business since the claim was incurred. *See* IRC § 382(l)(5)(E); Treas. Reg. § 1.382-9(d).

[7] The Record Date is the date the proposed Record Date Order is entered.

Active 15348083.2

carry forward any remaining NOLs to offset future taxable income for up to 20 taxable years, thereby potentially recovering cash for the benefit of the estates and potentially reducing the Debtors' future aggregate tax obligations to the extent NOLs remain available to be carried forward.[8] The Debtors may also use the NOLs to offset any taxable income generated by transactions completed during the chapter 11 cases. In addition, the Debtors may use the Built-in Losses and/or Tax Credits to offset their tax liabilities.

13. The Debtors estimate that the NOL carry-forwards are approximately $250 million as of December 31, 2013. Thus, the Debtors' Tax Attributes may prove to be a valuable asset to the company's business and efforts to maximize the recovery of its stakeholders. Depending on the value of the Debtors, they may also own assets with Built-in Losses. These losses are economically equivalent to NOL carryovers because a loss recognized on the disposition of an asset may be used to offset other taxable income.[9] Net unrealized Built-in Losses that are not subject to limitation under the IRC could translate into future tax savings of millions of dollars for the Debtors by reducing cash taxes the reorganized Debtors pay after emergence.

### B. Limitations on Use of Tax Attributes

14. Section 382 of the IRC limits a company's ability to utilize its Tax Attributes if an "ownership change" occurs with respect to the company's stock. To the extent transfers of equity securities or claims results in an "ownership change" within the meaning of Section 382 of the IRC, such trading or transfers could severely limit or even eliminate the Debtors' ability to utilize applicable Tax Attributes and lead to significant negative consequences for the Debtors, their estates, and the overall reorganization process.

---

[8] *See* 26 U.S.C. § 172.
[9] *See* 26 U.S.C. §§ 165, 1001.

15. Very generally, an "ownership change" occurs if the percentage (by value) of the stock of a corporation owned by one or more shareholders holding 5% of the stock increases by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change.

16. Although Section 382 of the IRC imposes annual limitations on a taxpayer's use of its Tax Attributes, Section 382 also provides significant relief to a debtor if an ownership change occurs in the context of a confirmed chapter 11 plan. Under Section 382(l)(5) of the IRC, a debtor corporation is not subject to the general limitation imposed by Section 382 with respect to an ownership change if, as a result of the transactions contemplated by a reorganization plan, historic stockholders and/or the corporation's "qualified creditors" own at least 50% of the total value and voting power of the reorganized debtor's stock (the "Section 382(1)(5) Exception"). *See* IRC § 382(l)(5)(A).

17. If the Debtors are unable to take advantage of the Section 382(1)(5) Exception and an ownership change is deemed to have occurred during the course of the chapter 11 cases, Section 382 of the IRC would limit the amount of taxable income that the Debtors could offset by the "pre-change losses" in taxable years (or a portion thereof) to an annual amount equal to the value of the corporation prior to the ownership change multiplied by the long-term tax exempt rate. *See* 26 U.S.C. § 382(b). The Debtors' "pre-change losses" would include (a) the NOLs, (b) the Built-in Losses, and (c) the Tax Credits. Section 382 would also limit the amount of income that the Debtors could offset by pre-change Built-in Losses recognized during the first five years after the date of an ownership change.[10]

---

[10] Similarly, if an ownership change were to occur, Section 383 of the IRC would limit the amount of tax liability that the Debtors could offset by their Tax Attributes to the liability attributable to the amount of income that could have been offset by pre-change losses, but was not so offset.

18.     Notably, the Debtors' ability to use Built-in Losses could be significantly limited if the Debtors are unable to take advantage of the Section 382(1)(5) Exception. Under the Section 382(l)(5) Exception, the Debtors need to ensure that historic shareholders and/or the Debtors' "qualified creditors" hold at least 50 percent of its stock immediately after emergence to preserve the majority of its Tax Attributes. The Record Date Order is designed to preserve the Debtors' ability to request this relief if they subsequently determine that a Sell-Down Order is necessary to satisfy the Section 382(1)(5) Exception.

