THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN DESCRIBED HEREIN WILL COMMENCE ONLY IF THIS OR AN AMENDED DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES IN CONNECTION THEREWITH ARE APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS MAY AMEND OR RESTATE THIS PROPOSED DISCLOSURE STATEMENT AT OR PRIOR TO THE HEARING TO APPROVE IT.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| AUTOSEIS, INC., *et al.*, | § | Case No. 14-20130 |
| | § | |
| Debtors. | § | Jointly Administered |
| | § | |

## DISCLOSURE STATEMENT FOR THE JOINT PLAN
## OF REORGANIZATION OF THE DEBTORS PURSUANT
## TO CHAPTER 11 OF THE BANKRUPTCY CODE

*CO-COUNSEL TO THE DEBTORS:*

**BAKER BOTTS L.L.P.**
James R. Prince
C. Luckey McDowell
Omar Alaniz
Ian E. Roberts
2001 Ross Avenue
Dallas, Texas 75201-2980
Telephone: 214.953.6500
Facsimile: 214.953.6503

**JORDAN, HYDEN, WOMBLE, CULBRETH & HOLZER, P.C.**
Shelby A. Jordan
Nathaniel Peter Holzer
Suite 900, Bank of America
500 North Shoreline
Corpus Christi, Texas 78471
Telephone: 361.884.5678
Facsimile: 361.888.5555

Dated: September 23, 2014

| DISCLAIMER |
| --- |

The information contained in this disclosure statement including the Exhibits attached hereto (collectively, the "**Disclosure Statement**") is included herein for purposes of soliciting acceptances of the Plan and may not be relied upon for any purpose other than to determine how to vote on the Plan. No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation regarding this Disclosure Statement or the Plan other than as contained in this Disclosure Statement and the Exhibits, Appendices, and/or other Schedules attached hereto, incorporated by reference or referred to herein, and if given or made, such information or representation may not be relied upon as having been authorized by the Debtors.

The Disclosure Statement shall not be construed to be advice on the tax, securities or other legal effects of the Plan as to holders of Claims against, or Equity Interests in, the Debtors, the Reorganized Debtors, or any other person. Each holder should consult with its own legal, business, financial, and tax advisors with respect to any matters concerning this Disclosure Statement, the solicitation of votes to accept the Plan, the Plan, and the transactions contemplated hereby and thereby.

Each holder of an impaired Claim entitled to vote on the Plan should carefully review the Plan, this Disclosure Statement and the Exhibits, Appendices and/or Schedules to both documents in their entirety before casting a ballot.  Plan summaries and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Exhibits, Appendices, and/or Schedules annexed to the Plan and this Disclosure Statement.  Please be advised, however, that the statements contained in this Disclosure Statement are made as of the date hereof unless another time is specified herein, and holders of Claims reviewing this Disclosure Statement should not infer at the time of such review that there has not been any change in the information set forth herein since the date hereof unless so specified. *In the event of any conflict between the descriptions set forth in this Disclosure Statement and the terms of the Plan, the terms of the Plan shall govern.*

As to contested matters, existing litigation involving, or possible litigation to be brought by, or against, the Debtors, adversary proceedings, and other actions or threatened actions, this Disclosure Statement and Plan shall not constitute or be construed as an admission of any fact or liability, a stipulation, or a waiver, but rather as a statement made without prejudice solely for settlement purposes in accordance with Federal Rule of Evidence 408, with full reservation of rights, and is not to be used for any litigation purpose whatsoever by any person, party, or entity.

**The Board of Directors of the Debtors has approved the Plan and recommends that the holders of Claims in all impaired classes entitled to vote (Classes 3A-I, 4A-B, and 5) vote to accept the Plan. The Plan has been negotiated with and has the support of (a) the holders of approximately 57% of the Debtors' Senior Notes and substantially all of the Debtors' secured DIP Loans and (b) the Official Committee of Unsecured Creditors (the "Creditors' Committee").**

The Debtors intend to confirm the Plan and cause the Effective Date to occur promptly after confirmation of the Plan.  There can be no assurance, however, as to when and whether confirmation of the Plan and the Effective Date actually will occur. The confirmation and effectiveness of the Plan are subject to material conditions precedent. See **Section IX.A—"Conditions Precedent to Effective Date**." There is no assurance that these conditions will be satisfied or waived.  Procedures for distributions under the Plan are described under **Section VIII.A—"Distributions Under the Plan**" as may be amended or altered in the Plan Supplement.  Distributions will be made only in compliance with these procedures as such may be amended or altered in the Plan Supplement.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and Equity Interests in, the Debtors (including, without limitation, those holders of Claims and Equity Interests that do not submit ballots to accept or reject the Plan or that are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

If the financial restructuring of the indebtedness contemplated by the Plan is not approved and consummated, there can be no assurance that the Debtors will be able to effectuate an alternative restructuring or

successfully emerge from their chapter 11 cases, and the Debtors may be forced into a liquidation under chapter 7 of the Bankruptcy Code or under the laws of other countries.  As reflected in the Liquidation Analysis, *__the Debtors believe that if operations are liquidated under chapter 7 of the Bankruptcy Code or otherwise, the value of the assets available for payment of creditors would be significantly lower than the value of the distributions contemplated by and under the Plan.__*

This Disclosure Statement contains projected financial information regarding the Reorganized Debtors and certain other forward-looking statements, all of which are based on various estimates and assumptions.  The Debtors' management prepared the projections with the assistance of its financial advisors.  The Debtors' management did not prepare the projections in accordance with Generally Accepted Accounting Principles ("**GAAP**") or International Financial Reporting Standards ("**IFRS**") or to comply with the rules and regulations of the SEC or any foreign regulatory authority.

**The Debtors intend to rely on the exemption from the Securities Act and Blue Sky Laws registration requirements provided by section 1145(a)(1) of the Bankruptcy Code to exempt the issuance of securities issued under or in connection with the Plan, except to the extent that any person receiving securities under the Plan may be deemed an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code, or with respect to the Rights and the Rights Offering Shares, in which case the Debtors intend to rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemption from Blue Sky Laws.**

**This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "will," "should," "could," "intend," "consider," "expect," "plan," "anticipate," "believe," "predict," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. You are cautioned that all forward-looking statements involve risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Important factors that could cause or contribute to such differences include those in Article XI: "*Certain Risk Factors to be Considered*," generally and in particular "Additional Factors to be Considered--Forward-Looking Statements are not Assured, and Actual Results May Vary." The Liquidation Analysis set forth in Exhibit E, distribution projections, valuation estimates and financial projections of the Reorganized Debtors, and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted.  Any analyses, estimates or recovery projections or valuation estimates may or may not turn out to be accurate.**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND EXECUTIVE SUMMARY ................................................................1

II.   THE PLAN ...........................................................................................................................2

   A.   Unclassified Claims ......................................................................................................3
        Unclassified Claims Summary .......................................................................................3
        Unclassified Claims Detail .............................................................................................3

   B.   Classified Claims and Equity Interests.........................................................................5
        Summary of Classification and Treatment .....................................................................5
        Classified Claims and Interests Detail ...........................................................................7
        1.    Class 1 – Other Priority Claims. ...........................................................................7
        2.    Class 2 – Secured Tax Claims. ..............................................................................7
        3.    Class 3A – Secured Amegy Claim. ........................................................................8
        4.    Class 3B – Secured Cal First Claim ......................................................................8
        5.    Class 3C – Secured Kubota Claim. ........................................................................9
        6.    Class 3D – Secured HP Lease Claim. ....................................................................9
        7.    Class 3E – Secured HP-5 Lease Claim ................................................................10
        8.    Class 3F – Secured HP-6 Lease Claim ................................................................10
        9.    Class 3G – Secured First National-2 Lease Claim ..............................................11
        10.   Class 3H – Secured First National-3 Lease Claim ..............................................11
        11.   Class 3I – Other Secured Claims. ........................................................................12
        12.   Class 4A – Financial Claims (Eligible Participants and Investors). ...................13
        13.   Class 4B – Financial Claims (Other than Eligible Participants or Investors). ....14
        14.   Class 5 – Trade Claims. .......................................................................................14
        15.   Class 6 –Subordinated Claims. ............................................................................14
        16.   Class 7 – Equity Interests in GGS. ......................................................................15
        17.   Class 8 — Intercompany Equity Interests ...........................................................15
        Deemed Substantive Consolidation and Use of Sub-classification ..............................15
        Special Provision Governing Unimpaired Claims ........................................................16
        Independent Tax Review ..............................................................................................16

III.  LIQUIDATION AND VALUATION ANALYSIS .................................................................16

   A.   Liquidation Analysis ...................................................................................................16

   B.   Financial Projections ..................................................................................................17

   C.   Other Available Information .......................................................................................17

IV.   VOTING PROCEDURES AND REQUIREMENTS .............................................................18

   A.   Classes Entitled to Vote on the Plan ..........................................................................18

   B.   Votes Required for Acceptance by a Class ..................................................................18

   C.   Certain Factors To Be Considered Prior to Voting......................................................18

D.   Classes Not Entitled To Vote on the Plan ........................................................... 19

E.   Cramdown ............................................................................................................. 19

F.   Allowed Claims ..................................................................................................... 19

G.   Impairment generally ............................................................................................ 20

H.   Solicitation and Voting Process ........................................................................... 20

The "Solicitation Package." ............................................................................................ 20

Voting Deadlines ............................................................................................................. 20

Voting Instructions .......................................................................................................... 21

Beneficial Owners of the Senior Notes ........................................................................... 22

Brokerage Firms, Banks, and Other Nominees ............................................................... 22

I.   The Confirmation Hearing ................................................................................... 23

V.   RIGHTS OFFERING AND WARRANTS ..................................................................... 23

A.   Summary of the Rights Offering .......................................................................... 23

B.   Summary of the Warrants ..................................................................................... 29

VI.   BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING ............. 29

A.   Overview of the Debtors and their Business ........................................................ 29

Proprietary Services ........................................................................................................ 30

Multi-client Services ....................................................................................................... 31

B.   Overview of Capital Structure .............................................................................. 31

Senior Secured DIP Facility and Take Out of TPG Facility .......................................... 31

Secured Tax Claims and Priority Tax Claims ................................................................. 33

10.5% Senior Notes due 2017 ......................................................................................... 33

Unsecured Bank Notes in Colombia ............................................................................... 33

Amegy LC Facility .......................................................................................................... 33

Insurance Financing ........................................................................................................ 34

Capital Leases ................................................................................................................. 34

Operating Leases ............................................................................................................. 34

Series A Preferred Stock ................................................................................................. 34

Common Stock ................................................................................................................ 35

C.   Organizational Structure ....................................................................................... 35

D.   SES Transaction .................................................................................................... 35

E.   SEI/GPI Transaction ............................................................................................. 35

F.   Restatement of Consolidated Financial Statements ............................................. 36

G.   Events Leading to Bankruptcy .............................................................................. 37

H.   Delisting from the New York Stock Exchange ..................................................... 39

I.   Securities Litigation .............................................................................................. 39

J.   SEC Investigation ................................................................................................. 39

VII.   THE CHAPTER 11 CASES ............................................................................................ 39

A.   Significant Events During the Chapter 11 Cases ................................................. 39

First Day Matters ....................................................................................................................... 39

Retention of Professionals .......................................................................................................... 41

Appointment of the Creditors' Committee .................................................................................. 41

Schedules, Statement of Financial Affairs and Operating Reports ............................................. 41

Colombian Enforcement Actions and Certain Colombian Tax Matters ....................................... 41

Key Employee Retention Plan for Certain Non-Insider Employees ............................................ 42

Additional Post-Petition Borrowings ......................................................................................... 43

Consulting Agreement with P. Mathew Verghese ....................................................................... 43

Lawsuit against Taurus Energy and U.S. Sand ........................................................................... 43

Rejection of Certain Unexpired Leases and Contracts ................................................................ 43

Investigation of SEI/GPI Transaction ........................................................................................ 44

Continued Implementation of Turnaround .................................................................................. 44

The Backstop Commitment Conversion Agreement .................................................................... 45

**VIII. OTHER KEY ASPECTS OF THE PLAN** ............................................................................ **47**

    **A.**    **Distributions under the Plan** ............................................................................... **47**

        Bar Dates .................................................................................................................................... 47

        Claims Reconciliation Process .................................................................................................... 47

        Disputed Claims Process ............................................................................................................. 47

        Prosecution of Objections to Claims and Equity Interests .......................................................... 48

        No Interest .................................................................................................................................. 48

        Disallowance of Certain Claims and Equity Interests ................................................................. 48

        Estimation. .................................................................................................................................. 48

        Insured Claims. ........................................................................................................................... 48

        Allowed Claims .......................................................................................................................... 49

    **B.**    **Means for Implementation of the Plan** ............................................................... **50**

        General Settlement of Claims and Interests. ................................................................................ 50

        Operations Between the Confirmation Date and Effective Date .................................................. 50

        Exit Financing ............................................................................................................................ 50

        Rights Offering ........................................................................................................................... 51

        Other Restructuring Transactions ............................................................................................... 51

        Vesting of Assets in the Reorganized Debtors ............................................................................ 52

        Cancellation of Existing Agreements, Senior Notes and Equity Interests .................................... 52

        New Common Stock .................................................................................................................... 52

        Exemption from Registration ...................................................................................................... 53

        Deregistration ............................................................................................................................. 54

        Section 1146 Exemption from Certain Transfer Taxes and Recording Fees ................................ 54

        Preservation of Causes of Action ............................................................................................... 54

        Effectuating Documents and Further Transactions ..................................................................... 55

        Reinstatement of Interests in Debtor Subsidiaries ...................................................................... 55

Intercompany Account Settlement ................................................................................................55

Issuance of New GGS Common Stock .........................................................................................55

**C.**     **Provisions Regarding Corporate Governance of the Reorganized Debtors** ...................**55**

Organizational Documents .............................................................................................................56

Indemnification Provisions in Organizational Documents ............................................................56

Directors and Officers of the Reorganized Debtors ......................................................................56

Powers of Officers .........................................................................................................................56

**D.**     **Compensation and Benefits Programs** ...........................................................................**56**

New Compensation and Benefits Programs ...................................................................................56

Compensation and Benefits Programs ...........................................................................................57

Workers' Compensation Program ..................................................................................................58

**E.**     **Effect of Confirmation of the Plan** ................................................................................**58**

Compromise and Settlement ..........................................................................................................58

Subordinated Claims ......................................................................................................................59

Discharge of the Debtors ...............................................................................................................59

Release of Liens .............................................................................................................................59

Release by the Debtors ...................................................................................................................59

Voluntary Release by Holders of Claims ......................................................................................60

Exculpation ....................................................................................................................................61

Injunction .......................................................................................................................................61

Limitations on Exculpations and Releases ....................................................................................62

Preservation of Insurance ..............................................................................................................62

Preservation of Causes of Action. .................................................................................................62

Votes Solicited in Good Faith. .......................................................................................................63

Claims Incurred After the Effective Date ......................................................................................63

Preservation of Insurance ..............................................................................................................63

**F.**     **Retention of Jurisdiction** ...............................................................................................**63**

**G.**     **Executory Contracts and Unexpired Leases.** ................................................................**65**

Rejection of Executory Contracts and Unexpired Leases .............................................................65

Claims Against the Debtors Upon Rejection .................................................................................65

Cure and Assumption of Specified Contracts ...............................................................................66

Effect of Assumption .....................................................................................................................66

Assumption or Rejection of Disputed Contracts ...........................................................................66

Modification, Amendments, Supplements, Restatements or Other Agreements ..........................67

Reservation of Rights .....................................................................................................................67

Contracts and Leases Entered Into After the Petition Date ...........................................................67

Directors and Officers Insurance Policies and Agreements ..........................................................67

Indemnification and Reimbursement Obligations .........................................................................67

**H.**     **Miscellaneous** ................................................................................................................**68**

Immediate Binding Effect. ...........................................................................................................68

Governing Law .............................................................................................................................68

Additional Documents. ................................................................................................................68

Reservation of Rights. ..................................................................................................................68

Successors and Assigns ................................................................................................................68

Term of Injunctions of Stays ........................................................................................................69

Withholding and Reporting Requirements. ..................................................................................69

Plan Supplement. ..........................................................................................................................69

Conflicts. ......................................................................................................................................69

IX.   CONFIRMATION AND EFFECTIVENESS OF THE PLAN ...........................................69

A.   Conditions Precedent to Effective Date ...........................................................................69

B.   Waiver of Conditions .......................................................................................................74

C.   Effect of Failure of Conditions. ......................................................................................74

D.   Modification of the Plan. .................................................................................................74

Effect of Confirmation on Modification ......................................................................................74

Revocation of Plan .......................................................................................................................74

X.   CONFIRMATION PROCEDURES ....................................................................................75

A.   Confirmation of the Plan .................................................................................................75

Best Interests Test/Liquidation Analysis ......................................................................................76

Feasibility .....................................................................................................................................76

B.   Confirmation Without Acceptance by All Impaired Classes ...........................................76

No Unfair Discrimination .............................................................................................................76

Fair and Equitable Test ................................................................................................................76

C.   Alternatives to Confirmation and Consummation of the Plan ........................................77

XI.   CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................77

A.   General .............................................................................................................................77

B.   Risk Relating to the Plan and Other Bankruptcy Considerations ..................................78

C.   Business and Financial Risks. .........................................................................................81

D.   Certain Risks Relating to the Shares of New GGS Common Stock .................................95

E.   Additional Factors to Be Considered ..............................................................................96

XII.   CERTAIN SECURITIES LAW MATTERS ......................................................................97

A.   Bankruptcy Code Exemptions from Registration Requirements. ....................................97

Securities Issued in Reliance on Section 1145 of the Bankruptcy Code. .....................................97

Subsequent Transfers of 1145 Securities .....................................................................................98

Subsequent Transfers of Securities Issued to Affiliates. ..............................................................99

Rights, Rights Offering Shares and New MIP Common Stock. .....................................................99

The Anti-Dilution Protection for the New GGS Equity Warrants Does Not Cover All Transactions that Could Adversely Affect the Warrants. ...............................................................................................99

XIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..........100

**A.    Introduction.** ........................................................................................................**100**

**B.    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors** ....................................**101**

Cancellation of Debt and Reduction of Tax Attributes ........................................................ 101

Limitation of NOL Carryforwards and Other Tax Attributes ................................................ 102

Alternative Minimum Tax .......................................................................................... 103

**C.    Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims** .....**103**

Consequences to U.S. Holders of Allowed Class 3B-3H Secured Capital Lease Claims ................................ 103

Consequences to U.S. Holders of Allowed Class 4A and Class 4B Financial Claims .................................. 104

Consequences to U.S. Holders of Allowed Class 5 Trade Claims ........................................................ 107

Distributions After the Effective Date .................................................................................... 107

Accrued Interest ........................................................................................................ 107

Market Discount ........................................................................................................ 108

Medicare Tax ........................................................................................................... 108

**D.    Information Reporting and Backup Withholding** ...........................................................**108**

**E.    Importance of Obtaining Professional Tax Assistance** ....................................................**109**

**XIV. RECOMMENDATION AND CONCLUSION** .................................................................**109**

**TABLE OF EXHIBITS**

**Exhibit A:**      Joint Chapter 11 Plan of Reorganization of Global Geophysical Services, Inc. and its Debtor Affiliates

**Exhibit B:**      The Company's Prepetition Corporate Structure

**Exhibit C:**      Backstop Commitment Conversion Agreement

**Exhibit D:**      Rights Offering Procedures

**Exhibit E:**      Unaudited Liquidation Analysis

**Exhibit F:**      Unaudited Financial Projections

**Exhibit G:**      Bidding Procedures

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN.**

## I.       INTRODUCTION AND EXECUTIVE SUMMARY

Global Geophysical Services, Inc. ("**GGS**") and certain of its direct and indirect subsidiaries, as chapter 11 debtors and debtors in possession (each a "**Debtor**" and collectively the "Debtors" or the "**Company**"[1]) in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), submit this Disclosure Statement pursuant to section 1126 of title 11 of the United States Code (the "**Bankruptcy Code**"), for use in the solicitation of votes on the Joint Chapter 11 Plan of Reorganization of Global Geophysical Services, Inc. and its Debtor Affiliates, dated as of September 23, 2014 (as the same may be amended from time to time) (the "**Plan**").  A copy of the Plan is annexed as **Exhibit A** to this Disclosure Statement.  **Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan**.

This Disclosure Statement sets forth certain information regarding the Company's proposed Restructuring, prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, and the Debtors' anticipated organization, operations, and liquidity upon successful emergence from chapter 11 protection.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, APPENDICES, AND ANY SCHEDULES HERETO AND THERETO IN THEIR ENTIRETY.   IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

The Plan and this Disclosure Statement are the result of months of extensive negotiations among the Company, an ad hoc group of Senior Noteholders (the "**Ad Hoc Group**"), and the Creditors' Committee (the Creditors' Committee together with the Ad Hoc Group, the "**Supporting Creditors**").   Together the Ad Hoc Group holds approximately 57% of the Senior Notes and substantially all of the Company's $151.9 million DIP Loan.  The culmination of these negotiations was the entry into a Backstop Conversion Commitment Agreement dated as of September 23, 2014 (the "**Backstop Commitment Conversion Agreement**") upon which the Plan is premised. The Backstop Commitment Conversion Agreement binds the parties thereto to support the restructuring provided in the Plan and described herein and in the Term Sheet annexed to the Backstop Commitment Conversion Agreement (the "**Restructuring**").    The Restructuring will substantially reduce the Company's debt burden, enhance its liquidity, and solidify the Company's long-term growth and operating performance.  Additionally, it will provide for a substantial recovery for unsecured creditors in a chapter 11 case where the senior secured post-petition lenders have agreed, with no legal requirement obligating them to do so, to equitize approximately one-third to one-half of their debt.

The Restructuring is predicated on an enterprise value for the Reorganized Debtors of $190 million (the "**Restructuring Enterprise Value**").  Importantly, the Backstop Commitment Conversion Agreement provides the Debtors the opportunity to engage in a market test, which may result in a transaction that implies a higher Restructuring Enterprise Value.  In particular, the Backstop Commitment Conversion Agreement allows the Debtors to implement a competitive sale or plan-sponsor selection process under procedures that are attached as Exhibit C thereto and subject to approval by the Bankruptcy Court (the "**Bidding Procedures**").  Under such procedures, the Debtors will solicit a binding commitment from an entity of sufficient financial means to sponsor a chapter 11 plan of reorganization that provides the Company with additional capital, provides for the purchase [of part or] all of the Company, or undertakes any other restructuring, provided such proposal (i) provides for payment of the DIP Loan Claims in full in cash on the Effective Date of any plan, as well as payment of the Termination Payment and Expense Reimbursement; (ii) is based on a higher implied enterprise value than the sum of the Restructuring Enterprise Value, the Minimum Overbid Increment, the Termination Payment, and the Expense Reimbursement; (iii) is higher and better in all material respects when viewed as a whole, and given the facts and circumstances of these Chapter 11 Cases, than the restructuring proposed in the Plan; and (iv) can be consummated no later than February 27, 2015 (in each case an "**Superior Transaction**").  If the sale process results in the timely submission of multiple Superior Transactions, an auction will be held to select the winner.  The Debtors will amend

---

[1]     The Debtors in these chapter 11 cases are:  Autoseis, Inc. (5224); Global Geophysical Services, Inc. (4281); Global Geophysical EAME, Inc. (2130); GGS International Holdings, Inc. (2420); Accrete Monitoring, Inc. (2256); and Autoseis Development Company (9066).

the Plan (and allow claimants to change their votes if they would like) to incorporate the terms of the highest and best Superior Transaction, if any. If the sale process does not result in the submission of a Superior Transaction, the Debtors will continue to seek Confirmation of the Plan.

The Plan provides, among other things, that the Debtors will: (a) enter into Exit Credit Facilities, consisting of a term loan of up to $100 million, and a revolving credit facility or delayed draw term loan of up to $50 million; (b) repay in full the Term A Loans (defined below) in cash and a portion of the Term B Loans (defined below) in cash and provide new equity for the remaining portion of the Term B Loans (as described below); (c) exchange existing Financial Claims for a combination of new equity and warrants; (d) offer new equity to certain holders of existing Financial Claims in the Rights Offering in exchange for cash; and (e) cancel existing equity. The current holders of Financial Claims will own approximately 11.95% to 32.71% of the new equity of Reorganized GGS (subject to dilution). In addition, while the Term B Loans are required under the Bankruptcy Code to be paid in full in cash in order for the Company to exit bankruptcy, members of the Ad Hoc Group have agreed to convert, on a pro rata basis, an amount not less than $51.9 million and not more than $68.1 million of the Term B Loans, *less* any amounts received under a Rights Offering provided in the Plan, into new equity of Reorganized GGS. The exact amount of the Term B Loans subject to conversion is governed by a formula contained in the Backstop Commitment Conversion Agreement and is tied to the Company's projected cash balance at December 31, 2014. The DIP Conversion impacts the amount of shares available for distribution to holders of Senior Notes. The Rights Offering, in turn, provides Eligible Participants, i.e., those holders of Financial Claims that qualify as Accredited Investors under the securities laws (other than any Holders of the Financial Claims that were held by the Investors at the time of execution of the Backstop Conversion Commitment Agreement), the right to voluntarily subscribe for and buy a pro rata share (approximately 44.43%) of the Rights Offering Shares, representing approximately 28.50% to 37.41% of Reorganized GGS' new equity, the exact amount of which depends upon the formula described above and in the Backstop Conversion Commitment Agreement for converting a portion of the Term B Loans to New Common Stock. The cash proceeds of the Rights Offering will be applied to the Term B Loans, reducing the amount of such Term B Loans to be converted into shares of New Common Stock under the Backstop Commitment. The members of the Ad Hoc Group and permitted transferees of Financial Claims from the Ad Hoc Group (with respect to Financial Claims held at the time of execution of the Backstop Conversion Commitment Agreement) and holders of Financial Claims that are not Eligible Participants will not receive Rights to participate in the Rights Offering. As part of the overall settlement embodied in the Backstop Commitment Conversion Agreement and the Plan, the Ad Hoc Group is voluntarily foregoing their right to part of the distribution they may otherwise be entitled to receive as DIP Lenders and Holders of Senior Notes so that the Debtors can provide a substantial cash distribution to holders of Allowed General Unsecured Claims, such as trade creditors and vendors.[2] This financial restructuring substantially deleverages the Company's balance sheet and provides the liquidity needed to exit Chapter 11 protection as a successfully reorganized company and execute the Company's business plan.

Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, and the instructions accompanying the Ballots, in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims for voting purposes and the tabulation of votes. The statements contained in this Disclosure Statement are made only as of the date hereof unless otherwise specified, and there can be no assurance that the statements contained herein will be correct at any time hereafter. All creditors should also carefully read **Section XI** of this Disclosure Statement – the "*Certain Risk Factors To Be Considered*" – before voting to accept or reject the Plan.

THE DEBTORS, THE AD HOC GROUP, AND THE CREDITORS' COMMITTEE BELIEVE THAT IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND ALL OF ITS STAKEHOLDERS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE, (*I.E.*, THE DATE BY WHICH YOUR BALLOT MUST BE **ACTUALLY RECEIVED**), WHICH IS **DECEMBER 4, 2014** AT 4:00 P.M. (CENTRAL TIME).

## II. THE PLAN

---

[2] Absent an Alternative Transaction resulting from a Superior Transaction, a comparable recovery for such creditors is not possible if the Plan is not confirmed.

The proposed restructuring under the Plan is favorable for the Debtors and all stakeholders because it achieves a substantial deleveraging of the Company's balance sheet through consensus with the overwhelming majority of the Company's creditors and eliminates potential deterioration of value – and disruptions to worldwide operations – that could otherwise result from a protracted, contentious and costly bankruptcy case. The debt-to-equity conversion of the Senior Notes and a portion of the DIP Loan is made possible by the support of the Ad Hoc Group, who have made numerous concessions in order to give the business the best opportunity to thrive.   In sum, the Plan embodies a settlement that avoids potential litigation that could decrease value for all stakeholders and delay (and possibly derail) the restructuring process.

### A.      Unclassified Claims

#### Unclassified Claims Summary

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims, Priority Tax Claims, DIP Loan Claims and Professional Claims.  The outstanding balance of the DIP Loan is approximately $151.9 million.   The aggregate amount of General Administrative Claims, Priority Tax Claims and Professional Claims are estimated to be approximately $20.2 million as of the Effective Date, including an estimated $7.5 million of Cure Costs under Executory Contracts likely to be assumed under the Plan, approximately $2.0 million of Priority Tax Claims[3] and approximately $0.5 million of claims under section 503(b)(9) of the Bankruptcy Code.

The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
|---|---|---|
| General Administrative Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash or deferred cash payments under Section 1129(a)(9)(C) | 100% |
| DIP Loan Claims | Paid by a combination of Cash and equity | Agreement to receiving less than repayment in full in cash pursuant to Backstop Conversion Commitment Agreement |
| Professional Claims | Paid in full in Cash | 100% |

#### Unclassified Claims Detail

(a)      **General Administrative Claims**

Except to the extent that a Holder of an Allowed General Administrative Claim agrees to less favorable treatment, the Holder of each Allowed General Administrative Claim shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed General Administrative Claim, Cash in an amount equal to the full unpaid amount of such Allowed General Administrative Claim on the later of (a) the Effective Date or as soon as reasonably practicable thereafter if such Administrative Claim is Allowed as of the Effective Date, (b) the date on which such Claim is Allowed or as soon as reasonably practicable thereafter, (c)

---

[3] Some portion of the approximately $2.0 million in Priority Tax Claims may also qualify as Secured Tax Claims depending upon whether such tax is secured by a Lien.

with respect to Ordinary Course General Administrative Claims, the date such amount is due in accordance with applicable non-bankruptcy law and the terms and conditions of any applicable agreement or instrument.

(b)     **DIP Loan Claims**

All DIP Loan Claims shall be Allowed and deemed to be Allowed Claims in the full amount due and owing under the DIP Credit Agreement.   The estimated Allowed amount of the Term A Loans is $60 million and the estimated Allowed amount of the Term B Loans is $91.88 million.

**DIP Term A Loans**.  Except to the extent that a holder of a Term A Loan agrees to a less favorable treatment, each holder of a Term A Loan shall receive Cash equal to the full amount of its Term A Loans in full and final satisfaction, settlement, release and discharge of and in exchange for such Term A Loan Claims on or as soon as practicable after the Effective Date.  Pursuant to the DIP Order and DIP Credit Agreement, Term A Loans shall be repaid in full before any DIP Term B Loans are repaid.

**DIP Term B Loans**.  Except to the extent that a holder of Term B Loans agrees to a less favorable treatment, each holder of a Term B Loan, in full and final satisfaction, settlement, release and discharge of and in exchange for each such Term B Loan Claims, shall receive:

i.      its *pro rata* share of an aggregate Cash payment in an amount equal to the difference between the aggregate amount of the Term B Loans *less* the Required Combined Offering and Conversion Amount; and

ii.     its *pro rata* share of:  (i) the Rights Offering Proceeds, if any; and (ii) the Term B Loans Conversion Shares.

(c)     **Professional Claims**

**Final Fee Applications**.  All final requests for payment of Professional Claims shall be filed and served no later than 60 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims.

**Payment of Professional Fees**.  The Reorganized Debtors shall pay in full Professional Claims in Cash as soon as reasonably practicable after such Claims are Allowed by order of the Bankruptcy Court.

**Professional Fee Estimated Amount**.  Professionals shall provide good faith estimates of their Professional Claims through the expected Effective Date and shall deliver such estimates to the Debtors and the Investors and their advisors no later than five Business Days prior to the expected Effective Date; provided that such estimates shall not be considered an admission or limitation with respect to the fees and expenses of such Professionals.

**Post-Confirmation Date Fees and Expenses**.  From and after the Confirmation Date, but subject in all cases to the terms of the Backstop Commitment Agreement, the Debtors or the Reorganized Debtors, as the case may be, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, but subject to providing invoices to the Investors and the DIP Lenders and the Investors' consent to such payment, pay in Cash the reasonable legal, professional or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors, the Reorganized Debtors, or the Creditors' Committee, as the case may be.  Except as otherwise specifically provided in the Plan, upon the Confirmation Date, any requirement that Professionals comply with sections 327, 328, 329, 330, 331 or 1103 of the Bankruptcy Code or the Professional Fee Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Reorganized Debtors or, solely with respect to the matters set forth in Article 15.9 hereof, the Creditors' Committee, may, subject to the consent of the Requisite Investors, employ and pay any Professional in the ordinary course of business, including the draw of any retainers held by a Professional without seeking relief from the Bankruptcy Court.

(d)        **Priority Tax Claims**

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, the Holder of each Allowed Priority Tax Claim due and payable on or prior to the Effective Date shall receive, in full and final satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim,  at the election of the applicable Debtor or Reorganized Debtor and consent of the Requisite Investors, (a) Cash on the Effective Date or as soon as reasonably practicable thereafter in an amount equal to the full unpaid amount of such Allowed Priority Tax Claim; or (b) commencing on the first Semi-Annual Payment Date following the Initial Distribution Date and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Priority Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Reorganized Debtors, with the consent of the Requisite Investors, to prepay the entire amount of the unpaid portion of the Allowed Priority Tax Claim in the ordinary course of business.  Any Allowed Priority Tax Claim that is not due and payable on or prior to the Effective Date shall be paid in the ordinary course of business after the Effective Date as and when due under applicable non-bankruptcy law.

(e)        **U.S. Trustee Fees**

The Debtors or the Reorganized Debtors, as applicable, shall pay all U.S. Trustee Fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

(f)        **Commitment Premium and Expense Reimbursement**

To the extent due and owing under the Backstop Conversion Commitment Agreement and the Backstop Approval Order, the Commitment Premium shall be paid, in full and final satisfaction, settlement, release and discharge of and in exchange for such Commitment Premium, by the issuance of the Commitment Premium Shares, in accordance with the Backstop Conversion Commitment Agreement, to the Investors allocated *pro rata* among the Investors or their respective designees (based on the principal amount of the Term B Loans held by such Investor on the Effective Date).

Any unpaid Expense Reimbursement, in full and final satisfaction, settlement, release and discharge of and in exchange for such Expense Reimbursement, shall be paid in cash as Allowed Administrative Claims on the Effective Date or upon termination of the Backstop Conversion Commitment Agreement, as applicable, in each case in accordance with and subject to the Backstop Conversion Commitment Agreement and the Backstop Approval Order.

(g)        **Termination Payment**

To the extent due and owing under the Backstop Conversion Commitment Agreement and the Backstop Approval Order, any Termination Payment, in full and final satisfaction, settlement, release and discharge of and in exchange for such Termination Payment, shall be paid in Cash, on or prior to the consummation of any Alternate Transaction, to the Investors or their designees based upon the respective pro rata share of Term B Loans held by such Investors on the date of payment, in each case in accordance with and subject to the Backstop Conversion Commitment Agreement and the Backstop Approval Order.

**B.        Classified Claims and Equity Interests**

**Summary of Classification and Treatment**

The Plan establishes a comprehensive classification of Claims and Equity Interests.[4]   The following table summarizes the classification and treatment of Claims and Equity Interests under the Plan and the

---

[4]  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify General Administrative Claims, Priority Tax Claims, DIP Loan Claims, U.S. Trustee Fees and Professional Claims.

estimated distributions to be received by the holders of Allowed Claims under the Plan and in a hypothetical liquidation under chapter 7. Amounts assumed in the recovery analysis are estimates only; actual recoveries received under the Plan, or in a liquidation scenario, may differ materially from the projected recoveries.

The summaries in this table are qualified in their entirety by the description of the treatment of such Claims in the Plan. The recoveries to Senior Notes Claims are based on a Restructuring Enterprise Value (defined below) of $190 million. The range of Projected Plan Recoveries to Senior Notes Claims in Class 4A and Class 4B is based on the high and low values of the Term B Loan Conversion Amount.

| Class | Claim or Interest | Treatment of Allowed Claims | Voting Rights | Estimated Amount | Projected Plan Recovery[5] | Projected Liquidation Recovery |
|---|---|---|---|---|---|---|
| 1 | Other Priority Claims | Paid in full in Cash | Unimpaired/ Deemed to Accept | De Minimis/ None | 100% | 100% |
| 2 | Secured Tax Claims | Paid in full in Cash or semi-annual Cash payments, with interest, over a period not to exceed five years from Petition Date | Unimpaired/ Deemed to Accept | $0 to $2 million | 100% | 100% |
| 3A | Secured Amegy Claim | Paid in Full in Cash six months after Effective Date. | Impaired/ Entitled to Vote | | 100% | |
| 3B-3H | Secured Capital Lease Claims | Repayment obligations extended by twelve months with interest; liens retained. | Impaired/ Entitled to Vote | $2 million | 100% | |
| 3I | Other Secured Claims | Reinstated, receive collateral, receive proceeds of sale of collateral, or other treatment to satisfy 11 U.S.C. § 1129. | Unimpaired/ Deemed to Accept | | 100% | |
| 4A | Financial Claims (Eligible Participants and Investors) | Pro Rata share of: (i) 11.95% to 32.71% of the New Common Stock, (ii) the Warrants, and (iii) the Rights. | Impaired/ Entitled to Vote | $262.874 million | 6.89% to 13.85% | 0% |
| 4B | Financial Claims (Other Than Eligible Participants and Investors) | Pro Rata share of: (i) 11.95% to 32.71% of the New Common Stock and (ii) the Warrants. | Impaired/ Entitled to Vote | | 5.01% to 12.65% | |
| 5 | Trade Claims | Pro Rata share of: $3 million in Cash, plus the Library Improvement (capped at $250,000). | Impaired/ Entitled to Vote | $14 million[6] | 21.43% to 23.05% | 0% |
| 6 | Subordinated | Disallowed and discharged | Impaired/ Deemed to | $0 | 0% | 0% |

---

[5] The projected recoveries to Class 4A and Class 4B are pre-dilution from both vested and unvested warrants but post dilution for the emergence grant of MIP restricted stock.