        **C.**     **Proposed Procedures for Trading in Equity Securities**

19.     By establishing procedures for continuously monitoring the trading of Equity Securities, the Debtors can preserve the ability to seek substantive relief at the appropriate time, particularly if it appears that additional trading may jeopardize the use of their Tax Attributes. Accordingly, the Debtors request that this Court enter an order establishing the following procedures (collectively, the "Procedures for Trading in Equity Securities"):

a. Any entity (as defined in Section 101(15) of the Bankruptcy Code) who currently is or becomes a Substantial Shareholder (as such term is defined in paragraph (e) below) must file with the Court, and serve upon the Debtors' counsel, a declaration of such status, substantially in the form of **Exhibit A** attached to the Interim Order (each, a "Declaration of Status as a Substantial Equityholder"), on or before the later of (i) 30 days after the date of the Notice of Order (as defined herein) and (ii) ten days after becoming a Substantial Shareholder.

b. Prior to effectuating any transfer of Equity Securities that would result in an increase in the amount of Equity Securities of which a Substantial Shareholder has Beneficial Ownership or would result in an entity becoming a Substantial Shareholder, such Substantial Shareholder or other entity must file with the Court, and serve upon the Debtor's counsel, an advance written declaration of the intended transfer of Equity Securities in the form of **Exhibit B** attached to the Interim Order (each, a "Declaration of Intent to Purchase, Acquire or Otherwise Accumulate Equity Securities").

c. Prior to effectuating any transfer of Equity Securities that would result in a decrease in the amount of Equity Securities of which a Substantial Shareholder has Beneficial Ownership or would result in an entity ceasing to be a Substantial Shareholder, such Substantial Shareholder must file with the Court, and serve

upon the Debtor's counsel, an advance written declaration of the intended transfer of Equity Securities in the form of **Exhibit C** to the Interim Order (each, a "Declaration of Intent to Sell, Trade, or Otherwise Transfer Equity Securities" and with a Declaration of Intent to Purchase, Acquire or Accumulate Equity Securities, each, a "Declaration of Proposed Transfer").

d. The Debtors shall have ten business days after receipt of a Declaration of Proposed Transfer to file with the Court and serve on such Substantial Shareholder an objection to any proposed transfer of Equity Securities described in the Declaration of Proposed Transfer on the grounds that such transfer might adversely affect the Debtors' ability to utilize their Tax Attributes. If the Debtors file an objection, such transaction would not be effective unless the Debtors withdraw their objection or such transaction is approved by a final order of the Court that becomes nonappealable. If the Debtors do not object within such 10-day period, such transaction could proceed solely as set forth in the Declaration of Proposed Transfer. Further transactions within the scope of this paragraph must be the subject of additional notices in accordance with the procedures set forth herein, with an additional 10-business day waiting period for each Declaration of Proposed Transfer.

e. For purposes of these procedures, (i) a "Substantial Shareholder" is any entity that has Beneficial Ownership of at least 1.7 million shares of GGS's common stock (representing approximately 4.5% of all issued and outstanding shares); (ii) "Beneficial Ownership" shall be determined in accordance with the applicable rules of IRC §382 and the regulations there under; and (iii) an "Option" to acquire stock includes any contingent purchase, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock or similar interest, regardless of whether it is contingent or otherwise not currently exercisable.

20. No later than five business days following entry of the Interim Order, the Debtors shall serve by first-class mail, postage prepaid notice of the Interim Order (the "Notice of Order") to (i) the Securities and Exchange Commission; (ii) the Internal Revenue Service; and (iii) all registered holders of equity securities in GGS (with instructions to serve their beneficial owners). Additionally, no later than five business days following entry of the Final Order, the Debtors shall serve notice of the Final Order (the "Notice of Final Order") to the same entities that received the interim Notice of Order.