[6] The estimated aggregate amount of the Claims in Class 5 does not include potential damages claims that may arise as a result of the rejection of executory contracts or unexpired leases under the Plan.

| | | Claims | reject | | | |
|---|---|---|---|---|---|---|
| 7 | GGS Equity Interests | Cancelled | Impaired/ Deemed to reject | N/A | 0% | 0% |
| 8 | Subsidiary Equity Interests | Unimpaired/Reorganized GGS will own, directly or indirectly, the Equity Interests of its Subsidiaries on and after the Effective Date | Unimpaired/ Deemed to Accept | N/A | N/A | N/A |

### Classified Claims and Interests Detail

1. **Class 1 – Other Priority Claims.**

    (1)   *Classification*:  Class 1 consists of all Other Priority Claims.

    (2)   *Treatment:*  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Priority Claims, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim becomes Allowed, and (iii) such other date as may be ordered by the Bankruptcy Court.

    (3)   *Voting:*  Class 1 is Unimpaired.  Each Holder of an Other Priority Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of Other Priority Claims is entitled to vote to accept or reject the Plan.

2. **Class 2 – Secured Tax Claims.**

    (1)   *Classification:*  Class 2 consists of any Secured Tax Claims against any Debtor.

    (2)   *Treatment:*  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Tax Claims, each holder of an Allowed Secured Tax Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, with the consent of the Requisite Investors, either: (i) Cash on the Effective Date or as soon as reasonably practicable thereafter in an amount equal to the full unpaid amount of such Allowed Secured Tax Claim; or (ii) commencing on the first Semi-Annual Payment Date following the Initial Distribution Date and continuing over a period not exceeding five (5) years from and after the Petition Date, equal semi-annual Cash payments in an aggregate amount equal to the unpaid portion of such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Reorganized Debtors (with the consent of the Requisite Investors) to prepay the entire amount of the unpaid portion of the Allowed Secured Tax Claim in the ordinary course of business.  To the extent any Allowed Secured Tax Claim is entitled to interest under Section 506(b) of the Bankruptcy Code and applicable non-bankruptcy law, such Claim shall earn post-petition interest at the statutory rate applicable to such tax claims under

applicable non-bankruptcy law.   Any Lien securing an Allowed Secured Tax Claim shall be retained until such time that such Allowed Secured Tax Claim is paid in full.

(3)     *Voting:*  Class 2 is Unimpaired.  Each Holder of a Secured Tax Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of a Secured Tax Claim is entitled to vote to accept or reject the Plan.

3.      **Class 3A – Secured Amegy Claim.**

(1)     *Classification*:  Class 3A consists of the Holder of the Secured Amegy Claim.

(2)     *Treatment:*  Except to the extent that a Holder of an Allowed Amegy Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Amegy Claim, each Holder of an Allowed Secured Amegy Claim shall receive on the sixth-month anniversary of the Effective Date, on account of any portion of such claim that is not contingent or unliquidated, cash in full solely from the cash collateral in the possession and control of Amegy as of the Effective Date.

(3)     *Voting*:  Class 3A is Impaired.  Each Holder of an Amegy Secured Claim is entitled to vote to accept or reject the Plan.

4.      **Class 3B – Secured Cal First Claim**

(1)     *Classification*:  Class 3B consists of the Holder of the Secured Cal First Claim.

(2)     *Treatment*: Except to the extent that the Holder of an Allowed Secured Cal First Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Cal First Claim, each Holder of such Allowed Claim shall, on the Effective Date:

(a)     retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

(b)     receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)    *Voting*: Class 3B is Impaired. Each Holder of a Cal First Secured Claim is entitled to vote to accept or reject the Plan.

5.    **Class 3C – Secured Kubota Claim**

      (1)    *Classification*: Class 3C consists of the Holder of the Secured Kubota Claim.

      (2)    *Treatment*: Except to the extent that the Holder of an Allowed Secured Kubota Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured Kubota Claim, each Holder of such Allowed Claim shall, on the Effective Date:

          (a)    retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

          (b)    receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

      (3)    *Voting*: Class 3C is Impaired.  Each Holder of a Secured Kubota Claim is entitled to vote to accept or reject the Plan.

6.    **Class 3D – Secured HP Lease Claim**

      (1)    *Classification*:  Class 3D consists of the Holder of the Secured HP Lease Claim.

      (2)    *Treatment*: Except to the extent that the Holder of an Allowed Secured HP Lease Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured HP Lease Claim, each Holder of such Allowed Claim shall, on the Effective Date:

          (a)    retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided

for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

(b)      receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)      *Voting*: Class 3D is Impaired.  Each Holder of a Secured HP Lease Claim is entitled to vote to accept or reject the Plan.

7.      **Class 3E – Secured HP-5 Lease Claim**

(1)      *Classification*:  Class 3E consists of the Holder of the Secured HP-5 Lease Claim.

(2)      *Treatment*: Except to the extent that the Holder of an Allowed Secured HP-5 Lease Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured HP-5 Lease Claim, each Holder of such Allowed Claim shall, on the Effective Date:

(a)      retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

(b)      receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)      *Voting*: Class 3E is Impaired.  Each Holder of a Secured HP-5 Lease Claim is entitled to vote to accept or reject the Plan.

8.      **Class 3F – Secured HP-6 Lease Claim**

(1)      *Classification*:  Class 3F consists of the Holder of the Secured HP-6 Lease Claim.

(2)      *Treatment*: Except to the extent that the Holder of an Allowed Secured HP-6 Lease Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured HP-6 Lease Claim, each Holder of such Allowed Claim shall, on the Effective Date:

(a)     retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

(b)     receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)     *Voting*: Class 3F is Impaired.  Each Holder of a Secured HP-5 Lease Claim is entitled to vote to accept or reject the Plan.

9.      **Class 3G – Secured First National-2 Lease Claim**

(1)     *Classification*:  Class 3G consists of the Holder of the Secured First National-2 Lease Claim.

(2)     *Treatment*: Except to the extent that the Holder of an Allowed Secured First National-2 Lease Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured First National-2 Lease Claim, each Holder of such Allowed Claim shall, on the Effective Date:

(a)     retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

(b)     receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)     *Voting*: Class 3G is Impaired.  Each Holder of a Secured First National-2 Lease Claim is entitled to vote to accept or reject the Plan.

10.     **Class 3H – Secured First National-3 Lease Claim**

(1)    *Classification*:  Class 3H consists of the Holder of the Secured First National-3 Lease Claim.

(2)    *Treatment*: Except to the extent that the Holder of an Allowed Secured First National-3 Lease Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Secured First National-3 Lease Claim, each Holder of such Allowed Claim shall, on the Effective Date:

    (a)    retain the liens securing such Claim, whether the property subject to such liens is retained by the Debtors or transferred to another entity, to the extent of the Allowed amount of such Claims and receive payment in full in cash in accordance with the terms of the applicable Capital Lease documents; provided, however, that the payment period shall be extended by 12 months, and the payments owed under such Capital Lease documents shall be modified to reflect such extension on the newly amortized basis at the rate of interest provided for in the applicable Capital Lease, as further described in an exhibit to the Plan Supplement, and which in all instances shall be determined by the Debtors with the consent of the Ad Hoc Group and in consultation with the Committee; or

    (b)    receive such other recovery or treatment necessary to satisfy Bankruptcy Code section 1129(b) as consented to by the Requisite Investors.

(3)    *Voting*: Class 3H is Impaired.  Each Holder of a Secured First National-3 Lease Claim is entitled to vote to accept or reject the Plan.

11.    **Class 3I – Other Secured Claims.**

(1)    *Classification*:  Class 3I consists of Other Secured Claims.  Class 3 includes (i) the Insurance Financing Claims and (ii) any other secured claim not otherwise expressly classified or described herein.  It is the Debtors' intent to treat Holders of Allowed Other Secured Claims as Unimpaired under the Plan.  In the event the Bankruptcy Court finds that Class 3 is nevertheless Impaired, or that separate classification of each Other Secured Claim is warranted, each Holder of an Other Secured Claim shall be separately classified into sub-classes for voting and confirmation purposes.   For example, Class 3(I)- Insurance Financing Claim, and so on.  In such event, the treatment provided below in Article 4.4.11(b) of the Plan shall apply to each such sub-class.

(2)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Other Secured Claims, each Holder of an Allowed Other Secured Claim shall, as the Debtors, or Reorganized Debtors, as applicable, in consultation with the Creditors' Committee and as consented to by the Requisite Investors, determine, after the latest of (i) the Effective Date and (ii) the date on which such Other Secured Claim becomes Allowed:

<table>
<tr><td>(a)</td><td>have its Allowed Other Secured Claim reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, including retention of any Lien securing an Allowed Other Secured Claim until such time that such Allowed Other Secured Claim is paid in full;</td></tr>
</table>

(a)    have its Allowed Other Secured Claim reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, including retention of any Lien securing an Allowed Other Secured Claim until such time that such Allowed Other Secured Claim is paid in full;

(b)    receive payment in full in Cash including the payment of any interest at the non-default rate, if such interest is required to be paid pursuant to section 506(b) of the Bankruptcy Code, including retention of any Lien securing an Allowed Other Secured Claim until such time that such Allowed Other Secured Claim is paid in full;

(c)    receive delivery of the collateral securing such Allowed Other Secured Claim;

(d)    receive delivery of the distribution of the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the Holder's secured interest in such collateral; or

(e)    such other recovery necessary to satisfy Bankruptcy Code section 1129.

(3)    *Voting*: Class 3I is Unimpaired.  Each Holder of an Other Secured Claim is conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  No Holder of an Other Secured Claim is entitled to vote to accept or reject the Plan.

12.    **Class 4A – Financial Claims (Eligible Participants and Investors).**

(1)    *Classification*: Class 4A consists of all Financial Claims of Eligible Participants and Investors.   Financial Claims that are not held by Eligible Participants or Investors are classified in Class 4B below.

(2)    *Treatment*:  Except to the extent that a Holder of an Allowed Financial Claim in Class 4A agrees to a less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 4A Financial Claims, each Holder of an Allowed Class 4A Financial Claim shall receive:

(a)    its Pro Rata share of the Class 4 New Common Stock;

(b)    its Pro Rata share of Rights to participate in the Rights Offering, provided, however, that (a) Holders of Class 4A Financial Claims that were held by the Investors will not receive Rights for any Financial Claims held by them as of September 23, 2014, and (b) Holders of Class 4A Financial Claims that purchase Financial Claims from Investors held by such Investors as of September 23, 2014 shall not receive Rights for such Financial Claims; and

(c)    its Pro Rata share of the Warrants.

        (3)      *Voting*: Class 4A is Impaired and each Holder of a Class 4A Financial Claim is entitled to vote to accept or reject the Plan.

13.      **Class 4B – Financial Claims (Other than Eligible Participants or Investors).**

        (1)      *Classification*: Class 4B consists of all Financial Claims not held by Eligible Participants or Investors.

        (2)      *Treatment*: Except to the extent that a Holder of an Allowed Financial Claim in Class 4B agrees to a less favorable treatment, and in full and final satisfaction, settlement, release and discharge of and in exchange for its Allowed Class 4B Financial Claims, each Holder of an Allowed Class 4B Financial Claim shall receive:

            (a)      its Pro Rata share of the Class 4 New Common Stock; and

            (b)      its Pro Rata share of the Warrants.

        (3)      *Voting*: Class 4B is Impaired and each Holder of a Class 4B Financial Claim is entitled to vote to accept or reject the Plan.

14.      **Class 5 – Trade Claims.**

        (1)      *Classification*: Class 5 consists of all Trade Claims.

        (2)      *Treatment*: Except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for its Allowed Class 5 Trade Claim, each Holder of Allowed Class 5 Trade Claims shall receive:

            (a)      on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Class 5 Claim becomes Allowed, its Pro Rata share of Cash in an amount equal to $3 million; and

            (b)      on or before March 1, 2016, its Pro Rata share of the Library Improvement.

        (3)      *Voting*: Class 5 is Impaired. Each Holder of a Class 5 Claim is entitled to vote to accept or reject the Plan.

15.      **Class 6 –Subordinated Claims.**

        (1)      *Classification*: Class 6 consists of Subordinated Claims.

        (2)      *Treatment*: No Holder of a Subordinated Claim shall receive any Distribution on account of its Subordinated Claim. On the Effective Date, all Subordinated Claims shall be discharged.

        (3)      *Voting*: Class 6 is Impaired. Holders of Subordinated Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. No Holder of a Subordinated Claim is entitled to vote to accept or reject the Plan.

16.   **Class 7 – Equity Interests in GGS.**

(1)   *Classification*:  Class 7 consists of all Equity Interests in GGS.

(2)   *Treatment*:  No Holder of an Equity Interest in GGS shall receive any Distributions on account of its Equity Interest.  On and after the Effective Date, all Equity Interests in GGS shall be cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

(3)   *Voting*: Class 7 is Impaired.  Each Holder of an Equity Interest in GGS is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  No Holder of an Equity Interest in GGS is entitled to vote to accept or reject the Plan.

17.   **Class 8 — Intercompany Equity Interests**

(1)   *Classification*:  Class 8 consists of Equity Interests in Subsidiary Debtors.

(2)   *Treatment*:  Class 8 Intercompany Equity Interests shall be left unaltered and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.  As such, Reorganized GGS shall own, directly or indirectly, all of the outstanding Equity Interests of its Subsidiaries on and after the Effective Date.

(3)   *Voting*:  Class 8 is Unimpaired and not entitled to vote to accept or reject the Plan.

**Additionally, as described in more detail in Sections VIII.D.1 through VIII.D.8 herein, the Plan provides for certain releases of Claims and Causes of Action against, among others, the (a) the Debtors, their respective Estates, and the Reorganized Debtors, (b) the Ad Hoc Group, (c) the Indenture Trustee, (d) Exit Credit Facility Parties, (e) the Creditors' Committee and its current and former members, (f) the Investors, (g) the DIP Loan Agent and DIP Lenders, and each of their respective professionals, employees, officers and directors.**

**Deemed Substantive Consolidation and Use of Sub-classification**

The Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order deeming the substantive consolidation of the Debtors' Estates into a single Estate for certain limited purposes related to the Plan, including Voting, Confirmation and Distribution.  As a result of the deemed substantive consolidation of the Estates, each Class of Claims and Equity Interests will be treated as against a single consolidated Estate without regard to the separate legal existence of the Debtors.  The Plan will not result in the merger or otherwise affect the separate legal existence of each Debtor, other than with respect to voting and distribution rights under the Plan, and otherwise in satisfying the applicable requirements of Bankruptcy Code section 1129.  All Intercompany Claims between and among the Debtors shall be eliminated for Plan purposes so that such Claims will not be classified, will not vote and will not receive any Distribution under the Plan.  All Claims filed by the same Creditor against more than one Debtor are eliminated, disallowed and expunged to the extent that such are duplicative Claims.  In the event that the Bankruptcy Court does not authorize substantive consolidation, or if the Bankruptcy Court authorizes the Debtors to consolidate for voting and distribution purposes fewer than all of the Classes of Claims and Equity Interests sought to be consolidated for these purposes, the Debtors may proceed with separate classifications for any such non-consolidated Classes of Claims and Equity Interests, such Classes of Claims and Equity Interests will be treated as against each individual non-consolidated Debtor for voting and distribution purposes.  In such event, each Class of Claims and Equity Interest shall be divided in subclasses; one for each of the Debtors, as set forth below.

**GGS**- Global Geophysical Services, Inc.;
**AI** - Autoseis, Inc.;
**GGE** - Global Geophysical EAME, Inc.;
**GGI** - GGS International Holdings, Inc.;
**AMI** - Accrete Monitoring, Inc.; and
**ADC** - Autoseis Development Company.

For example, Class 1 - "Other Priority Claims—can be divided into six sub-classes for voting purposes:  Class 1-GGS, Class 1-AI . . . through Class 1-ADC.   Class 1-GGS relates to Other Priority Claims asserted against GGS, Class 1-AI relates to Other Priority Claims asserted against Autoseis, Inc., and so on.  A particular Debtor may have no claims asserted against it in a particular Class.

### Special Provision Governing Unimpaired Claims

Except as otherwise provided herein, the Plan shall not affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including legal and equitable defenses or setoff or recoupment rights with respect thereto.

### Independent Tax Review

*Holders are strongly urged to consult their own tax advisors about the United States federal, state, local, and applicable foreign income and other tax consequences of the plan, including with respect to tax reporting and record keeping requirements.  Please also see Section XIII of the Disclosure Statement.*

### III.        LIQUIDATION AND VALUATION ANALYSIS

**A.**    **Liquidation Analysis**

The Debtors believe that the Plan provides the same (where holders are receiving no recovery in both instances) or a greater (for all other holders) recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Debtors' primary assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the sale of the Debtors' assets and services in which such assets and services could be marketed and sold.

The Debtors, with the assistance of Alvarez & Marsal ("**A&M**"), have prepared an unaudited liquidation analysis, which is attached hereto as **Exhibit E** (the "**Liquidation Analysis**"), to assist holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

The Restructuring is predicated on an enterprise value for the Reorganized Debtors of $190 million.  As stated above, the Backstop Commitment Conversion Agreement allows the Debtors to "market test" the Restructuring Enterprise Value of $190 million by actively seeking Superior Transactions as part of a competitive sale or plan-sponsor selection process.  The Debtors believe that the results of the competitive sale or plan-sponsor selection process under the Bidding Procedures will imply an enterprise value for the Debtors as going concerns and will either confirm the Restructuring Enterprise Value or imply a higher value.

**B.**      **Financial Projections**

In connection with the planning and development of the Plan, the Debtors prepared projections for the calendar years 2014 through 2018 to present the anticipated impact of the Plan.  The projections assume that the Plan will be implemented in accordance with its stated terms. The Debtors are unaware of any circumstances as of the date of this Disclosure Statement that would require the re-forecasting of the projections due to a material change in the Debtors' prospects.  The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes, and/or a variety of other factors, including the factors listed in this Disclosure Statement and in the projections. Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties.   Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.   The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and other financial information.  The Debtors' financial projections for the calendar years 2014 through 2018 including management's assumptions related thereto, are attached hereto as **Exhibit F**.  For purposes of the financial projections, the Debtors have assumed an Effective Date of December 31, 2014.

The Financial Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.  Factors that could cause actual results to differ materially include, but are not limited to: the ability of Reorganized GGS to operate the Reorganized Debtors' businesses consistent with its projections generally, including the ability to maintain or increase revenue and cash flow to satisfy its liquidity needs, service its indebtedness and finance the ongoing obligations of its business, and to manage its future operating expenses and make necessary capital expenditures; the ability of the Reorganized Debtors to comply with the covenants and conditions under their credit facilities and their ability to borrower thereunder; the loss or reduction in business from the Debtors' significant customers or the failure of the Debtors' significant customers to perform their obligations to the Debtors; the loss or material downtime of major suppliers; material declines in demand for services; changes in production of, or demand for, hydrocarbons, either generally or in particular regions; changes in the typical seasonal variations; social or political unrest or conflict in areas where the Company conducts its business, particularly in foreign countries; increases in costs including, without limitation, crew wages, insurance, provisions, repairs and maintenance; changes in rules and regulations applicable to the industry including, without limitation, legislation adopted by international organizations or by individual countries; actions by the courts, the U.S. Department of Justice or other governmental or regulatory authorities, and the results of the legal proceedings to which the Reorganized Debtors or any of their affiliates may be subject; changes in the condition of the Debtors' operating assets or applicable maintenance or regulatory standards (which may affect, among other things, the Debtors' anticipated maintenance and repair costs); the Reorganized Debtors' ability to attract and maintain key executives, managers and employees; changes in general domestic and international political conditions; and adverse changes in foreign currency exchange rates affecting the Debtors' expenses.

**C.**      **Other Available Information**

The Company files with the SEC its Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and all required amendments to those reports, proxy statements and registration statements. You may read and copy any material the Company files with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may also obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. In addition, the SEC maintains an internet site at www.sec.gov that contains reports, proxy and information statements, and other information regarding issuers, including the Company, that file electronically.

All of the Company's reports and materials filed with the SEC are available free of charge through its website, www.globalgeophysical.com, as soon as reasonably practical, after the Company electronically filed such material with the SEC. Information about the Company's Board members, the Board's Standing Committee Charters, and Code of Business Conduct and Ethics is also available, free of charge, through the Company's website.

The Company's consolidated financial statements for the year ended December 31, 2013, together with other financial information for prior reporting periods, are included in its Form 10-K for the fiscal year ended December 31, 2013, filed with the SEC on April 29, 2014.  Such information was prepared assuming that the Company will continue as a going concern and contemplate the realization of assets and the satisfaction of liabilities in the normal course of business.  The Company's ability to continue as a going concern, however, is contingent upon, among other factors, the Company's ability to comply with the provisions in its DIP Loan, the Bankruptcy Court's approval of a plan of reorganization in the Bankruptcy Cases and the Company's ability to implement such a plan of reorganization, including obtaining exit financing.

## IV.     VOTING PROCEDURES AND REQUIREMENTS

### A.     Classes Entitled to Vote on the Plan

The following Classes are the only Classes entitled to vote to accept or reject the Plan (the "***Voting Classes***"):

| Class | Claim or Interest | Status |
|-------|-------------------|--------|
| 3A | Secured Amegy Claim | Impaired |
| 3B-3H | Secured Capital Lease Claims | Impaired |
| 4A | Financial Claims (Eligible Participants and Investors) | Impaired |
| 4B | Financial Claims (Other Than Eligible Participants and Investors) | Impaired |
| 5 | Trade Claims | Impaired |

If your Claim or Equity Interest is not included in one of the Voting Classes, you are not entitled to vote.  If your Claim is included in one of the Voting Classes, you should read your ballot and carefully follow the instructions included in the ballot.  Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, or the Notice and Claims Agent on behalf of the Debtors, otherwise provided to you.

### B.     Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Acceptance by a class of claims requires an affirmative vote of more than one-half in number of total allowed claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total allowed claims that have voted.  **Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

### C.     Certain Factors To Be Considered Prior to Voting

There are a variety of factors that all holders of Claims or Interests entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to **ARTICLE XI**, entitled "*Certain Risk Factors to be Considered*," of this Disclosure Statement.

### D.      Classes Not Entitled To Vote on the Plan

Under the Bankruptcy Code, holders of claims and interests are not entitled to vote if their contractual rights are unimpaired by the proposed plan or if they will receive no property under the plan. Accordingly, the following Classes of Claims and Interests are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Tax Claims | Unimpaired | Presumed to Accept |
| 3I | Other Secured Claims | Unimpaired | Presumed to Accept |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests in GGS | Impaired | Deemed to Reject |
| 8 | Subsidiary Equity Interests | Unimpaired | Presumed to Accept |

### E.      Cramdown

Section 1129(b) permits confirmation of a plan of reorganization notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

The Debtors intend to pursue a "cram down" of:   (a) the Holders of Claims in Class 6 (Subordinated Claims), (b) Holders of Equity Interests in GGS in Class 7, both of which are deemed to have rejected the Plan, (c) any Voting Class that rejects the Plan and (d) any other Class that is ultimately permitted to Vote, but rejects the Plan.

### F.      Allowed Claims

Only administrative expenses, claims, and equity interests that are "*allowed*" may receive distributions under a chapter 11 plan.  An "allowed" administrative expense, claim or equity interest means that a debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines by Final Order, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, a debtor.

G.        **Impairment generally**

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is "impaired" unless, with respect to each claim or interest of such class, the plan of reorganization (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holders' right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable or contractual rights.

**Only holders of allowed claims or equity interests in impaired classes of claims or equity interests that receive or retain property under a proposed plan of reorganization, but are not otherwise deemed to reject the plan, are entitled to vote on such a plan**.

H.        **Solicitation and Voting Process**

October 30, 2014, (the "***Voting Record Date***"), is the date that was used for determining which holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' Creditors and other parties in interest.

The following summarizes the procedures to accept or reject the Plan.  Holders of Claims entitled to vote are encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or to consult their own attorneys.

**The "Solicitation Package."**

The following materials are provided to each holder of a Claim that is entitled to vote on the Plan:

- the applicable Ballot and voting instructions;

- a Disclosure Statement with all exhibits; and

- the Plan.

If you (a) did not receive a Ballot and believe you are entitled to one; (b) received a damaged Ballot; (c) lost your Ballot; (d) have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, or the solicitation packet of materials you received; or (e) if you wish to obtain a paper copy of the Plan, this Disclosure Statement or any exhibits to such documents, **please contact Prime Clerk LLC, retained and approved by the Bankruptcy Court as the Debtors' notice and claims agent (the "*Notice and Claims Agent*" or "*Prime Clerk*"), at 830 3rd Avenue, 9th Floor New York, NY 10022 or by calling (855) 650-7243.**

Before the Voting Deadline (defined below), the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website:  *http://cases.primeclerk.com/ggs/*.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement by visiting the Debtors' restructuring website, *http://cases.primeclerk.com/ggs/*; and/or by calling (855) 650-7243.

**Voting Deadlines.**

**To be counted, your Ballot(s) must be actually received by the Notice and Claims Agent no later than:**

- **December 4, 2014 at 4:00 p.m**. (Central Time) for Holders of Claims entitled to vote.   This is the "***Voting Deadline***."   **If you miss the Voting Deadline your vote will not be counted.**

**Voting Instructions.**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  Separate forms of Ballots are provided for the holders of Claims in different Voting Classes entitled to vote on the Plan.  **A separate Ballot must be used for each Voting Class**.  Any Person who holds Claims in more than one Voting Class is required to submit a separate ballot for its Claims in each Voting Class.  Except as provided below, **holders of Claims are required to vote all of their Claims within a Class either to accept or reject the Plan and may not split their votes.  Any Ballot received that does not indicate either an acceptance or rejection of the Plan or that indicates both acceptance and rejection of the Plan will be counted as an acceptance.  Any Ballot received that is not signed or that contains insufficient information to permit the identification of the holder will be an invalid Ballot and will not be counted.**

If you are the record holder of Claims that are beneficially owned by another party, you may submit a separate Ballot with respect to such portion of Claims that are beneficially owned by such third party, and the vote indicated on such separate Ballot may differ from the vote indicated on Ballots submitted with respect to Claims that you beneficially own yourself or that are beneficially owned by other parties.  In no event may you submit Ballots with respect to Claims in excess of the amount of Claims for which you are the record holder as of the Voting Record Date.

Please sign and complete a separate Ballot with respect to each Claim, and return your Ballot(s), so that they are **received** by Prime Clerk by the Voting Deadline,  directly to the Company's voting agent, Prime Clerk, **by one of the following methods**:

- by hand delivery or overnight courier to: _____; or

- by first class mail to: _____.

 (If you are the beneficial owner of a Senior Note Claim, please follow the directions listed on your Ballot and read Section E – "**Beneficial Owners of the Senior Notes**").

**Only Ballots with a signature will be counted.  Email submission of ballots is preferred.  Only Ballots (including Ballots forwarded by a Master Balloting Agent (as defined below)) received by Prime Clerk by the Voting Deadline will be counted.**

**If delivery of a Ballot is by mail, it is recommended that voters use an air courier with guaranteed next day delivery or registered mail, properly insured, with return receipt requested.  In all cases, sufficient time should be allowed to ensure timely delivery.  The method of such delivery is at the election and risk of the voter.**

A Ballot may be withdrawn by delivering a written notice of withdrawal to Prime Clerk, so that Prime Clerk receives the notice before the Voting Deadline.  In order to be valid, a notice of withdrawal must (a) specify the name of the creditor who submitted the Ballot to be withdrawn, (b) contain a description of the Claim(s) to which it relates, and (c) be signed by the creditor in the same manner as on the Ballot. The Company, with the consent of the Requisite Investors, expressly reserves the right to contest the validity of any withdrawals of votes on the Plan.

After the Voting Deadline, any creditor who has timely submitted a properly-completed Ballot to Prime Clerk or a Master Ballot Agent (defined below), which is then timely delivered to Prime Clerk by the Voting Deadline, may change or withdraw its vote only with the approval of the Bankruptcy Court or the consent of the Debtors (with the consent of the Requisite Investors).  If more than one timely, properly-completed Ballot is received with respect to the same Claim and no order of the Bankruptcy Court allowing the creditor to change its vote has been entered before the Voting Deadline, the Ballot that will be counted for purposes of determining

whether sufficient acceptances required to confirm the Plan have been received will be the timely, properly-completed Ballot determined by Prime Clerk to have been received last.

**EACH BALLOT ADVISES CREDITORS THAT, IF THEY VOTE TO REJECT THE PLAN AND <u>DO NOT ELECT</u> TO OPT OUT OF THE RELEASE PROVISIONS CONTAINED IN ARTICLE XII OF THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. CREDITORS WHO VOTE TO ACCEPT THE PLAN SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN. EACH BALLOT ALSO ADVISES CREDITORS THAT, IF THEY <u>FAIL TO RETURN A BALLOT</u> VOTING EITHER TO ACCEPT OR REJECT THE PLAN, THEY SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND CAUSES OF ACTION AGAINST THE RELEASED PARTIES IN ACCORDANCE WITH THE PLAN.**

<u>**Beneficial Owners of the Senior Notes.**</u>

**If you are a beneficial owner of Senior Notes, please use the Ballot for beneficial owners (a "Beneficial Owner Ballot") or the customary means of transmitting your vote to your broker, dealer, commercial bank, trust company or other nominee ("Nominee") to cast your vote to accept or reject the Plan. You must return your completed Beneficial Owner Ballot or otherwise transmit your vote to your Nominee so that your Nominee will have sufficient time to complete a Ballot summarizing votes cast by beneficial owners holding securities (each a "Master Ballot"), which must be forwarded to Prime Clerk by the Voting Deadline. If your Beneficial Owner Ballot or other transmittal of your vote is not received by your Nominee with sufficient time for your Nominee to submit its Master Ballot by the Voting Deadline, your vote will not count.**

**If you are the Beneficial Owner of Senior Notes and hold them in your own name, you can vote by completing either a Beneficial Owner Ballot or by completing and signing the enclosed Ballot.**

**Do not return your Senior Notes or any other instruments or agreements that you may have with your Ballot(s).**

You may receive multiple mailings of this Disclosure Statement, especially if you own Senior Notes through more than one brokerage firm, commercial bank, trust company, or other nominee. If you submit more than one Ballot for a Class because you beneficially own the securities in that Class through more than one broker or bank, you must indicate in the appropriate item of the Ballot(s) the names of ALL broker-dealers or other intermediaries who hold securities for you in the same Class.

Authorized signatories voting on behalf of more than one beneficial owner must complete a separate Ballot for each such beneficial owner. Any Ballot submitted to a brokerage firm or proxy intermediary will not be counted until the brokerage firm or proxy intermediary (a) properly executes the Ballot(s) and delivers them to Prime Clerk, or (b) properly completes and delivers a corresponding Master Ballot to Prime Clerk.

By voting on the Plan, you are certifying that you are the beneficial owner of the Senior Notes (as of the Record Date) being voted or an authorized signatory for the beneficial owner. Your submission of a Ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

<u>**Brokerage Firms, Banks, and Other Nominees.**</u>

A brokerage firm, commercial bank, trust company, or other nominee that is the agent on behalf of a Senior Note for a beneficial owner, or an agent therefor, or that is a participant in a securities clearing agency and

is authorized to vote in the name of the securities clearing agency pursuant to an omnibus proxy and is acting for a beneficial owner, can vote on behalf of such beneficial owner by: (a)(i) distributing a copy of this Disclosure Statement and all appropriate Ballots to the beneficial owners; (ii) collecting all such Ballots; (iii) completing a Master Ballot compiling the votes and other information from the Ballots collected; and (iv) transmitting the completed Master Ballot to Prime Clerk; or (b) pre-validating the Beneficial Owner Ballot, and addressing such ballot as returnable to Prime Clerk.

A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of the beneficial owner. If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please contact Prime Clerk in the manner set forth above.

## I.      **The Confirmation Hearing.**

The Company will request that the Bankruptcy Court schedule a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), at the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, 1133 North Shoreline Boulevard, Corpus Christi, Texas 78401. The Company will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code and consistent with the terms, conditions, consent and consultation rights set forth in the Backstop Commitment Conversion Agreement, and has reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

## V.      **RIGHTS OFFERING AND WARRANTS**

The Debtors will effectuate a Rights Offering in which holders of Financial Claims that are Eligible Participants will be permitted to acquire up to 100% of their Pro Rata share of the Rights Offering Shares, representing 28.50% to 37.41% of the total New Common Stock, pre-dilution from both vested and unvested warrants but post dilution for the emergence grant of MIP restricted stock.  The exact amount of the aggregate Rights Offering Shares available depends on the Required Combined Offering and Conversion Amount.  The record date for determining those holders of Claims that may participate in the Rights Offering will be set forth in the Rights Offering Procedures (the "**Rights Offering Record Date**").

All holders of Financial Claims that are Eligible Participants will be mailed (i) the Rights Offering Procedures, (ii) a form to exercise Rights, and (iii) other related rights offering documents.  To exercise their Rights, holders must return their Rights Offering exercise form, together with applicable payment, by the Rights Offering Subscription Deadline, which will be a date certain specified in the Rights Offering Procedures. Following the Rights Offering Subscription Deadline, the Debtors will provide the Investors with a notice setting forth the number of subscribed and unsubscribed shares, if any.

For the avoidance of doubt, nothing herein constitutes an offer of Rights Offering Shares.

## A.      **Summary of the Rights Offering.**

(a)      Generally

The Debtors will implement the Rights Offering in accordance with the Backstop Conversion Commitment Agreement and the Rights Offerings Procedures.

(b)      Eligibility

The Rights shall be issued only to Eligible Participants.

**A HOLDER OF A FINANCIAL CLAIM THAT DOES NOT DULY COMPLETE, EXECUTE AND TIMELY DELIVER A CERTIFICATION FORM TO THE**

**SUBSCRIPTION AGENT ON OR BEFORE _____, 2014 AT 5:00 P.M. (EASTERN TIME) CANNOT PARTICIPATE IN THE RIGHTS OFFERING.**

(c)      Securities Offered

Pursuant to the Plan and the Backstop Conversion Commitment Agreement, the Company will issue Rights to acquire up to 3,740,544 million shares of New Common Stock in the Rights Offering (the "**Maximum Rights Offering Share Amount**"), representing approximately 37.41% of the total shares of New Common Stock of Reorganized GGS, subject to dilution on account of warrants, equity awards under certain management incentive plans and other future equity issuances. The total [number of Rights and the corresponding] number of shares of New Common Stock actually available for subscription in the Rights Offering is subject to reduction based on the calculation of the Projected Cash Balance of Reorganized GGS as of December 31, 2014 (determined in accordance with the Plan and the Backstop Conversion Commitment Agreement). The Required Combined Offering and Conversion Amount will be reduced if the Projected Cash Balance increases, but in no event shall the shares of New Common Stock issued in the Rights Offering be reduced below approximately 2.85 million shares (the "**Minimum Rights Offering Share Amount**"). The actual number of Rights and corresponding number of shares of New Common Stock available in the Rights Offering, after giving effect to any such reduction, is referred to as the "**Rights Offering Offered Share Amount**" and is determined in accordance with the Plan, the Backstop Conversion Commitment Agreement and these Rights Offering Procedures.

The following represents the maximum, base and minimum Rights Offering Offered Share Amounts based upon variances in the Projected Cash Balance, as set forth below:

|  | Maximum Rights Offering Share Amount | Base Rights Offering Share Amount | Minimum Rights Offering Share Amount |
|---|---|---|---|
| **Projected Cash Balance** | ~-$11.3 million | ~-$6.0 million | >$5 million |
| **Required Combined Offering and Conversion Amount** | $68.1 million | $62.9 million | $51.9 million |
| **Rights Offering Offered Share Amount** | 3,740,544 shares of New Common Stock | 3,453,096 shares of New Common Stock | 2,849,657 shares of New Common Stock |
| **% of Outstanding Shares of New Common Stock as of Effective Time (assuming all Rights are exercised)** | 37.41% | 34.53% | 28.50% |

Each Eligible Participant has the right, but not the obligation, to purchase all or a portion of its Pro Rata Rights Offering Share Amount (as defined below), subject to any Reduction as set forth in the following paragraph.

In the event that the Rights Offering Offered Share Amount is less than the Maximum Rights Offering Share Amount, an aggregate number of Rights equal to the Maximum Rights Offering Share Amount minus the Rights Offering Offered Share Amount (the "**Reduction**") shall be deemed automatically cancelled without any further action by the Company. Each Rights holder shall have a number of Rights equal to their pro rata share (based on the number of Rights initially issued to such Rights holder assuming the Maximum Rights Offering Share Amount is available in the Rights Offering) of the Reduction cancelled without any further action by the Company and, to the extent that any subscribing Rights holder has paid the Rights Offering Subscription Price with respect to such cancelled Rights, the Subscription Agent shall refund such amounts to such subscribing Rights holder, as provided in the Rights Offering Procedures.

(d)        Subscription Price

Each Right will entitle its holder to purchase one share of New Common Stock at the Rights Offering Subscription price of $8.0887, representing a 15% discount to the per share equity value, prior to giving effect to dilution from the New MIP Common Stock and derived from the implied enterprise value of the Reorganized Debtors on the Effective Date of $190 million as restructured under the Plan.