21. Any entity or broker or agent acting on such entity's behalf who sells in excess of 400,000 shares of GGS common stock (i.e., approximately 1% of such outstanding common

stock) to another entity shall be required to serve a copy of the Notice of Order or Notice of Final Order, as applicable, on such purchaser of such Equity Securities or any broker or agent acting on such purchaser's behalf.

22. The Interim Order may be granted on an interim basis pending this Court's entry of a Final Order. This will allow parties in interest to file an objection pursuant to the procedures set forth in the Interim Order and seek to be heard with respect to this motion, if necessary. If no objections are timely filed (or if any such timely filed objections are withdrawn before a hearing), the Debtors request that the Court enter in the Final Order at the Final Hearing. If the Court enters the Final Order, the Debtor shall serve a Notice of Order modified to reflect that the Final Order has been entered (as modified, the "Notice of Final Order") to the same entities that received the Notice of Order.

### D. Notice and Summary of Potential Sell-Down Procedures

23. The Debtors anticipate that after formulation of a detailed proposed plan of reorganization, they may need to seek entry of a Sell-Down Order that will enable them to determine whether the Debtors will qualify for the Section 382(1)(5) Exception and, if necessary, require Substantial Claimholders to "sell-down" unsecured claims to the extent necessary to allow the Debtor to qualify for the Section 382(1)(5) Exception (the "Sell-Down Procedures"). Based solely on a preliminary analysis, a "Substantial Claimholder" is any person or entity that has acquired unsecured claims against the Debtor during these chapter 11 cases in the amount equal to or greater than $15 million[11] (the "Threshold Amount")[12] such that the holders of such

---

[11] $15 million is the product (with rounding) of (x) $350 million (the Debtors' outstanding liabilities that could potentially be converted into equity under a potential plan of reorganization) and (y) 4.5 percent. The Debtors believe it appropriate to be very conservative in making this calculation at this early stage of the proceedings, since the Debtors' enterprise value is not currently known and, as a result, it cannot be determined whether or to what extent any of its debt may be converted to equity.

[12] Because the Threshold Amount is based on a preliminary analysis as of the Petition Date, the Debtors reserve the right to increase or decrease the Threshold Amount in the Sell-Down Procedures.

claims would be entitled to receive more than 4.5% of the equity of any reorganized Debtor. The amount of claims held by a Substantial Claimholder as of the Record Date would constitute the "Protected Amount."

24. Any potential Sell-Down Procedures would require a Substantial Claimholder to provide the Debtors with limited information, such as the size of its claim and the date such claim was acquired. Claimholders would never be required to sell down their claims below the Threshold Amount or the Protected Amount, whichever is greater. In other words, the Debtors would propose that the Sell-Down Procedures apply only to persons or entities that acquire claims in excess of the Threshold Amount after entry of the proposed Record Date Order and with full notice of the possibility that the claims they acquire could be subject to sell-down if the Debtors later determine the Sell-Down Procedures are necessary.

25. If the Sell-Down Procedures prove to be necessary, the Debtors would seek to require certain claimholders to provide updated holdings information shortly after the date on which the Court approves a disclosure statement for a plan of reorganization that proposes to utilize the Section 382(l)(5) Exception. Based on the updated holdings information, the Debtors would then determine whether it would be necessary to require Substantial Claimholders to sell down a portion of their holdings to preserve the Tax Attributes. The Debtors would only require a sell-down if it were deemed necessary for the Debtors to qualify for the Section 382(l)(5) Exception, and in no event would the Debtors seek to require a claimholder to sell-down claims below its Protected Amount.