(e)        Rights Exercise Form

In order to exercise Rights, an Eligible Participant must duly complete, execute and timely deliver the Rights Exercise Form, along with payment of the Rights Offering Subscription Price for each share subscribed, in accordance with the Rights Offering Procedures.  The Rights Exercise Form shall provide, among other things, that if the Rights Offering Shares shall be subject to the terms and conditions of the Stockholders Agreement of Reorganized GGS and that, if required in accordance with the distributions procedures established by the Plan, the Subscribing Participant will execute a joinder to the Stockholders Agreement.

(f)        Subscription Privilege

Each Eligible Participant (other than an Investor under the Backstop Conversion Commitment Agreement or its Permitted Claim Transferees with respect to Senior Note Claims held by an Investor on the execution date of the Backstop Conversion  Commitment Agreement) may (after giving effect to the Reduction) subscribe for a number of Rights Offering Shares equal to the product of (a) the resulting quotient of (x) the aggregate amount of Financial Claims owned by such Eligible Participant *divided by* (y) $116.8 million,[7] *multiplied by* (b) the Rights Offering Offered Share Amount.

(g)        Escrow of Rights Offering Proceeds

All Rights Offering Proceeds shall be deposited when made and held in escrow by the Subscription Agent pending the Effective Date of the Plan in an account or accounts (a) which shall be separate and apart from the Subscription Agent's general operating funds and from any other funds subject to any lien or any cash collateral arrangements and (b) which segregated account or accounts will be maintained for the sole purpose of holding the Rights Offering Proceeds for administration of the Rights Offering.  The Subscription Agent shall not use the Rights Offering Proceeds for any purpose other than to release such funds as directed by the Debtors pursuant to the Plan on the Effective Date and shall not encumber or permit the Rights Offering Proceeds to be encumbered by any lien or similar encumbrance.    No interest will be paid on account of any Rights Offering Proceeds or other amounts paid in connection with the Rights Offering under any circumstances. The Rights Offering Proceeds shall not be property of the Debtors' estates until the occurrence of the Effective Date, and shall be used solely to repay amounts outstanding under the DIP Facility.

(h)        Duration of the Rights Offering

The Rights Offering will commence on the day upon which the  Rights Exercise Form is first mailed or made available to Eligible Participants (the "**Rights Offering Commencement Date**"), which the Debtors estimate to be as soon as practicable after the Certification Deadline, but no later than **Friday, November 14, 2014**.

The Rights Offering will **EXPIRE** at **5:00 p.m. (Eastern Time) on Wednesday, December 3, 2014**, (as may be extended in accordance with the Rights Offering Procedures, the "**Rights Offering Expiration Date**"). **Unexercised Rights will be canceled on the Rights Offering Expiration Date.**

The period commencing on the Rights Offering Commencement Date and ending on the Rights Offering Expiration Date is the "**Rights Exercise Period**."

---

[7]  This amount represents the aggregate amount of Financial Claims, <u>excluding</u> the Senior Notes Claims held by the Investors as of the execution date of the Backstop Conversion Commitment Agreement and excluding the Senior Notes Claims held by holders of Financial Claims other than Eligible Participants.

Each Eligible Participant intending to participate in the Rights Offering must affirmatively make a binding election to exercise its Rights on or prior to the Rights Offering Expiration Date, and submit payment by wire transfer of immediately available funds, in an amount equal to the Aggregate Rights Offering Subscription Price (assuming that the Maximum Rights Offering Share Amount is available in the Rights Offering and therefore without giving any effect to the Reduction) so that such payment is actually received by the Subscription Agent on or prior to the Rights Offering Expiration Date.

An Eligible Participant shall be deemed to have relinquished and waived all rights to participate in the Rights Offering to the extent the Subscription Agent for any reason does not receive from an Eligible Participant, on or before the Rights Offering Expiration Date, (i) a duly completed Rights Exercise Form and (ii) immediately available funds by wire transfer for the Rights Offering Subscription Price with respect to the Rights the Eligible Participant is exercising in such Rights Exercise Form.

Any attempt to exercise any Rights after the Rights Offering Expiration Date shall be null and void and the Debtors shall not honor any Rights Exercise Form or other documentation received by the Subscription Agent relating to such purported exercise after the Rights Offering Expiration Date, regardless of when such Rights Exercise Form or other documentation was sent.

**THE METHOD OF DELIVERY OF THE RIGHTS EXERCISE FORM AND ANY OTHER REQUIRED DOCUMENTS BY EACH ELIGIBLE PARTICIPANT IS AT SUCH ELIGIBLE PARTICIPANT'S OPTION AND SOLE RISK, AND DELIVERY WILL BE CONSIDERED MADE ONLY WHEN SUCH RIGHTS EXERCISE FORM AND OTHER DOCUMENTATION ARE ACTUALLY RECEIVED BY THE SUBSCRIPTION AGENT.   IN ALL CASES, EACH ELIGIBLE PARTICIPANT SHOULD ALLOW SUFFICIENT TIME TO ENSURE TIMELY DELIVERY PRIOR TO THE RIGHTS OFFERING EXPIRATION DATE.**

Any and all disputes concerning the timeliness, viability, form and eligibility of any exercise of Rights shall be addressed in good faith by the Debtors and the Requisite Investors in consultation with the Creditors' Committee.  Any determination made by the Debtors with respect to such disputes, with the consent of the Requisite Investors, shall be final and binding.

(i)   Exercise of Rights

In order to participate in the Rights Offering, each Eligible Participant must affirmatively make a binding election to exercise all or a portion of its Rights on or prior to the Rights Offering Expiration Date.  The exercise of the Rights shall be irrevocable unless the Rights Offering is not consummated by the date of termination of the Backstop Conversion Commitment Agreement.

In order to exercise Rights, each Eligible Participant must submit a Rights Exercise Form indicating the whole number of Rights Offering Shares (up to such Eligible Participant's Pro Rata Rights Offering Offered Share Amount) and that such participant elects to purchase, along with payment by wire transfer of immediately available funds in an amount equal to the product of (a) the number of Rights Offering Shares such Eligible Participant elects to purchase multiplied by (b) the Rights Offering Subscription Price, so that the Rights Exercise Form and such payment are actually received by the Subscription Agent on or before the Rights Offering Expiration Date in accordance with the Rights Offering Procedures.  Subscriptions may only be made in a minimum initial amount of Rights to subscribe for 12,400 shares of New Common Stock and thereafter in additional increments of 2,500 shares of New Common Stock.

Any over-payments actually paid by any Eligible Participant, as applicable, to the Subscription Agent shall be refunded, without interest, as soon as reasonably practicable after refund amounts are determined by the Subscription Agent, provided that the Subscription Agent shall use commercially reasonable efforts to refund such amounts no later than twenty (20) Business Days after the Effective Date or the termination of the Backstop Conversion Commitment Agreement.

(j)      Transfer Restrictions

**THE RIGHTS ARE NOT TRANSFERABLE.**

**ASSIGNABLE RIGHTS MAY ONLY BE EXERCISED BY OR THOUGH THE ELIGIBLE PARTICIPANT ENTITLED TO EXERCISE SUCH RIGHTS AS OF THE RIGHTS OFFERING RECORD DATE.  ANY TRANSFER OF RIGHTS WILL BE NULL AND VOID AND THE DEBTORS WILL NOT TREAT ANY PURPORTED TRANSFEREE OF ANY RIGHT AS AN ELIGIBLE HOLDER OF SUCH RIGHT.  IN ADDITION, SUBJECT TO ANY REDUCTION, ONCE AN ELIGIBLE PARTICIPANT HAS PROPERLY EXERCISED ITS RIGHTS, SUCH EXERCISE CANNOT BE REVOKED, RESCINDED OR ANNULLED FOR ANY REASON OTHER THAN AS EXPRESSLY PROVIDED HEREIN.**

(k)      Issuance of the Rights Offering Shares

On or as soon as practicable after the Effective Date, Reorganized GGS shall issue the Rights Offering Shares, in exchange for payment therefor, to those Eligible Participants, that, in accordance with the Plan and the Rights Offering Procedures, validly exercised their respective Rights to participate in the Rights Offering and paid the appropriate Rights Offering Subscription Price for each Right to the Subscription Agent.

No fractional shares of New Common Stock will be issued.  Each Eligible Participant's Pro Rata Rights Offering Share Amount will be rounded down to the nearest whole share.  No compensation shall be paid in respect of such adjustment.

(l)      Use of Rights Offering Proceeds on Effective Date

All funds paid by the Rights holders to the Subscription Agent in connection with the valid and proper exercise of their Rights pursuant to the Rights Offering shall be used by the Company, upon the occurrence of the Effective Date and contemporaneously with the issuance of the Rights Offering Shares by the Company, to reduce the outstanding principal amount of Term B Loans owed under the DIP Credit Agreement by paying such Rights Offering Proceeds to the DIP Agent on behalf of the Term B Loans DIP Lenders in accordance with the terms of the DIP Credit Agreement, the Plan and the applicable provisions of Backstop Conversion Commitment Agreement, and shall reduce the amount of New Common Stock to be issued to the Term B Lenders in connection with the DIP Conversion under the Backstop Conversion Commitment Agreement.

(m)      DIP Conversion

In exchange for the Commitment Premium, and as part of a global compromise reflected in the Plan, the Investors have agreed, subject to the terms and conditions in the Backstop Conversion Commitment Agreement, to convert their pro rata portions of not less than $51.9 million and not greater than $68.1 million of the aggregate outstanding principal amount of the Term B Loans into shares of New Common Stock, which amount shall include all Rights Offering Unsubscribed Shares.  For the avoidance of doubt, the Investors shall not be required to fund additional Cash in respect of their DIP Conversion.

(n)      Refund of Payments

All exercises of Rights are subject to and conditioned upon confirmation of the Plan and the occurrence of the Effective Date.  In the event that the Plan is not confirmed and consummated on or prior to termination of the Backstop Agreement, all Rights Offering Funds held by the Subscription Agent will be refunded, without interest, to each respective Eligible Participant as soon as reasonably practicable.

Any over-payments actually paid by any Eligible Participant to the Subscription Agent shall be refunded, without interest, as soon as reasonably practicable after refund amounts are determined by the Subscription Agent, provided that the Subscription Agent shall use commercially reasonable efforts to refund such amounts no later than twenty (20) Business Days after the Effective Date.

(o)      Modifications

Notwithstanding anything contained in the Plan or the Rights Offering Procedures to the contrary, the Debtors may, with the consent of the Requisite Investors and in consultation with the Creditors' Committee, modify the Rights Offering Procedures or adopt such additional detailed procedures to more efficiently administer the exercise of the Rights.

(p)      Certain Conditions

The closing of the Rights Offering is conditioned on the consummation of the Plan.  Amounts held by the Subscription Agent with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts.

(q)      Exemption From Securities Act Registration

Each Right and the Rights Offering Shares are being distributed and issued by the Debtors without registration under the Securities Act, in reliance upon the exemption provided in section 4(a)(2) thereof and/or Regulation D promulgated thereunder.

None of the Rights distributed in connection with the Rights Offering Procedures have been or will be registered under the Securities Act, nor any state, local, or foreign law requiring registration for offer or sale of a security.  As described herein, no Rights may be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Rights, the Rights Offering Shares, or the New Common Stock) (in each case, a "**Transfer**").

None of the Rights Offering Shares (which, for the avoidance of doubt does not include the Term B Loans Conversion Shares) have been registered or will be registered under the Securities Act, nor any state, local, or foreign law requiring registration for offer or sale of a security, and no [Rights Offering Shares] may be Transferred except pursuant to an exemption from registration under the Securities Act, such as the exemption from registration provided by Rule 144 thereunder, when available.

Each certificate or book entry position evidencing a Rights Offering Share issued pursuant to the Rights Offering shall reflect, or be stamped or otherwise imprinted with a legend (the "**Securities Act Legend**") in substantially the following form, with only such amendments, modifications, supplements or changes as are in form an substance satisfactory to the Company and the Requisite Investors in consultation with the Committee:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [•], 2014, AND THE CERTIFICATE OF INCORPORATION AND BY-LAWS OF GLOBAL GEOPHYSICAL SERVICES, INC. (THE "COMPANY"), EACH AS MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND EXERCISE SET FORTH THEREIN. COPIES OF THE STOCKHOLDER AGREEMENT, THE CERTIFICATE OF**

INCORPORATION AND BY-LAWS ARE ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY."

**B.      Summary of the Warrants**

(a)      Issuance

The Warrants will be issued pursuant to the terms of the Plan and the Warrant Agreement, entitling holders of the Warrants, on a pro rata basis, to purchase up to approximately 10% of the New Common Stock, on the terms and conditions set forth in the Warrant Agreement.

(b)      Exercise Price and Other Terms

Each Warrant will have a 4-year term (commencing on the Effective Date) and will be exercisable for one share of New Common Stock, subject to anti-dilution protection as provided below, for $14.1000 per share, reflecting a total implied enterprise value of $235 million for Reorganized GGS.  Any Warrants not exercised by the Warrant Expiration Date shall automatically expire.  Fractional Warrants shall not be issued and any such fractional Warrants will be rounded up or down to the nearest whole number.

(c)      Restrictions on Exercise

Warrants will not be exercisable if prior to, or as a result, of such exercise Reorganized GGS has or will have more than 275 holders of record of New Common Stock, determined in accordance with Rule 12g5-1 under the Securities Exchange Act of 1934.

(d)      Anti-Dilution Protection

The Warrant Agreement will contain customary provisions for the adjustment of the shares of New Common Stock issuable upon exercise following organic dilutive events such as stock splits, stock dividends, combinations, issuance of preferred stock and similar transactions.

(e)      Voting and Other Rights

Holders of Warrants will not be entitled to any voting rights of holders of New Common Stock until, and to the extent, they have validly exercised their Warrants; provided, however, that for so long as the exercisable Warrants represent, on an as converted basis, a to-be determined percentage of the fully diluted New Common Stock, Reorganized GGS will not, without the consent of the Holders of a majority of the Warrants entitled to vote on such matter, do or permit certain acts as more fully described in the Warrant Agreement.

(f)      Form and Transferability

All Warrants distributed under the Plan will be issued in book-entry form.   The Warrants shall be freely transferrable, on the same terms and conditions as the New Common Stock.

(g)      Other Terms

The Warrants will be subject to other terms and conditions that will be set forth in the Warrant Agreement, which will be filed as part of the Plan Supplement.

**VI.      BUSINESS DESCRIPTION AND REASONS FOR CHAPTER 11 FILING**

**A.      Overview of the Debtors and their Business**

GGS, a Delaware corporation incorporated on June 18, 2003, and the other Debtors[8] in these cases provide an integrated suite of seismic-data solutions to the global oil and gas industry consisting primarily of seismic-data acquisition, micro-seismic monitoring, processing, and interpretation services and the sale of seismic recording equipment to third parties.  Through these services, the Debtors deliver data that enables the creation of high-resolution images of the earth's subsurface and reveals complex structural and stratigraphic details.  These images are used primarily by oil and gas companies to identify geologic structures favorable to the accumulation of hydrocarbons, to reduce risk associated with oil and gas exploration, to optimize well-completion techniques, and to monitor changes in hydrocarbon reservoirs.  The Debtors integrate seismic survey design, data acquisition, processing and interpretation to deliver enhanced services to their clients.  In addition, the Debtors own and market, directly or through third parties, a seismic-data library and license that data to clients on a non-exclusive basis.

As further described below, the Debtors generate revenues primarily by providing two types of services to their clients, proprietary services and multi-client services.  Proprietary services ("**Proprietary Services**") consist of conducting geophysical surveys for clients on a contractual basis where the clients generally acquire all rights to the seismic data obtained through such surveys.  Multi-client services ("**Multi-client Services**") include selling licenses, on a non-exclusive basis, to seismic data the Debtors own as a part of their collection of seismic data, generally referred to as "seismic-data library" or "multi-client library."  The Debtors also generate revenues by providing microseismic monitoring, data processing, and interpretation services and through the sale of seismic-recording equipment to third parties.

Many of the world's largest and most technically advanced oil and gas exploration and production companies use the Debtors' services.  This includes national oil companies, major integrated oil companies, and large independent oil and gas companies.  The Debtors and their foreign non-debtor subsidiaries provide seismic-data acquisition services throughout the world, including in some of its most challenging political and natural environments, such as marshes, forests, jungles, arctic climates, mountains, and deserts.

The Debtors also have significant operational experience in most of the major U.S. shale and tight reservoir plays, including Eagle Ford, Bakken, the Haynesville, Permian, Utica, Fayetteville, and Woodford, where Debtors believe their high resolution RG-3D Reservoir Grade[SM] ("**RG3D**") seismic solutions are particularly well-suited.  As of December 31, 2013, the Debtors owned approximately 130,000 recording channels that were primarily comprised of their new AUTOSEIS[®] High Definition Recorder Systems.  The Debtors' recording channels and systems are interoperable, which provides operational scalability and efficiency enabling the Debtors to execute on large and technologically complex projects.

Indeed, the Debtors and their foreign subsidiaries operate on a truly global scale with crews currently operating in Alaska, Colombia, Brazil, Iraq (Kurdistan), and Kenya.  The Debtors' crews work in some of the world's most challenging environments, and their experience includes projects in the Continental U.S., and internationally in Algeria, Argentina, Canada, Chile, the Republic of Georgia, India, Mexico, Oman, Peru, Poland, and Uganda.  As further described below, the Debtors' recent and projected growth is overwhelmingly international in its focus, principally through foreign branch offices of GGS and foreign non-debtor affiliates.

The Debtors have long-standing client relationships with a number of blue chip oil and gas companies, including many national and major integrated oil companies.  The Debtors' technology platform and global operating ability leverage these relationships throughout the world.  The Debtors' management has the knowledge base, experience, and relationships that underlie the Debtors' strong operational reputation in the seismic industry.

### Proprietary Services

The Debtors provide seismic-data acquisition, microseismic monitoring, data processing, and interpretation services on a proprietary basis where their clients ultimately own the output of the Debtors' efforts. For proprietary seismic-data acquisition services, clients typically request a bid for a seismic survey based on their

---

[8] The Debtors in these chapter 11 cases are:  Autoseis, Inc.; Global Geophysical Services, Inc.; Global Geophysical EAME, Inc.; GGS International Holdings, Inc.; Accrete Monitoring, Inc.; and Autoseis Development Company.

own survey design specifications. In some cases, the Debtors are shown a prospect area and asked to propose and bid on a survey of the Debtors' own design. In other cases, the Debtors may be able to propose modifications in the process or scope of a proposed project in ways intended to create value for the Debtors' customers, in which case the Debtors are able to propose and bid on an alternative survey design. Once the scope of the work is defined, either the Debtors or the client will undertake to obtain the required surface and mineral access consents and permits. Once the required consents and permits are obtained, the Debtors survey the prospect area to determine where the energy sources and receivers that are required to acquire the seismic data will be located based on the chosen design. The Debtors' crews then place geophones and energy sources into position, initiate the energy sources, collect the data generated, and deliver the data sets to the client. Where possible, the Debtors seek to combine seismic-data acquisition with processing and interpretation services. Throughout the entire process, the Debtors coordinate with clients in an effort to add value at each stage of data acquisition, processing, and interpretation. This integrated approach allows the Debtors to sell multiple bundled services, offer clients greater value, and advance toward obtaining the highest available margins.

### Multi-client Services

The Debtors also offer data-acquisition services in a multi-client structure. These Multi-client Services projects differ from Proprietary Services projects in that the Debtors set the specifications of the program (with some input from clients), generally handle all aspects of the acquisition from permitting to data processing, and maintain ownership of the seismic data and associated rights after the project is completed, including any future revenue stream. Clients also participate in the multi-client surveys by underwriting all or a portion of the costs of acquiring the data (referred to as pre-commitments). In return for their underwriting participation in a Multi-client Services project, customers receive a non-exclusive license to a designated portion of the underlying seismic data acquired by the Debtors at a favorable price on a per-square-mile basis.

The Debtors include the seismic data sets acquired through multi-client surveys in their multi-client library, which is then available for licensing to other clients on a non-exclusive basis for a fee (referred to as a late sale). The seismic data licenses are typically transferable only under limited circumstances and only upon payment to the Debtors of a specified transfer fee. Substantially all costs directly incurred in acquiring, processing and otherwise completing seismic surveys are capitalized into the multi-client surveys and then amortized based on estimated future revenues (from both pre-commitments and late sales).

In addition to acquiring seismic data through multi-client seismic surveys, in certain cases the Debtors will grant a non-exclusive license to a specific multi-client data set in the seismic-data library to a client in exchange for ownership of complementary proprietary seismic data owned by that client. The seismic data acquired from the client by Debtor under such an arrangement will then be added to the Debtors' seismic-data library.

### B.      Overview of Capital Structure

### Senior Secured DIP Facility and Take Out of TPG Facility

On the Petition Date, GGS was a party to a secured Financing Agreement, dated as of September 30, 2013 (as amended, the "**September 2013 TPG Financing Agreement**"), with TPG Specialty Lending, Inc. and Tennenbaum Capital Partners, LLC (collectively, the "**Pre-petition Secured Lenders**"). The September 2013 Financing Agreement provided for a senior secured first-lien term loan in the initial principal amount of $82.8 million. As of the Petition Date, approximately $81.765 million of indebtedness was outstanding under the September 2013 TPG Financing Agreement. The debt under the September 2013 TPG Financing Agreement was guaranteed by each of the Debtors and secured by substantially all real and personal property of the Debtors pursuant to various collateral documents, including a Pledge and Security Agreement dated as of September 30, 2013. The debt under the September 2013 TPG Financing Agreement was not guaranteed by any of the Debtors' foreign non-debtor subsidiaries.

In connection with filing their voluntary chapter 11 petitions, the Debtors filed motions seeking Bankruptcy Court approval of a senior secured debtor-in-possession credit facility, as detailed in a commitment letter and term sheet, among the Company, as borrower, each of the direct and indirect domestic subsidiaries of the

Company designated therein, as guarantors, certain Holders of the Senior Notes (collectively, the "**DIP Lenders**"), and Wilmington Trust, National Association, as administrative agent and collateral agent. The initial debtor-in-possession credit facility provided for a super-priority senior secured term loan facility in an aggregate principal amount of $60 million to be drawn upon in two or more tranches: (i) $25 million (the "**Initial DIP Loan**") upon entry of the interim order of the Bankruptcy Court (the "**Interim Order**"); and (ii) $35 million upon entry of an order by the Bankruptcy Court approving the loans on a final basis.  On March 28, 2014, the Bankruptcy Court entered the Interim Order approving the Initial DIP Loan over the objection of the Prepetition Secured Lenders, and the Initial DIP Loan was funded.  Tennenbaum Capital Partners, LLC, who is now an ex officio member of the Creditors' Committee, argued at the hearing to consider approval of the Initial DIP Loan that the value of the Company was not high enough to adequately protect the Pre-petition Secured Lenders' liens in the event the DIP Lenders were granted a senior lien to secure a debtor-in-possession loan in the amount of $60 million.

On April 14, 2014, the Debtors filed a supplemental motion for entry of a final order authorizing the Debtors to obtain postpetition financing, refinance the prepetition secured indebtedness and approve a related settlement with the Prepetition Secured Lenders, including authorizing the Debtors to enter into a senior secured postpetition financing agreement in an aggregate principal amount of up to $151.9 million, pursuant to the terms of a Financing Agreement dated as of April 14, 2014 (the "**DIP Credit Agreement**"), among the Company, as borrower, and certain subsidiaries of the Company, as guarantors, the lenders from time to time party thereto, and Wilmington Trust, National Association, as administrative agent and as collateral agent for the DIP Lenders.  The DIP Credit Agreement provides for a super-priority senior secured term loan facility in an aggregate principal amount of $151.9 million (the "**DIP Loan**") to be drawn upon in two or more tranches: (i) the Initial DIP Loan of $25.0 million, which was drawn on March 28, 2014 following entry of the Interim Order; and (ii) an additional $126.9 million that would be available upon entry of the DIP Order. The motion for approval of the replacement DIP Credit Agreement was filed on a consensual basis reflecting a settlement agreement, subject to Bankruptcy Court approval, among the Debtors, the DIP Lenders and the Prepetition Secured Lenders that resolved certain disputes among the parties, thereby avoiding the significant cost, delays and uncertainty of litigation, and provide consensual debtor-in-possession financing for the Debtors.

On April 25, 2014, the Bankruptcy Court entered the Final Order approving the DIP Credit Agreement and related settlement agreement and the final DIP Loan was funded.  The proceeds of the DIP Loan were used, in part, to repay, in full, the indebtedness under the September 2013 TPG Financing Agreement (including payment of certain fees and expenses) and the balance is available for general corporate purposes of the Debtors during the Chapter 11 Cases, working capital, certain transaction fees, costs and expenses and certain other costs and expenses with respect to the administration of the Chapter 11 Cases. The DIP Loan is split into two tranches consisting of $60.0 million of Term A Loan, which is comprised of the $25.0 million Initial DIP Loan and an additional $35.0 million (the "**Term A Loan**") and $91.9 million of the Term B Loan (the "**Term B Loan**"). The Term A Loan bears interest, at the Company's option, at either LIBOR plus 8.50% per annum (subject to a LIBOR floor of 1.5% per annum) or the base rate (the highest of the federal funds effective rate plus 1/2 of 1%, The Wall Street Journal prime rate and the three-month LIBOR rate plus 1%, subject to a floor of 2.5%) plus 7.50%. The Term B Loan bears interest, at the Company's option, at either LIBOR plus 10.50% per annum (subject to a LIBOR floor of 1.5% per annum) or the base rate (the highest of the federal funds effective rate plus 1/2 of 1%, The Wall Street Journal prime rate and the three-month LIBOR rate plus 1%, subject to a floor of 2.5%) plus 9.50%. During the continuance of an event of default under the replacement DIP Credit Agreement, an additional default interest rate equal to 2% per annum would apply. The DIP Credit Agreement also provides for certain additional fees payable to the DIP Loan Agent and DIP Lenders.

The DIP Loans will mature on the earliest to occur of: (i) June 25, 2015; (ii) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors; (iii) the substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the date that an order of the Bankruptcy Court is entered approving a debtor-in-possession financing loan for the Company other than as provided for in the replacement DIP Credit Agreement; and (v) the acceleration of the loans and the termination of the commitments under the DIP Credit Agreement.  The obligations of the Debtors under the DIP Credit Agreement are secured by a first priority perfected security interest in substantially all assets owned by the Debtors, except as provided in the DIP Order.  The loans under the DIP Credit Agreement are subject to mandatory prepayments in certain instances

including, without limitation, certain asset dispositions, casualty or condemnation events, equity and debt issuances and extraordinary receipts. The DIP Credit Agreement provides for representations and warranties, affirmative and negative covenants (including a budget variance covenant with a cushion of the greater of 15% or $200,000), reporting requirements and events of default customary for similar debtor-in-possession financings.

As of September 23, 2014, the outstanding balance of the DIP Loan was $151,880,588.

**Secured Tax Claims and Priority Tax Claims**

The Company estimates that Secured Tax Claims and Priority Tax Claims will total approximately [$2 million] as of December 31, 2014. The Company does not anticipate having any material Other Priority Claims as of December 31, 2014.

**10.5% Senior Notes due 2017**

As of the Petition Date, GGS had approximately $250 million aggregate principal amount in publicly traded unsecured bond debt, consisting of the following two issuances: (i) $200 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of April 27, 2010; and (ii) $50 million aggregate principal amount outstanding of 10.5% Senior Notes due 2017 issued pursuant to an indenture dated as of March 28, 2012 (such indentures, as supplemented to the Petition Date, collectively, the "**Indentures**"). The Bank of New York Mellon Trust Company, N.A., serves as the trustee under both Indentures.

The Senior Notes are the general unsecured, senior obligations of GGS and are jointly and severally guaranteed by each of the other Debtors on a senior unsecured basis. The Senior Notes mature on May 1, 2017, with interest payable semi-annually on May 1 and November 1 of each year.

As of the Petition Date, the outstanding balance of the Senior Notes, including accrued but unpaid interest, was $255,984,045.20.

**Unsecured Bank Notes in Colombia**

GGS has issued six unsecured short-term promissory notes to Bancolombia and Helm Bank—both based in Colombia—to finance equipment purchases and working capital needs for foreign operations in Colombia. The notes are summarized in the chart below:

| Bank | Origination Date | Maturity Date | Amount (approximate U.S. dollars) |
|---|---|---|---|
| Helm Bank | 8/22/11 | 8/5/14 | $2.3 million |
| Helm Bank | 10/6/11 | 3/21/14 | $730,000 |
| Helm Bank | 10/24/11 | 7/11/14 | $1.36 million |
| Bancolombia | 9/8/12 | 3/18/14 | $1.1 million |
| Bancolombia | 5/28/13 | 5/28/15 | $780,000 |
| Bancolombia | 10/10/13 | 4/10/14 | $488,000 |

**Amegy LC Facility**

GGS is party to a Letter of Credit Agreement dated February 5, 2007 with Amegy Bank N.A. (as amended, the "Amegy **LC Facility**") for revolving commitments in an aggregate principal amount of up to $10.0 million.  The facility is cash collateralized by amounts in accounts maintained with Amegy Bank.  As of June 15, 2014, the Company had a total of $424,756 in undrawn letters of credit outstanding under the LC Facility, which are fully cash collateralized.

### Insurance Financing

GGS is party to (i) a Premium Finance Agreement with Talbot Premium Financing, LLC, dated May 20, 2013, (ii) a Commercial Insurance Premium Finance and Security Agreement, dated as of April 8, 2013, with BankDirect Capital Finance, a division of Texas Capital Bank, N.A. and (iii) a Premium Finance Agreement with AFCO Premium Credit LLC, dated as of April 27, 2014.  As of September 23, 2014, the outstanding amount financed under these agreements is $[●].

### Capital Leases

From time to time, certain of the Debtors enter into capital leases to acquire seismic equipment, computers, and vehicles ("Capital Leases").  The balance outstanding under these Capital Leases as of the Petition Date was approximately $4.4 million, but has since been reduced to approximately $[3.7 million] as of July 31, 2014.  At December 31, 2014, the estimated balance of the Capital Leases is estimated to be approximately $2.0 million.

### Operating Leases

The Debtors lease certain office space and other property under operating lease agreements, which expire at various dates and require various minimum annual rentals.  The following table summarizes future commitments under operating leases which have initial or remaining terms in excess of one year, for each of the years remaining and in the aggregate as of July 31, 2014 (excluding two operating leases that are expected to be rejected in the Chapter 11 Cases):

| | Operating Leases |
|---|---|
| **Year Ended December 31,** | (in thousands) |
| 2014 | $ 1,065 |
| 2015 | 1,348 |
| 2016 | 398 |
| 2017 | 206 |
| 2018 | 22 |
| Thereafter | — |
| Total future minimum lease payments | $ 3,039 |

### Series A Preferred Stock

In December 2013, GGS received net proceeds of approximately $7.1 million through the issuance of 347,827 depositary shares (the "**Depositary Shares**"), each representing a 1/1000th interest in a share of GGS's 11.5% Series A Cumulative Preferred stock (the "**Series A Preferred Stock**"). Holders of the Series A Preferred Stock are entitled to cumulative dividends (whether or not declared) at the rate of 11.5% per year of the $25,000 liquidation preference per preferred share, and the dividends are payable monthly in arrears when, as and if declared by GGS's board of directors. Holders of the Series A Preferred Stock generally have no voting rights, but have the right to elect two additional directors to the GGS board of directors if GGS fails to pay dividends in full for any monthly dividend period within a quarterly period for a total of six or more quarterly periods or fails to maintain a listing of the Depositary Shares on a national exchange for 180 consecutive days.

### Common Stock

GGS is a public company whose common stock and Depositary Shares traded on the New York Stock Exchange prior to the Petition Date. As of March 1, 2014, there were approximately 38.12 million shares of common stock outstanding. As described below, subsequent to the Petition Date, GGS's common stock and Depositary Shares have been delisted from trading on the New York Stock Exchange.

**C.     Organizational Structure**

Attached as **Exhibit B** is a copy of the Debtors' organizational chart. Only the U.S. entities are debtors; none of the foreign subsidiaries currently are debtors in any proceeding. GGS operates a significant portion of its international business through foreign branch offices of GGS, as opposed to separate foreign subsidiaries. As a result, a significant portion of the Debtors' operations, employees, and assets are located in foreign jurisdictions.

**D.     SES Transaction**

On December 30, 2013, AutoSeis, Inc. ("**AutoSeis**"), a wholly owned subsidiary of the Company, entered into a cooperation agreement ("the "**SES Agreement**") with Seismic Equipment Solutions ("**SES**"). Under the terms of the SES Agreement, SES became the exclusive provider for the rental and leasing of AutoSeis' AUTOSEIS® HDR sysytem in the geophysical equipment rental industry. In connection with entering into the SES Agreement, the following ancillary agreements were entered into: (i) AutoSeis and SES entered into a sales agreement providing, among other things, for the purchase by SES of equipment from AutoSeis ("**Sales Agreement**"), and (ii) GGS and SES entered into a lease agreement providing for the lease by GGS of the equipment that is the subject of the Sales Agreement ("**Lease Agreement**"). In connection with the signing of the SES Agreement, SES placed an order of $9.5 million for an AUTOSEIS® HDR nodal system comprised of 20,000 single-channel units and other related equipment. The Sales Agreement was accounted for as a sale of equipment with revenue recognized totaling $7.3 million upon the delivery of the first equipment order. Cost of sales of $7.3 million was recognized based on the cost of the AUTOSEIS® HDR. The profit on the sale, $2.2 million, was deferred and will be recognized as revenue in proportion to the related gross rental charge to expense over the lease term. The Lease Agreement was accounted for as an operating lease. At December 31, 2013, GGS had a note receivable of $3.2 million, due April 2014, related to the Sales Agreement classified in the Consolidated Balance Sheet as Prepaid Expenses and Other Current Assets.

**E.     SEI/GPI Transaction**

The Company entered into a License and Marketing Agreement dated as of March 28, 2013 (the "**SEI/GPI Agreement**") with SEI-GPI JV LLC, a limited liability company jointly owned by Seismic Exchange, Inc. and Geophysical Pursuit, Inc., ("**SEI/GPI**"). Under the terms of the SEI/GPI Agreement, SEI/GPI, as licensee, received the right, for a term of 40 years, to market exclusively a substantial portion of the Company's North American onshore Multi-client library. SEI/GPI paid a $25.0 million non-refundable license fee upon execution of the SEI/GPI Agreement. The Company entered into the SEI/GPI Agreement to, among other things, raise cash necessary to meet maturing borrowing commitments under its then senior secured revolving credit facility and interest payments on the Senior Notes. SEI/GPI receives, as compensation for marketing the data, a commission of 43.33% on all gross revenues resulting from the sub-licensing of the data subject to the SEI/GPI Agreement. For the year ended December 31, 2013, the Company recorded late sale revenues of $25.0 million, representing the license

fee related to completed Multi-client library assets.  Revenues for sub-licenses issued by SEI/GPI as licensee are recorded in the Company's accounts at their gross sales value, with the commission being recorded and classified as Multi-client data library commission expense in the Company's Consolidated Statements of Operations.  For the year ended December 31, 2013, the Company recorded commission expense of $14.8 million.   For the year ended December 31, 2013, the Company recorded amortization expense of $14.3 million on Multi-client data library late sale revenues, related to the $25.0 million non-refundable license fee.

Effective in October 2013, SEI/GPI and the Company amended the Agreement, pursuant to which SEI/GPI advanced the Company $5 million from the Company's portion of future revenues under the SEI/GPI Agreement in exchange for the Company's agreement to transfer to SEI/GPI of the right to exclusively market data associated with additional properties in the Company's North American onshore Multi-client library that were not part of the original SEI/GPI Agreement.

**F.**    **Restatement of Consolidated Financial Statements**

Prior to the issuance of the 2013 financial statements, the Company identified certain errors in the Company's previously released financial information for the years ended December 31, 2009 through 2012 and the quarters ended March 31, June 30 and September 30 in 2013.  As a result of the identification of the errors, the Company recorded various accounting corrections to the previously reported financial information. Descriptions of the restatement adjustments recorded are as follows:

- **Revenue Recognition**: The Company has identified certain revenues and expenses associated with generating such revenue that were recognized during the impacted periods at a time other than when performance of seismic acquisition services were performed for certain contracts in Latin America. The Company has recorded adjustments to correct the timing of revenue recognition based on the performance of seismic acquisition services in accordance with the Company's revenue recognition policy.

- **Research and Development Expenses**: During 2010 through 2013, the Company capitalized costs totaling $4.9 million associated with research and development with respect to certain marine seismic technologies. Such costs were incorrectly capitalized and should have been expensed as incurred in accordance with ASC 730 "Research and Development". The Company has recorded adjustments in the restated Consolidated Financial Statements to reflect the recognition of expenses in the periods in which they were incurred.

- **Sales Tax**:  The Company failed to properly accrue sales tax due to the State of Texas on certain taxable items purchased during certain periods. As a result of an audit, an overall tax liability of $1.9 million for the periods from 2008 through 2011 was recorded. In addition, the Company has also recorded tax liability adjustments associated with its 2012 and 2013 fiscal years based on the estimated impact.