26. Any Sell-Down Procedures the Debtor would propose would provide an adequate opportunity and notice for claimholders to sell down their claims without triggering an unreasonable adverse impact on the value of such claims. Specifically, if a claimholder were

required to sell down its holdings, the claimholder would have until shortly before the Debtor consummates a reorganization plan to effectuate the sell-down.  Moreover, entry of the proposed Record Date Order at the commencement of the chapter 11 cases will provide claimants with advance notice prior to any opportunity to trade claims that any claims against the Debtor purchased after entry of the Record Date Order may ultimately be subject to Sell-Down Procedures.

        E.        **The Proposed Procedures for Trading in Equity Securities and the Record Date Order are Narrowly Tailored**

        27.        The establishment of the Procedures for Trading in Equity Securities does not bar transfers of equity in the Debtors, and the procedures will only be in effect until the Debtors emerge from chapter 11.  At this time, the Debtors seek only to establish procedures enabling them to monitor transfers of equity in the Debtors that pose a serious risk to their Tax Attributes under section 382 of the IRC, so as to preserve the opportunity for substantive relief at the appropriate time.  The procedures requested by the Debtors ultimately would permit most transfer of equity in the Debtors, subject only to applicable securities, corporate, and other laws.

        28.        Approval of the proposed Record Date does not constitute approval of any Sell-Down Procedures with respect to claims trading, or even endorse the notion of Sell-Down Procedures.  Moreover, the Record Date Order will not impose a burden on any party since the Record Date Order alone, without a Sell-Down Order, will not affect the rights of any party.  As stated above, the Record Date Order merely establishes the Record Date as the effective date for any Sell-Down Procedures established in the future, and provides notice to claimholders and claims traders that if the Debtors eventually request and the Court ultimately approves Sell-Down Procedures, the ownership of claims will be measured as of the Record Date and the

claimholders may be subject to a required sell-down of any claims purchased after the Record Date.

**SUPPORTING AUTHORITY**

A.  **The Tax Attributes are Property of the Debtors' Estates**

29.  Courts have held that a debtor's interest in the right to carry forward its Tax Attributes constitutes property of the estate under Section 541 of the Bankruptcy Code and, as such, have the authority to implement protective measures to preserve this right. *See, e.g., Official Comm. of Unsecured Creditors v. PSS Steamship Co. (In re Prudential Lines, Inc.)*, 928 F.2d 565 (2d Cir. 1991), *cert. denied*, 502 U.S. 821 (1991) (debtor's right to NOL carryforward was property of its estate); *In re Delta Air Lines, Inc.*, No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005) (holding non-NOL tax credit carry forwards were property of the debtors' estates and approving notification procedures and restrictions on certain transfers of claims against and interests in the debtors to protect the tax credits). Because the Debtors' Tax Attributes are property of their estates, the Debtors have a duty to take steps to preserve them.

30.  Moreover, the automatic stay prohibits "any act" to exercise control over property of the estate, including Tax Attributes. Accordingly, "where a non-Debtors' action with respect to an interest that is intertwined with that of a bankruptcy debtor would have the legal effect of diminishing or eliminating property of the bankrupt estate, such action is barred by the automatic stay." *Prudential Lines*, 928 F.2d at 574 (quoting *48th St. Steakhouse v. Rockefeller Group, Inc. (In re 48th St. Steakhouse, Inc.)*, 835 F.2d 427, 431 (2d Cir. 1987)). The Second Circuit in *Prudential*, in upholding the application of the automatic stay and enjoining debtor's parent from taking action that would adversely affect the debtor-subsidiary's NOLs, therefore, held that "despite the fact that the [parent corporation's] action is not directed specifically at [the debtor-subsidiary], it is barred by the automatic stay as an attempt to exercise control over property of

the estate." *Id*. The Second Circuit went on to uphold the permanent injunction set forth by the bankruptcy court as an exercise of the court's equitable powers under Bankruptcy Code § 105, and supported the bankruptcy court's finding that impairing the debtor's ability to apply its NOL carry-forwards to offset income on future tax returns would impede its reorganization. *Id.*