- **Other Adjustments**: In the third quarter of 2013, the Company did not record a $1.2 million gain from excess insurance proceeds associated with a fire at a Company warehouse in Colombia in May 2013. As of September 30, 2013, the gain associated with the insurance proceeds was realized or realizable and should have been recognized. During the third quarter of 2013, the Company did not recognize approximately $0.7 million of compensation expense associated with the issuance of stock performance units. Certain unsupported amounts were included in the balance of property and equipment during the impacted periods. These adjustments reduced pre-tax income by less than $0.1 million in each of the years ended December 31, 2012 and 2011. The adjustments reduced pre-tax income by approximately $0.3 million for the nine months ended September 30, 2013. Certain capitalized costs associated with the Multi-client library were not correctly accounted for. As a result, the operating costs for 2011 and 2012 were understated for $0.2 million in aggregate. The Company did not re-measure a contingent liability associated with the 2012 acquisition of Sensor Geophysical Ltd., which resulted

in an adjustment of $0.4 million to reflect the changes in fair value of the liabilities in earnings during 2012. The Company also adjusted its provisions for income tax and related tax accounts to account for the effects of the restatement adjustments described herein.

- **Impact of Adjustments**:  The determination to restate these Consolidated Financial Statements was approved by the Audit Committee of the Company's Board of Directors upon the recommendation of the Company's management. The impact of these adjustments on the previously filed Consolidated Financial Statements for the years ended December 31, 2012 and 2011 is presented in Note 21 in the Company's Annual Report for the fiscal year ended December 31, 2013, Form 10-K, filed with the SEC on April 29, 2014. The impact on quarterly financial information is provided in Note 22 of the Annual Report.

## G.        Events Leading to Bankruptcy

Prior to 2013, GGS placed a substantial emphasis on its Multi-client Services and building up its Multi-client library with external sources of financing.  In fiscal years 2010, 2011 and 2012, GGS' net cash used in investing activities exceeded its net cash provided by operating activities by $96.9 million, $64.8 million and $45.1 million, respectively.  During those periods, GGS invested $201.2 million in 2010, $199.4 million in 2011 and $179.6 million in 2012, respectively, in its Multi-client library.  GGS financed these investing activities, including its investments in its Multi-client library, primarily from issuances of long-term debt, borrowings under a revolving credit facility and, for 2010, issuances of common stock.  GGS' net investment in its Multi-client library increased from $145.9 million at year end 2010 to $232.5 million at year end 2011 and to $309.2 million at year end 2012.

GGS reported net losses of $42.2 million in 2010 and $15.6 million in 2012. GGS reported net income of $4.9 million in 2011.  At year-end 2012, GGS had liquidity (available cash and undrawn borrowing capacity under its revolving credit facility) of $29.3 million and backlog of $101.3 million, as compared with backlog of $200.7 million at the end of 2011.

In the latter part of 2012, following a change in executive leadership, the Company made a strategic decision to increase its emphasis on Proprietary Services in what it viewed to be a more lucrative international market and decrease its emphasis on Multi-client Services in the increasingly competitive U.S. market. While this transition continued during 2013, the Company increased its backlog to $180.0 million at March 31, 2013 ($136.0 million Proprietary Services), $200.3 million at June 30, 2013 ($173.3 million Proprietary Services) and $184.3 million at September 30, 2013 ($174.7 million Proprietary Services.)

This change in emphasis to international Proprietary Services impacted the Company's liquidity during 2013 and continues to impact liquidity.   Contracts for the Company's international Proprietary Services generally require the Company to incur working capital for start-up expenditures well in advance of when the Company receives revenues and cash flows under such contracts, which negatively impacts liquidity during the early phases of such contracts.  Historically, the Company's primary internal sources of liquidity have been cash generated by the Proprietary Services and Multi-Client Services provided to clients, and, from occasional sales of non-core assets.  The Company's primary external sources of liquidity have been borrowings under its credit facilities, debt and equity offerings and equipment financings such as operating and capital leases.  The Company's primary uses of capital include the acquisition of seismic data recording equipment, seismic vehicles, other equipment needed to outfit new crews and to enhance the capabilities of and maintain existing crews' energy sources, and investments in the Company's Multi-client library. With the increased emphasis on international Proprietary Services as described above also came increased expenses and working capital needs for mobilizing personnel and equipment to various foreign locations and increased costs of complying with local regulatory requirements, which expenses and working capital needs are difficult to forecast and require expenditures in advance, sometimes months in advance, of when project revenues are received.

The Company's internal sources of liquidity, including its cash position, to a large extent depend on the level of demand for the Company's services. Historically, the Company has periodically supplemented its internal sources of liquidity with external sources, including borrowings under its previous revolving credit facility,

as the need arises.  However, limitations in the Company's debt agreements became increasingly restrictive during 2013, including a scheduled reduction in available capacity under the Company's prior revolving credit facility from $80.0 million to $67.5 million at September 30, 2013.  The Company refinanced the outstanding principal amount of its then revolving credit facility with the September 2013 TPG Financing Agreement that was entered into as of September 30, 2013, but this agreement (i) provided for a term facility with scheduled amortization, (ii) provided no available borrowing capacity in addition to the initial $82.8 million of initial advances (other than an additional amount contingent on certain possible acquisitions that did not materialize), and (iii) imposed further limitations and restrictions, including more restrictions on the Company's ability to incur or guarantee additional indebtedness or to grant additional liens on the Company's assets.  Combined with the Company's low share price, these events began to severely limit the Company's access to additional debt and equity capital, resulting in the Company being almost exclusively dependent on internal sources of liquidity.  As a result, during 2013 the Company increased its focus on enhancing operating cash flows, remaining fully pre-funded on investments in the Multi-client library, increasing the weighting of Proprietary Services revenues as a percentage of total revenues and pursuing selective asset sales as means of providing liquidity.  During 2013, the Company also explored several asset sale or other transactions that would have, if consummated, improved the Company's balance sheet and liquidity.  However, the Company was unable to consummate these transactions.  While it focused on improving liquidity during 2013, the Company reported in public filings that events beyond its control could affect the Company's results of operations, financial condition and liquidity.  While the Company's liquidity fluctuated during the year, on June 30, 2013 the Company's reported liquidity was $10.8 million, with only $0.1 million of borrowing capacity under its prior revolving credit facility.  At year end, the Company's liquidity was $18.9 million, with no available borrowing capacity under the September 2013 TPG Financing Agreement.

The Company experienced a number of adverse developments that, collectively, materially and adversely impacted liquidity in the first part of 2014.  These developments included higher than anticipated working capital requirements associated with project start-up costs for new international projects; reduced revenues attributable to reductions in programs in Colombia; higher than anticipated project costs and increases in estimated taxes; slower than anticipated production in Kenya; and project cancellations in Libya due to security concerns. The Company also recorded in the fourth quarter of 2013 an impairment of its Multi-client library in the amount of $75.2 million, reflecting a decrease in the expected cash flow generation potential of certain portions of such library.

Compounding their liquidity problems, the Debtors also faced potential covenant defaults under the September 2013 TPG Financing Agreement related to liquidity and restatement of historical financial statements and related consolidated financial information for various annual and quarterly periods going back to 2009.  As result of these restatements, management concluded that there were material weaknesses in the Debtors' internal controls and accounting procedures.  GGS did not file its annual report (Form 10-K) with the Securities and Exchange Commission ("SEC") on March 17, 2014, and instead filed an 8-K disclosing the events related to the restatements.  This securities filing implicated potential covenant defaults under the September 2013 TPG Financing Agreement and, by extension, the Indentures.  On the same date, March 17, 2014, the Debtors entered into a forbearance agreement with the Pre-petition Secured Lenders under the September 2013 TPG Financing Agreement under which the lenders agreed to forbear from exercising any rights and remedies in connection with existing or potential future specified defaults and events of default.  The forbearance period was subject to termination by such lenders beginning on March 24, 2014.  On March 24, 2014, the day before the Petition Date, the Pre-petition Secured Lenders  gave notice of such termination and acceleration of the debt under the September 2013 TPG Financing Agreement.  The aggregate principal amount of debt outstanding under the September 2013 TPG Financing Agreement as of the date of acceleration was $81.8 million. Under the Indentures and some of the Company's other debt obligations, the acceleration of the Company's obligations under the September 2013 TPG Financing Agreement constituted a cross default and would have allowed the holders of such debt to accelerate their respective obligations.

The combination of these events led the Company to seek relief under the Bankruptcy Code by filing voluntary chapter 11 petitions initiating the Chapter 11 Cases on March 25, 2014. The Chapter 11 Cases were filed for hallmark bankruptcy rationales—to achieve a breathing spell for the development of restructuring alternatives, implement debtor-in-possession financing to resolve liquidity needs, and maximize value for the benefit of all of the Debtors' stakeholders.

**H.      Delisting from the New York Stock Exchange**

On March 26, 2014, the Company received notice that the New York Stock Exchange LLC (the "**NYSE**") had determined that the listing of the Company's common stock and Depositary Shares should be suspended immediately as a result of the commencement of the Chapter 11 Cases.  The NYSE announced that it had determined to commence proceedings to delist Company's common stock and Depositary Shares, based on NYSE Regulation Inc.'s determination that those securities are no longer suitable for listing.

The last day that the common stock traded on the NYSE was March 25, 2014. The Company does not intend to take further action to appeal the NYSE's decision.  It is therefore expected that the common stock and Depositary Shares will be delisted and deregistered under section 12(b) of the Securities Exchange Act of 1934 on October 30, 2014 after the completion of the 90-day period from the NYSE's notifications of removal from listing filed with the Securities and Exchange Commission on August 1, 2014.

**I.      Securities Litigation**

On March 20, 2014, a lawsuit styled *Britt Miller, et al. v. Global Geophysical Services, Inc., et al.*, Civil Action No. 4:14-CV-00708 (the "**Miller Action**"), was filed in the United States District Court for the Southern District of Texas, Houston Division.  On March 21, 2014, a lawsuit styled *Janice S. Gibson v. Global Geophysical Services, Inc., et al.*, No. 4:14-CV-0735 (the "**Gibson Action**"), was filed in the United States District Court for the Southern District of Texas, Houston Division.  On April 3, 2014, a lawsuit styled *Leslie Trinin v. P. Matthew Verghese, et al.*, No. 4:14-CV-00873 (the "**Trinin Action**"), was filed in the United States District Court for the Southern District of Texas, Houston Division.  The cases were filed as putative class actions. The Miller Action was initiated on behalf of a putative class of all purchasers of the Company's common stock from April 21, 2010 to March 18, 2014, and purchasers of the Depositary Shares purchased in, or traceable to, the Company's registration statement of December 3, 2013. The Gibson Action was filed on behalf of a putative class of purchasers of the Company's common stock from February 7, 2011 to March 17, 2014.  The Trinin Action was filed on behalf of a putative class of all purchasers of Depositary Shares purchased in, or traceable to, the Company's registration statement of December 3, 2013.  The named defendants in the Trinin Action are certain officers and directors of the Company, and MLV Co. and National Securities Corporation, the underwriters of the Company's December 3, 2013 offering of Depositary Shares. None of the Debtors are a party to the Trinin Action.

Collectively, the plaintiffs in these cases allege violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934, SEC Rule 10b-5, and sections 11, 12(a)(2), and 15 of the Securities Act of 1933, resulting in alleged damages to members of the putative classes.

On July 1, 2014, the Bankruptcy Court entered an Order authorizing the payment and/or advancement of defense costs by the carrier under the Debtors' Directors and Officers Liability Insurance Policies.

**J.      SEC Investigation**

On March 21, 2014, the Company received a letter from the SEC notifying it that the SEC was conducting an inquiry relating to the Company and requesting, among other things, that the Company voluntarily preserve and retain certain documents and information relating to its March 17, 2014 public announcement of a "Restatement of Certain Financial Results and Delay in Filing of Form 10-K."  On March 28, 2014, the Company received a letter from the SEC notifying it that the SEC was conducting an investigation in connection with possible violations of the federal securities laws, and on the same date the SEC issued a subpoena seeking the testimony of one of the Company's senior executives.  The Company has retained counsel and is cooperating with the SEC's investigation.

## VII.      THE CHAPTER 11 CASES

**A.      Significant Events During the Chapter 11 Cases.**

### First Day Matters

On the Petition Date, the Debtors filed several motions requesting that the Bankruptcy Court enter orders authorizing the Debtors to continue operating in the ordinary course (the "First Day Motions"). The First Day Motions were designed to facilitate a smooth transition into chapter 11 and ease the strain on the Debtors' businesses as a consequence of filing the Chapter 11 Cases.

(a)     DIP Loan

As discussed above, the Company obtained interim and final orders approving the DIP Loan, a senior secured post-bankruptcy loan in the aggregate principal amount of $151.8 million, which has been fully funded and drawn. The DIP Loan was provided by an ad hoc group of Holders of Senior Notes, who collectively, hold approximately 57% of the Senior Notes. Borrowings in the aggregate amount of approximately $91.88 million (plus certain fees and expenses) under the DIP Credit Agreement were used to retire all obligations under the September 2013 TPG Financing Agreement. The balance of the borrowings under the DIP Credit Agreement have been or will be used for general corporate purposes of the Debtors during the Chapter 11 Cases, working capital, certain transaction fees, costs and expenses and certain other costs and expenses with respect to the administration of the Chapter 11 Cases.

(b)     Cash Management System and foreign operations

The Company maintains a centralized cash management system to collect, track, aggregate and disburse cash on a daily basis between the Debtors and non-debtor subsidiaries with operations abroad. To facilitate a smooth transition into the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to continue using their existing cash management system, bank accounts and business forms and to continue intercompany transactions, including ordinary course transactions and matters in respect of the Debtors' operations abroad.

(c)     Employee Motion

The Debtors' employees rely on their compensation and benefits to pay their daily living expenses; absent which they would be exposed to significant financial difficulties. The Debtors needed the sole focus of their employees during the Chapter 11 Cases and could not afford for their employees to be distracted by unnecessary concern over the payment of their wages and other benefits in the ordinary course of operations. Accordingly, the Debtors obtained authority to (a) honor and pay certain prepetition amounts due to its employees related to, among other things, compensation, benefit programs and reimbursable expenses; and (b) continue certain benefit programs and policies, consistent with the ordinary course of business and past practices, on a post-petition basis, whether arising before or after the Petition Date.

(d)     Operations Motion

To operate their worldwide business, the Debtors rely upon a variety of vendors and service providers (many of which are foreign). Accordingly, the Debtors obtained entry of an order authorizing but not directing them, subject to an aggregate cap, to continue to honor and pay certain prepetition amounts owed to certain critical vendors and suppliers, locally and abroad, if such vendors satisfied criteria identified in the relevant Bankruptcy Court order.

(e)     Postpetition Delivery of Goods

The Debtors' vendors, international ones in particular, may be concerned that they will not be paid for goods shipped or services ordered prepetition, but actually delivered or performed postpetition. The Company's ability to operate its businesses and reorganize could have been jeopardized if these vendors stopped doing business with the Debtors over payment concerns. Accordingly, the Debtors obtained, out of an abundance of caution, entry of an order (a) granting administrative priority status to undisputed obligations of the Company that are owed to vendors arising from the postpetition delivery of goods and services that may have been ordered prior to the Petition Date and (b) authorizing the Debtors to pay such obligations in the ordinary course of business.

(f)     Utilities

The Debtors contract with certain utility provider services. Uninterrupted utility services are important to the Debtors' ongoing business operations and to the success of their restructuring. To that end, the Debtors obtained an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.

(g)     Insurance

The Debtors obtained authorization to allow the Debtors to preserve their insurance coverage by authorizing the continued maintenance, administration, finance and payment of premiums on insurance policies.

**Retention of Professionals**

The Debtors have obtained authorization to retain the following professionals to provide professional services in connection with the Chapter 11 Cases:

- Baker Botts L.L.P., as counsel;

- Jordan, Hyden, Womble, Culbreth & Holzer, a co-counsel;

- Alvarez & Marsal North America LLC, as financial advisor;

- Rothschild Inc., as financial advisor and investment banker;

- Ernst & Young, as tax-related services provider;

- UHY LLP, as auditor

- PrimeClerk, as notice and claims agent; and

- Other professionals relied upon in the Debtors' ordinary course of business.

**Appointment of the Creditors' Committee**

On or about April 4, 2014, the U.S. Trustee appointed an official committee of unsecured creditors (the "**Creditors' Committee**").  The Creditors' Committee consists of (1) The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee under the Senior Notes, (2) Creation Technologies Texas, LLC  (3) ION Geophysical Corporation, (4) Greyco Seismic Personnel Services, LLC, (5) Discovery Acquisition Services, LLC, (6) ENTRIX, Inc. (Cardino ENTRIX) and (7) Pariveda Solutions, Inc.

The Creditors' Committee retained Greenberg Traurig, LLP ("**GT**"), as counsel; and Lazard Freres & Co. LLC and Lazard Middle Market LLC (collectively, "**Lazard**"), as financial advisor and investment banker.

**Schedules, Statement of Financial Affairs and Operating Reports**

The Debtors filed their schedules of assets and liabilities and statements of financial affairs (the "**Schedules**") with the Bankruptcy Court on or about May 23, 2014.  As required under the Bankruptcy Code, the Debtors have also filed monthly operating reports ("**MORs**") since the Petition Date.  Copies of the Schedules and MORs can be obtained at *https://ecf.txsb.uscourts.gov/* or *https://cases.primeclerk.com/ggs*.

**Colombian Enforcement Actions and Certain Colombian Tax Matters**

As of the Petition Date, the Company was indebted to Bancolombia S.A. ("**Bancolombia**") pursuant to the terms of certain promissory notes in the aggregate amount of approximately $2,285,420.32. Notwithstanding the commencement of the Chapter 11 Cases and the automatic stay provided by 11 U.S.C. § 362(a), on or around April 22, 2014, Bancolombia, in disregard and defiance of the Bankruptcy Code and in an effort to improve its position relative to all other creditors, initiated an *ex parte* collection action (the "**Bancolombia Enforcement Action**") in the 39th Civil Circuit Court of Bogota (the "**39th Civil Court**"), and thereafter the 39th Civil Court entered an order allowing for the embargo and seizure of certain of the Company's assets.  The 39th Civil Court subsequently transferred jurisdiction of the Bancolombia Enforcement Action to the 10th Civil Court of Bogota (the "**10th Civil Court**").

In response to the Bancolombia Enforcement Action, on May 8, 2014, with the prior authorization of the Bankruptcy Court, the Company sought an order from the Superintendencia de Sociedades de Bogota (a Colombian insolvency court) (the "**Superintendencia de Sociedades**") recognizing the Chapter 11 Cases as a foreign main proceeding under Title III of law 1116 of 2006, the Colombian codification of the United Nations Model Law on Cross Border Insolvency.  On May 19, 2014, the Superintendencia de Sociedades granted the Company's request, entering an order (the "**Recognition Order**") that, among other things, recognized the Company's Chapter 11 Case for purposes of Colombian law, ordered the cessation of the Bancolombia Enforcement Action and collection efforts initiated by Bancolombia or any other creditor of the Company in Colombia, and further directed the Colombian Civil Courts to withdraw and remove lift the embargo and seizure that had been ordered.  The 10th Civil Court has lifted the embargo that was ordered in the Enforcement Action. The Superintendencia de Sociedades did not order the commencement of a separate insolvency case in Colombia for the Company.

On July 22, 2014, the Bankruptcy Court authorized (but did not direct) the Debtors to pay prepetition taxes of approximately $4.6 million plus interest and penalties to the Dirección de Impuestos y Aduanas Nacionales (the "**DIAN**"), the national taxing authority of Colombia, and certain other local governments and municipalities in Colombia (collectively with DIAN, the "**Colombian Taxing Authorities**").  Notwithstanding the Recognition Order, the Colombian Taxing Authorities are not subject to an automatic stay, and DIAN threatened to commence enforcement actions on account of tax liabilities that result primarily from the Company's operations in Colombia during the first quarter of 2014.  The Colombian taxes at issue relate to payments made to employees and other third parties, value-added taxes relating to services rendered and received, taxes on income, profits, and assets, and taxes pertaining to the funding of social programs for Colombian citizens.  Any payments made to the Colombian Taxing Authorities pursuant to the Bankruptcy Court's order are also subject to the DIP Order.

### Key Employee Retention Plan for Certain Non-Insider Employees

By Order dated June 5, 2014, the Bankruptcy Court approved a key employee retention plan (the "**KERP**") for certain non-insider employees of the Debtors, generally described as follows:

- *Participants*:  forty-three key, non-insider employees (the "**KERP Participants**").

- *Average Payment to Each KERP Participant*:  $18,133 for two quarters.

- *Payment Structure*:  KERP Participants earn their retention payment at the end of each quarter, so long as they have not voluntarily resigned or been terminated with cause.  One half of each quarterly payment will be paid at the end of each quarter, with the remaining one half of each quarterly payment payable upon the Debtors' emergence from chapter 11.

- *Retention Program After September 30, 2014*:  The Debtors are permitted to continue the KERP for each successive quarter on the same terms (and amounts) as noted above so long as both (a) the Ad Hoc Group and (b) the Creditors' Committee have no objection, with the deadline for any such objection to be made at the end of the first month of any such quarter.

- *Discretionary Pool*:  As part of the KERP, the Debtors' senior management (CEO and CFO) have the discretion to make bonus payments to employees who are not KERP Participants up to an aggregate pool of

$250,000 (the "**Total Pool**"), with no single employee receiving more than $20,000 in the aggregate; however, any bonus payments to be made that exceed $50,000 in the aggregate (calculated on a cumulative basis) of the Total Pool shall only be made after giving four Business Days' notice and an opportunity to object to both (a) the Ad Hoc Group and (b) the Creditors' Committee.

- *Other Conditions*:  Payments under the KERP, as applicable, are subject to the DIP Order.

Under the Backstop Commitment Conversion Agreement, the KERP will be extended (on the same terms) through the earlier of (1) the Effective Date; or (2) the end of the first quarter of 2015.

### Additional Post-Petition Borrowings

As is routine in their industry, the Debtors obtain new work through competitive bidding on contracts offered by potential customers.  In addition to offering competitive pricing terms and superior service, the Debtors are often required to provide as a condition of submitting a bid a letter of credit, surety, performance bond, or similar security.  By order entered by the Bankruptcy Court on July 22, 2014, the Debtors obtained authorization to procure such security, up to $5 million, in connection with post-petition bidding for contracts, subject to the DIP Loan Documents.

### Consulting Agreement with P. Mathew Verghese

On August 4, 2014, the Debtors moved the Bankruptcy Court for authorization to enter into a consulting agreement with P. Mathew Verghese, then the Debtors' Chief Operating Officer ("**COO**") who as of September 1, 2014 is no longer an employee of the Debtors.  Mr. Verghese served as a member of the Debtors' senior executive management for the previous five years and, as such, has institutional knowledge relevant to ongoing inquiries of GGS by the SEC and the Financial Industry Regulatory Authority ("**FINRA**").  The SEC and FINRA inquiries could continue beyond the conclusion of the Chapter 11 Cases.  The Debtors believe that preserving access to Mr. Verghese's institutional knowledge during these inquiries will help the Debtors' engagement of these matters.  Accordingly, the Debtors entered into the consulting agreement with Mr. Verghese, by which, he will provide consulting services to the Company for up to 18 months and will receive $10,000 for each month of service, as well as certain additional amounts for replacement medical coverage and expense reimbursements.  Under the terms of the consulting agreement, Mr. Verghese is permitted to pursue other interests, subject to certain non-compete and other provisions.  As of September 1, 2014, the responsibilities of the COO are performed by other members of the executive team, including the Company's Chief Executive Officer, Mr. Richard White.

### Lawsuit against Taurus Energy and U.S. Sand

On August 8, 2014, Debtors initiated an adversary proceeding in the Bankruptcy Court against Taurus Energy, LLC and U.S. Sand, LLC to recover damages for breach of Taurus Energy's contract with GGS, and for an unlawful taking and misappropriation of GGS's personal property and trade secrets.  The adversary proceeding has been assigned case no. 14-02014 and is currently pending.

### Rejection of Certain Unexpired Leases and Contracts

While the focus of the Chapter 11 Cases is to improve the Company's capitalization and financial condition, the Company also intends to pursue changes to enhance its operations in furtherance of that goal, including the ability to reject certain unexpired leases and executory contracts that are net liabilities or burdensome the Company.  The Company sought and obtained authorization to reject commercial office and warehouse space, located at 1510 W. Montgomery, Midland, Texas, and commercial office space located at 10175 Harwin Drive, Houston, Texas, to reduce monthly administrative rental expenses.  The rejections will have no impact upon ongoing operations.

The Debtors will continue to review all of their unexpired leases and executory contracts and may seek rejection, with the consent of the Requisite Investors, of additional leases and contracts, either before

Confirmation or in accordance with the procedures described in the Plan, that the Debtors determine no longer provides benefits to the Estates.

### Investigation of SEI/GPI Transaction

The Creditors' Committee has commenced an investigation of transfers of assets, and incurrence of obligations, in connection with the SEI/GPI Agreement described above for possible avoidance under the Bankruptcy Code and applicable non-bankruptcy law, including without limitation, claims for fraudulent and preferential transfers. The Debtors have been cooperating in the Creditors' Committee investigation. All Causes of Action in respect of the SEI/GPI Agreement, its participants, and the direct or indirect recipients of transfers of assets and the proceeds thereof, including past and future late sale revenues and fees and commissions, are reserved and not waived.

### Continued Implementation of Turnaround

Prior to and after the Petition Date, the Debtors, with the assistance of their legal and financial advisors, have taken action to effectuate a turnaround of their business, including:

- Changes in leadership and staff: In the eighteen months leading up to the Petition Date, nine of the top twelve senior management positions were newly filled either through outside hiring or internal promotions. For this same time period, the total number of employees of the Debtors was reduced by approximately 35%.

- Changes in business mix: At the start of 2013, approximately 54% of the Debtors' revenues were derived from Multi-client Services and 46% from Proprietary Services. During 2013, this proportional mix of revenues changed to approximately 47% from Multi-client Services and 53% from Proprietary Services. The revenue mix for 2014 is projected to be 28% from Multi-client Services and 72% from Proprietary Services. As of February 28, 2014, Proprietary Services accounts for approximately $165 million and 92% of the Debtors' pro-forma backlog,[9] compared to only $35 million and 35% at the end of 2012. All of these changes reflect the priority that the company has placed on Proprietary Services.

- Changes in geographical focus: In support of a greater focus on international operations and opportunities, the Debtors have further decentralized their operations and shifted certain administrative and operational functions to Brazil and Dubai. For 2012, prior to the time the changes in management and increasing focus on international Proprietary Services had been in place sufficiently long to have a meaningful impact, approximately 48% of the Debtors' total revenues derived from international operations and 52% from domestic sources. In 2013, revenues favored international operations over domestic revenues at a ratio of almost 2:1. The Debtors' allocation of revenues in 2013 further reflected a more global company with an almost equal balance of expenditures among the United States, Latin America, and the Middle East. The Debtors' pursuit of the international market is reinforced with 2014 projections: industry-wide seismic spend is expected to grow 7–9% in international markets and only 3%–4% in domestic markets.

- Changes in funding of Multi-client Services: New management has also been less willing to invest heavily in Multi-client Services projects. Prior to the changes in management, the Debtors typically performed acquisitions of multi-client data once the projects received on average 65% of their projected costs in pre-commitments from clients. Since late 2012, however, the Debtors have required 100% of projected survey costs in pre-commitments from customers prior to commencing the acquisition of multi-client projects. This has reduced the

---

[9] Pro-forma backlog estimates represent those seismic data acquisition projects as of December 31, 2013 for which a client has executed a contract and has scheduled a start date for the project and unrecognized pre-committed funding from the company's multi-client services segment adjusted for additions through February 28, 2014.

Debtors' exposure risk associated with capitalizing on its balance sheet larger amounts for its multi-client library.

- <u>Backlog</u>:  The Debtors' backlog represents contracts for services that have been entered into but which have not yet been completed, constituting a key indicator of future revenue.  As of February 28, 2014, the Debtors' pro-forma backlog (including both Proprietary Services and Multi-client Services) total was approximately $180 million, representing an 80% increase over the backlog for year-end 2012.

- <u>Reduction in Expenses</u>:  Management has successfully overseen significant reductions in general and administrative expenses.  These and other changes resulted in an improvement in the Debtors' Cash EBITDA for 2013.

### The Backstop Commitment Conversion Agreement

Starting in the spring of 2014, and after the Debtors completed their long-range business plan, the Debtors began negotiations with the Ad Hoc Group and the Creditors' Committee to create a consensual framework that would reduce the Debtors' $400-plus million debt burden, improve liquidity and restructure the balance sheet. On September 23, 2014, after weeks of intensive negotiations, the Debtors, the Ad Hoc Group and the Creditors' Committee entered into the Backstop Commitment Conversion Agreement.

(a)        <u>Material Terms of the Restructuring</u>

The Backstop Commitment Conversion Agreement bound the parties thereto to support the Restructuring.  Specifically, the parties agreed to support the Plan that embodied the terms set forth in the Term Sheet annexed to the Backstop Commitment Conversion Agreement.  The Debtors encourage all Claimants and Equity Interests holders to read the Backstop Commitment Conversion Agreement and Term Sheet in full (as well as the motion seeking the Bankruptcy Court's approval of the Debtors' entry into such agreements).  A summary of material terms provided therein is as follows:

- A $23.05 million to $30.26 million Rights Offering for 28.50% to 37.41% of the pro forma equity in Reorganized GGS (subject to dilution), the cash proceeds of which will be applied to reduce the balance of the Terms B Loans under the DIP Credit Agreement in accordance with the Backstop Commitment Conversion Agreement.

- Each Investor under the Backstop Commitment Conversion Agreement, severally and not jointly, agreed to convert its *pro rata* share (based on the principal amount of Term B Loans held by such Investor on the Effective Date) of outstanding principal of Term B Loans equal to the Reduced Remaining DIP Principal Amount into New Common Stock.

- Conversion of 100% of the Senior Notes into 11.95% to 32.71% of the pro forma equity in Reorganized GGS (subject to dilution).  Holders of Senior Notes will also receive a pro rata share of the Warrants with strike prices based on the prospect of increased equity values during the life of the warrants.  In addition, Eligible Participants (other than Holders of the DIP Loan) will also receive their proportionate share of the Rights to participate in the Rights Offering.

- A covenant and condition that the Company refinance and replace approximately $100 million of the DIP Loans with a new secured term credit facility on exit and enter into a new secured  revolving facility on exit for post-emergence liquidity needs.

- Unimpairment of Allowed Secured Tax Claims and Other Secured Claims under section 1124 of the Bankruptcy Code.

- Subordinated Claims will receive no distribution and will be discharged.

- Equity Interests in GGS will be cancelled as of the Effective Date and holders of such Equity Interests in GGS will receive no distribution.

        After good faith negotiations, the parties to the Backstop Commitment Conversion Agreement agreed to embody these terms in definitive documentation, including the Plan, the Disclosure Statement, the Backstop Commitment Conversion Agreement, and the solicitation procedures. Each party agreed to certain consent and consultation rights with respect to some or all of the definitive documents.

        (b)      Milestones and Bidding Procedures

        The Backstop Commitment Conversion Agreement, as mentioned above, obligates the Debtors to solicit Superior Transactions under sale procedures approved by the Bankruptcy Court. The Backstop Commitment Conversion Agreement provides a timeline and milestones for the Debtors to implement the sale procedures and exit from bankruptcy, as follows:

- The Debtors shall file a motion to approve the Backstop Agreement, the Backstop Commitment Conversion Agreement, and the auction procedures, on or before **September 23, 2014**.

- The Debtors shall file the Plan and Disclosure Statement describing the Restructuring on or before **September 23, 2014**.

- The Debtors will obtain approval of the Backstop Commitment Conversion Agreement and the sale procedures, on or before **October 15, 2014**.

- The Debtors will obtain approval of the Disclosure Statement on or before **October 30, 2014**.

- Binding bids for a Superior Transaction (a "**Binding Proposal**") are due on or before 4:00 p.m. central time on **December 1, 2014**.

- If the Debtors' Board concludes, in its reasonable business judgment, that one or more Binding Proposals constitutes a Superior Transaction that, in the Board's business judgment, is a higher and better transaction for the Debtors' estates than the restructuring contemplated in the Plan, the Company will hold an auction on **December 5, 2014** or such other date as provided in the auction procedures approved by the Court, to select the winning Superior Transaction, in which the Ad Hoc Group and any Bidder who has submitted such a Binding Proposal may participate.

- If Binding Proposals are received and a winning Superior Transaction is selected, the Debtors will:

    o    file an amended chapter 11 plan and amended disclosure statement based on the Superior Transaction on or before **December 9, 2014**;

    o    seek a hearing to approve the amended disclosure statement on or before **January 5, 2015**;

    o    Commence solicitation of votes in respect of Amended Plan on or before **January 9, 2015**;

    o    Seek a hearing to approve the amended plan on or before **February 13, 2015** and exit chapter 11 on or before **February 27, 2015**.

- Solicitation of votes on the Plan will begin on or about **November 4, 2014**. The solicitation period will last for approximately 30 days. If no Binding Proposals are received, a Confirmation Hearing will be held not later than **December 10, 2014**, and the Effective Date will occur on or about **December 31, 2014**.

        Given the overwhelming consensus among creditors that is manifest in the Backstop Commitment Conversion Agreement, the Debtors believe that the Backstop Conversion Commitment Agreement, and the Plan,

give the Debtors the best chance to emerge from chapter 11 expeditiously, with an optimized balance sheet that will allow the Reorganized Debtors to succeed in a competitive industry. This outcome would be in the best interests of the Debtors and their stakeholders.

## VIII.   OTHER KEY ASPECTS OF THE PLAN

### A.   Distributions under the Plan

One of the key concepts under the Bankruptcy Code is that only claims and interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions herein.  In general, an Allowed Claim or Equity Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines, by Final Order, that the Claim or Equity Interest, and the amount thereof, is in fact a valid obligation of or Equity Interest in the Debtors.

### Bar Dates

On May 20, 2014, the Bankruptcy Court entered an order (the "**Bar Date Order**") establishing June 30, 2014 at 5:00 p.m., central time (the "**General Bar Date**") as the last date and time for each person or entity (other than a governmental unit) to file proofs of claim based on prepetition Claims or on section 503(b)(9) of the Bankruptcy Code.  The Bar Date Order established September 22, 2014 at 5:00 p.m., central time ("**Governmental Bar Date**") as the last date and time for governmental units to files proofs of claims.  The Bar Date Order also provided that any Claim arising out of the rejection of an unexpired lease or executory contract of a Debtor pursuant to section 365 of the Bankruptcy Code during the Debtors' bankruptcy case, must be filed on or before the latest of: (1) thirty days after the date of the order, pursuant to section 365 of the Bankruptcy Code, authorizing the rejection of such contract or lease; (2) any date set by another order of the Court; or (3) the General Bar Date (the "**Rejection Bar Date**," and together with the General Bar Date and the Governmental Bar Date, collectively the "**Bar Dates**" and each a "**Bar Date**").

**Except as otherwise provided in the Plan, all Proofs of Claim filed after the applicable Bar Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor or its property, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### Claims Reconciliation Process

As of September 23, 2014, approximately 467 proofs of claim (other than Claims of Senior Noteholders) had been filed against the Debtors, asserting approximately $2,879,894,712.23 in aggregate liquidated Claims.   Additional claims were filed in unliquidated amounts.

The Debtors, together with their financial and legal advisors, have begun to reconcile the amount and classification of Claims asserted against them.  The Debtors reserve the right to prosecute objections to Claims, as warranted. The Debtors and Reorganized Debtors, as applicable, expect to prepare, file and resolve objections to Claims throughout the course of the Chapter 11 Cases and after the Effective Date.

A significant number of Claims have not yet been resolved, and the actual ultimate aggregate amount of Allowed Claims may differ significantly from the amounts used for the purposes of the Debtors' estimates. The Debtors continue to investigate differences between the claim amounts filed by Creditors and Claim amounts determined by the Debtors. Certain Claims filed may be duplicative, may be based on contingencies that have not occurred, or may be otherwise overstated, and would therefore be subject to revision or disallowance.

### Disputed Claims Process

Except as otherwise provided in the Plan, if a party timely filed a Proof of Claim and the Debtors, or the Reorganized Debtors, as applicable, do not determine, without the need for notice to or action, order or

approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in the Plan.

### Prosecution of Objections to Claims and Equity Interests

Except insofar as a Claim or Equity Interest is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to any Claim or Equity Interest.  Any objections to Claims and Equity Interests shall be served and filed on or before:  (a) the date that is the later of (i) 180 days after the Effective Date, or (ii) as to Proofs of Claim filed after the applicable Claims Bar Date, the 60th day after a Final Order is entered by the Bankruptcy Court deeming the late-filed Proof of Claim to be treated as timely filed; or (b) such later date as may be established by order of the Bankruptcy Court upon a motion by the Reorganized Debtors, with notice only to those parties entitled to receive notice pursuant to Bankruptcy Rule 2002 (the latest of such dates, the "**Claims Objection Bar Date**").  All properly-filed or scheduled Claims and Equity Interests that are not otherwise deemed Disputed or disallowed under the Plan and not objected to by the Claims Objection Bar Date shall be deemed Allowed.

For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim or Equity Interest, including the Causes of Action retained under this the Plan.

### No Interest

Unless otherwise specifically provided for in the Plan or by order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

### Disallowance of Certain Claims and Equity Interests

All Claims and Equity Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed until such time as the Holder of such Claim or Equity Interests returns such property, unless the Debtors, with the consent of the Requisite Investors, or Reorganized Debtors otherwise agree or the Bankruptcy Court enters a Final Order directing a different outcome.