31. Similarly, in *In re Phar-Mor, Inc.,* 152 B.R. 924 (Bankr. N.D. Ohio 1993), the chapter 11 debtors moved to prohibit any transfer of the debtors' stock that could have an adverse effect on the debtors' ability to utilize NOL carryovers. The court held that the NOL qualified as property of the estate and issued an injunction enforcing the automatic stay. Significantly, the court granted the relief requested even though the stockholders did not state any intent to sell their stock and even though the debtors did not show that a sale was pending that would trigger the prescribed change in ownership under Section 382. *Id.* at 927. Despite the uncertainty of the applicability of Section 382 at that time, the court observed that "[w]hat is certain is that the NOL has *potential value, as yet undetermined*, which will be of benefit to creditors and will assist the Debtors in their reorganization process. This asset is entitled to protection while the Debtors move forward toward reorganization." *Id*. (emphasis added). The court also concluded that because the debtors sought to enforce the stay, they did not have to meet the more stringent requirements for the granting of a preliminary injunction:

> The requirements for enforcing an automatic stay under 11 U.S.C. § 362(a)(3) do not involve such factors as lack of an adequately remedy at law, or irreparable injury, or loss and likelihood of success on the merits. The key elements for a stay … are the existence of property of the estate and the enjoining of all efforts by others to obtain possession or control of the estate.

*Id.* at 926 (quoting *In re Golden Distribs., Inc*., 122 B.R. 15,19 (Bankr. S.D.N.Y. 1990)). This Court, therefore, has the authority under Section 362 of the Bankruptcy Code to enforce the

automatic stay by taking steps to restrict the transfer of equity or claims that could jeopardize the existence and value of the Tax Attributes.

32. Based on these rationales, courts in this District and elsewhere have granted relief similar to that sought by this Motion. *See e.g., In re ATP Oil and Gas Corporation*, Case No. 12-36187 (MI) (Bankr. S.D. Tex. Mar. 1, 2013) (approving notification procedures for equity securities and setting claims record date for later sale down order); *In re Crusader Energy Group*, Case No. 09-31797 (BJH) (Bankr. N.D. Tex. Sept 17, 2009) (approving notification procedures and sanctions); *In re Energy Partners Ltd.*, Case No. 09-32957 (Bankr. S.D. Tex. June 10, 2009) (same); *In re Gadzooks, Inc.*, Case No. 04-31486 (HDH) (Bankr. N.D. Tex. June 21, 2004); *In re Mirant Corporation, et al.,* Case No. 03-46590 (DML) (Bankr. N.D. Tex. 2004); *In re Hawker Beechcraft, Inc.*, Case No. 12-11873 (Bankr. S.D.N.Y. May 4, 2012); *In re TOUSA, Inc.*, Case No. 08-10928 (JKO) (Bankr. S.D. Fla. Mar. 6, 2008); *In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005); *In re AMR Corp.*, Case No. 11-15463 (SHL) (Bankr. S.D.N.Y. Nov. 30, 2011) (interim order approving claims trading notification procedures); *In re Dana Corp.*, No. 06-10354 (BRL) (Bankr. S.D.N.Y. Aug. 9, 2006) (approving notification and sell-down procedures); *In re Delta Air Lines, Inc.*, No. 05-17923 (PCB) (Bankr. S.D.N.Y. Sept. 16, 2005) (approving notification procedures and restrictions on certain transfers of claims against and equity interests in the debtors on an interim basis); *In re Northwest Airlines Corp.*, No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005) (approving notification procedures and restrictions on certain transfers of claims against and equity interests in the debtors on an interim basis).

33. For the avoidance of doubt, entry of the Record Date Order would in no way be deemed a determination of any kind that entry of a Sell-Down Order is necessary or warranted in

these cases and the Court's review of any request for the entry of a Sell-Down Order would be without regard to entry of the Record Date Order.