### Estimation.

The Reorganized Debtors may, at any time, request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors had previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan or (iii) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (with the consent of the Requisite Investors) or the Reorganized Debtors, as the case may be, may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

### Insured Claims.

If any portion of an Allowed Claim is an Insured Claim, no distributions under the Plan will be made on account of such Allowed Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies. To the extent that the Debtors' insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

**Allowed Claims.**

(a)     Delivery of Distributions.

Distributions under the Plan will be made by the Reorganized Debtors (or their agent or designee) to the Holders of Allowed Claims in all Classes for which a distribution is provided in the Plan at the addresses set forth on the Schedules, unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Claims Record Date (or at the last known addresses of such Holders if the Debtors or the Reorganized Debtors have been notified in writing of a change of address).

(b)     Distribution of Cash.

Any payment of Cash by the Reorganized Debtors pursuant to the Plan will be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a domestic bank selected by the Reorganized Debtors.

(c)     Unclaimed Distributions of Cash.

Subject to the Plan, any distribution of Cash under the Plan that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will, pursuant to section 347(b) of the Bankruptcy Code, become the property of the Reorganized Debtors against which such Claim was Allowed notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the Holder of such unclaimed Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

(d)     Distributions of New Common Stock.

On the Effective Date, the Reorganized Debtors (or their agent or designee) will distribute the New Common Stock to the holders of Financial Claims (or their designees), and will issue the DIP Conversion Shares and the Commitment Premium Shares to the Investors. The Rights Offering Shares will be issued on the Effective Date through the Subscription Agent or its designee.

All distributions and issuances of New Common Stock to (1) the Investors under the Plan or the Backstop Conversion Commitment Agreement, (2) [certain members of senior management of the Company pursuant to the New MIPs] (each, a "***Management Holder***") and (3) the [beneficial holders of a certain percentage, as determined by the Company and the Requisite Investors, of the Financial Claims or New Common Stock (each, a "***Significant Holder***") shall be issued in the name of such person as the holder of record thereof.    All other distributions and issuances of New Common Stock under the Plan or pursuant to the Rights Offering shall be issued in the name of the broker, dealer, commercial bank, trust company or other nominee (each, a "***Nominee***") that acts as the DTC participant for the Financial Claims giving rise to the right to receive such New Common Stock pursuant to the Plan or the Rights Offering as the holder of record thereof.

Each of the Investors, Management Holders and Significant Holders shall be required, as a condition to receiving its shares of New Common Stock, to execute and deliver a joinder to the Stockholders Agreement; provided that each such Holder of New Common Stock shall be deemed bound to the terms of the Stockholders Agreement from and after the Effective Date even if not a signatory thereto.  To the extent that any shares of New Common Stock are not distributed to Significant Holders who would otherwise be entitled to receive such shares within six months of the Effective Date due to a failure of such Significant Holder to become a signatory

to the Stockholders Agreement, such shares of New Common Stock shall be treated as Unclaimed Property in accordance with Section [9.9] of the Plan.

As of the Effective Date, as a condition of receiving any distribution of New Common Stock under the Plan or pursuant to the Rights Offering, each Nominee that receives shares of New Common Stock shall be deemed to be bound by the Stockholders Agreement as if an original party thereto.

All shares of New Common Stock shall be issued in book-entry form; provided, however, that any holder of record that executes a joinder to the Stockholders Agreement in accordance with the terms thereof, including the Investors, Management Holders and Significant Holders, may require the Company to issue shares of New Common Stock held of record thereby in certificated form in accordance with the terms of the Stockholders Agreement.

(e)     Unclaimed Distributions of New Common Stock.

Subject to the Plan, any distribution of New Common Stock that is unclaimed after six (6) months after it has been delivered (or attempted to be delivered) will be retained by the Reorganized Debtors, notwithstanding any state or other escheat or similar laws to the contrary, and the entitlement by the holder of such Allowed Claim to such distribution or any subsequent distribution on account of such Allowed Claim will be extinguished and forever barred.

> **FAILURE TO PROVIDE EVIDENCE TO DEMONSTRATE ELIGIBLE PARTICIPANT OR INELIGIBLE PARTICIPANT STATUS TO THE REASONABLE SATISFACTION OF THE DEBTORS OR THE REORGANIZED DEBTORS WILL RESULT IN A DELAY OR FORFEITURE OF A DISTRIBUTION**.

**B.     Means for Implementation of the Plan**

**General Settlement of Claims and Interests.**

As discussed herein, the provisions of the Plan will, upon consummation, constitute a good faith compromise and settlement, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, among the Debtors, the Investors and the Creditors' Committee, of disputes arising from or related to the total enterprise value of the Debtors' estates and the Reorganized Debtors for allocation purposes under the Plan. In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Investors, and the Creditors' Committee reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan. The entry of the Confirmation Order will constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings will constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

**Operations Between the Confirmation Date and Effective Date**

During the period from the Confirmation Date through and until the Effective Date, the Debtors may continue to operate their businesses as debtors in possession, subject to all applicable orders of the Bankruptcy Court and any limitations set forth in the Backstop Conversion Commitment Agreement.

**Exit Financing**

On the Effective Date, the applicable Reorganized Debtors or Reorganized GGS, as the case may be, shall execute and deliver, as applicable,  (a) the Exit Term Credit Agreement, (b) the Exit Revolver Credit Agreement,  and (c) all related documents, including the Exit Credit Facility Documents to which the applicable Reorganized Debtors are intended to be a party on the Effective Date. All such documents are incorporated herein by reference, and shall become effective in accordance with their terms and the Plan.

Confirmation of the Plan shall be deemed (a) approval of the Exit Credit Facilities and all transactions contemplated hereby and thereof (including additional syndication of the Exit Credit Facilities (if any)), and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, expenses, losses, damages, indemnities and other amounts provided for by the Exit Credit Facility Documents, and (b) authorization for the Reorganized Debtors to enter into and perform under the Exit Credit Facility Documents.  The Exit Credit Facility Documents shall constitute legal, valid, binding and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms. The financial accommodations to be extended pursuant to the Exit Credit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.

On the Effective Date, all of the liens and security interests to be granted in accordance with the Exit Credit Facility Documents (a) shall be deemed to be approved; (b) shall be legal, binding and enforceable liens on, and security interests in, the collateral granted under respective Exit Credit Facility Documents in accordance with the terms of the Exit Credit Facility Documents; (c) shall be deemed perfected on the Effective Date, subject only to such liens and security interests as may be permitted under the Exit Credit Facility Documents, and the priorities of such liens and security interests shall be as set forth in the respective Exit Credit Facility Documents; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the secured parties (and their designees and agents) under such Exit Credit Facility Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents to establish and perfect such liens and security interests under the provisions of the applicable state, provincial, federal or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the liens and security interests granted under the Exit Credit Facility Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals and consents shall not be necessary or required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. To the extent that any Holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such Holder, has filed or recorded any liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, Reorganized GGS or any administrative agent under the Exit Credit Facility Documents that are necessary to cancel and/or extinguish such liens and/or security interests (it being understood that such liens and security interests held by Holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically canceled/or extinguished automatically on the Effective Date by virtue of the entry of the Confirmation Order).

### Rights Offering

The Company will complete the Rights Offering in accordance with the Rights Offering Procedures.  The proceeds of the Rights Offering will be applied to the Term B Loans in accordance with the Backstop Commitment Conversion Agreement.

### Other Restructuring Transactions

Following the Confirmation Date, the Debtors, with the consent of the Requisite Investors, may reorganize their corporate structure by eliminating certain entities (including non-Debtor entities) that are deemed no

longer helpful, and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, liquidation, domestication, continuation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, debt or obligation on terms consistent with the terms of the Plan; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution with the appropriate governmental authorities pursuant to applicable law; and (d) all other actions that the Debtors, with the consent of the Requisite Investors, determine are necessary or appropriate, including making filings or recordings that may be required by applicable law.   To the extent deemed helpful or appropriate to the Debtors or the Reorganized Debtors, the restructuring may, with the consent of the Requisite Investors, be effected pursuant to sections 368 and 381 of the Internal Revenue Code, to preserve for the Debtors or the Reorganized Debtors the tax attributes of such entities.

### Vesting of Assets in the Reorganized Debtors

Except as otherwise provided herein or the Confirmation Order: (i) each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of its Estate, and any property acquired by such Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Equity Interests and other interests, except for Liens and obligations expressly established under the Plan (including in respect of the Exit Credit Facilities, as applicable); provided that nothing in Section 5.3 of the Plan shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claim Objection Bar Date unless otherwise ordered by the Bankruptcy Court.

The Reorganized Debtors, on and after the Effective Date, may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims or Causes of Action without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments and other materials comprising the Plan Supplement.

### Cancellation of Existing Agreements, Senior Notes and Equity Interests

On the Effective Date, except as otherwise specifically provided for in the Plan, the obligations of the Debtors under the Indentures for the Senior Notes, and any other Certificate, Equity Interest, share, note, bond, indenture, purchase right, option, warrant or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Equity Interest (except such Certificates, notes or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any obligations thereunder and shall be released and discharged therefrom; provided that (x) the Senior Notes Indentures shall remain in effect and govern the rights and obligations of the Indenture Trustee and the beneficial holders of notes issued under such Indentures, including to effectuate any charging liens permitted under the Indentures, respectively and (y) any obligations of the Debtors in the Backstop Conversion Commitment Agreement that by their terms are to be satisfied after, or are otherwise stated to survive, the closing of the Backstop Conversion Commitment Agreement shall be the obligations of the Reorganized Debtors.

### New Common Stock

On the Effective Date, the Reorganized GGS Organizational Documents shall have provided for 10 million shares of authorized New Common Stock, and Reorganized GGS shall issue or reserve for issuance a

sufficient number of shares of New Common Stock to comply with the terms of the Plan, the Rights Offering, the Backstop Conversion Commitment Agreement, the Warrant Agreement and the New MIPs.  The shares of New Common Stock issued in connection with the Plan, including in connection with the consummation of the Rights Offering, the Backstop Conversion Commitment Agreement, or upon exercise of the Warrants, and options or other equity awards issued pursuant to the New MIPs, shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable.

Each certificate or book entry position evidencing shares of New Common Stock issued pursuant to the Backstop Conversion Commitment Agreement or the Plan, including the Shares to be issued in the Rights Offering, Term B Loans Conversion Shares, and shares of New Common Stock issued in respect of Financial Claims or upon the exercise of Warrants), shall, (i) in the case of book entry position, reflect, and (ii) in the case of certificates, be stamped or otherwise imprinted with a legend (the "**Stockholder Agreement Legend**") in substantially the following form, with only such amendments, modifications, supplements or changes as are in form and substance satisfactory to the Company and the Requisite Investors in consultation with the Committee:

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A STOCKHOLDERS AGREEMENT, DATED AS OF [●], 2014, AND THE CERTIFICATE OF INCORPORATION AND BY-LAWS OF GLOBAL GEOPHYSICAL SERVICES, INC. (THE "COMPANY"), EACH AS MAY BE AMENDED FROM TIME TO TIME, INCLUDING CERTAIN RESTRICTIONS ON TRANSFER AND EXERCISE SET FORTH THEREIN. COPIES OF THE STOCKHOLDER AGREEMENT, THE CERTIFICATE OF INCORPORATION AND BY-LAWS ARE ON FILE AT THE PRINCIPAL EXECUTIVE OFFICES OF THE COMPANY"**

All distributions and issuances of New Common Stock to (1) the Investors under the Plan or the Backstop Conversion Commitment Agreement, (2) Management Holders, and (3) Significant Holders shall be issued in the name of such person as the holder of record thereof.   All other distributions and issuances of New Common Stock under the Plan or pursuant to the Rights Offering shall be issued in the name of the broker, dealer, commercial bank, trust company or other nominee (each, a "Nominee") that acts as the DTC participant for the Senior Notes Claims giving rise to the right to receive such New Common Stock pursuant to the Plan or the Rights Offering as the holder of record thereof.

Each of the Investors, [Management Holders] and Significant Holders shall be required, as a condition to receiving its shares of New Common Stock, to execute and deliver a joinder to the Stockholders Agreement.  Each of the Investors, [Management Holders], and Significant Holders shall be required, as a condition to receiving its shares of New Common Stock, to execute and deliver a joinder to the Stockholders Agreement; provided that each such Holder of New Common Stock shall be deemed bound to the terms of the Stockholders Agreement from and after the Effective Date even if not a signatory thereto.  To the extent that any shares of New Common Stock are not distributed to Significant Holders who would otherwise be entitled to receive such shares within six months of the Effective Date due to a failure of such Significant Holder to become a signatory to the Stockholders Agreement, such shares of New Common Stock shall be treated as Unclaimed Property in accordance with Section [9.9] of the Plan.

As of the Effective Date, as a condition of receiving any distribution of New Common Stock under the Plan or pursuant to the Rights Offering, each Nominee that receives shares of New Common Stock shall be deemed to be bound by the  Stockholders Agreement as if an original party thereto.

All shares of New Common Stock shall be issued in book-entry form; provided, however, that any holder of record that executes a joinder to the Stockholders Agreement in accordance with the terms thereof, including the Investors, [Management Holders] and Significant Holders, may require the Company to issue shares of New Common Stock held of record thereby in certificated form in accordance with the terms of the Stockholders Agreement

**Exemption from Registration**

The offer, issuance, sale or distribution under the Plan of the (a) shares of New Common Stock to Holders of Class 4A and Class 4B Financial Claims (other than any Rights Offering Shares issued to such Holders of Class 4A Financial Claims), (b) the Term B Loans Conversion Shares and Commitment Premium Shares, (c) the Warrants, and (d) the shares of New Common Stock issuable upon the exercise of the Warrants, shall all be exempt from registration under Section 5 of the Securities Act (or any State or local law requiring registration for offer or sale of a security) under, and to the extent provided by, section 1145 of the Bankruptcy Code.

The Rights and the Rights Offering Shares shall all be issued without registration in reliance upon the exemption set forth in section 4(a)(2) of the Securities Act and will be "restricted securities."

The New Common Stock or other securities underlying the New MIPs will be issued pursuant to another available exemption from registration under the Securities Act and other applicable law.

All securities described in Section 5.8 of the Plan were offered, distributed and sold pursuant to the Plan.

### Deregistration

Reorganized GGS expects to have fewer than 300 record holders of New Common Stock on and after the Effective Date and intends to seek a suspension of SEC reporting under the Securities Exchange Act of 1934 and to terminate all effective registration statements under the Securities Act of 1933, subject to and in accordance with the Backstop Conversion Commitment Agreement.

### Section 1146 Exemption from Certain Transfer Taxes and Recording Fees

To the fullest extent permitted by law, pursuant to section 1146(a) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or to any other Person, pursuant to, in contemplation of, or in connection with the Plan (including any transfer pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors; (b) the creation, modification, consolidation, assumption, termination, refinancing and/or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (c) the making, assignment or recording of any lease or sublease; (d) the grant of collateral as security for any or all of the Exit Credit Facilities; (e) the issuance, transfer or exchange under the Plan of New Common Stock, the Rights, the Rights Offering Shares, Warrants or the New MIP Common Shares; (f) the Backstop Conversion Commitment Agreement; or (g) the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan) shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, sales and use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local government officials or agents shall, and shall be directed to, forgo the collection of any such tax, recordation fee or government assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or government assessment.  The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

### Preservation of Causes of Action

Except as otherwise expressly provided in the Plan or Confirmation Order, each and every Cause of Action, right of setoff and other legal and equitable defenses of any Debtor or any Estate are preserved for the benefit of Reorganized Debtors and, along with the exclusive right to enforce such Cause of Action and rights, shall vest exclusively in Reorganized Debtors as of the Effective Date; provided that nothing in this Article 5.12 shall limit the ability under the Bankruptcy Code of any party-in-interest to object to any Claim prior to the Claim Objection Bar Date unless otherwise ordered by the Bankruptcy Court.  Unless a Cause of Action is expressly waived, relinquished, released or compromised in the Plan or an order of the Bankruptcy Court, the Reorganized Debtors expressly reserve such Cause of Action for later adjudication and, accordingly, no doctrine of res judicata,

collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases.

**No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue such Cause of Action against them. The Debtors or Reorganized Debtors, as applicable, instead expressly reserve all rights to prosecute any and all Causes of Action against any Person, in accordance with the Plan, including without limitation, all Causes of Action against SEI-GPI JV LLC ("SEI-GPI"), Richard Degner, Bancolombia, and their respective Affiliates and insiders. Without limiting any the foregoing, the Reorganized Debtors shall retain the Retained Causes of Action described in the Plan Supplement.**

### Effectuating Documents and Further Transactions

The Debtors or the Reorganized Debtors, as applicable, may take all actions to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, including the distribution of the securities to be issued pursuant hereto in the name of, and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions or consents except for those expressly required pursuant hereto; provided that after the Confirmation Date (but prior to the Effective Date) the Debtors shall consult with and, to the extent required by the terms of the Backstop Conversion Commitment Agreement, seek the consent of the Requisite Investors on such actions subject to the terms of the Backstop Conversion Commitment Agreement. The secretary and any assistant secretary of each Debtor shall be authorized to certify or attest to any of the foregoing actions.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the shareholders, directors or members of the Debtors shall be deemed to have been so approved and shall be in effect prior to, on or after the Effective Date (as appropriate), pursuant to applicable law, and without any requirement of further action by the shareholders, directors, managers or partners of the Debtors, or the need for any approvals, authorizations, actions or consents.

### Reinstatement of Interests in Debtor Subsidiaries

Each Reorganized Debtor shall be deemed to have issued authorized new equity securities to the Reorganized Debtor that was that Debtor's corporate parent prior to the Effective Date so that each Reorganized Debtor will retain its 100% ownership of its pre-Petition Date Debtor subsidiaries. The Debtors may modify the foregoing at any time in their unfettered discretion with the consent of the Requisite Investors.

### Intercompany Account Settlement

The Debtors and Reorganized Debtors, and their respective subsidiaries, will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Debtors or Reorganized Debtors (as applicable) to satisfy their obligations under the Plan, subject to and in accordance with the Backstop Conversion Commitment Agreement.

### Issuance of New GGS Common Stock

Shares of New Common Stock will be authorized under the New GGS Organizational Documents, and shares of New Common Stock will be issued on the Effective Date and distributed as soon as practicable thereafter in accordance with the Plan. All stated amounts of New GGS Common Stock to be distributed as set forth in the Plan. All of the New Common Stock issuable in accordance with the Plan, when so issued, will be duly authorized, validly issued, fully paid, and non-assessable. The issuance of the New Common Stock is authorized without the need for any further corporate action and without any further action by any holder of a Claim.

### C.    Provisions Regarding Corporate Governance of the Reorganized Debtors

### Organizational Documents

On or as of the Effective Date, the Reorganized GGS Organizational Documents shall prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code.  The Reorganized GGS certificate of incorporation will be filed on or as soon as reasonably practicable after the Effective Date with the applicable authority in the jurisdiction of incorporation in accordance with the corporate laws of its jurisdiction of incorporation.

### Indemnification Provisions in Organizational Documents

Notwithstanding any other provisions of the Plan, from and after the Effective Date, indemnification obligations owed by the Debtors or Reorganized Debtors to directors, officers or employees of the Debtors who served or were employed by a Debtor on or after the Petition Date, to the extent provided in the applicable articles or certificates of incorporation, bylaws or similar constituent documents, by statutory law or by written agreement, policies or procedures of such Debtor, will be deemed to be, and treated as though assumed pursuant to the Plan. All such indemnification obligations shall survive confirmation of the Plan, remain unaffected thereby, and not be discharged, irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

### Directors and Officers of the Reorganized Debtors

The identity and affiliations of each individual proposed to serve as a director or officer of Reorganized GGS after the Effective Date, as well as the nature of any compensation of such individual who is an insider of a Debtor, will be disclosed in the Plan Supplement no later than the Confirmation Hearing.

The initial Board of Directors of Reorganized GGS shall have five members, consisting of (a) the Chief Executive Officer of GGS, Mr. Richard White, (b) two members designated by Third Avenue Focused Credit Fund, and (c) two members ("Independent Directors") designated by the Investors in consultation with the Committee.  The Ad Hoc Group shall consult with Mr. White and the Creditors' Committee regarding the selection of the two Independent Directors.

The Officers of Reorganized GGS, subject to entry in New Management Agreements, will be as follows:   Mr. Richard White, Chief Executive Officer; Mr. Sean Gore, Chief Financial Officer; Mr. Tom Fleure, Senior Vice President of Geophysical Technology; Mr. Ross Peebles, Senior Vice President of North America and E&P Services; and Mr. James Brasher, Senior Vice President and General Counsel.

### Powers of Officers

The officers of the Debtors or the Reorganized Debtors, as the case may be, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan, subject to the consent of the Requisite Investors.

## D.      Compensation and Benefits Programs

### New Compensation and Benefits Programs

On the Effective Date, Reorganized GGS shall enter into the New Management Agreements.

Reorganized GGS shall adopt (i) the New Emergence MIP on the Effective Date and (ii) the New Long Term MIP on or as soon as reasonably practicable after the Effective Date, under which, from time to time, equity or equity-based awards may be awarded to eligible members of management and employees of Reorganized GGS.

New Emergence MIP.  The New Emergence MIP will be filed in the Plan Supplement, be in form and substance satisfactory to the Requisite Investors and the Debtors, in consultation with the Creditors Committee, and which will be consistent with the following terms:

- *MIP Shares*:  A pool of New Common Stock, representing approximately 5.2% of the total New Common Stock as of the Effective Date, issued for the benefit of New Emergence MIP on the Effective Date;

- *Participants*:  Mr. Richard White, Chief Executive Officer; Mr. Sean Gore, Chief Financial Officer; Mr. Tom Fleure, Senior Vice President of Geophysical Technology; Mr. Ross Peebles, Senior Vice President of North America and E&P Services; and Mr. James Brasher, Senior Vice President and General Counsel and potentially other members of management, as determined by the Board of Directors with the consent of the Requisite Investors.

- *Vesting of Awards*:   25% on the Effective Date and the remaining 75% in three equal annual installments of 25% on each of the first three anniversaries of the Effective Date provided that such participant is employed by Reorganized GGS on such vesting date(s).

- *Form of Awards*:

  o   70% in the form of restricted stock/restricted stock units

  o   15% at-the-money nonqualified stock options, with an exercise price no less than the per share "fair market value" as determined in accordance with Section 409A of the U.S. Internal Revenue Code of 1986, as amended and applicable published guidance thereunder ("Code Section 409A")

  o   15% premium nonqualified stock options (with an exercise price calculated based on 125% of Restructuring Enterprise Value, but in no event having an exercise price less than the per share "fair market value" as determined under Code Section 409A)

- *Allocation among Participants*:  85% of the awards under the New Emergence MIP shall be allocated to the above-named participants.

- *Other Terms*:   Additional terms, including anti-dilution, liquidity mechanism and tag-along rights to be acceptable to the Debtors and the Requisite Investors in consultation with the Creditors' Committee and memorialized in the plan documents filed with the Plan Supplement (the form and substance of which as consented to by the Requisite Investors in consultation with the Creditors' Committee).

New Long Term MIP.  After the Effective Date, the Board of Directors of Reorganized GGS will adopt the New Long Term MIP under which equity or equity-based awards may be awarded.  The terms of the New Long Term MIP, including proposed recipients, vesting schedule and conditions and form of awards, will be determined by the Board of Directors of Reorganized GGS.

## Compensation and Benefits Programs

On the Effective Date, with respect to  the KEIP, the Company's annual bonus plan, and all other Compensation and Benefits Programs, each Reorganized Debtor, as applicable, shall assume and continue to honor in accordance with their terms and applicable laws (including, as applicable, ERISA and the Internal Revenue Code) and perform the KEIP, the Company's annual bonus plan, and all other Compensation and Benefits Programs, subject to any rights to terminate or modify such plans; provided, however, that (i) the Reorganized Debtors will

reject, not assume and will not honor the Company's Amended and Restated 2006 Incentive compensation Plan or any awards thereunder, and on the Effective Date, any awards of, or rights in respect of, restricted stock units, incentive stock options and performance units, or any Claims in respect of same, whether vested or not, will be treated as Equity Interests in Class 7 under the Plan, cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and (ii) notwithstanding anything herein to the contrary, the implementation of the annual cash incentive plan (also referred to as the 2014 Bonus Plan or Yearly Bonus Plan, which is in the approximate amount of $4.5 million - $5.7 million), shall be determined (with regard to amount and whether performance criteria have been reached) and paid in the sole discretion of the Board of the Reorganized Debtors, regardless of whether the Debtors emerge from Chapter 11 prior to December 31, 2014 or after.

The Debtors' or Reorganized Debtors' performance under any employment agreement will not entitle any person to any benefit or alleged entitlement under any contract, agreement, policy, program or plan that has expired or been terminated on or before the Effective Date, or restore, reinstate or revive any such benefit or alleged entitlement under any such contract, agreement, policy program or plan, and any assumed Compensation and Benefits Programs shall be subject to modification in accordance with their terms.  Nothing herein shall limit, diminish or otherwise alter the Debtors' or the Reorganized Debtors' defenses, claims, Causes of Action or other rights with respect to any such contracts, agreements, policies, programs and plans, including the Reorganized Debtors' rights to modify unvested benefits pursuant to their terms, nor shall confirmation of the Plan and/or consummation of any restructuring transactions constitute a change in control or change in ownership under any such contracts, agreements, policies, programs and plans.

### Workers' Compensation Program

On the Effective Date, except as set forth in the Plan or Disclosure Statement, the applicable Reorganized Debtor shall assume and continue to honor the Debtors' obligations under (a) all applicable workers' compensation laws in states in which the Reorganized Debtors operate and (b) the Debtors' written policies, programs, and plans for workers' compensation and workers' compensation insurance; provided that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such policies, programs and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors or the Reorganized Debtors in addition to what is provided for under applicable state law.

### E.      Effect of Confirmation of the Plan

### Compromise and Settlement

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim, or any Distribution to be made on account of such Allowed Claim.

Without limiting the foregoing, as discussed in the Disclosure Statement, the provisions of the Plan shall, upon consummation, constitute a good faith compromise and settlement, pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code, among the Debtors, the Investors, the DIP Lenders, the Creditors' Committee, and the Ad Hoc Group of disputes arising from or related to the total enterprise value of the Debtors' estates and the Reorganized Debtors for allocation purposes under the Plan, the DIP Loan Claims, and the treatment and distribution to holders of Allowed Trade Claims and Financial Claims.  In the event that, for any reason, the Confirmation Order is not entered or the Effective Date does not occur, the Debtors, the Investors, the DIP Lenders, the Creditors' Committee, and the Ad Hoc Group, reserve all of their respective rights with respect to any and all disputes resolved and settled under the Plan.

The entry of the Confirmation Order shall constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtors, their estates, creditors, and other parties-

in-interest, and are fair, equitable, and within the range of reasonableness. The provisions of the Plan, including, without limitation, its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

### Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, however the Debtors reserve the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim.

### Discharge of the Debtors

**Pursuant to section 1141(d) of the Bankruptcy Code and effective as of the Effective Date, and except as otherwise specifically provided in the Plan: (a) the distributions, rights and treatment that are provided in the Plan shall be in complete satisfaction, discharge and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against and Equity Interests in, the Debtors, the Reorganized Debtors or any of their assets, properties or Estates, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities and Causes of Action that arose before the Effective Date; (b) the Plan shall bind all holders of Claims and Equity Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt, right or Equity Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder; and (d) all Entities shall be precluded from ever asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any Claims and Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.   The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.**

### Release of Liens

**Except (a) with respect to the Liens securing the Exit Credit Facility to the extent set forth in the Exit Credit Facility Documents, or (b) as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date (and, with respect to the DIP Loan Claims, subject to the payment to the DIP Loan Claims pursuant to the Plan), all mortgages, deeds of trust, Liens, pledges or other security interests against any property of the Estates shall be fully released and discharged, and all of the rights, title and interest of any Holder of such mortgages, deeds of trust, Liens, pledges or other security interests shall revert to the Reorganized Debtors and their successors and assigns.**

### Release by the Debtors

**Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan and the compromises contained herein, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtors, the Reorganized Debtors and the Estates, including any successor to the Debtors or any Estate representative**

from all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor subsidiaries, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, Exit Credit Facility Documents, the Rights Offerings, the Backstop Conversion Commitment Agreement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a non-Debtor subsidiary, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud or a criminal act.

### Voluntary Release by Holders of Claims

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan, and the compromises contained herein, on and after the Effective Date, to the fullest extent permitted by applicable law, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) shall be deemed to conclusively, absolutely, unconditionally, irrevocably and forever release, waive and discharge the Released Parties of any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including: any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including, those that any of the Debtors, the Reorganized Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors and their non-Debtor subsidiaries, the Estates, the conduct of the businesses of the Debtors and their non-Debtor subsidiaries, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement, the Rights Offerings, the Exit Credit Facility Documents, the Backstop Conversion Commitment Agreement or, in each case, related agreements, instruments or other documents, any action or omission with respect to Intercompany Claims, any action or omission as an officer, director, agent, representative, fiduciary, controlling person, affiliate or responsible party, or any transaction entered into or affecting, a non-Debtor subsidiary, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date of the Plan, other than claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, fraud or a criminal act.

Each Person providing releases under the Plan, including the Debtors, the Reorganized Debtors, the Estates and the Releasing Parties, shall be deemed to have granted the releases set forth in those sections notwithstanding that such Person may hereafter discover facts in addition to, or different from,

those which it now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person expressly waives any and all rights that it may have under any statute  or common law principle which would limit the effect of such releases to those claims or causes of action actually known or suspected to exist at the time of execution of such release.

### Exculpation

Notwithstanding anything  herein to the contrary, as of the Effective Date, the Debtors and their directors, officers, employees, attorneys, investment  bankers, financial advisors, restructuring advisors and other professional advisors, representatives and agents will be deemed to have solicited acceptances  of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including section 1125(e) of the Bankruptcy Code and any applicable  non-bankruptcy law, rule, or regulation governing the adequacy  of disclosure in connection with the solicitation.

Notwithstanding anything  herein to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Entity act taken or omitted to be taken in connection with, or arising from or relating in any way to, the Chapter 11 Cases, including but not limited to, (a) the management and operation of the Debtors' businesses and the discharge of their duties under the Bankruptcy Code during the pendency of these Chapter 11 Cases; (b) implementation of any of the transactions provided for, or contemplated in, the Plan or the Plan Supplement; (c) any action taken in the negotiation, formulation, development, proposal, solicitation, disclosure, Confirmation, or implementation of the Plan or Plan Supplement; (d) formulating, negotiating,  preparing, disseminating, implementing, administering, confirming and/or effecting the DIP Loan and Exit Credit Facility Documents, the Disclosure Statement and the Plan, the Plan Supplement, the New MIPs, the Rights Offerings and the issuance of Rights Offerings Shares, the Rights Offerings Procedures, the DIP Conversion, the Commitment Premium, the Termination Payments, the issuance of Warrants and shares of New Common Stock in connection with the Plan, and any related contract, instrument, release or other agreement or document  created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of Confirmation and Consummation of the Plan); (e) the offer and issuance of any securities under or in connection with the Plan, including pursuant to the Rights Offerings and the Backstop Conversion Commitment Agreement; (f) the administration of the Plan or the assets and property to be distributed pursuant to the Plan; (g) any other Prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the bankruptcy restructuring of the Debtors; and (h) the preparation and filing of the Chapter 11 Cases, provided that nothing in the foregoing "Exculpation" shall exculpate any Person or Entity from any liability resulting from any act or omission that is determined by Final Order to have constituted fraud, willful misconduct,  gross negligence, or criminal conduct; provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

### Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR FOR OBLIGATIONS ISSUED PURSUANT HERETO, ALL ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO THE PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE 12.7 ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, OR THE RELEASED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR PROCEEDING, OF ANY KIND, ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH RELEASED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH RELEASED PARTIES OR THE PROPERTY OR ESTATES OF SUCH RELEASED PARTIES ON ACCOUNT OF OR IN

CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF OR SUBROGATION OF ANY KIND AGAINST ANY OBLIGATIONS DUE FROM THE DEBTORS OR THE REORGANIZED DEBTORS OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTORS ON ACCOUNT OF ANY SUCH CLAIM, CAUSE OF ACTION OR EQUITY INTEREST; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION OR EQUITY INTERESTS RELEASED, SETTLED, EXCULPATED OR DISCHARGED PURSUANT TO THE PLAN OR CONFIRMATION ORDER.

### Limitations on Exculpations and Releases

**Notwithstanding anything contained  herein to the contrary, the releases and exculpation contained herein does not release any obligations of any party arising under the Plan or any document, instrument or agreement (including those set forth in the Backstop Conversion Commitment Agreement, the Exit Credit Facility Documents and the Plan Supplement) executed to implement the Plan.**

### Preservation of Insurance

The Debtors' discharge, exculpation and release, and the exculpation and release in favor of Released Parties, as provided in the Plan shall not, except as necessary to be consistent with the Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other Person.

### Preservation of Causes of Action.

Section 1123(b)(3) of the Bankruptcy Code provides that a debtor's plan of reorganization may provide for the debtor to retain and enforce any claim or interest on behalf of the debtor's estate for the benefit of its creditors.

Except as otherwise expressly provided in the Plan or Confirmation Order, each and every Cause of Action, right of setoff and other legal and equitable defenses of any Debtor or any Estate are preserved for the benefit of Reorganized Debtors and, along with the exclusive right to enforce such Cause of Action and rights, shall vest exclusively in Reorganized Debtors as of the Effective Date.  The Reorganized Debtors expressly reserve such Cause of Action, rights and defenses for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases.  **No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as an indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue such Cause of Action against them.  The Debtors or Reorganized Debtors, as applicable, instead expressly reserve all rights to prosecute, and will prosecute, any and all Causes of Action against any Person, in accordance with the Plan.**

Without limiting the foregoing each and every Cause of Action, right of setoff and other legal and equitable defenses of any Debtor or any Estate relating to or against: Taurus Energy, U.S. Sand, SEI/GPI, the SEI/GPI Transaction, Bancolombia, the SES Transaction, and all Causes of Action disclosed herein, in the Plan Supplement, and in the Schedules, including transfers and payments disclosed in the Schedules filed by each Debtor in the Bankruptcy Cases, and any Causes of Action under chapter 5 of the Bankruptcy Code or similar non-bankruptcy law, are all expressly reserved for later adjudication and, accordingly, no doctrine of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), laches or other preclusion doctrine shall apply to such Cause of Action, right or defense as a consequence of the Confirmation, the Plan, the vesting of such Cause of Action in Reorganized Debtors, any order of the Bankruptcy Court or these Chapter 11 Cases.   Each Debtor's Schedules can be found at Debtors' restructuring website: *http://cases.primeclerk.com/ggs* under the link titled "Schedules and SOFA."

From and after the Effective Date, the Reorganized Debtors, as applicable, will have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any Cause of Action and to decline to do any of the foregoing without further notice to or action, order or approval of the Court. The Reorganized Debtors are deemed a representatives of the Estates for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to 11 U.S.C. 1123(b)(3)(B).

**Votes Solicited in Good Faith.**

The Debtors have, and upon entry of the Confirmation Order will be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code. The Debtors (and their respective affiliates, agents, directors, officers, members, employees and Professionals) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under the Plan and therefore have not been, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

**Claims Incurred After the Effective Date**

Claims incurred by the Reorganized Debtors after the Effective Date may be paid by the Reorganized Debtors in the ordinary course of business and without application for or Court approval, subject to any agreements with such holders of a Claim.

**Preservation of Insurance**

The Debtors' discharge, exculpation and release, and the exculpation and release in favor of Released Parties, as provided herein shall not diminish or impair the enforceability of any insurance policy that may provide coverage for Claims against the Debtors, the Reorganized Debtors, their current and former directors and officers, or any other Person.

**F.      Retention of Jurisdiction.**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain its existing exclusive jurisdiction over all matters arising in or out of, or related to, the Chapter 11 Cases or the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

    i.    Allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any General Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

    ii.    Decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

    iii.    Resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including any disputes regarding cure obligations in accordance with Article 8.3; and (ii) any dispute regarding whether a contract or lease is, or was, executory or expired;

<table>
<tr><td>iv.</td><td>Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the Plan;</td></tr>
<tr><td>v.</td><td>Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;</td></tr>
<tr><td>vi.</td><td>Adjudicate, decide or resolve any and all matters related to Causes of Action pending before the Bankruptcy Court on the Effective Date;</td></tr>
<tr><td>vii.</td><td>Adjudicate, decide or resolve any Causes of Action, including any Avoidance Actions, whether or not such Cause of Action was pending as of the Effective Date;</td></tr>
<tr><td>viii.</td><td>Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;</td></tr>
<tr><td>ix.</td><td>Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan, Plan Supplement or the Disclosure Statement;</td></tr>
<tr><td>x.</td><td>Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;</td></tr>
<tr><td>xi.</td><td>Adjudicate, decide or resolve any and all disputes as to the ownership of any Claim or Equity Interest;</td></tr>
<tr><td>xii.</td><td>Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;</td></tr>
<tr><td>xiii.</td><td>Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;</td></tr>
<tr><td>xiv.</td><td>Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the existence, nature and scope of the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;</td></tr>
<tr><td>xv.</td><td>Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;</td></tr>
<tr><td>xvi.</td><td>Determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Plan Supplement or the Disclosure Statement;</td></tr>
<tr><td>xvii.</td><td>Enter an order or final decree concluding or closing the Chapter 11 Cases;</td></tr>
<tr><td>xviii.</td><td>Adjudicate any and all disputes arising from, or relating to, Distributions under the Plan;</td></tr>
</table>

xix.          Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

xx.          Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Credit Facility Documents and any intercreditor agreement, which disputes shall be adjudicated in accordance with the terms of such agreements);

xxi.          Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

xxii.          Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retirement benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

xxiii.          Enforce all orders previously entered by the Bankruptcy Court;

xxiv.          Adjudicate, decide, or resolve any disputes relating to the Rights Offerings (and the conduct thereof) and the issuances of Rights Offerings Shares;

xxv.          Adjudicate, decide, or resolve any disputes relating to the Backstop Conversion Commitment Agreement; and

xxvi.          Hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in this Article 14 to the contrary, the Exit Credit Facility Documents shall be governed by the jurisdictional provisions therein.