  **B.**  **The Requested Relief Is Necessary To Preserve Assets of the Estates**

  34.  Implementation of the Procedures for Trading in Equity Securities are necessary to avoid significant loss to the Debtors' estate that could result from the loss of the Tax Attributes, which are necessary for the Debtors' efforts to maximize value for all stakeholders. The entry of the Record Date Order will not affect the rights of any party in interest; instead, it will set and preserve the Record Date should Sell-Down Procedures eventually become necessary to avoid the imposition of an irrevocable limitation on the Debtors' Tax Attributes. Whether or not the Debtors ultimately request—and the Court ultimately implements—Sell-Down Procedures, entry of the Record Date Order protects the Debtors' option to choose to preserve the Tax Attributes without affecting any party in interest. To preserve the ability to request and implement Sell-Down Procedures, the Debtors seek to notify claims traders prospectively that claims acquired after the Record Date in excess of the Threshold Amount may be subject to a Sell-down Order. Entry of the Record Date Order will preserve the Debtors' flexibility to seek to implement Sell-Down Procedures if it determines that proposing a plan of reorganization that would take advantage of the Section 382(l)(5) Exception is in the best interest of its estate. Without the Record Date Order fixing the Record Date on or about the commencement of the chapter 11 cases, it is unlikely that the Debtors would ever be able to implement Sell-Down Procedures preventing an ownership change and thereby avoid limitations on, and possibly the loss of, the Tax Attributes.

  **THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED**

  35.  Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date to the extent that relief is necessary to avoid immediate and irreparable

harm.  Absent the relief requested herein, the Debtors would suffer immediate and irreparable harm because the Procedures for Trading in Equity Securities are immediately necessary to ensure the preservation of Tax Attributes.  Furthermore, failure to establish the Record Date immediately would jeopardize the Debtors' ability to request and implement Sell-Down Procedures in the future.  Accordingly, the Debtors submit that they have satisfied the standard of Bankruptcy Rule 6003.

## NOTICE

36. Notice of this Motion has been provided by overnight delivery, e-mail or facsimile to: (a) the United States Trustee for the Southern District of Texas; (b) any debtor-in-possession lender in these cases; (c) TPG Specialty Lending, Inc. and its counsel; (d) Tennenbaum Capital Partners, LLC and its counsel; (e) Bank of New York Mellon Trust Company, N.A. as indenture trustee; (f) the 30 largest unsecured creditors of the Debtors on a consolidated basis; (g) the United States Attorney's Office; (h) the Securities and Exchange Commission; (i) the Internal Revenue Service; (j) all statutory committees appointed in these cases; (k) all parties requesting notice under Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (l) all parties on whom the Court orders notice.  The Debtors submit that in light of the nature of relief requested, no other or future notice need be given

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the relief requested by this Motion and such further relief as may be just and necessary under the circumstances.

Date:  March 25, 2014    Respectfully submitted,

Baker Botts L.L.P.

*/s/ C. Luckey McDowell*
C. Luckey McDowell, State Bar No.  24034565
Omar Alaniz, State Bar No. 24040402
Ian E. Roberts, State Bar No. 24056217
2001 Ross Avenue
Dallas, Texas  75201
Telephone: 214.953.6500
Facsimile: 214.953.6503
Email: *luckey.mcdowell@bakerbotts.com*
         *omar.alaniz@bakerbotts.com*
         *ian.roberts@bakerbotts.com*

JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.

Shelby A. Jordan, State Bar No. 11016700
Nathaniel Peter Holzer, State Bar No. 00793971
Suite 900, Bank of America
500 North Shoreline
Corpus Christi, Texas 78471
Telephone:  361.884.5678
Facsimile:   361.888.5555
Email:  *sjordan@jhwclaw.com*
         *pholzer@jhwclaw.com*

**PROPOSED COUNSEL TO DEBTORS-IN-POSSESSION**

Active 15348083.2