**G.      Executory Contracts and Unexpired Leases.**

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Court, to assume or reject executory contracts and unexpired leases. If an executory contract or unexpired lease is rejected, the other party to the agreement may file a claim for damages, if any, incurred by reason of the rejection. In the case of the Debtors' rejection of leases of real property, such damage claims are subject to certain caps imposed by the Bankruptcy Code.

**Rejection of Executory Contracts and Unexpired Leases**

Except as otherwise provided herein, all Executory Contracts and Unexpired Leases will be rejected by the Plan on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, other than (a) Executory Contracts or Unexpired Leases previously assumed or rejected pursuant to an order of the Bankruptcy Court, (b) Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Effective Date and (c) the Specified Contracts that GGS elects to assume pursuant to the Plan. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejection of such Executory Contracts and Unexpired Leases pursuant to sections 365 and 1123 of the Bankruptcy Code.

**Claims Against the Debtors Upon Rejection**

No Executory Contract or Unexpired Lease rejected by the Debtors on or prior to the Effective Date shall create any obligation or liability of the Debtors or the Reorganized Debtors that is not a Claim. Any Proof of Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court within 30 days after the Effective Date, unless rejected at a later date as a result of a disputed assumption, assignment or cure amount as set forth in Article 8.5 herein. Any Claim arising from or relating to the rejection of an Executory Contract or Unexpired Lease that is not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors or any of their property. Any Allowed Claim arising from the rejection of an Executory Contract or Unexpired Lease shall be classified as a Class 5 Trade Claim, and shall be treated in accordance with Article 4.4.of the Plan.

### Cure and Assumption of Specified Contracts

Any counterparty to a Specified Contract that fails to object timely to the proposed assumption of such Specified Contract or the related cure amount will be deemed to have consented to the assumption and cure on the terms provided in the notice, and entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of assumption and amount required to cure a default (if any) under such Specified Contract and/or a determination of the cure amount, as applicable, pursuant to sections 365 and 1123 of the Bankruptcy Code. Any payment required to cure a default under a Specified Contract shall be paid in Cash promptly after the Effective Date or, if there is a dispute regarding the assumption or cure of such Specified Contract, the entry of a Final Order or orders resolving such dispute.

### Effect of Assumption

Assumption of any agreement, Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, and the deemed waiver of any termination right or remedial provision arising under any such agreement, Executory Contract or Unexpired Lease at any time prior to the effective date of its assumption, or as a result of such assumption, the transactions contemplated by the Plan or any changes in control or ownership of any Debtors during the Chapter 11 Cases or as a result of the implementation of the Plan. For the avoidance of doubt, any clause or provision of any agreement between the Debtor and any other party (including any holder of a Claim or Interest under the Plan) that purports to modify the rights of such other party based on the Plan, events relating to the Chapter 11 Cases, or any of the transactions contemplated by the Plan shall be ineffective, including without limitation that certain Service Mark Agreement, dated January 10, 2006, by and between GGS and Richard Degner. Notwithstanding the foregoing, with respect to Executory Contracts with customers of the Debtors that are assumed pursuant to the Plan, the Reorganized Debtors shall remain obligated to honor any obligations set forth in such contracts to provide rebates or discounts, to the extent such rebates or discounts accrued but are not yet due under the terms of such contracts, in the ordinary course of business. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged without further notice to, or action, order or approval of, the Bankruptcy Court, except in the event that the applicable Debtor and the counterparty to an Executory Contract or Unexpired Lease have separately agreed to a waiver or reduction of obligations that would otherwise constitute cure obligations, subject to the counterparties' explicit retention of their rights to assert any such amounts as Unsecured Claims.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article 8 or any order of the Bankruptcy Court, which has not been assigned to a third party on or prior to the Effective Date, shall vest in, and be fully enforceable by, the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

### Assumption or Rejection of Disputed Contracts

Except as otherwise provided by order of the Bankruptcy Court, if there is a dispute as of the Effective Date regarding any of the terms or conditions for the assumption, assignment or cure of an Executory Contract or Unexpired Lease (whether or not a Specified Contract) proposed by the Debtors (with the consent of the Requisite Investors) to be assumed by the Reorganized Debtors or assumed and assigned to any other Person, the

Reorganized Debtors shall have until 30 days after entry of a Final Order resolving such dispute to determine whether to (a) proceed with assumption (or assumption and assignment, as applicable) in a manner consistent with such Final Order or (b) reject the Executory Contract or Unexpired Lease.  If the Reorganized Debtors elect to reject the applicable Executory Contract or Unexpired Lease, the Reorganized Debtors shall send written notice of rejection to the applicable counterparty within such 30-day period and the counterparty may file a Proof of Claim arising out of rejection within 30 days after receipt of notice of rejection, the Allowed amount which shall be treated as a Class 5 Trade Claim.

### Modification, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or rejected shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to Prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the Prepetition nature of such Executory Contract or Unexpired Leases or the validity, priority or amount of any Claims that may arise in connection therewith.

### Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease as a Specified Contract, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Reorganized Debtor has any liability thereunder.

### Contracts and Leases Entered Into After the Petition Date

Each Reorganized Debtor will perform its obligations under each contract and lease entered into by such Reorganized Debtor after the Petition Date, including any Executory Contract and Unexpired Lease assumed by such Reorganized Debtor, in each case, in accordance with and subject to the then applicable terms. Accordingly, such contracts and leases (including any assumed Executory Contracts or Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order and all of the Debtors' or Reorganized Debtors' rights, claims, defenses and privileges under such contracts and leases are expressly reserved.

### Directors and Officers Insurance Policies and Agreements

To the extent that the D&O Liability Insurance Policies issued to, or entered into by, the Debtors prior to the Petition Date constitute executory contracts, notwithstanding anything in the Plan to the contrary, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies effective as of the Effective Date.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any advancement, indemnity or other obligations of the insurers under any of the D&O Liability Insurance Policies.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any of the D&O Liability Insurance Policies with respect to conduct occurring prior to the Effective Date.

### Indemnification and Reimbursement Obligations

On and from the Effective Date, except as prohibited by applicable law and subject to the limitations set forth herein, the Reorganized Debtors shall assume all (i) contractual indemnification obligations set forth in the Plan Supplement and the Backstop Conversion Commitment Agreement and (ii) for Indemnified Parties, indemnification and advancement obligations currently in place in the Debtors' bylaws, certificates of incorporation (or other formation documents), board resolutions, and in Compensation and Benefits Programs or other agreements, provided that, with respect to those individuals who were insured Persons under the D&O Liability Insurance Policies (including directors or officers of any of the Debtors at any time) prior to the Effective Date, but who, as of the Effective Date, no longer serve in the capacity pursuant to which such Persons became insured Persons under the D&O Liability Insurance Policies, the Debtors' obligation to make advancements to and indemnify such Persons shall be limited to the extent of available coverage under their D&O Liability Insurance Policies (and payable from the proceeds of such D&O Liability Insurance Policies).

## H.   Miscellaneous

### Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(g) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors and any and all Holders of Claims and Equity Interests (irrespective of whether Holders of such Claims or Equity Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Texas (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) will govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

### Additional Documents.

On or before the Effective Date, the Debtors, with the consent of the Investors, may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving Distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any other Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (a) any Debtor with respect to the Holders of Claims or Equity Interests or other Entity; or (b) any Holder of a Claim or an Equity Interest or other Entity prior to the Effective Date.

### Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**Term of Injunctions of Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

**Withholding and Reporting Requirements.**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtors will comply with all withholding and reporting requirements imposed by any United States federal, state, local or foreign taxing authority and all distributions hereunder will be subject to any such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors will be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distribution pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

**Plan Supplement.**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. The documents contained in the Plan Supplement will be available online at www.pacer.gov and *http://cases.primeclerk.com/ggs*.

**Conflicts.**

The terms of the Plan will govern in the event of any inconsistency between the Plan and the Disclosure Statement. In the event of any inconsistency between the Plan and the Confirmation Order, the Confirmation Order will govern with respect to such inconsistency.

## IX.   CONFIRMATION AND EFFECTIVENESS OF THE PLAN

### A.   Conditions Precedent to Effective Date

The Plan provides that the following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived in accordance with the Plan:

    i.    <u>Confirmation Order</u>.  The Confirmation Order shall have been entered in a form and substance reasonably satisfactory to Debtors, the Requisite Investors, and the Creditors' Committee.

    ii.    <u>No Stay of Confirmation</u>.   There shall not be in force any order, decree or ruling of any court or governmental body having jurisdiction, restraining, enjoining or staying the consummation of, or rendering illegal the transactions contemplated by, the Plan.

    iii.    <u>Backstop Commitment</u>.  The Backstop Conversion Commitment Agreement shall be in full force and effect, the conditions contained in Article VIII therein either satisfied or waived in accordance with the terms therewith, and the transactions contemplated thereunder shall have been consummated and there shall not be a stay or injunction in effect with respect thereto.

iv.     <u>Plan Term Sheet</u>.  Each of the following conditions referred to as the "Certain Closing and Other Conditions to the Restructuring" that are set forth in the Plan Term Sheet shall have occurred or been waived by the Requisite Investors:

     a.     The definitive documentation relating to the Restructuring (including, for the avoidance of doubt, the terms and conditions of any Exit Facility) shall be agreed to by the Debtors, the Ad Hoc Group and the Committee; provided, that subsequent to the Committee delivering the Committee Support Letter the consent of the Committee shall only be required where the definitive documentation (a) has not been finalized in a form and substance acceptable to the Committee prior to such date or (b) is modified in a manner (i) that is inconsistent with the terms set forth herein and (b) that individually or in the aggregate materially adversely impacts or affects the rights or recoveries of the holders of Trade Claims or Financial Claims.

     b.     All of the Ad Hoc Group's professional fees and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Debtors' chapter 11 cases, shall have been paid by the Debtors as a condition to the Effective Date.

     c.     The Debtors shall have provided the Ad Hoc Group (and its advisors) with full and complete access to the Debtors and their management, including without limitation, access to all non-privileged pertinent information, memoranda, and documents reasonably requested by the advisors to the Ad Hoc Group in connection with (1) any investigation conducted by the SEC or other governmental or regulatory agency or (2) any matter relating to the restatement of the Debtors' pre-petition financial statements (and the Debtors shall use reasonable efforts to work with the Ad Hoc Group's counsel to provide information subject to any common interest agreements or privilege between them).

     d.     The Restructuring transactions shall be structured in the most tax efficient manner as determined by the Ad Hoc Group in consultation with the Committee, and all accounting treatment and other tax matters shall be resolved by the Ad Hoc Group in consultation with the Committee.

     e.     Entry of an order of the Bankruptcy Court confirming the Plan on terms consistent with this Term Sheet and otherwise acceptable to the Debtors, the Ad Hoc Group and the Committee; provided that the consent of the Committee shall only be required where the order (a) is inconsistent with the terms set forth herein and (b) materially and adversely impacts or affects the rights of the holders of Trade Claims or Financial Claims.

     f.     All requisite governmental authorities and third parties shall have approved or consented to the Restructuring, to the extent required, and all applicable appeal periods shall have expired.

     g.     The Debtors shall have publicly filed a document "cleansing" all of the members of the Ad Hoc Group of any and all material non-public information shared with the members of the Ad Hoc Group prior to the filing of the Plan at the time of filing of the Disclosure Statement, and

such document shall be in form and substance satisfactory to the Ad Hoc Group and its advisors.  The Debtors shall also have publicly filed a document "cleansing" all of the members of the Ad Hoc Group of any and all material non-public information shared with the members of the Ad Hoc Group prior to the Effective Date, and such document shall be in form and substance satisfactory to the Ad Hoc Group and their advisors.

h.  (i)  The Requisite Investors are reasonably satisfied that following the consummation of the transactions contemplated by this Agreement, (A) shares of New Common Stock and (B) the New Warrants, will each not be "held of record" within the meaning of Rule 12g5-1 under the Exchange Act by 300 or more Persons (whether such shares of New Common Stock or New Warrants are acquired pursuant to this Agreement, the Rights Offering, the Plan, the Management Incentive Plan or otherwise); (ii) A Form 25 for each class of the Company's securities that were registered under section 12(b) of the Exchange Act has become effective;  (iii) No classes of the Company's securities are registered or deemed registered under section 12 of the Exchange Act; (iv) the SEC has declared effective all post-effective amendments required to be filed by Section 7.4(b) of the Backstop Agreement; (v) there are no effective Securities Act registration statements on file with the SEC for any of the Company's securities; (vi) the Company has filed all SEC Reports prior to the Effective Date and such reports shall comply with the Compliance Criteria; (vii) the Company has submitted a written or oral request to the SEC for no-action relief from the requirement to file the Company's Form 10-K for the fiscal year ending December 31, 2014 in form and substance satisfactory to the Company and the Investors and the Committee; provided that the consent of the Committee shall only be required where such request (a) is inconsistent with the terms set forth in the Plan Term Sheet and (b) materially and adversely impacts or affects the rights of the holders of Trade Claims or Financial Claims. [Capitalized term used in this (h) not defined in the Term Sheet shall have the meaning ascribed to them in the Backstop Agreement].

i.  The Debtors shall not assume, or settle chapter 5 causes of action related to, that certain License and Marketing Agreement with SEI-GPI JV LLC (the "SEI/GPI Agreement"), without the consent of the Ad Hoc Group and the Committee.  For the avoidance of doubt, and as set forth above, the Debtors shall not assume the SEI/GPI Agreement without the consent of the Ad Hoc Group and the Committee.

j.  The Debtors shall not be in default of the DIP Financing Agreement (as defined herein) or the Final DIP Order (or, to the extent that the Debtors have been in default or are in default at the time of consummation of the Restructuring, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility) at any time during the Chapter 11 Cases.

k.  The total amount of any administrative expenses paid by the Debtors on the Effective Date (or prior thereto) shall not exceed the sum of (i) fees and expenses incurred by legal and financial advisors and (ii) the administrative expenses set forth on a schedule to the Backstop

Agreement; provided that such expenses described in clause (ii) may vary by up to $250,000 in the aggregate, solely as necessary to make any KERP payments in accordance with the order approved by the Bankruptcy Court on June 5, 2014; and provided further that such expenses may be increased with the consent of the Investors upon consultation with the Committee.

l.      The Debtors shall not pay, have paid or make any agreement to pay the following professional firms' fees in excess of the following amounts incurred by such professional firm in the Fee Capped Months (as defined below):10 (i) Baker Botts LLP, $1.793 million incurred during the months of October, November, and December 2014 (the "Fee Capped Months");11 (ii) Greenberg Traurig LLP, $743,000 incurred during the Fee Capped Months; (iii) Opportune, the Debtors' current projected12 aggregate fees for Opportune incurred in the Fee Capped Months less $57,000 incurred during the month of December; (iv) Akin Gump, the Debtors' current projected aggregate fees for Akin Gump incurred in the Fee Capped Months less $182,000; (v) Alvarez & Marsal, the Debtors' current projected aggregate fees for Alvarez & Marsal incurred in the Fee Capped Months less $232,000; (vi) Rothschild, the Debtors' current projected aggregate fees for Rothschild incurred in the Fee Capped Months less $157,000, which shall be taken as a deduction from the completion fee in Rothschild's engagement letter, which deduction shall be acknowledged by Rothschild in a notice filed with the Bankruptcy Court within a reasonable time after the date hereof; and (vii) Lazard, the Debtors' current projected aggregate fees for Lazard incurred in the Fee Capped Months less $69,500, which shall be taken as a deduction from the "success" or "completion" fee in Lazard's engagement letter and which engagement letter and order approving same shall be amended within a reasonable time after the date hereof (all such amounts, collectively, the "Professional Fee Caps"); provided, however, that the Debtors' professionals and the Committee's professionals may exceed such fee caps if and to the extent they or their respective clients make a good faith determination that the incurrence of such additional fees is consistent with the applicable professional responsibilities of such professional or the  fiduciary duties of their clients; provided, further, that in such event, the Debtors, the Committee or their respective professionals, as the case may be, make such determination, they shall provide the Investors and the Committee notice of such event as soon as reasonably practicable. The Investors shall not be required to close and consummate the transaction implemented as part of the Plan if there is an amount incurred in excess of the Professional Fee Caps.   If the Investors choose to close and consummate the transaction, none of the Debtors, the Committee, nor the Investors (whether acting in their capacity as Investors, DIP Lenders, or as holders of Senior Notes), members of the Ad Hoc Group (in any capacity) shall object to the

---

[10]     For the avoidance of doubt, this condition precedent does not apply to any fees incurred outside of the Fee Capped Months (other than any completion fees of Rothschild or Lazard) regardless of when such fees may be paid.

[11]     For the avoidance of doubt, the monthly limitation of professional fees shall only apply to fees incurred during the Fee Capped Months, whether payable under interim compensation procedures or holdbacks to be paid in subsequent months.

[12]     The Debtors' current projections are those that have been shared with the Ad Hoc Group and the Committee.

professional fees (a) incurred during the Fee Capped Months, or (b) that are the subject of the engagement letters of Rothschild, Lazard, or Opportune.

m.      The timing of the Effective Date of the Plan shall be as agreed upon by the Debtors, the Ad Hoc Group and the Committee.

n.      The Debtors shall not exit chapter 11 without $5 million in cash in their U.S. bank accounts after taking into account the effects of the Restructuring, including the DIP conversion and the Exit Term Loan, but excluding the Exit Revolving Facility, without the consent of the Ad Hoc Group in consultation with the Committee.

o.      From and after the date of the Backstop Agreement, the Debtors shall not have commenced an insolvency (or similar) proceeding in any foreign jurisdiction and the recognition proceeding in Colombia shall not have been converted to a plenary insolvency proceeding or liquidation.

p.      Since the date of entry into the Backstop Agreement, there shall not have been a Material Adverse Change.

q.      For purposes of this section, Material Adverse Change means any event after the date of the Backstop Agreement which individually, or together with all other events, has had or could reasonably be expected to have a material and adverse change on (a) the business, assets, liabilities, finances, properties, results of operations or condition (financial or otherwise) of the Company and its subsidiaries, taken as a whole, or (b) the ability of the Company and its subsidiaries to perform their obligations under, or to consummate, the transactions contemplated by the Backstop Agreement or the Plan; provided, that the following shall not constitute a Material Adverse Change and shall not be taken into account in determining whether or not there has been, or could reasonably be expected to be, a Material Adverse Change: (i) any change after the date hereof in any law or GAAP, or any interpretation thereof; (ii) any change after the date hereof in currency, exchange or interest rates or the financial or securities markets generally; (iii) any change to the extent resulting from the announcement or pendency of the transactions contemplated by the Backstop Agreement; and (iv) any change resulting from actions of the Company or its subsidiaries expressly required to be taken pursuant to the Backstop Agreement; except in the cases of (i) and (ii) to the extent such change or event is disproportionately adverse with respect to the Company and its subsidiaries when compared to other companies in the industry in which the Company and its subsidiaries operate. Notwithstanding anything herein to the contrary, (i) any event after the date of the Backstop Agreement which individually, or together with all other events, has directly or indirectly resulted in, or could reasonably be expected to result in, a reduction in any fiscal year of more than $8 million in cash EBITDA collectively for the Company and its subsidiaries, taken as a whole, shall be a Material Adverse Change and (ii) any event after the date of the Backstop Commitment which individually, or together with all other events, has not directly or indirectly resulted in, or could not reasonably be expected to result in, a reduction in any fiscal year of more than $8 million in cash EBITDA

collectively for the Company and its subsidiaries, taken as a whole, shall not be a Material Adverse Change.

v.       New GGS Charter.  The Reorganized GGS Organization Documents, as applicable, shall have been duly filed with the applicable Secretary of State.

vi.      Exit Credit Facilities.  The Exit Credit Facility Documents shall have been duly executed and delivered by the Reorganized Debtors parties thereto, and all conditions precedent to the consummation of the Exit Credit Facilities shall have been waived or satisfied in accordance with the terms thereof.

vii.     Necessary Documents.  All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered, as applicable.

viii.    Necessary Authorizations.  All authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved.

**B.**      **Waiver of Conditions**

The Debtors may waive conditions to the occurrence of the Effective Date set forth in this Article 11 at any time (x) in consultation with the Creditors' Committee, and (y) with the consent of the Requisite Investors.

**C.**      **Effect of Failure of Conditions.**

If the Plan is confirmed, but the Effective Date does not occur within 120 days after the Confirmation Date, or such later date as the Debtors, in consultation with the Requisite Investors, agree, the Plan shall be null and void in all respects and nothing contained in the Plan or the Amended Disclosure Statement shall constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors, prejudice in any manner the rights of the Debtors or any other Person, or constitute an admission, acknowledgment, offer or undertaking by the Debtors or any Person.

**D.**      **Modification of the Plan.**

Subject to the limitations contained in the Plan: (a) the Debtors reserve the right, in consultation with the Creditors' Committee and with the consent of the Requisite Investors, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, in consultation with the Creditors' Committee, if then in existence, and with the consent of the Requisite Investors, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

**Effect of Confirmation on Modification**

Entry of a Confirmation Order shall mean that all modifications and amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code, and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019

**Revocation of Plan**

The Debtors reserve the right, with the consent of the Investors and subject to the terms of the Backstop Conversion Commitment Agreement, to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if

the Confirmation Order is not entered or the Effective Date does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (c) nothing contained in the Plan shall:  (i) constitute a waiver or release of any claims by or Claims against, or any Equity Interests in, any Debtor or any other Entity; (ii) prejudice in any manner the rights of the Debtors or any other Entity; or (iii) constitute an admission of any sort by the Debtors or any other Entity.

## X.   CONFIRMATION PROCEDURES

### A.   Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a plan are that the plan is (i) accepted by all Impaired classes of Claims and Equity Interests or, if rejected by an Impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) feasible and (iii) in the "best interests" of creditors and equity interest holders that are Impaired under the Plan.

Among the requirements for Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.  The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, or officer, the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims or Interests is Impaired under the Plan, at least one Class of Claims or Interests that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

### Best Interests Test/Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. The Debtors believe that the Plan provides the same (where holders are receiving no recovery in both instances) or a greater (for all other holders) recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including: (a) the Debtors' primary assets are intangible and include goodwill and customer relationships, which would have little to no value in a chapter 7 liquidation; (b) the additional Administrative Claims generated by conversion to a chapter 7 case and any related costs in connection with a chapter 7 liquidation; and (c) the absence of a robust market for the sale of the Debtors' assets and services in which such assets and services could be marketed and sold.

### Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as **Exhibit B**. Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

**B.** **Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### No Unfair Discrimination

This test applies to Classes of Claims or Equity Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

### Fair and Equitable Test

This test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims or Equity Interests receive more than 100% of the amount of the allowed Claims or Equity Interests in such Class. As to the dissenting Class, the test sets different standards depending on the type of Claims or Equity Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- <u>Secured Creditors</u>: Each holder of a secured claim: (1) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim; (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (3) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the chapter 11 plan.

- <u>Equity Interests</u>: Either (1) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that each of Class 6 and Class 7 is deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such Class will receive or retain any property on account of the Claims in such Class.

**C.     Alternatives to Confirmation and Consummation of the Plan**

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the Debtors under chapter 7 of the Bankruptcy Code. If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited Liquidation Analysis, attached hereto as **Exhibit E**.

**XI.     CERTAIN RISK FACTORS TO BE CONSIDERED**

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.     General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, holders of

Claims and Equity Interests should read and carefully consider the risk factors set forth below, as well as all other information set forth or otherwise referenced or incorporated by reference in this Disclosure Statement.

**B.        Risk Relating to the Plan and Other Bankruptcy Considerations**

The Plan could be denied Confirmation or delayed

For the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtor, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan. Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court will confirm the Plan. Even if the Bankruptcy Court determines that this Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court may still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including, without limitation, that the Plan does not discriminate unfairly and is fair and equitable with respect to non-accepting Classes. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications will not necessitate the resolicitation of votes. If the Plan is not confirmed, it is unclear what Distributions Holders of Claims or Equity Interests would ultimately receive with respect to their Claims or Equity Interests in a subsequent plan of reorganization. Although the Debtors believe that the Plan satisfies all of the requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Additionally, by its terms, the Plan will not become effective unless, among other things, the conditions precedent described in **Section IX.A** of this Disclosure Statement have been satisfied or waived.

The impact that prolonging the Chapter 11 Cases may have on the Debtors' operations cannot be accurately predicted or quantified. The continuation of the Chapter 11 Cases, particularly if the Plan is not approved, confirmed, or implemented within the time frame currently contemplated, could adversely affect operations and relationships between the Debtors and their customers and charterers, suppliers, service providers and creditors; result in increased professional fees and similar expenses; and threaten the Debtors' ability to obtain the DIP Conversion. Failure to confirm the Plan could further weaken the Debtors' liquidity position, which could jeopardize the Debtors' exit from chapter 11.

A Number of Agreements and Other Documents Relating to or Governing the Reorganized Debtors Have Not Been Negotiated or Finalized

A number of agreements and other documents relating to or governing the Reorganized Debtors remain subject to documentation and/or further negotiations. The terms and conditions of these agreements and other documents may adversely affect the Reorganized Debtors, their operations, their financial condition or results of operations and/or the holders of New Common Stock in a number of ways that cannot be predicted at this time. In addition, certain of the documents described in this Disclosure Statement have not been finalized, and the terms and provisions of the final agreements and other documents include other material terms not included in the summaries contained herein. Furthermore, failure to finalize or successfully negotiate these documents or obtain any required approvals, including any required approvals from the Requisite Investors, may delay or prevent consummation of the Plan.

The DIP Loan may be insufficient to fund the Debtors' business operations through the Effective Date, or may be unavailable if the Debtors do not comply with its terms

Although the Debtors project that they will have sufficient liquidity to operate their businesses through the Effective Date, there can be no assurance that the revenue generated by the Debtors' business operations and the cash made available to the Debtors under the DIP Loan will be sufficient to fund the Debtors' operations. In the event that revenue flows and the DIP Loan are not sufficient to meet the Debtors' liquidity requirements, the Debtors may be required to seek additional financing. There can be no assurance that such additional financing would be available or, if available, offered on terms that are acceptable to the Debtors or the Bankruptcy Court. If, for one or more reasons, the Debtors are unable to obtain such additional financing, the Debtors' businesses and

assets may be subject to liquidation under chapter 7 of the Bankruptcy Code and the Debtors may cease to continue as going concern.

The DIP Loan provides for affirmative and negative covenants applicable to the Debtors and their subsidiaries, including negative covenants restricting the ability of the Debtors and their subsidiaries to incur additional indebtedness, grant liens, as well as financial covenants applicable to the Debtors including compliance with a budget. There can be no assurance that the Debtors will be able to comply with these covenants and meet their obligations as they become due or to comply with the other terms and conditions of the DIP Order.

Any Event of Default under the DIP Loan could result in a default of the Debtors' obligations which could imperil the Debtors' ability to confirm the Plan and may permit the DIP Lenders to take enforcement action against the Debtors and their assets, substantially all of which are encumbered by Liens securing the DIP Loan.

<u>The DIP Conversion May Not Be Obtained and the Backstop Conversion Commitment Agreement May Be Terminated</u>

The Backstop Conversion Commitment Agreement is subject to specified conditions and contains termination rights in favor of the Investors.  See Article VIII of the Backstop Conversion Commitment Agreement for the list of conditions and Section 10.1 of the Backstop Conversion Commitment Agreement for the list of termination rights.  For example, the Backstop Conversion Commitment Agreement may be terminated by the Investors if events occur during the term of the Backstop Conversion Commitment Agreement that would have a material adverse impact on the Debtors' post-Effective Date business.  Since the Plan is predicated on the Debtors' receipt of the Rights Offering Proceeds, the Debtors will not be able to consummate the Plan in its current form if the Rights Offering is not fully subscribed and the Backstop Conversion Commitment Agreement is terminated.

<u>The Chapter 11 Case may have negatively impacted the Debtors' business</u>

The Chapter 11 Cases may have affected the Debtors' relationships with, and their ability to negotiate favorable terms with, creditors, customers, vendors, employees, and other personnel and counterparties. While the Debtors have continued normal operations during the Chapter 11 Cases, public perception of their continued viability may affect, among other things, the desire of new and existing customers to enter into or continue agreements or arrangements with the Debtors. The failure to maintain any of these important relationships could adversely affect the Debtors' business, financial condition and results of operations.

Because of the public disclosure of the Chapter 11 Cases and concerns foreign vendors may have about the liquidity, the Debtors' ability to maintain normal credit terms with vendors may have been, to some degree, impaired.  As a result, the effect that the Chapter 11 Cases have had on the Debtors' business, financial condition and results of operations cannot be accurately predicted or quantified at this time.

Additionally, the terms of the DIP Loan limit the Debtors' ability to undertake certain business initiatives without the DIP Lenders' consent.  These limitations, which are common in chapter 11 financing agreements, include, among other things, the Debtors; ability to: (a) sell assets outside the normal course of business; (b) consolidate, merge, sell or otherwise dispose of all or substantially all of their assets; (c) grant Liens; and (d) finance their operations from other sources.

<u>The Debtors may object to the amount or classification of a Claim or Equity Interest</u>

Except as otherwise provided in the Plan, the Debtors and other parties in interest reserve the right to object to the amount or classification of any Claim or Equity Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Equity Interest where such Claim or Equity Interest is subject to an objection.  Any holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement.

<u>The Debtors may fail to meet all conditions precedent to effectiveness of the Plan.</u>

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied.  The Debtors cannot assure anyone that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.  In particular, the Plan is predicated on the Debtors' ability to obtain Exit Financing on the terms and conditions set forth in the Plan and the Backstop Conversion Commitment Agreement.  Failure to obtain such financing will make consummation of the Plan impossible.

Contingencies may affect Distributions to Holders of Allowed Claims

The Distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims and whether the Bankruptcy Court orders that certain Disputed Claims become Allowed Claims.  The occurrence of any and all such contingencies could affect Distributions under the Plan.

Plan releases may not be approved

There can be no assurance that the Plan releases, as provided in Article XII of the Plan, will be granted.  Failure of the Bankruptcy Court to grant such relief may result in a plan of reorganization that differs from the Plan and relieve the Investors of their obligations under the Backstop Conversion Commitment Agreement.

The Plan is based upon financial projections and assumptions the Debtors developed that may prove incorrect and could render the Plan unsuccessful

The Plan affects the Debtors' capital structure and the ownership, the structure and operation of their businesses, and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to (i) the ability to implement the substantial changes to the capital structure contemplated by the Plan; (ii) the ability to obtain adequate liquidity and financing sources; (iii) the ability to maintain customers' confidence in their viability as continuing entities and to attract and retain sufficient business from them; (iv) the ability to retain key employees, and (v) the overall strength and stability of general economic conditions of the financial and shipping industries, both in the United States and in global markets. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' businesses.

In addition, the Plan relies upon financial projections, including with respect to revenues, EBITDA, debt service and cash flow.  Financial forecasts are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. In the Debtors' case, the forecasts are even more speculative than normal, because they involve fundamental changes in the nature of the Debtors' capital structure.

Accordingly, the Debtors expect that their actual financial condition and results of operations will differ, perhaps materially, from what is anticipated. Consequently, there can be no assurance that the results or developments contemplated by the Plan  the Debtors may implement will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their businesses or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan or any other plan of reorganization.

The Debtors may seek to amend, waive, modify, or withdraw the Plan at any time prior to Confirmation

The Debtors, with the consent of the Investors, reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Backstop Conversion Commitment Agreement, and consistent with the terms of the Plan, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan.  The potential impact of any such amendment or waiver on the holders of Claims and Equity Interests cannot presently be foreseen but may include a

change in the economic impact of the Plan, either positively or negatively, on some or all of the proposed Classes or a change in the relative rights of such Classes.

<u>The Debtors' businesses may be negatively affected if the Debtors are unable to assume certain of their executory contracts</u>

Generally, an executory contract is a contract where performance remains due to some extent by both parties to the contract.  The Plan provides for the assumption of certain executory contracts and unexpired leases.  The Debtors intend to preserve as much of the benefit of their existing executory contracts and unexpired leases that are valuable to their ongoing business as possible.  However, with respect to some limited classes of executory contracts, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the executory contract.  There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the executory contracts in question unattractive.  The Debtors then would be required to either forego the benefits offered by such executory contracts or find alternative arrangements to replace them.

<u>The Debtors will be subject to business uncertainties and contractual restrictions prior to the Effective Date</u>

Uncertainty about the effects of the Plan on employees and senior management may have an adverse effect on the Debtors.  These uncertainties may impair the Debtors' ability to retain and motivate key personnel and could cause customers and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors.  In addition, if key employees depart because of uncertainty about their future roles and the potential complexities of the Restructuring, the Debtors' businesses could be harmed.

<u>Failure to confirm and consummate the Plan could negatively impact the Debtors</u>

If the Plan is not confirmed and consummated, the ongoing businesses of the Debtors may be adversely affected and there may be various consequences, including:

- the incurrence of substantial costs and investment of time and resources by the Debtors in connection with the Restructuring transaction, without realizing any of the anticipated benefits of the Restructuring;

- the possibility, for the Debtors, of being unable to repay indebtedness when due and payable; and

- the Debtors pursuing chapter 7 proceedings that would result in recoveries for creditors that are less than contemplated under the Plan and no recovery for certain creditors..

**C.      Business and Financial Risks**

<u>The Reorganized Debtors will have significant debt on emergence and there can be no assurance that the Reorganized Debtors will maintain sufficient liquidity to meet their obligations</u>

The Reorganized Debtors are expected to incur up to an aggregate of approximately $[•] million in indebtedness under the Exit Credit Facilities as of the Effective Date and will have to pay material fees to the lenders under the Exit Credit Facilities.    Closing such Exit Credit Facilities is a condition precedent to the effectiveness of the Plan and to the obligations of the Term B Lenders to complete the DIP Conversion, each of which may or may not occur; without the liquidity to be provided by such exit financing, the Plan cannot be consummated.

Further, the Reorganized Debtors' indebtedness and interest expense under the Exit Credit Facilities could have important consequences, including limiting the Reorganized Debtors' ability to use a substantial portion of their cash flow from operations in other areas of their business, such as for working capital,

capital expenditures and other general business activities, because a substantial portion of these funds will be dedicated to servicing their debt. The Debtors' ability to maintain adequate liquidity could depend on their ability to successfully implement the Plan, the successful operation of their businesses, the appropriate management of operating expenses and capital spending, and their ability to complete asset sales on favorable terms.

<u>The Reorganized Debtors will be subject to restrictive covenants in the Exit Credit Facilities</u>

The negative and financial covenants in the Exit Credit Facilities may adversely affect the Reorganized Debtors' ability to finance future operations or capital needs or to engage in new business activities. The Exit Credit Facilities will likely restrict the Reorganized Debtors' ability to, among other things, incur additional debt and provide additional guarantees, pay dividends or make other restricted payments, create or permit certain Liens, sell assets, make certain investments, engage in certain transactions with affiliates, and consolidate or merge with or into other companies or transfer all or substantially all of the Reorganized Debtors' assets.

There can be no assurance that the Reorganized Debtors will satisfy the affirmative, negative and financial covenants to be included in the Exit Credit Facilities. A breach of any of the covenants in, or the Reorganized Debtors' inability to maintain the required financial ratios under, the Exit Credit Facilities would prevent the Reorganized Debtors from borrowing additional money under the Exit Credit Facilities, to the extent such ability exists, and could result in a default under the Exit Credit Facilities. If a default occurred under any of the Exit Credit Facilities and continued beyond any grace or cure period with respect to such default set forth therein, the lenders could most likely elect to declare that debt, together with accrued interest and other fees, to be immediately due and payable and proceed against the collateral securing that debt. Moreover, if the lenders under any of the Exit Credit Facilities were to accelerate the debt outstanding under the applicable facility, it could result in an event of default under the Reorganized Debtors' other debt obligations that may exist at that time, and if all or any part of the Reorganized Debtors' indebtedness were to be accelerated, the Reorganized Debtors may not have, or may not be able to obtain, sufficient funds to repay it or to repay their other indebtedness.

<u>The Debtors' results of operations could be materially adversely affected by economic conditions</u>

Prices for oil and natural gas have been volatile. During the most recent period of depressed commodity prices, many oil and gas exploration and production companies significantly reduced their levels of capital spending, including amounts dedicated to the purchase of seismic data services. Historically, demand for the Debtors' services has depended significantly on the level of exploration spending by oil and gas companies. A return of depressed commodity prices, or a decline in existing commodity prices or other economic factors, could have a material adverse effect on demand for the services the Debtors provide, and therefore affect the Debtors' business, results of operations, financial condition and cash flows.

<u>Operating internationally subjects the Debtors to significant risks and regulation inherent in operating in foreign countries</u>

The Debtors conduct operations on a global scale. For the year ended December 31, 2013, approximately 36% of the Debtors' revenues were attributable to operations in foreign countries.

The Debtors' international operations are subject to a number of risks inherent to any business operating in foreign countries, and especially those with emerging markets. As the Debtors continue to increase their presence in such countries, the Debtors' operations may encounter the following risks, among others:

- government instability, which can cause investment in capital projects by the Debtors' potential clients to be withdrawn or delayed, reducing or eliminating the viability of some markets for the Debtors' services;

- potential expropriation, seizure, nationalization or detention of the Debtors' assets;

- difficulty in repatriating foreign currency received in excess of local currency requirements and laws;

- trade sanctions or import/export quotas;

- civil uprisings, riots and war, which can make it unsafe to continue operations, adversely affect both budgets and schedules and expose the Debtors to losses;

- availability of suitable personnel and equipment, which can be affected by government policy, or changes in policy, which limit the importation of qualified crewmembers or specialized equipment in areas where local resources are insufficient;

- decrees, laws, regulations, interpretation and court decisions under legal systems, which are not always fully developed and which may be retroactively applied and cause the Debtors to incur unanticipated and/or unrecoverable costs as well as delays; and

- terrorist attacks, including kidnappings of the Debtors' personnel.

The Debtors cannot predict the nature and the likelihood of any such events. However, if any of these or other similar events should occur, it could have a material adverse effect on the Debtors' businesses, results of operations and financial condition.

The Debtors are subject to taxation in many foreign jurisdictions and the final determination of their tax liabilities involves the interpretation of the statutes and requirements of local and national taxing authorities worldwide. The Debtors' tax returns are subject to routine examination by taxing authorities, and these examinations may result in assessments of additional taxes, penalties and/or interest.

The Debtors' overall success as a global business depends, in part, upon their ability to succeed in differing economic, social and political conditions. The Debtors may not continue to succeed in developing and implementing policies and strategies that are effective in each location where they do business, which could negatively affect the Debtors' business, results of operations and financial condition.

A portion of the seismic equipment that the Debtors use in certain foreign countries may require prior U.S. government approval, in the form of an export license, and may otherwise be subject to tariffs and import/export restrictions. The delay in obtaining required governmental approvals could affect the Debtors' ability to timely commence a project, and the failure to comply with all such controls could result in fines and other penalties.

A terrorist attack or armed conflict could harm the Debtors' businesses

Some seismic surveys are located in unstable political jurisdictions, including North Africa and the Middle East. Terrorist activities, anti-terrorist efforts and other armed conflicts involving the United States or other countries may adversely affect the Debtors' ability to work in these markets which could adversely affect their businesses, results of operations or financial condition. These activities could have a direct negative effect on the Debtors' business in those areas, including loss of life, equipment and data. Costs for insurance and security may increase as a result of these threats, and some insurance coverage may become more difficult to obtain on acceptable terms, if available at all. As an example, current unrest in portions of Iraq have delayed and stopped certain of the Debtors' business operations in that region, and have put their business operations in that region in jeopardy of further delays and work stoppages of indefinite duration and uncertain impact on revenues.

The Debtors' success depends on key members of their management, the loss of any of whom could disrupt the Debtors' business operations

The Debtors have undergone a reorganization of their senior level management. Additional reorganization or the loss of services of additional members of the senior level executives or other key personnel could disrupt the Debtors' operations, which in turn could materially and adversely affect the Debtors' businesses, results of operations and financial condition.

The Debtors may be unable to attract and retain skilled and technically knowledgeable employees, which could adversely affect the business

The Debtors' success depends upon attracting and retaining highly skilled professionals and other technical personnel.  A number of the Debtors' employees are highly skilled scientists and highly trained technicians, and their failure to continue to attract and retain such individuals could adversely affect the Debtors' ability to compete in the seismic services industry.  The Debtors may confront significant and potentially adverse competition for these skilled and technically knowledgeable personnel, particularly in light of the bankruptcy proceedings, and otherwise during periods of increased demand for seismic services.  Additionally, at times there may be a shortage of skilled and technical personnel available in the market, potentially compounding the difficulty of attracting and retaining these employees. As a result, the Debtors' business, results of operations and financial condition may be materially adversely affected.

<u>Industry spending on the Debtors' services is subject to rapid and material change</u>

The willingness of the Debtors' clients to explore, develop and produce depends largely upon prevailing industry conditions that are influenced by numerous factors over which the Debtors have no control, such as:

- demand for oil and natural gas, especially in the United States, China and India;

- the ability of oil and gas exploration and production companies to generate funds or otherwise obtain external capital for exploration, development, construction and production operations;

- the sale and expiration dates of leases and concessions in the United States and the international markets where the Debtors operate;

- domestic and foreign tax and environmental policies;

- the cost of exploring for, developing, producing and delivering oil and natural gas;

- the expected rates of decline related to current production;

- the availability and discovery rates of new oil and gas reserves;

- technical advances affecting energy exploration, production, transportation and consumption;

- weather conditions, including hurricanes and monsoons that can affect oil and gas operations over a wide area as well as less severe inclement weather that can preclude or delay seismic data acquisition;

- political and economic instability in oil and gas producing countries;

- government and other organizational policies, including those of the Organization of the Petroleum Exporting Countries, regarding the exploration, production and development of oil and gas reserves; and

- merger and divestiture activity among oil and gas producers.

In addition, increases in oil and natural gas prices may not have a positive effect on the Debtors' results of operations or financial condition.  Although demand for the Debtors' services may decrease when depressed economic conditions are present, including lower oil and natural gas prices, the reverse is not necessarily true due to the factors listed herein as well as other factors beyond the Debtors' control.

<u>The Debtors have identified material weaknesses in their disclosure controls and procedures and their internal control over financial reporting, and may be unable to develop, implement and maintain appropriate controls in future periods</u>

The Sarbanes-Oxley Act of 2002 and SEC rules require that management report annually on the effectiveness of the Debtors' internal control over financial reporting and their disclosure controls and procedures. Among other things, management must conduct an assessment of the Debtors' internal control over financial reporting to allow management to report on, and their independent registered public accounting firm to audit, the effectiveness of the Debtors' internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act. As more fully described herein and in Note 21 of the Notes to Consolidated Financial Statements included in Item 8 of the Company's Form 10-K filed April 29, 2014, the Debtors have restated their consolidated financial statements for prior periods to correct certain errors. Accordingly, based on management's assessment, the Debtors believe that, as of December 31, 2013, their internal controls over financial reporting were not effective. The specific material weaknesses are described in Item 9A, "Controls and Procedures" of the Company's 2013 Form 10-K in "Management's Annual Report on Internal Control over Financial Reporting". A "material weakness" is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Debtors' annual or interim consolidated financial statements would not be prevented or detected. The Debtors cannot assure Holders of Claims and Equity Interests that additional material weaknesses in their internal control over financial reporting will not be identified in the future. Any failure to maintain or implement required new or improved controls, or any difficulties the Debtors encounter in implementation, could result in additional material weaknesses, or could result in material misstatements in the Debtors' financial statements. These misstatements could result in additional restatements of the Debtors' financial statements, cause a loss in confidence in the Company's reported financial information or other adverse consequences.

The Debtors have work remaining to remedy the material weaknesses in their internal control over financial reporting. The Debtors are in the process of developing and implementing their remediation plan for the identified material weaknesses, and this work will continue throughout fiscal year 2014. There can be no assurance as to when the remediation plan will be fully developed, when it will be fully implemented and the aggregate cost of implementation. Until the Debtors' remediation plan is fully implemented, the Debtors will continue to devote time and attention to these efforts. If the Debtors do not complete their remediation in a timely fashion, or at all, or if their remediation plan is inadequate, there will continue to be an increased risk that that the Debtors' future financial statements could contain errors that will be undetected. The Debtors will rely upon additional interim control procedures prescribed by management, including the use of manual mitigating control procedures, to fairly state their financial statements in all material respects. However, the establishment of these interim controls does not provide the same degree of assurance as a remediated control environment. Further and continued determinations that there are material weaknesses in the effectiveness of the Debtors' internal controls could also reduce the Debtors' ability to obtain financing or could increase the cost of any financing the Debtors obtain and requires additional expenditures of resources to comply with applicable requirements. For more information relating to the Debtors' internal control over financial reporting and disclosure controls and procedures, and the remediation plan undertaken by the Debtors, see "Item 9A, Controls and Procedures" of the Company's 2013 Form 10-K.

The Debtors may not be able to file the required Forms 10-Q

As noted above, the Debtors have undertaken efforts to remedy the material weaknesses in their internal controls, but still have work remaining before they achieve full remediation. One consequence of the remediation process is that GGS has not timely filed its Forms 10-Q for the first and second quarters of 2014. Filing all required forms with the SEC is a condition precedent to the Effective Date of the Plan. The failure to file the 2014 Forms 10-Q could adversely affect the successful consummation of the Plan.

The Debtors' revenues are subject to fluctuations that are beyond the Debtors' control, which could adversely affect the Debtors' results of operations in any financial period

The Debtors' operating results may vary in material respects from quarter to quarter and may continue to do so in the future. Factors that cause variations include the timing of the receipt and commencement of contracts for seismic data acquisition, processing or interpretation and clients' budgetary cycles, which matters are beyond the Debtors' control. Furthermore, in any given period, the Debtors could have idle crews that result in a significant portion of their revenues, cash flows and earnings coming from a relatively small number of crews.

Additionally, due to location, service line or particular project, some of the Debtors' individual crews may achieve results that are a significant percentage of the Debtors' consolidated operating results. Should one or more of these crews experience significant changes in timing or delays, the Debtors' financial results could be subject to significant variations from period to period. Combined with the Debtors' high fixed costs, these revenue fluctuations could have a material adverse effect on the Debtors' results of operations or financial condition in any financial period.

<u>The Debtors' working capital needs are difficult to forecast and may vary significantly, which could require the Debtors to seek additional financing that they may not be able to obtain on satisfactory terms, or at all</u>

The Debtors' working capital needs are difficult to predict with certainty. This difficulty is due primarily to working capital requirements related to the Debtors' seismic data services where their revenues vary in material respects as a result of, among other things, the timing of their projects, their clients' budgetary cycles and their receipt of payment. As a result, the Debtors may be subjected to significant and rapid increases in their working capital needs that could require the Debtors to seek additional financing sources. The Chapter 11 Cases and restrictions in the Debtors' debtor-in-possession financing, prior to the Effective Date, and most likely in the Debtors' Exit Credit Facilities, on and after the Effective Date, will impair the Debtors' ability to obtain other sources of financing, and access to additional sources of financing may not be available on terms acceptable to the Debtors, or at all.

<u>The Debtors face intense competition in their business that could result in downward pricing pressure and the loss of market share</u>

Competition among seismic contractors historically has been, and likely will continue to be, intense. Competitive factors have in recent years included price, crew experience, equipment availability, Health, Safety and Environmental ("**HSE**") performance, technological expertise and reputation for quality and dependability. The Debtors also face increasing competition from nationally owned companies in various international jurisdictions that operate under less significant financial constraints than those the Debtors experience. Many of the Debtors' competitors have greater financial and other resources, more clients, greater market recognition and more established relationships and alliances in the industry than the Debtors do. They and other competitors may be better positioned to withstand and adjust more quickly to volatile market conditions, such as fluctuations in oil and natural gas prices and production levels, as well as changes in government regulations. Additionally, the seismic data acquisition business is extremely price competitive and has a history of protracted periods of months or years where seismic contractors under financial duress bid jobs at unattractive pricing levels and therefore adversely affect industry pricing. Competition from these and other competitors could result in downward pricing pressure, which could adversely affect the Debtors' EBITDA margins, and the loss of market share.

<u>The Debtors have had losses and there is no assurance of their profitability for the future</u>

The Debtors experienced a net loss of $153.5 million in 2013 and $15.6 million in 2012. The Debtors cannot give assurances that they will be profitable in future periods.

<u>The Debtors have supply arrangements with a limited number of key suppliers, the loss of any one of which could have a material adverse effect on the Debtors' results of operations and financial condition</u>

Beginning in 2011, the Debtors sourced their principal nodal seismic recording systems from Autoseis, Inc., a wholly owned subsidiary and Debtor in the Chapter 11 Cases. The systems are manufactured under an exclusive arrangement with Creation Technologies, a U.S. supplier of electronics. If the Debtors' key supplier discontinues operations or otherwise refuses to honor its supply arrangements, the Debtors may be required to enter into agreements with alternative suppliers on less favorable terms, which could result in increased product costs, longer delivery lead times, and other risks.

<u>Key suppliers or their affiliates may compete with the Debtors</u>

The Debtors purchase seismic vibrator equipment manufactured by ION, which directly or indirectly through a joint venture with BGP, competes with the Debtors. There are a limited number of companies which manufacture this equipment in addition to ION. If ION chooses to no longer sell this equipment to the Debtors, or to no longer sell such equipment to the Debtors on commercially reasonable terms, whether as a result of competitive pressures or otherwise, the Debtors may be required to use less suitable replacement equipment which could impair their ability to execute business solutions for customers.

<u>The Debtors are dependent upon a relatively small number of significant clients. Additionally, from time to time, a significant portion of the Debtors' revenues are generated by a single project</u>

The Debtors derive a significant amount of their revenues at any one time from a relatively small number of oil and gas exploration and development companies. During the year ended December 31, 2013, the Debtors had one client that accounted for 11% of the Debtors' revenues. While the Debtors' revenues are derived from a concentrated client base, the Debtors' significant clients may vary between years. If the Debtors lose one or more major clients in the future, or if one or more clients encounter financial difficulties, the Debtors' businesses, results of operations and financial condition could be materially and adversely affected.

Additionally, from time to time, a significant portion of the Debtors' revenues are generated by a single project. The Debtors' dependence from time to time on a single project for a significant percentage of their revenues may result in significant variability of earnings from period to period as these projects are completed.

Historically, the Debtors' large clients have represented a significant percentage of revenues. Smaller or less capitalized oil and gas exploration and production companies may be required to reduce sharply their expenditures for seismic data acquisition services in periods of depressed or declining commodity prices. The Debtors' dependence on customers other than large clients for a substantial portion of their revenues could expose them to greater earnings and cash flow volatility.

<u>Revenues derived from the Debtors' projects may not be sufficient to cover the costs of completing those projects</u>

The Debtors' revenues are determined, in part, by the price received for their services, the productivity of crews and the accuracy of cost estimates. Crew productivity is partly a function of external factors, such as seasonal variations in the length of days, weather, including the onset of hurricanes, difficult terrain, and third party delays, over which the Debtors have little or no control. In addition, cost estimates for the Debtors' projects may be inadequate due to unknown factors associated with the work to be performed and market conditions, resulting in cost over-runs. If crews encounter operational difficulties or delays, or if the Debtors have not correctly priced their services, the Debtors' results of operation may vary, and in some cases, may be adversely affected. The Debtors in the past experienced cost over-runs that caused the costs from a particular project to exceed the revenues from that project, and the Debtors cannot give assurances that this will not happen again.

Many of the Debtors' projects are performed on a turnkey basis where a defined amount and scope of work is provided for a fixed price, with extra work, which is subject to client approval, being billed separately. The revenues, cost and gross profit realized on a turnkey contract can vary from the estimated amount because of changes in job conditions, variations in labor and equipment productivity from the original estimates, the performance of subcontractors, and other similar conditions. Turnkey contracts may also cause the Debtors to bear substantially all of the risks of business interruption caused by weather delays and other hazards. These variations, delays and risks inherent in billing clients at a fixed price may result in the Debtors experiencing reduced profitability or losses on projects that could materially and adversely affect the Debtors' businesses, results of operations and financial condition.

<u>From time to time the Debtors experience disputes with their clients relating to the amounts invoiced  for services, particularly with respect to billings relating to standby time.  The exercise of remedies against clients in connection with the Debtors' collection efforts could negatively affect their ability to secure future business from those clients</u>

The Debtors' contracts for seismic data acquisition services typically include provisions that require payment at a reduced rate for a limited amount of time if they are unable to record seismic data as a result of

weather conditions or certain other factors outside the Debtors' control, including delays caused by their clients. From time to time the Debtors experience disputes with their clients relating to the amounts they invoice for services. The exercise of the Debtors' contractual remedies against these or other clients in connection with their collection efforts could negatively affect the Debtors' relationship with these clients or with other clients who learn about the exercise of the Debtors' contractual remedies, and could result in the loss of future business, which in turn could negatively affect their businesses, results of operations and financial condition in future periods.

<u>Technological change in the Debtors' business creates risks of technological obsolescence and requirements for future capital expenditures. If the Debtors are unable to continue investing in, or otherwise acquire, the latest technology, they may not be able to compete effectively</u>

The development of seismic data acquisition, processing and interpretation equipment has been characterized by rapid technological advancements in recent years, and the Debtors expect this trend to continue. Manufacturers of seismic equipment may develop new systems that have competitive advantages relative to systems now in use that either renders the equipment currently used by the Debtors obsolete or require the Debtors to make substantial capital expenditures to maintain their competitive position. Additionally, a number of seismic equipment manufacturers are affiliated with or are otherwise controlled by the Debtors' competitors. If any such equipment manufacturer developed new equipment or systems and, for competitive reasons or otherwise, declined to sell such equipment or systems to the Debtors, the Debtors could be placed at a competitive disadvantage. In order to remain competitive, the Debtors must continue to invest additional capital to maintain, upgrade and expand their seismic data acquisition capabilities.

<u>If the Debtors do not effectively manage their transitions into new products and services, revenues may suffer</u>

Products and services for the seismic industry are characterized by rapid technological advances in hardware performance, software functionality and features, frequent introduction of new products and services, and improvement in price characteristics relative to product and service performance. Among the risks associated with the introduction of new products and services are delays in development or manufacturing, variations in costs, delays in customer purchases or reductions in price of existing products in anticipation of new introductions, write-offs or write-downs of the carrying costs of assets associated with prior generation products, difficulty in predicting customer demand for new product and service offerings and effectively managing inventory levels so that they are in line with anticipated demand, risks associated with customer qualification, evaluation of new products, and the risk that new products may have quality or other defects or may not be supported adequately by application software. The introduction of new products and services by the Debtors' competitors also may result in delays in customer purchases and difficulty in predicting customer demand. If the Debtors do not make an effective transition from existing products and services to future offerings, their revenues and margins may decline.

Furthermore, sales of the Debtors' new products and services may replace sales, or result in discounting, of some the Debtors' current offerings, offsetting the benefit of a successful new product introduction. In addition, it may be difficult to ensure performance of new products and services in accordance with the Debtors' revenues, margin, and cost estimates and to achieve operational efficiencies embedded in those estimates. Given the competitive nature of the seismic industry, if any of these risks materialize, the future demand for the Debtors' products and services, and their future business, results of operations and financial condition, may suffer.

<u>The Debtors are exposed to risks related to complex, highly technical products</u>

The Debtors' customers often require demanding specifications for product performance and reliability. Because many of the Debtors' products are complex and often use unique advanced components, processes, technologies, and techniques, undetected errors and design and manufacturing flaws may occur. Even though the Debtors attempt to assure that their systems perform reliably in the field, the many technical variables related to their operations can cause a combination of factors that may, and from time to time have, caused performance and service issues with certain of the Debtors' products. Product defects result in higher product service, warranty, and replacement costs and may affect the Debtors' customer relationships and industry reputation, all of which may adversely impact the Debtors' businesses, results of operations and financial condition. Despite testing and quality assurance programs, undetected errors may not be discovered until the product is purchased and

used by a customer in a variety of field conditions.  If customers deploy the Debtors' new products and they do not work correctly, the Debtors' relationship with those customers may be materially and adversely affected.

The Debtors face risks related to inventory

The Debtors are exposed to inventory risks that may adversely affect operating results as a result of new product launches, rapid changes in product cycles and pricing, defective merchandise, changes in customer demand and other factors.  The Debtors endeavor to accurately predict these trends and avoid shortages or excess or obsolete inventory.  Demand for products, however, can change significantly between the time inventory or components are ordered and the date of sale. Any one of the inventory risk factors set forth above may adversely affect the Debtors' businesses, results of operations and financial condition.

The Debtors' backlog estimates are based on certain assumptions and are subject to unexpected adjustments and cancellations and thus may not be timely converted to revenues in any particular fiscal period, if at all, or be indicative of the Debtors' actual operating results for any future period

The Debtors' backlog estimates represent those seismic data acquisition projects for which a client has executed a contract and has a scheduled start date for the project as well as unrecognized pre-committed funding from the Debtors' Multi-client Services segment.  Backlog estimates are based on a number of assumptions and estimates including assumptions related to foreign exchange rates and proportionate performance of contracts and the Debtors' valuation of assets, such as seismic data, to be received by the Debtors as payment under certain agreements. The realization of the Debtors' backlog estimates is further affected by their performance under term rate contracts, as the early or late completion of a project under term rate contracts will generally result in decreased or increased, as the case may be, revenues derived from these projects.  Contracts for services are also occasionally modified by mutual consent.  Because of potential changes in the scope or schedule of the Debtors' clients' projects, the Debtors cannot predict with certainty when or if their backlog will be realized. Even where a project proceeds as scheduled, it is possible that the client may default and fail to pay amounts owed to the Debtors.  In addition, the contracts in the Debtors' backlog are cancelable by the client.  Material delays, payment defaults or cancellations could reduce the amount of backlog currently reported, and consequently, could inhibit the conversion of that backlog into revenues.

The Debtors have invested, and may continue to invest, significant amounts of money in acquiring and processing seismic data for multi-client surveys and for their seismic data library without knowing precisely how much of this seismic data they will be able to license or when and at what price they will be able to license such data

Multi-client surveys and the resulting seismic data library are an important part of the Debtors' business.  Although the Debtors are placing greater emphasis on proprietary projects for their customers, the Debtors expect to continue to invest in acquiring and processing seismic data that the Debtors own.  By making such investments, the Debtors are exposed to the following risks:

- The Debtors may not fully recover their costs of acquiring, processing and interpreting seismic data through future sales. The amounts of these data sales are uncertain and depend on a variety of factors, many of which are beyond the Debtors' control.

- The timing of these sales is unpredictable and can vary greatly from period to period. The costs of each survey are capitalized and then amortized over the expected useful life of the data.  This amortization will affect the Debtors' earnings and, when combined with the sporadic nature of the sales, will result in increased earnings volatility.

- Regulatory changes that affect companies' ability to drill, either generally or in a specific location where the Debtors have acquired seismic data, could materially and adversely affect the value of the seismic data contained in the Debtors' library.  Technology changes could also make existing data sets obsolete. Additionally, each of the Debtors' individual surveys has a limited book life based on its location and oil and gas companies' interest in prospecting for reserves in such location, so a particular survey may be subject to a significant and/or accelerated decline in value beyond initial estimates.

- The value of the Debtors' multi-client data could be significantly adversely affected if any material adverse change occurs in the general prospects for oil and gas exploration, development and production activities.

- The cost estimates upon which the Debtors base their pre-commitments of funding could be wrong, which could result in losses that have a material adverse effect on the Debtors' business, results of operations and financial condition.

- Pre-commitments of funding are subject to the creditworthiness of the Debtors' clients.  In the event that a client refuses or is unable to pay its commitment, the Debtors could lose a material amount of money.

- If the Debtors' clients significantly increase their preference toward licensing seismic data from multi-client data libraries, the Debtors may not have the appropriate existing data library assets to be able to obtain permits and access rights to geographic areas of interest from which to record such data, or make appropriate levels of investment in the creation of new data library assets to support the Debtors' business strategy.

Any reduction in the market value of such data will require the Debtors to write down its recorded value, which could have a significant material adverse effect on the Debtors' businesses, results of operations and financial condition.

The Debtors' operations are subject to delays related to obtaining land access rights from third parties which could affect the Debtors' results of operations

The Debtors' seismic data acquisition operations could be adversely affected by their inability to obtain timely access to both public and private land included within a seismic survey.  The Debtors cannot begin surveys on property without obtaining permits from certain governmental entities as well as the permission of the parties who have rights to the land being surveyed.  In recent years, it has become more difficult, costly and time-consuming to obtain access rights as drilling activities have expanded into more populated areas.  Additionally, while land owners generally are cooperative in granting access rights, some have become more resistant to seismic and drilling activities occurring on their property and stall or refuse to grant these rights for various reasons.  In the Debtors' multi-client services segment, the Debtors acquire data sets pertaining to large areas of land.  Consequently, if the Debtors do not obtain land access rights from a specific land owner, the Debtors may not be able to provide a complete survey for that area.  The failure to redact or remove the seismic information relating to mineral interests held by non-consenting third parties could result in claims against the Debtors for seismic trespass.  In addition, governmental entities do not always grant permits within the time periods expected.  Delays associated with obtaining such permits and significant omissions from a survey as a result of the failure to obtain consents could have a material adverse effect on the Debtors' businesses, results of operations and financial condition.

The Debtors operate under hazardous conditions that subject them and their employees to risk of damage to property or personal injury, and limitations on the Debtors' insurance coverage may expose it to potentially significant liability costs

The Debtors' activities are often conducted in dangerous environments and under hazardous conditions, including the detonation of dynamite.  Operating in such environments and under such conditions carries with it inherent risks, such as damage to or loss of human life, property or equipment, as well as the risk of downtime or reduced productivity resulting from equipment failures caused by such adverse operating environment.  These risks could cause the Debtors to experience equipment losses, injuries to their personnel and interruptions in their business. In addition, there is a risk that (i) the Debtors' insurance may not be sufficient or adequate to cover all losses or liabilities, and (ii) the insurance relied upon by the Debtors may not continue to be available to the Debtors or available to the Debtors on acceptable terms.  A successful claim for which the Debtors are not fully insured, or which exceeds the policy limits of the applicable insurance policy, could have a material adverse effect on the Debtors' businesses, results of operations and financial condition. Moreover, the Debtors do not carry business interruption insurance with respect to their operations.

The Debtors' agreements with their clients may not adequately protect the Debtors from unforeseen events or address all issues that could arise with clients. The occurrence of unforeseen events not adequately addressed in the contracts could result in increased liability, costs and expenses associated with any given project

With many clients, the Debtors enter into master service agreements that allocate certain operational risks. Despite the inclusion of risk allocation provisions in their agreements, the Debtors' operations may be affected by a number of events that are unforeseen or not within the Debtors' control. The Debtors' agreements may not adequately protect the Debtors from each possible event. If an event occurs that the Debtors have not contemplated or otherwise addressed in an agreement, the Debtors, and not the client, will likely bear the increased cost or liability. To the extent the Debtors' agreements do not adequately address these and other issues, or the Debtors are not able to resolve successfully resulting disputes, the Debtors may incur increased liability, costs and expenses.

Weather may adversely affect the Debtors' ability to conduct business

The Debtors' seismic data acquisition operations could be adversely affected by inclement weather conditions. Delays associated with weather conditions could have a material adverse effect on the Debtors' businesses, results of operations and financial condition. For example, weather delays focused on a particular project or region could lengthen the time to complete the project, resulting in decreased margins for the Debtors. As a result, the results of any one quarter are not necessarily indicative of annual results or continuing trends.

Significant Physical Effects of Climatic Change Could Damage the Debtors' Facilities, Disrupt Production Activities, and Cause the Debtors to Incur Significant Costs to Prepare for or Respond to Those Effects

Climate change could have an effect on the severity of weather (including hurricanes and floods), sea levels, the arability of farmland, and water availability and quality. If such effects were to occur, the Debtors' seismic acquisition operations have the potential to be adversely affected. Potential adverse effects could include damages to facilities from powerful winds or rising waters in low-lying areas, disruption of production activities because of climate-related damages to facilities, increased costs of operation potentially arising from such climatic effects, less efficient or non-routine operating practices necessitated by climate effects, or increased costs for insurance coverage in the aftermath of such effects. Significant physical effects of climate change could also have an indirect effect on the Debtors' financing and operations by disrupting the transportation or process-related services provided by midstream companies, service companies, or suppliers with whom the Debtors have a business relationship. The Debtors may not be able to recover through insurance some or any of the damages, losses, or costs that may result from potential physical effects of climate change.

The Debtors may be held liable for the actions of their subcontractors

The Debtors often work as the general contractor on seismic data acquisition surveys and consequently engage a number of subcontractors to perform services and provide products. There can be no assurance that the Debtors will not be held liable for the actions of these subcontractors. In addition, subcontractors may cause damage or injury to the Debtors' personnel and property that is not fully covered by insurance.

Current or future distressed financial conditions of clients could have an adverse effect on the Debtors in the event these clients are unable to pay for the Debtors' products and services

Some of the Debtors' clients may, from time to time, experience severe financial problems that have had or may have a significant effect on their creditworthiness. The Debtors generally do not require that their clients make advance payments or otherwise collateralize their payment obligations. The Debtors cannot provide assurance that one or more of their financially distressed clients will not default on their payment obligations or that such a default or defaults will not have a material adverse effect on the Debtors' businesses, results of operations, financial condition or cash flows. Furthermore, the bankruptcy of one or more of the Debtors' clients, or other similar proceeding or liquidity constraint, will reduce the amounts the Debtors can expect to recover, if any, with respect to amounts owed by such party. In addition, such events might force those clients to reduce or curtail their

future use of the Debtors' products and services, which could have a material adverse effect on their business, results of operations and financial condition.

<u>The high fixed costs of the Debtors' operations could result in operating losses</u>

The Debtors are subject to high fixed costs that primarily consist of depreciation and other amortization, maintenance expenses associated with seismic data acquisition, processing and interpretation equipment and certain crew costs. Because some of the Debtors' equipment is new or nearly new, the Debtors believe that their depreciation expense relative to revenues could be higher than that of many of the Debtors' competitors.  Extended periods of significant downtime or low productivity caused by reduced demand, weather interruptions, equipment failures, permit delays or other causes could reduce the Debtors' profitability and have a material adverse effect on their business, results of operations and financial condition.

<u>The Debtors are subject to compliance with stringent environmental laws and regulations that may expose them to significant costs and liabilities</u>

The Debtors' operations are subject to stringent federal, provincial, state and local environmental laws and regulations in the United States and foreign jurisdictions relating to environmental protection. In their business, the Debtors use explosives and certain other regulated hazardous materials that are subject to such regulation. These laws and regulations may impose numerous obligations that are applicable to the Debtors' operations including:

- the acquisition of permits before commencing regulated activities;

- the limitation or prohibition of seismic activities in environmentally sensitive or protected areas such as wetlands, wilderness areas or archaeological sites;

- restrictions pertaining to the management and operation of the Debtors' vehicles and equipment; and

- licensing requirements for the Debtors' personnel handling explosives and other regulated hazardous materials.

Numerous governmental authorities, such as the U.S. Environmental Protection Agency ("**EPA**"), BATFE, the Bureau of Land Management ("**BLM**") and analogous state agencies in the United States and governmental bodies with control over environmental matters in foreign jurisdictions, have the power to enforce compliance with these laws and regulations and any licenses and permits issued under them, oftentimes requiring difficult and costly actions.  In addition, failure to comply with these laws, regulations and permits may result in the assessment of administrative, civil and criminal penalties, the imposition of obligations to investigate and/or remediate contaminations, and the issuance of injunctions limiting or preventing some or all of the Debtors' operations.

The Debtors invest financial and management resources to comply with these laws and related licensing and permitting requirements, and the Debtors believe that the regulatory environment for the oil and natural gas industry and related service providers is likely to become more burdensome and time consuming in future years. Over the last several years, permitting authorities have begun requiring the Debtors to comply with standards that have never before applied to seismic companies. While shale plays continue to represent a significant opportunity for the Debtors, some proposed and existing regulations would inhibit the use of hydraulic fracturing in connection with the drilling of wells, which is a crucial part in recovering economic amounts of hydrocarbons from shale plays.  If oil and natural gas companies face regulation that makes drilling for resources uneconomic, the demand for the Debtors' services may be adversely affected. In addition, the ongoing revision of such environmental laws and regulations, sometimes as a direct result of particular economic, political, or social events, makes it difficult for seismic data acquisition companies to predict future costs or the impact of such laws and regulations on future projects. As a result, the Debtors could incur capital and operating expenses, as well as compliance costs, beyond those anticipated which could adversely affect their business, results of operations and financial condition.

There is inherent risk of incurring significant environmental costs and liabilities in the Debtors' operations due to their controlled storage, use and disposal of explosives. In the event of an accident, the Debtors could be held liable for any damages that result or they could be penalized with fines, and any liability could exceed the limits of or fall outside of applicable insurance coverage.

<u>Current and future legislation relating to climate change and hydraulic fracturing may negatively impact the exploration and production of oil and gas, and implicitly the demand for the Debtors' products and services</u>

Along with other seismic data acquisition companies, the Debtors may be affected by new environmental legislation intended to limit or reduce increased emissions of gases, such as carbon dioxide and methane from the burning of fossil fuels (oil, gas and coal), which may be a contributing factor to climate change. The European Union has already established greenhouse gas ("**GHGs**") regulations, and many other countries, including the United States, are in the process of enacting similar regulations. This could cause the Debtors to incur additional direct and indirect compliance costs in relation to any new climate change laws and regulations. Moreover, passage of climate change legislation or other regulatory initiatives that target emissions of GHGs may impair exploration and production of hydrocarbons and thus adversely affect future demand for the Debtors' products and services. Reductions in the Debtors' revenues or increases in their expenses as a result of climate control legislative initiatives could have negative impact on the Debtors' business, results of operations and financial condition. Although various climate change legislative measures have been under consideration by the U.S. Congress, it is not possible at this time to predict whether or when Congress may act on climate change legislation.

In addition, the "Fracturing Responsibility and Awareness of Chemicals Act" (the "**FRAC Act**") was introduced to both houses of the 113th U.S. Congress in May and June 2013, aiming to amend the "Safe Drinking Water Act" (the "**SDWA**") by repealing an exemption from regulation for hydraulic fracturing. The 111th and 112th U.S. Congresses did not take any significant action on previously introduced versions of the FRAC Act. If enacted, the FRAC Act would amend the definition of "underground injection" in the SDWA to encompass hydraulic fracturing activities. Such a provision could require hydraulic fracturing operations to meet permitting and financial assurance requirements, adhere to certain construction specifications, fulfill monitoring, reporting, and recordkeeping obligations, and meet plugging and abandonment requirements. The FRAC Act also proposes to require the reporting and public disclosure by the energy industry of the chemicals mixed with the water and sand it pumps underground in the hydraulic fracturing process, information that has largely been protected as trade secrets. The adoption of any future federal or state laws or implementing regulations imposing reporting obligations on, or otherwise limiting, the hydraulic fracturing process could make it more difficult to complete natural gas wells. Shale gas cannot be economically produced without extensive fracturing. In the event this legislation is enacted, demand for seismic acquisition services may be adversely affected. In addition, the EPA has asserted federal regulatory authority over certain hydraulic fracturing operations involving diesel additives under the SDWA and has released permitting guidance for hydraulic fracturing activities that use diesel in fracturing fluids in those states where EPA is the permitting authority.

Most recently, investor groups are increasingly pressing U.S. oil and gas companies to take stronger actions and increase public disclosure of information on fracking, climate change, and environment changes. In their resolutions, these groups request detailed accounting of how oil and gas companies are addressing the risks of fracking associated with threats to environment, communities, labor, regulatory changes and drilling moratoriums. If successful, these actions may result in substantial cost increases, delays, suspensions or even cancellations of existing or new exploration projects, with a direct adverse effect on the Debtors' business, results of operations and financial condition.

<u>Historically, the Debtors' operational expenses incurred in connection with international seismic data projects have been higher than the operational expenses incurred in connection with seismic data projects undertaken in the United States. The profitability of future international operations will depend significantly on the Debtors' ability to control these expenses</u>

The expense of mobilizing personnel and equipment to various foreign locations, as well as the cost of obtaining and complying with local regulatory requirements, historically have been significantly higher than the expenses incurred in connection with seismic data projects undertaken in the United States. If the Debtors are

unable to reduce the expenses incurred in connection with an international seismic data project, or to obtain better pricing for such services, the Debtors' business, results of operations and financial condition could be materially and adversely affected.

As companies subject to compliance with the Foreign Corrupt Practices Act (the "**FCPA**"), the Debtors' business may suffer because their efforts to comply with U.S. law could restrict their ability to do business in foreign markets relative to competitors who are not subject to U.S. law. Additionally, the Debtors' business plan may involve establishing joint ventures with partners in certain foreign markets. Any determination that the Debtors or their foreign agents or joint venture partners have violated the FCPA may adversely affect the Debtors' business and operations

The Debtors and their local partners operate in many parts of the world that have experienced governmental corruption to some degree and, in certain circumstances, strict compliance with anti-bribery laws may conflict with local customs and practices. The Debtors may be subject to competitive disadvantages to the extent that the Debtors' competitors are able to secure business, licenses or other preferential treatment by making payments to government officials and others in positions of influence or using other methods that U.S. law and regulations prohibit the Debtors from using.

As U.S. corporations, the Debtors are subject to the regulations imposed by the FCPA, which generally prohibits U.S. companies and their intermediaries from making improper payments to foreign officials for the purpose of obtaining or keeping business. In particular, the Debtors may be held liable for actions taken by strategic or local partners even though those partners are not subject to the FCPA. Any such violations could result in substantial civil and/or criminal penalties and might adversely affect the Debtors' business, results of operations or financial condition. In addition, the Debtors' ability to continue to work in the countries discussed above could be adversely affected if they were found to have violated certain U.S. laws, including the FCPA.

The Debtors' results of operations can be significantly affected by currency fluctuations

A portion of the Debtors' revenues is derived in the local currencies of the foreign jurisdictions in which they operate. Accordingly, the Debtors are subject to risks relating to fluctuations in currency exchange rates. In the future, and especially as the Debtors expand their sales in international markets, the Debtors' clients may increasingly make payments in non-U.S. currencies. Fluctuations in foreign currency exchange rates could affect sales, cost of sales and operating margins. In addition, currency devaluation can result in a loss to the Debtors if they holds deposits of that currency. Hedging foreign currencies can be difficult, especially if the currency is not actively traded. The Debtors cannot predict the effect of future exchange rate fluctuations on their operating results.

The Debtors Rely on Proprietary Information, Proprietary Software, Trade Secrets, and Confidentiality and Licensing Agreements to Conduct Operations

The Debtors rely on certain proprietary information, proprietary software, trade secrets, and confidentiality and licensing agreements to conduct current operations. The Debtors are continuously working to improve technology and operating techniques, through internal development activities and working with vendors to develop new technologies to maintain pace with industry innovation. The Debtors' future success will be partly dependent on their ability to maintain and extend their technology base and preserve intellectual property without infringing on the rights of any third parties. There can be no assurance that the Debtors will be successful in protecting their intellectual property or that their competitors will not develop technologies that are substantially equivalent or superior to the Debtors' technologies.

The Debtors' Results of Operations Could Be Adversely Affected by Asset Impairments

The Debtors periodically review their portfolio of equipment and intangible assets, including their multi-client seismic data library, for impairment. If the future cash flows anticipated to be generated from these assets falls below net book value, the Debtors may be required to write down their value. If the Debtors are forced to write down the value of intangible assets or equipment, these non-cash asset impairments could negatively affect results of operations in the period in which they are recorded.

<u>The Cyclical Nature of, or a Prolonged Downturn in, the Seismic Data Industry Can Affect the Carrying Value of
Long-Lived Assets and Negatively Impact the Debtors' Results of Operations</u>

        The Debtors are required to annually assess whether the carrying value of long-lived assets has
been impaired, or more frequently if an event occurs or circumstances change which could indicate the carrying
amount of an asset may not be recoverable.  Recoverability is measured by a comparison of the carrying amount of
an asset to future net cash flows expected to be generated by the asset.  If management determines that the carrying
value of long-lived assets may not be recoverable, the Debtors' results of operations could be impacted by non-cash
impairment charges.

<u>The Debtors May Be Negatively Affected by Industry Consolidation</u>

        Consolidation in the energy industry could adversely affect the Debtors by increasing the scale or
scope of the Debtors' competitors, or by creating a competitor that is capable of providing services similar to those
the Debtors intend to offer, thereby making it more difficult for the Debtors to compete. Industry consolidation also
may impede the Debtors' ability to identify acquisition, joint venture, or other strategic opportunities.

**D.**      **Certain Risks Relating to the Shares of New GGS Common Stock**

<u>Significant Holders</u>

        After the Effective Date, the Investors, who together hold approximately 57% percent of the
Senior Notes, will hold a majority of the New Common Stock.  If such holders of New Common Stock were to act
as a group, such holders would be in a position to control the outcome of all actions requiring stockholder approval,
without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a
negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the
New Common Stock.

<u>Restrictions on transfer of New Common Stock</u>

        The recipients of Rights Offering Shares (as well as recipients of the DIP Conversion Shares and
the Commitment Premium Shares and recipients of other securities issued under the Plan to holders who are deemed
to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code) will be restricted in their ability to
transfer or sell their securities.  These persons will be permitted to transfer or sell such securities only pursuant to the
provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration
requirements of the Securities Act.  These restrictions may adversely impact the value of the shares of New
Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the
shares, at a time when they may wish to do so. See Section _____ "Securities Law Matters" for additional
information regarding restrictions on resales of the New Common Stock.

<u>The Debtors intend to suspend their reporting requirements, which could negatively affect the liquidity and trading
prices of the New Common Stock and result in less public disclosure</u>

        Given the increasing cost and resource demands of being a public company, either prior to or in
connection with the Effective Date, the Debtors intend to suspend their SEC reporting requirements under the
Exchange Act. In this event, the Debtors' obligations to file reports with the SEC, including periodic reports, will
cease, and the Debtors expect that the liquidity of the New Common Stock will be materially and adversely affected
even though it is possible that stockholders may still continue to trade the Debtors' common stock on over-the-
counter markets.  The Debtors, however, can provide no assurance that the New Common Stock will trade in over-
the-counter markets or that market makers would make a market in the New Common Stock.  In addition,
companies with common stock quoted on the over-the-counter markets may not be required to meet the reporting
requirements set forth under the Exchange Act depending on, among other things, the number of holders of record
of the common stock.  As a result, investors may find it more difficult to dispose of or obtain accurate quotes as to
the market value of the New Common Stock, and the ability of the Debtors' stockholders to sell the Debtors'
securities in the secondary market may be materially limited.

<u>Lack of established market for New Common Stock</u>

A liquid trading market for the New Common Stock and the Warrants issued under the Plan does not exist. The future liquidity of the trading markets for New Common Stock and Warrants will depend, among other things, upon the number of holders of such securities and whether such securities become listed for trading on an exchange or trading system at some future time.  The Reorganized Debtors are under no obligation to list the New Common Stock or Warrants on any securities exchange and has no current intention to do so.

<u>Historical financial information of the Debtors may not be comparable to the financial information of the Reorganized Debtors</u>

As a result of the consummation of the Plan and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

<u>The projections set forth in this Disclosure Statement may not be achieved</u>

The projections set forth in this Disclosure Statement cover the operations of the Reorganized Debtors through 2018. The projections are based on numerous assumptions that are an integral part thereof, including Confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, competition, adequate financing, absence of material claims, the ability to make necessary capital expenditures, the ability to establish strength in new markets and to maintain, improve and strengthen existing markets, customer purchasing trends and preferences, the ability to increase gross margins and control future operating expenses and other matters, many of which are beyond the control of the Reorganized Debtors.  In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the operations of the Reorganized Debtors.

These variations may be material and adverse.  Because the actual results achieved throughout the periods covered by the Projections will vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur.

**E.      Additional Factors to Be Considered**

<u>The Debtors have no duty to update</u>

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement under the Bankruptcy Code unless otherwise ordered to do so by the Bankruptcy Court.

<u>No representations outside this Disclosure Statement are authorized</u>

No representations concerning or related to the Debtors, the Chapter 11 Cases, once commenced, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

<u>Forward-looking statements are not assured, and actual results may vary</u>

This Disclosure Statement contains forward-looking statements. These forward-looking statements are based on the current expectations and observations of the Debtors' management, and include factors that could cause actual results to differ materially such as the following:  the Debtors' ability to meet current operating needs,

including their ability to maintain contracts that are critical to their operation, to obtain and maintain acceptable terms with their vendors, customers and service providers and to retain key executives, managers and employees; the Debtors' ability to obtain Bankruptcy Court approval with respect to motions in the Chapter 11 Cases; the effects of the Bankruptcy Court rulings in the Chapter 11 Cases and the outcome of the case in general; the length of time the Debtors will operate under the Chapter 11 Cases; the pursuit by the Debtors' various creditors, equity holders and other constituents of their interests in the Chapter 11 Cases; risks associated with third party motions in the Chapter 11 Cases, which may interfere with the ability to consummate the Plan; the adverse effects of the Chapter 11 Cases on the Debtors' liquidity or results of operations generally; the increased administrative and restructuring costs related to the Chapter 11 Cases; the Debtors' ability to maintain adequate liquidity to fund operations during the Chapter 11 Cases and thereafter; the sufficiency of the "exit" financing contemplated by the Plan; the Debtors' ability in the future to arrange and consummate financing or sale transactions or to access capital; the effects of changes in the Debtors' credit ratings; the timing and realization of the recoveries of assets and the payments of Claims and the amount of expenses projected to recognize such recoveries and reconcile such Claims; the occurrence of any event, change or other circumstance that could give rise to the termination of the Backstop Conversion Commitment Agreement; and the other factors described in this **Article XI**.

<u>No Legal or Tax Advice Is Provided to You by This Disclosure Statement</u>

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of Claims and Equity Interests against the Debtors should consult his, her or its own legal counsel and accountants as to legal, tax and other matters concerning such holder's Claims or Equity Interests. This Disclosure Statement is not legal advice to you and may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

<u>Other factors</u>

See "Risk Factors" in GGS's Annual Report on Form 10-K for the year ended December 31, 2013 for a list of other risk factors that could have a significant impact on the Company's operating performance.

## XII.    CERTAIN SECURITIES LAW MATTERS

No registration statement will be filed under the Securities Act of 1933, as amended (the "**Securities Act**"), or pursuant to any state securities laws with respect to the offer and distribution of securities under the Plan.  The Debtors will rely on the exemption provided by section 4(a)(2) of the Securities Act and applicable exemptions from Blue Sky Laws to issue the Rights and the Rights Offering Shares. The Debtors believe that the provisions of section 1145 of the Bankruptcy Code will exempt the issuance and distribution of securities (other than the Rights, the Rights Offering Shares and the New MIP Common Stock) issued under the Plan (the "**1145 Securities**") from federal and state securities registration requirements.

### A.    **Bankruptcy Code Exemptions from Registration Requirements.**

**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code.**

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state laws if three principal requirements are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must each hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or other property.

The exemptions provided for in section 1145 do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code. Section 1145(b) defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":

(a)     purchases a claim against, an interest in, or a claim for administrative expense against, the debtor, with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

(b)     offers to sell securities offered under a plan for the holders of such securities ("distributors");

(c)     offers to buy securities from the holders of such securities, if the offer to buy is (i) with a view to distributing such securities and (ii) made under a distribution agreement; and

(d)     is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act, which includes affiliates of the issuer, defined as persons who are in a relationship of "control" with the issuer.

Persons who are not deemed "underwriters" may generally resell the securities they receive that comply with the requirements of Section 1145(a)(1) without registration under the Securities Act or other applicable law.  Persons deemed "underwriters" may sell such securities without registration only pursuant to exemptions from registration under the Securities Act and other applicable law. The Investors will not be deemed to be "underwriters" under section 1145(b) solely on account of their participation in the Backstop Commitment.

## Subsequent Transfers of 1145 Securities

Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to section 1145(a)(1) are deemed to have been issued in a public offering.  In general, therefore, resales of and subsequent transactions in the 1145 Securities will be exempt from registration under the Securities Act pursuant to section 4(a)(1) of the Securities Act, unless the holder thereof is deemed to be an "issuer," an "underwriter" or a "dealer" with respect to such securities. For these purposes, an "issuer" includes any "affiliate" of the issuer, defined as a person directly or indirectly controlling, controlled by or under common control with the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise. A "dealer," as defined in section 2(a)(12) of the Securities Act, is any person who engages either for all or part of his or her time, directly or indirectly, as agent, broker or principal, in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another person. Whether or not any particular person would be deemed to be an "affiliate" of Reorganized GGS or an "underwriter" or a "dealer" with respect to any 1145 Securities will depend upon various facts and circumstances applicable to that person.

Notwithstanding the provisions of section 1145(b) of the Bankruptcy Code regarding accumulators and distributors, the staff of the SEC has taken the position that resales of securities distributed under a plan of reorganization by accumulators and distributors of securities who are not affiliates of the issuer of such securities are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction by such non-affiliates may be considered an "ordinary trading transaction" if it is made on a national securities exchange or in the over-the-counter market and does not involve any of the following factors:

(a)     (i) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (ii) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

(b)     the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto, and documents filed with the SEC pursuant to the Exchange Act; or

(c)      the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arm's-length negotiations between a seller and a broker or dealer, each acting unilaterally, not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

The staff of the SEC has not provided any guidance for privately arranged trades. The views of the staff of the SEC on these matters have not been sought by the Debtors and, therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any person intending to rely on such exemption is urged to consult their counsel as to the applicability thereof to their circumstances.

The 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states.

However, the availability of such state exemptions depends on the securities laws of each state, and holders of Claims should consult with their own legal advisors regarding the availability of these exemptions in their particular circumstances.

**Subsequent Transfers of Securities Issued to Affiliates.**

Securities issued under the Plan to affiliates of Reorganized GGS will be subject to restrictions on resale. Affiliates of Reorganized GGS for these purposes will generally include its directors and officers and its controlling stockholders.  While there is no precise definition of a "controlling" stockholder, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns 10% or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" of the debtor.

The Staff of the SEC has indicated that Rule 144 under the Securities Act is available for the immediate resale of securities issued under a plan of reorganization to affiliates of the issuing debtor that would otherwise be unrestricted under the Securities Act. This Rule is conditioned [on the public availability of certain information concerning the issuer][13] and imposes on selling stockholders certain volume limitations and certain manner of sale and notice requirements.

**GIVEN THE COMPLEX NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, AFFILIATE OR DEALER, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES TO BE DISTRIBUTED PURSUANT TO THE PLAN.**

**THE DEBTOR RECOMMENDS THAT HOLDERS OF CLAIMS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES**.

**Rights, Rights Offering Shares and New MIP Common Stock.**

The Rights, the Rights Offering Shares and the New MIP Common Stock Primary Equity are being offered and issued pursuant to exemption from registration under the Securities Act and applicable state securities laws. Such securities may be deemed restricted securities, and may only be resold pursuant to applicable exemptions from registration (but the ability of holders thereof to resell 1145 Securities shall not be affected). Holders of such securities should consult their own counsel concerning resale.

**The Anti-Dilution Protection for the New GGS Equity Warrants Does Not Cover All Transactions that Could Adversely Affect the Warrants.**

---

[13] [TBD]

The terms of the Warrants will provide for anti-dilution protection in the event of a stock split, reverse stock split, stock dividend, reclassification, dividend or distribution (other than ordinary cash dividends) and business combination transaction. However, there could be other transactions that adversely affect the Warrants, such as the issuance of common stock at a price below the exercise price for the Warrants or below the fair market value for the New Common Stock, that could adversely affect the value of the Warrants for which there will be no anti-dilution adjustment. Also, if Reorganized GGS were to engage in a business combination transaction for cash at a time when the fair market value of the Warrants was below the applicable exercise price, holders of these warrants would receive no value.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to U.S. holders (as defined below) of Allowed Class 3B-3H, Class 4A, Class 4B, and Class 5 Claims in their capacities as such.

This summary is provided for informational purposes only and is based on the Tax Code, the Treasury regulations promulgated thereunder, judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No ruling will be sought from the Internal Revenue Service (the "**IRS**") with respect to any of the tax aspects of the Plan and no opinion of counsel has heretofore been obtained by the Debtors with respect thereto. This summary does not address any aspects of U.S. federal non-income, state, local, or non-U.S. taxation.

The summary of certain U.S. federal income tax consequences to U.S. holders of Claims does not address all aspects of U.S. federal income taxation that may be relevant to a particular U.S. holder of a Claim in light of its particular facts and circumstances or to particular types of holders of Claims subject to special treatment under the Tax Code (for example, financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; certain former U.S. citizens or long-term residents; persons who hold Claims, New Common Stock, Rights or Warrants as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that have a functional currency other than the U.S. dollar; governments or governmental organizations; pass-through entities; investors in pass-through entities that hold Claims, New Common Stock, Rights or Warrants; and persons who received their Claims, New Common Stock, Rights or Warrants upon exercise of employee stock options or otherwise as compensation). Furthermore, the summary of certain U.S. federal income tax consequences to U.S. holders of Claims applies only to holders that hold their Claims as capital assets for U.S. federal income tax purposes (generally, property held for investment) and will hold their New Common Stock, Rights or Warrants, as applicable, as capital assets for U.S. federal income tax purposes. Insofar as such summary addresses U.S. federal income tax consequences related to the New Common Stock, Warrants or Rights, such summary applies only to U.S. holders of Claims that acquire the New Common Stock, Warrants or Rights, as applicable, in exchange for their Claims pursuant to the Plan.

A "U.S. holder" for purposes of this summary is a beneficial owner of a Class 3B-3H, Class 4A, Class 4B, or Class 5 Claim that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate whose income is subject to U.S. federal income taxation regardless of its source; or

• a trust (1) if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

*This summary does not describe the tax consequences of the Plan to any holder of a Class 3B-3H, Class 4A, Class 4B, or Class 5 Claim that is not a U.S. holder (a "**Non-U.S. holder**"). Non-U.S. holders are urged to consult their tax advisors regarding the tax consequences (including the U.S. federal income tax consequences) to them of the Plan, including the possible imposition of U.S. withholding taxes in certain circumstances if the Non-U.S. holder fails to establish an exemption by providing an applicable IRS Form W-8 or otherwise. All distributions to holders of Claims will be subject to any applicable withholding and backup withholding.*

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of a Claim, the treatment of a partner in the partnership will generally depend upon the status of the partner and the activities of the partnership. Partnerships and their partners should consult their tax advisors about the U.S. federal income tax consequences of participating in the Plan, including the tax consequences with respect to the ownership and disposition of New Common Stock, Rights, and Warrants, as applicable, received under the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

### B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

This discussion assumes that Reorganized GGS will be a continuation of GGS for U.S. federal income tax purposes. If this structure is not implemented, this section of the Disclosure Statement will be materially modified. At present, no decision has been made. The decision will be made by the Ad Hoc Group prior to the hearing on the Disclosure Statement.

### Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market value of any other consideration.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) net operating losses ("**NOLs**") and NOL carryovers; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. A debtor with COD Income may elect first to reduce the basis of its depreciable assets. In the context of a consolidated group of corporations, the tax rules provide for a complex ordering mechanism in determining how the tax attributes of one member can be reduced by the COD Income of another member.

Because the Plan provides that holders of certain Claims may receive New Common Stock, Warrants, Rights, or a share of the Library Improvement, the amount of COD Income, and accordingly the amount of tax attributes required to be reduced, will depend in part on the fair market value of the New Common Stock, Warrants, Rights and possibly the Library Improvement. These values cannot be known with certainty as of the date

hereof.  The Debtors expect that, subject to the limitations discussed herein, they will be required to make material reductions in their tax attributes.

### Limitation of NOL Carryforwards and Other Tax Attributes

The Debtors had significant NOLs as of December 31, 2013.  The Debtors expect that, as a consequence of the COD Income, their NOLs will be substantially reduced.  The amount of tax attributes, if any, that will be available to the Reorganized Debtors following such reduction is based on a number of factors and is impossible to calculate at this time.  Some of the factors that will impact the amount of available tax attributes include:  the amount of taxable income or loss incurred by the Debtors in 2014 and the amount of COD Income recognized by the Debtors in connection with the consummation of the Plan.  Following the consummation of the Plan, the Debtors anticipate that any remaining NOLs and other tax attributes, if any, may be subject to limitation under section 382 of the Tax Code by reason of the transactions under the Plan.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its pre-ownership change NOLs (collectively, "**Pre-Change Losses**") that may be utilized to offset future taxable income generally is subject to an annual limitation.  Capital loss carryovers and certain tax credit carryovers are also generally limited after an ownership change under Section 383 of the Tax Code.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the Tax Code applies.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(a)      **General Section 382 Annual Limitation**

In general, the annual limitation determined under section 382 of the Tax Code in the case of an "ownership change" of a corporation (the "**Section 382 Limitation**") is equal to the product of (a) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" posted by the IRS in effect for the month in which the ownership change occurs (*e.g.*, 3.05% for October 2014).  Generally, the Section 382 Limitation may be increased if the debtor corporation has a net unrealized built-in gain at the time of the ownership change.  If, however, the debtor corporation has a net unrealized built-in loss at the time of the ownership change, the Section 382 Limitation may apply to such net unrealized built-in loss.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  The debtor corporation's Pre-Change Losses will be subject to further limitations if the debtor does not continue its business enterprise for at least two years following the ownership change or if it experiences additional future ownership changes.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

(b)      **Special Bankruptcy Exceptions**

An exception to the foregoing annual limitation rules generally applies when the existing shareholders and/or so-called "qualified creditors" of a debtor corporation in a chapter 11 bankruptcy case receive, in respect of their claims or interests, at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation of the plan, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

When the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply to a debtor in chapter 11 (the "**382(l)(6) Exception**").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

It is possible that the Debtors will not qualify for the 382(l)(5) Exception.  Alternatively, the Reorganized Debtors may elect out of the 382(l)(5) Exception.  In either case, the Debtors expect that their use of the Pre-Change Losses, if any, after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception.  Regardless of whether the Reorganized Debtors take advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtors' use of their Pre-Change Losses, if any, after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the Tax Code were to occur after the Effective Date.

### Alternative Minimum Tax

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for AMT NOLs for certain taxable years, only 90% of a corporation's AMTI may be offset by available AMT NOL carryforwards.  Additionally, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets may cause the corporation's aggregate tax basis in its assets to be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

### C.      Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims

This discussion assumes that Reorganized GGS will be a continuation of GGS for U.S. federal income tax purposes.  If this structure is not implemented, this section of the Disclosure Statement will be materially modified.  At present, no decision has been made.  The decision will be made by the Ad Hoc Group prior to the hearing on the Disclosure Statement.

The U.S. federal income tax consequences of the Plan to a U.S. holder of a Claim may depend, in part, on whether the Claim constitutes a "security" for U.S. federal income tax purposes, what type of consideration was received in the exchange for the Claim, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless security deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.  U.S. holders should consult their tax advisors regarding the tax consequences of the Plan based on their individual circumstances.

### Consequences to U.S. Holders of Allowed Class 3B-3H Secured Capital Lease Claims

In the event that (1) a Class 3B-3H Claim is treated as debt for tax purposes; (2) the extension of the applicable Capital Lease pursuant to the Plan constitutes a "significant modification" of the such Claim for tax purposes; and (3) such extension does not constitute a tax-free recapitalization, the U.S. holder of such Class 3B-3H Claim would generally have taxable gain or loss to the extent that the "issue price" of the extended Capital Lease is greater than or less than, respectively, the U.S. holder's tax basis in the Class 3B-3H Claim.  If the extension of a Capital Lease does not constitute a significant modification, or constitutes a tax-free recapitalization, the U.S. holder of the Class 3B-3H Claim would generally not recognize gain or loss as a result of such extension, except with respect to payments for accrued interest, fees, expenses, charges, or principal (to the extent that the U.S. holder

previously took a bad debt deduction with respect to such principal) received by the holder in connection with the extension.  Whether the extension of a Class 3B-3H Claim would constitute a significant modification that is not a tax-free recapitalization depends on the specific facts and circumstances.  U.S. holders should consult their tax advisors regarding the tax consequences of the Plan with respect to an applicable Capital Lease that is not treated as debt for tax purposes.

**Holders of Class 3B-3H Claims should consult their own tax advisors regarding the tax consequences of the Plan with respect to their specific Claims.**

<u>**Consequences to U.S. Holders of Allowed Class 4A and Class 4B Financial Claims**</u>

(a)    **Exchange of Claims**

Whether a U.S. holder of an Allowed Class 4A or Class 4B Claim recognizes gain or loss on the exchange of its Class 4A or Class 4B Claim for New Common Stock, Warrants and, if applicable, Rights, depends (in part) on whether the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt underlying the Allowed Class 4A or Class 4B Claim surrendered is treated as a "security" of GGS for the reorganization provisions of the Tax Code.  Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security.  Holders of Class 4A and Class 4B Claims are urged to consult their tax advisors to determine whether their Claims constitute securities of GGS.

With respect to Class 4A or Class 4B Claims that are treated as securities of GGS, the exchange of such Claims for New Common Stock, Warrants, and Rights, if any, should be treated as a recapitalization under section 368(a)(1)(E) of the Tax Code.  In such case, the U.S. holder of such a Claim generally should not recognize any gain or loss upon the exchange, except that such U.S. holder will generally be required to recognize ordinary income to the extent that the consideration received in exchange for such Claim is treated as attributable to accrued but untaxed interest on such Claim, as described under "Accrued Interest" below.  A U.S. holder of a Class 4A or Class 4B Claim that is treated as a security of GGS should generally obtain an aggregate tax basis in the shares of New Common Stock, Warrants, and Rights, if any, received in exchange for such Claim equal to its tax basis in such Claim.  Notwithstanding the previous sentence, such a holder should receive a tax basis in any shares of New Common Stock, Warrants, and Rights which it receives as consideration attributable to accrued interest on its Claim equal to the fair market value of such New Common Stock, Warrants, and Rights.  Such a U.S. holder should allocate its aggregate tax basis in the shares of New Common Stock, Warrants, and Rights received (other than to the extent such consideration is attributable to accrued interest on such Claim) among the New Common Stock, Warrants, and Rights so received in proportion to their respective fair market values at the time received.  Such a U.S. holder should have a holding period in the New Common Stock, Warrants, and Rights, if any, received in exchange for its Claim equal to its holding period in such Claim, except to the extent such Holder receives such New Common Stock, Warrants, and Rights, if any, as consideration attributable to accrued interest on its Claim, with respect to which such holder should have a holding period that begins on the day following the receipt of such consideration.  U.S. holders should consult their tax advisors regarding the proper tax treatment of the Disputed Claims Reserve and any distributions therefrom.

The discussion above generally assumes that the exchange of Class 4A or Class 4B Claims treated as "securities" for New Common Stock, Warrants, and Rights, if applicable, is treated as a recapitalization under section 368(a)(1)(E) of the Tax Code.  However, it is possible that the IRS may assert that the exchange should be treated as part of a transaction governed by section 351 of the Tax Code and that section 368(a)(1)(E) of the Tax Code should not apply to the exchange.  Alternative characterizations of the exchange may also be possible under certain circumstances.  Holders of Class 4A and Class 4B Claims are urged to consult their tax advisors regarding the proper characterization of the exchange and the resulting U.S. federal income tax consequences to them.

With respect to Allowed Class 4A or Class 4B Claims that are not treated as securities of GGS, a U.S. holder of such Claims generally will be treated as exchanging its Claims for the consideration received for such Claims pursuant to the Plan in a taxable exchange. Accordingly, such a U.S. holder generally should recognize gain or loss equal to the difference between (i) the fair market value of the New Common Stock, Warrants, and Rights, if any, received (excluding New Common Stock, Warrants, and Rights treated as attributable to accrued interest on such Claims, which are taxable as described below under "Accrued Interest"), and (ii) the U.S holder's adjusted tax basis in such Claims. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. The U.S. holder's tax basis in such New Common Stock, Warrants and Rights, if any, should generally be their fair market value at the time received. The U.S. holder's holding period in such New Common Stock, Warrants and Rights, if any, should begin on the day following the day of receipt. U.S. holders should consult their tax advisors regarding the proper tax treatment of the Disputed Claims Reserve and any distributions therefrom.

**The tax consequences of the Plan to the U.S. holders of Allowed Class 4A and Class 4B Financial Claims are uncertain. U.S. holders of Allowed Class 4A and 4B Claims should consult their tax advisors, including seeking advice regarding whether such Claims will be treated as "securities" for U.S. federal income tax purposes.**

  (b)  **Rights**

A U.S. holder of Rights should generally not recognize gain or loss upon its exercise of such Rights. Such a U.S. holder's tax basis in shares of New Common Stock received upon exercise of such Rights should equal the aggregate amount of such holder's tax basis in such Rights, if any, and the amount paid for such shares of New Common Stock. Such a holder should have a holding period in such stock that begins on the day following the acquisition thereof (or possibly on the day of the acquisition thereof). Upon the lapse of such Rights, such a Holder should generally recognize a short-term capital loss equal to its tax basis in such Rights. Holders of Rights are urged to consult their tax advisors regarding the tax consequences related to the Rights.

  (c)  **Warrants**

    (1)  <u>Exercise</u>

A U.S. holder of Warrants should generally not recognize gain or loss upon its exercise of such Warrants for cash. Such a U.S. holder's tax basis in shares of New Common Stock received upon exercise of such a Warrant should equal the aggregate amount of such holder's tax basis in such Warrant, if any, and the amount paid for such shares of New Common Stock. Such a holder should have a holding period in such stock that begins on the day the Warrant is exercised (or possibly on the day following the day such Warrant is exercised).

    (2)  <u>Sale, Exchange, Lapse, or Other Disposition</u>

Upon the sale, exchange, lapse, or other disposition of a Warrant (other than its exercise), a U.S. holder should generally recognize capital gain or loss equal to the difference between the amount realized and such holder's adjusted tax basis in such Warrant. Such gain or loss should generally be long-term capital gain or loss if the holder has held its Warrant for more than one year at the time of the sale, exchange, or other disposition, and short-term capital gain or loss otherwise. Depending on the particular circumstances in which the Claim for which the Warrant was exchanged had been acquired and the treatment of the U.S. holder's exchange of its Claim for its Warrant, the sale, exchange or other disposition of the Warrant might result in the recognition of market discount. Holders of Warrants are urged to consult their tax advisors regarding the application of the market discount rules to any gain recognized upon the sale, exchange or other disposition of a Warrant.

(3)      Adjustments

A U.S. holder of Warrants might be treated as receiving a constructive dividend distribution from Reorganized GGS if (i) the exercise price is adjusted and as a result of such adjustment such holder's proportionate interest in Reorganized GGS's assets or earnings and profits is increased and (ii) the adjustment is not made pursuant to a *bona fide*, reasonable anti-dilution formula, as determined under applicable Treasury regulations. An adjustment in the exercise price would not be considered made pursuant to such a formula if the adjustment were made to compensate the holder of a Warrant for certain taxable distributions with respect to the shares of New Common Stock. Thus, under certain circumstances, a reduction in the exercise price might give rise to a taxable dividend to a holder of Warrants even though such holder would not receive any cash related thereto.

Holders of Warrants are urged to consult their tax advisors regarding the tax consequences related to the Warrants.

(d)      **New Common Stock**

(1)      Distributions

The gross amount of any distribution of cash or property made to a U.S. holder with respect to shares of New Common Stock generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of the current or accumulated earnings and profits of the Reorganized Debtors, as determined under U.S. federal income tax principles. Dividends received by non-corporate U.S. holders may qualify for reduced rates of taxation. Subject to applicable limitations, a distribution which is treated as a dividend for U.S. federal income tax purposes may qualify for the dividends-received deduction if such amount is distributed to a U.S. holder that is a corporation and certain holding period and certain other requirements are satisfied. Any dividend received by a U.S. holder that is a corporation may be subject to the "extraordinary dividend" provisions of the Tax Code. A distribution in excess of the Reorganized Debtors' current and accumulated earnings and profits, as determined under U.S. federal income tax principles, will first be treated as a return of capital to the extent of the U.S. holder's adjusted tax basis in its shares of New Common Stock and will be applied against and reduce such basis dollar-for-dollar (thereby increasing the amount of gain and decreasing the amount of loss recognized on a subsequent taxable disposition of the shares of New Common Stock). To the extent that such distribution exceeds the U.S. holder's adjusted tax basis in its shares of New Common Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such U.S. holder's holding period in its shares of New Common Stock exceeds one year as of the date of the distribution.

(2)      Sale, Exchange, or Other Taxable Disposition.

Subject to the discussion of market discount below, for U.S. federal income tax purposes, a U.S. holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its shares of New Common Stock in an amount equal to the difference, if any, between the amount realized for the shares of New Common Stock and the U.S. holder's adjusted tax basis in the shares of New Common Stock. Capital gains of non-corporate U.S. holders derived with respect to a sale, exchange, or other disposition of shares of New Common Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations. Holders are urged to consult their own tax advisors regarding such limitations.

Any gain recognized upon the sale, exchange or other disposition of shares of New Common Stock by a U.S. holder that received such stock in exchange for a Claim with respect to which such U.S. holder had accrued but untaxed market discount at the time of the exchange, and which stock was treated as received in a recapitalization of GGS, should be included in the U.S. holder's ordinary income to the extent of such accrued but untaxed market discount. In addition, if such a U.S. holder of a Claim was required under the market discount rules of the Tax Code to defer its deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry such Claim, continued deferral of the deduction for interest on such indebtedness may be required. In such case, any such deferred interest expense attributed to the shares of New Common Stock received in

exchange for the Claim may be treated as interest paid or accrued in the year in which the shares of New Common Stock are sold.

Holders of New Common Stock are urged to consult their tax advisors regarding the tax consequences related to the New Common Stock.

### Consequences to U.S. Holders of Allowed Class 5 Trade Claims

The following discussion assumes that the Library Improvement will not be treated as a "security" for U.S. federal income tax purposes.  See the discussion above regarding "securities" under "—Consequences to U.S. Holders of Allowed Class 4A and Class 4B Financial Claims."  If the IRS were to take a different position, the tax consequences could be materially different from those described below.

Each U.S. holder of an Allowed Class 5 Claim will generally recognize gain or loss as a result of the exchange of its Class 5 Claim for cash and the applicable share of the Library Improvement in an amount equal to the difference between (1) the amount of cash and the fair market value of the applicable share of the Library Improvement (or, if the Library Improvement is treated as debt for U.S. federal income tax purposes, the "issue price" of the applicable share of the Library Improvement) received by such U.S. holder (other than any amount allocable to accrued interest, which is taxable as described below under "Accrued Interest") and (2) the U.S. holder's adjusted tax basis in such Allowed Class 5 Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest, market discount, and distributions after the Effective Date below.  U.S. holders should consult their tax advisors regarding the proper tax treatment of the Disputed Claims Reserve and any distributions therefrom.

**U.S. holders of Allowed Class 5 Claims should consult their tax advisors regarding the tax consequences of the Plan under their particular circumstances, including the potential applicability of (and ability to elect out of) the installment sale rules, the potential applicability of the imputed interest rules and whether the Library Improvement could be treated as a "security" for U.S. federal income tax purposes.**

### Distributions After the Effective Date

If a U.S. holder of an Allowed Claim receives a distribution pursuant to the Plan subsequent to the Effective Date, a portion of such distributions may be treated as imputed interest under the imputed interest provisions of the Tax Code.  Such imputed interest may accrue over time, in which case a holder may be required to include such imputed interest in income prior to the actual distributions.  Any loss and a portion of any gain realized by such holder may be subject to deferral.  Furthermore, the "installment sale" rules of the Tax Code may apply to gain recognized by such U.S. holder unless the U.S. holder elects out of such rules.

**U.S. holders of Claims should consult their tax advisors regarding the tax consequences of distributions made after the Effective Date, including the potential applicability of (and ability to elect out of) the installment sale rules and the potential applicability of the imputed interest rules.**

### Accrued Interest

To the extent that any amount received by a U.S. holder of a surrendered Allowed Class 3B-3H, Class 4A, Class 4B, or Class 5 Claim under the Plan is attributable to accrued but unpaid interest and such interest has not previously been included in the U.S. holder's gross income for U.S. federal income tax purposes, such amount would generally be taxable to the U.S. holder as ordinary interest income.  A U.S. holder of a surrendered Allowed Class 3B-3H, Class 4A, Class 4B, or Class 5 Claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instrument constituting such Claim was previously so included in the U.S. holder's gross income but was not paid in full by the Debtors.

The extent to which any amount received by a U.S. holder of a surrendered Allowed Class 3B-3H, Class 4A, Class 4B or Class 5 Claim will be attributable to accrued but untaxed interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class in full or partial satisfaction of their Claims will be treated as first satisfying the stated principal amount of the Allowed Claims for such Holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any.  The IRS could take the position, however, that the consideration received by a Holder should be allocated in some way other than as provided in the Plan.  Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the Tax Code, some or all of any gain realized by a U.S. holder exchanging any debt instrument constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

A debt instrument to which sections 1276 through 1278 of the Tax Code may apply is generally considered to have been acquired with "market discount" if it is acquired other than on original issue and its basis immediately after its acquisition by the U.S. holder is less than (i) its "stated redemption price at maturity," or (ii) in the case of a debt instrument issued with OID, its "revised issue price," by at least a statutorily defined *de minimis* amount.

Any gain recognized by a U.S. holder on the taxable disposition of debts to which sections 1276 through 1278 of the Tax Code may apply and that it acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).  To the extent that such surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here if an exchange is treated as a recapitalization), any market discount that accrued on such debts but was not recognized by the U.S. holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### Medicare Tax

Certain U.S. holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends, interest, and gains from the sale or other disposition of capital assets.  U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their own situation.

### D.     Information Reporting and Backup Withholding

Payments made pursuant to the Plan and other payments made by the Reorganized Debtors (*e.g.*, dividends on the New Common Stock) will generally be subject to any applicable federal income tax information reporting and backup withholding requirements.  The Tax Code imposes backup withholding tax on certain payments, including payments of interest and dividends, if a taxpayer (a) fails to furnish its correct taxpayer identification number (generally on IRS Form W-9 for a U.S. holder); (b) furnishes an incorrect taxpayer identification number; (c) is notified by the IRS that it has previously failed to report properly certain items subject to backup withholding tax; or (d) fails to certify, under penalty of perjury, that such taxpayer has furnished its correct taxpayer identification number and that the IRS has not notified such taxpayer that it is subject to backup withholding tax.  However, taxpayers that are corporations generally are excluded from these information reporting and backup withholding tax rules provided that evidence of such corporate status is furnished to the payor.  Backup withholding is not an additional federal income tax.  Any amount withheld under the backup withholding tax rules will generally be allowed as a credit against a taxpayer's federal income tax liability, if any, or will be refunded to the extent the amounts withheld exceed the taxpayer's actual tax liability, if such taxpayer timely furnishes required

information to the IRS.  Each taxpayer should consult its own tax advisor regarding the information reporting and backup withholding tax rules as they relate to distributions under the Plan.

In addition, from an information reporting perspective, U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

## E.    Importance of Obtaining Professional Tax Assistance

**The foregoing discussion is intended only as a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for consultation with a tax professional.  The above discussion is for informational purposes only and is not tax advice.  The tax consequences of the Plan are complex and are in many cases uncertain and may vary depending on a claimant's particular circumstances. Accordingly, claimants are strongly urged to consult their own tax advisors about the federal, state, local, and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.**

## XIV.    RECOMMENDATION AND CONCLUSION

The Debtors believe that confirmation of the Plan is in the best interests of all Creditors and Equity Interest holders and urge all creditors in the Voting Classes to vote in favor of the Plan.  In addition, the Plan has the support of the Creditors' Committee and the Ad Hoc Group.